Jeff P. Prostok
State Bar No. 16352500
Lynda L. Lankford
State Bar No. 11935020
Dylan T.F. Ross
State Bar No. 24104435
FORSHEY & PROSTOK LLP
777 Main St., Suite 1550
Fort Worth, TX  76102
Telephone: 817-877-8855
Facsimile:  817-877-4151
jprostok@forsheyprostok.com
llankford@forsheyprostok.com
dross@forsheyprostok.com

PROPOSED ATTORNEYS FOR DEBTOR
AND DEBTOR IN POSSESSION

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 Case |
| | ) | |
| LION STAR NACOGDOCHES HOSPITAL, | ) | Case No. 23-43535-MXM-11 |
| LLC d/b/a NACOGDOCHES MEMORIAL | ) | |
| HOSPITAL | ) | |
| | ) | |
| Debtor. | ) | **Emergency Hearing Requested** |

**DEBTOR'S EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS
(I) AUTHORIZING THE DEBTOR TO OBTAIN POSTPETITION FINANCING ON
A SECURED, SUPERPRIORITY BASIS; (II) AUTHORIZING THE DEBTOR TO USE
CASH COLLATERAL; (III) SCHEDULING A FINAL HEARING; (IV) MODIFYING
THE AUTOMATIC STAY, AND (V) GRANTING RELATED RELIEF**

**Emergency relief has been requested. Relief is requested not later than
November 21, 2023.**

**If you object to the relief requested or you believe that emergency
consideration is not warranted, you must appear at the hearing if one is set,
or file a written response prior to the date that relief is requested in the
preceding paragraph. Otherwise, the Court may treat the pleading as
unopposed and grant the relief requested.**

**A hearing will be conducted on this matter on November 21, 2023 at 2:00
p.m. in Courtroom 128, United States Courthouse, 501 West 10th Street, Fort
Worth, Texas 76102.**

**Audio communication will be by use of the Court's dial-in facility. You
may access the facility at Dial-In: 650.479.3207, Meeting ID: 474 603 746.
Video communication will be by use of the Cisco WebEx platform.
Connect via the Cisco WebEx application or click the link on Judge**

> **Mullin's home page. Click the settings icon in the upper right corner and enter your name under the personal information setting.**
>
> **Hearing appearances must be made electronically in advance of electronic hearings. To make your appearance, click the "Electronic Appearance" link on Judge Mullin's home page. Select the case name, complete the required fields and click "Submit" to complete your appearance.**

TO THE HONORABLE MARK X. MULLIN:

COMES NOW Lion Star Nacogdoches Hospital LLC d/b/a Nacogdoches Memorial Hospital (the "Debtor"), as debtor in possession, and pursuant to Sections 105, 362, 363, 364, 503(b), and 507 of Title 11 of the United States Code (the "Bankruptcy Code") and Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") for entry of interim order, substantially in the form attached hereto as **Exhibit "A"** (the "Interim Order") and a final order (the "Final Order," and together, the "DIP Orders") to be submitted to the Court for approval in connection with the final hearing on the Motion (the "Final Hearing"), (i) authorizing the Debtor to obtain postpetition financing on a secured, superpriority basis; (ii) authorizing the Debtor to use Cash Collateral; (iii) scheduling a final hearing; (iv) modifying the automatic stay, and (v) granting related relief. In support of the Motion, the Debtor respectfully represents as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. sections 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. section 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. sections 1408 and 1409.

2.      The basis for the relief requested herein are Sections 105, 361, 362, 363(c), 363(e), 364(c), 364(e), 503(b), and 507 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, 6004, and 9014.

## BACKGROUND

3.      On November 17, 2023, (the "Petition Date"), the Debtor commenced this case

by filing a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.  The Debtor

continues to manage and operate its business as a debtor in possession pursuant to sections

1107 and 1108 of the Bankruptcy Code.  No trustee, examiner, or committee has been

appointed in this case.

4.      The Debtor is a Texas limited liability company that owns and operates the

Nacogdoches Memorial Hospital located at 1204 N. Mound Street, Nacogdoches, Texas (the

"Hospital").  The Hospital is a 231-patient room facility that provides, among other services,

emergency care, general surgery, cardiac care, geriatric care and maternity care.  The Hospital

serves the East Texas communities in and around Nacogdoches County and employs more

than 600 health care providers and support staff.

5.      Additional information regarding the Debtor and this chapter 11 case, including

the Debtor's business operations, capital structure, financial condition, and the reasons for and

objective of this chapter 11 case is set forth in the First Day Declaration of Ed King filed herein

(the "Declaration").

## RELIEF REQUESTED

6.      By this Motion, the Debtor seeks entry of the Interim Order substantially in the

form attached hereto as **Exhibit "A"**, and after the Final Hearing, entry of a Final Order:

(a)     authorizing the Debtor to obtain postpetition financing on a secured, superpriority
basis pursuant to the Superpriority Debtor-In-Possession Credit and Security
Agreement substantially in the form attached hereto as **Exhibit "B"** (the "DIP
Credit Agreement") between the Debtor, as Borrower, and eCapital Healthcare
Corp. (the "DIP Lender"), as Lender providing for:

(i)     a revolving credit facility in the principal amount of up to $10,000,000 (the "DIP
Facility"); and

(ii)    the roll-up of the Pre-Petition Obligations (as defined below), such that,
effective immediately upon the making of an advance under the DIP Credit
Agreement, the Pre-Petition Obligations shall be automatically deemed to
constitute loans under the DIP Credit Agreement (on a dollar-for-dollar basis)
which shall be due and payable in accordance with the terms and conditions
set forth in the DIP Credit Agreement as if originally funded thereunder (such
aggregate amount advance, the "Roll-Up Amount");

(b)     authorizing the Debtor to execute, deliver and perform under the DIP Credit Agreement and any security agreements, control agreements and other Loan Documents (as defined in the DIP Credit Agreement) related to the DIP Facility (collectively, the "DIP Facility Documents");

(c)     authorizing the Debtor, pursuant to the Interim Order, to borrow up to the interim amount of $1,300,000 plus the Roll-Up Amount pursuant to the DIP Credit Agreement and Interim Order;

(d)     granting to the DIP Lender on account of the DIP Facility and all obligations of the Debtor incurred under the DIP Facility Documents and DIP Orders (collectively, the "DIP Obligations"), an allowed superpriority administrative expense claim, subject to the Carve Out (as provided in the DIP Orders);

(e)     granting to the DIP Lender automatically perfected security interests in and lien on all of the DIP Collateral (as defined below), including all property constituting "cash collateral" as defined in section 363(a) of the Bankruptcy Code ("Cash Collateral");

(f)     authorizing the Debtor to pay the principal, interest, fees, expenses and other amounts due and owing under the DIP Facility as provided in the DIP Orders;

(g)     authorizing the Debtor to use Cash Collateral in accordance with the terms of the DIP Documents, the DIP Orders and the applicable Budget;

(h)     approving the forms of adequate protection to be provided to the Pre-Petition Lender (as defined below) to protect the Pre-Petition Lender's interest in Prepetition Collateral as provided in the DIP Orders;

(i)     approving certain stipulations, waivers and releases as provided in the DIP Credit Agreement and DIP Orders;

(j)     authorizing the Debtor, subject to entry of the Final DIP Order and the Carve Out, to waive any right to surcharge the DIP Collateral pursuant to section 506(c) of the Bankruptcy Code;

(k)     providing that, subject to entry of the Final DIP Order, the DIP Lender shall be entitled to all the rights and benefits of the "equities of the case" exception under section 552(b) of the Bankruptcy Code;

(l)     modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement the provisions of the DIP Facility Documents, subject to the terms of the DIP Orders;

(m)     scheduling the Final Hearing to consider entry of the Final DIP Order authorizing and approving, on a final basis, the relief requested herein and approving the form and manner of the notice thereof; and

(n)    waiving any applicable stay (including under Bankruptcy Rule 6004) to provide for the immediate effectiveness of the DIP Orders.

## **MATERIAL TERMS OF THE DIP FACILITY**[1]

7.    Pursuant to Bankruptcy Rule 4001 and local rules of procedure, the Debtor

submits the following summary of material terms of the DIP Facility, as set forth in the DIP

Orders and the DIP Facility Documents:

| Summary of Material Term | |
| --- | --- |
| **DIP Credit Agreement Parties**<br><br>DIP Credit Agreement Preamble | Borrower: Lion Star Nacogdoches Hospital, LLC<br><br>Lender: eCapital Healthcare Corp. |
| **DIP Facility**<br>DIP Credit Agreement §2.1<br><br>Interim Order ¶2(a), DIP Credit Agreement §2.1(e) | Secured superpriority debtor-in-possession revolving credit facility in the aggregate principal amount of up to $10,000,000, including a Roll-Up of Pre-Petition Credit Obligations.<br><br>The Debtor may borrow up to $1,300,000 plus the Roll Up Amount on an interim basis and up to a total of $10,000,000 on a final basis, which may be increased as provided in section 2.1(e) of the DIP Credit Agreement. |
| **Roll-Up**<br><br>DIP Credit Agreement §2.1(b)<br><br><br><br><br><br><br><br><br><br>Interim Order ¶J(i) | Roll-Up. Effective immediately upon the making of an Advance under this Agreement (such date, the "Roll-Up Date"), and without any further action by any party to this Agreement or the other Loan Document, the Bankruptcy Court or any other Person, (i) the Pre-Petition Obligations shall be automatically deemed to constitute Loans under this Agreement (on a dollar-for-dollar basis) (such Loans, the "Rolled-Up Loans") which shall be due and payable in accordance with the terms and conditions set forth in this Agreement as if originally funded hereunder on the date of such Advance (such aggregate amount advance, the "Roll-Up Amount") and (ii) from and after the Roll-Up Date, Pre-Petition Obligations shall be automatically and irrevocably reduced by the Roll-Up Amount.<br><br>As of the date of filing of this Chapter 11 Case (the "Petition Date"), the aggregate principal amount outstanding under the Pre-Petition Credit Facility was not less than $4,664,661.94 (collectively, together with accrued and unpaid interest, outstanding letters of credit and bankers' acceptances, any reimbursement obligations (contingent or otherwise) in respect of letters of credit and bankers' acceptances, any fees, expenses and disbursements (including, without limitation, attorneys' fees, accountants' fees, auditor fees, appraisers' fees and financial advisors' fees, and related expenses and disbursements), treasury, cash management, bank product and derivative obligations, indemnification obligations, guarantee obligations, and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Debtor's obligations pursuant to, or secured by, the Pre-Petition Credit Documents, including all interest, fees (including amendment fees), prepayment premiums, costs and other charges allowable under section 506(b) of the Bankruptcy Code, the "Pre- |

---

[1] This concise statement is qualified in its entirety by reference to the applicable provisions of the DIP Facility Documents or Interim Order, as applicable.

| | |
|---|---|
| | Petition Credit Obligations"). |
| **Borrowing Limits and Conditions**<br><br>DIP Credit Agreement, §§ 1.2, 2.1(a), 4.1 | <u>Advances</u>. Subject to the provisions of this Agreement, Lender shall make Advances to Borrower under the Revolving Facility from time to time during the Term, and not more than once per each week unless agreed to by Lender and subject to the processing fees set forth in Section 2.4; provided that, notwithstanding any other provision of this Agreement (but subject to the provisions of this Section 2.1(a)), the principal amount at any one time outstanding under the Revolving Facility shall not exceed the Revolving Loan Limit. The Revolving Facility is a revolving credit facility, which may be drawn, repaid, and redrawn from time to time as permitted under this Agreement. Any determination as to whether there is availability within the Borrowing Base for Advances shall be made by Lender in its discretion and is final and binding upon Borrower. Unless otherwise permitted by Lender, each Advance requested by Borrower shall be in an amount of at least $25,000. Subject to the provisions of this Agreement, Borrower may request Advances under the Revolving Facility up to and including the Availability. Lender may, in Lender's sole discretion, withhold from Advances made to Borrower such amounts as may be necessary to pay interest on the Revolving Facility and other Obligations hereunder. In addition, Advances under the Revolving Facility automatically may, in the discretion of Lender, be made for the payment of interest on the Revolving Facility and other Obligations on the date when due to the extent of Availability and as provided for herein.<br><br>"Availability" shall mean the Revolving Loan Limit less all Revolving Loans outstanding less cash on hand, minus any reserves against Availability imposed by the Lender in its discretion.<br><br>"Borrowing Base" shall mean, as of any date of determination: (a) the Net Collectible Value of Eligible Receivables of the Borrower, as such Net Collectible Value is determined by the Lender with reference to the most recent Borrowing Certificate, other factors deemed relevant by the Lender and otherwise in accordance with the Agreement; <u>provided</u>, <u>however</u>, that if as of such date of determination the most recent Borrowing Certificate is of a date more than four (4) Business Days before such date, the Borrowing Base shall be determined by Lender; *minus* (b) the amount of any Carve-Outs, reserves, or adjustments against the Borrowing Base provided for in this Agreement or determined by the Lender from time to time.<br><br>The obligations of the DIP Lender to consummate the transactions contemplated by the DIP Credit Agreement and to make Advances thereunder are subject to the satisfaction of further standard conditions as outlined in section 4.1 (a-q) of the DIP Credit Agreement. |
| **Use of DIP Facility and Cash Collateral, Budget, Variance, Budget Covenant**<br><br>Interim Order ¶¶ 3, 5, 6<br><br>DIP Credit Agreement §1.2 | <u>Use of Cash Collateral</u>. Subject to the terms and conditions of this Interim Order, the DIP Facility, and the DIP Documents and in accordance with the Budget (subject to such variances as permitted in the DIP Documents), the Debtor is authorized to use Cash Collateral until the Termination Date (as defined herein).<br><br><u>Budget Maintenance</u>.  The use of borrowings under the DIP Facility and Cash Collateral shall be in accordance with the Budget depicting on a weekly basis, cash revenues, receipts, expenses and disbursements, net cash flows, inventory receipts and other items set forth therein, for the first thirteen (13) week period following the Effective Date (as defined in the DIP Documents) which shall be in form and substance satisfactory to, and approved by the DIP Lender in its sole discretion prior to the Effective Date.  The Budget shall be updated by the Debtor |

(with the consent and/or at the reasonable request of the DIP Lender) from time to time in accordance with the DIP Documents.  No such updated, modified, or supplemented budget shall be effective until so approved (which approval shall be deemed given unless the DIP Lender objects in writing (for which email shall suffice) to Debtor's counsel within five (5) business days following actual receipt thereof), and once approved, shall thereafter be deemed the "Budget"; *provided, however,* that in the event that the DIP Lender and the Debtor cannot agree as to an updated, modified or supplemented budget, the prior approved Budget shall continue in effect for this Chapter 11 Case, and such disagreement shall give rise to an Event of Default under the DIP Credit Agreement and this Interim Order once the period covered by the prior approved Budget has terminated. A copy of any Budget (or updated Budget) shall be delivered to counsel for a Committee (if appointed) and the U.S. Trustee after (or if) it has been approved by the DIP Lender.

Budget Compliance.  The Debtor shall at all times comply with the Budget, subject to the variances set forth in the DIP Credit Agreement.  The Debtor shall provide all reports and other information as required in the DIP Credit Agreement (subject to the applicable grace periods provided therein).  The Debtor's failure to comply with the Budget (including the variances set forth in the DIP Credit Agreement and in this Interim Order) or to provide the reports and other information required in the DIP Credit Agreement and this Interim Order shall constitute an Event of Default (as defined herein) following the expiration of any applicable cure period set forth in the DIP Credit Agreement or in this Interim Order.

(i)  By no later than 5:00 p.m. (prevailing Eastern Time) on November 30, 2023 and every second Thursday thereafter, the Debtors shall deliver to the DIP Lender a variance report (in substantially the same format as the Budget) showing actual cash receipts, disbursements and other applicable information for the immediately preceding calendar week (ending on the immediately preceding Friday) noting therein all variances and including explanations for all such variances, on a line-item basis, from values set forth for such period(s) in the Budget or the most current Budget, as applicable (each, a "Variance Report"), provided, that each Variance Report delivered on a Testing Date (as defined herein) shall include a cumulative variance report (in substantially the same format as the Initial Approved Budget) showing actual cash receipts, disbursements and other applicable information for the immediately preceding week period (ending on the immediately preceding Friday) (the "Budget Period;" provided, that for the first four weeks following the Petition Date, the Budget Period shall begin on the Petition Date and end on the Testing Date), noting therein all variances and including explanations for all such variances, on a line-item and aggregate basis, from values set forth for such period(s) in the most current approved Budget.

(ii)  Budget Covenants.  The permitted variances listed below (collectively, the "Permitted Variances") shall be tested on a rolling four-week basis, which shall first be reported on November 30, 2023, and on the Thursday of every second week thereafter (with respect to the immediately preceding Budget Period) (each such date, a "Testing Date").  The budget-related covenants under this Section 6(d) are collectively referred to herein as the "Budget Covenants".

"Permitted Variance" shall mean a variance of no more than twelve and one half percent (12.5%) between the projected Net Operating Cash Flow as set forth and the actual Net Operating Cash Flow.

| | |
|---|---|
| **Fees** | Facility Fee.  On the Closing Date, and as a condition of Closing, the Borrower shall pay to the Lender one percent (1.0%) of the Facility Cap as a nonrefundable |

| | |
|---|---|
| DIP Credit Agreement §§ 3.1-3.5, 3.8 | fee (such fee and the fee payable pursuant to Section 2.1(e) are referred to here in as the "Facility Fee").<br><br>Unused Line Fee. The Borrower shall pay to the Lender monthly an unused line fee (the "Unused Line Fee") in an amount equal to eight and one third basis points (*i.e.*, 0.0833%) per month of the difference derived by subtracting (i) the average daily balance under the Revolving Facility outstanding during the preceding month, from (ii) the Facility Cap.  The Unused Line Fee shall be payable monthly in arrears but in no event later than the first day of each successive calendar month (starting with the first full calendar month following the Closing Date). The final payment shall be pro-rated to the date of payment in full and shall be paid on that date as part of the Obligations.<br><br>Collateral Management Fee.  The Borrower shall pay the Lender as additional interest a monthly collateral management fee (the "Collateral Management Fee") for monitoring and servicing the Revolving Facility, equal to one fourth of one percent (i.e., 0.25%) per month, calculated on the basis of the average daily balance under the Revolving Facility outstanding during the preceding month. The Collateral Management Fee shall be payable monthly in arrears but in no event later than the first calendar day of each successive calendar month (starting with the first full calendar month following the Closing Date). The final payment shall be pro-rated to the date of payment in full and shall be paid on that date as part of the Obligations.<br><br>Termination Fee.  Upon a termination of the Revolving Facility for any reason, Borrower shall pay Lender (in addition to the then outstanding principal, accrued interest and other Obligations (other than indemnity obligations with respect to which no claim has been made) relating to the Revolving Facility pursuant to the terms of this Agreement and any other Loan Documents), as yield maintenance for the loss of bargain and not as a penalty, an amount equal to the Termination Fee. Notwithstanding any other provision of any Loan Document, no Termination Fee as described above shall be due and payable if (i) Borrower refinances the Obligations (in whole or in part) with Lender (which, for purposes of this Section 3.4, shall include Lender and any of its parents, subsidiaries or Affiliates), (ii) this Agreement terminates in accordance with its terms at the end of its Term, or (iii) Borrower terminates this Agreement within ten (10) days after Borrower provides written notice to Lender of a default by Lender hereunder, and such default by Lender remains uncured as of the date of such termination.<br><br>Software Interface Fee.  Upon the first occurrence of an Event of Default, Borrower shall pay to Lender a nonrefundable fee of $5,000 for the setup and implementation of the software interface used by Lender to calculate the Borrowing Base. Payment of the setup fee shall be made, at the discretion of Lender: (i) by application of available funds in the Concentration Account pursuant to Section 2.5, (ii) by application of Advances under the Revolving Facility pursuant to Section 2.1, or (iii) upon two Business Days' notice, directly by Borrower. Commencing with the first calendar month in which an Event of Default occurs, Borrower shall pay Lender a monthly software interface fee (the "Software Interface Fee") for maintaining and servicing the software interface used by Lender to calculate the Borrowing Base, equal to $1,000 per month. The Software Interface Fee shall be payable monthly in arrears but in no event later than the first day of each successive calendar month.<br><br>Structuring Fee.  On the Closing Date, Borrower shall pay Lender one and two- |

| | |
|---|---|
| Interim Order ¶ 8 | tenths of one percent (1.2%) of the Facility Cap as a nonrefundable structuring fee, which shall be deemed fully earned and paid upon Closing.<br><br>DIP Lender's Fees and Expenses.  Without duplication of amounts required to be paid pursuant to the DIP Facility Documents, upon entry of this Interim Order, the Debtor shall pay in cash all fees, expenses, and disbursements payable to the DIP Lender.   The post-petition payment of the fees, expenses, and disbursements set forth in the foregoing sentence shall be made within ten (10) days (which time period may be extended by the applicable professional in its sole discretion) upon the receipt by the Debtor, the creditors' committee (if any) and the U.S. Trustee (the "Review Period") of invoices therefor (the "Invoiced Fees") and without the necessity of filing formal fee applications, including such amounts arising before or after the Petition Date.  The invoices for such Invoiced Fees shall include (i) a summary of the work performed during the relevant compensation period; (ii) the name of, hourly rate (if applicable) of, and number of hours worked by each professional and paraprofessional who worked on the matter during the relevant compensation period; and (iii) the total fee amount being requested. The Debtor, the Committee (if any), and the U.S. Trustee may object to any portion of the Invoiced Fees within the Review Period by written notice to the applicable professional or by filing with the Court a motion or other pleading, on at least ten (10) days prior written notice to the applicable DIP Lender and the applicable professional of any hearing on such motion or other pleading, setting forth the specific objections to the disputed Invoiced Fees in reasonable narrative detail and the bases for such objections; *provided*, that payment of any undisputed portion of Invoiced Fees shall be paid within the time frame set forth above and shall not be delayed based on any objections thereto; *provided, further*, that the applicable parties shall endeavor in good faith to consensually resolve any dispute prior to the filing of any such motion or pleading. |
| **DIP Collateral** (including claims arising under chapter 5 of the Bankruptcy Code)<br><br>Interim Order ¶10(b) | Subject to the Carve-Out, "DIP Collateral" shall mean the Debtor's right, title, and interest in and to the following, whether now owned or hereafter created, acquired or arising, and wherever located:<br><br>(i)   all Accounts (including healthcare insurance receivables) and related property;<br><br>(ii)   all of the Debtor's deposit accounts;<br><br>(iii)   all books and records, whether or not related to any Collateral;<br><br>(iv)   all other personal property and fixtures of Debtor, including all goods, inventory, Equipment, furniture, fixtures, General Intangibles (including, without limitation, payment intangibles and software), chattel paper (whether tangible or electronic), supporting obligations, investment property, financial assets, documents, instruments (including any promissory notes), securities, securities accounts, contract rights or rights to payment of money, leases, permits, license agreements, franchise agreements, commercial tort claims, stock in direct and indirect subsidiaries, machinery, cash, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), Intellectual Property, copyrights, trademarks, patents, and tradestyles, and<br><br>(v)   any and all claims, rights, and interests in any of the above and all substitutions for, additions, attachments, accessories, accessions, and improvements to Superpriority Debtor-in-Possession Credit and Security |

| | |
|---|---|
| | Agreement, and replacements, products, proceeds, and insurance proceeds of any or all of the foregoing. |
| **Liens and Priorities**<br><br>Interim Order<br>¶¶ 9 and 10(a) | <u>DIP Superpriority Claims.</u> Subject and subordinate to the Carve-Out as set forth in this Interim Order, upon entry of this Interim Order, the DIP Lender is hereby granted, pursuant to Section 364(c)(1) of the Bankruptcy Code, allowed superpriority administrative expense claims in the Chapter 11 Case and any successor cases (collectively, the "DIP Superpriority Claims") for all DIP Obligations.  Except as set forth herein, the DIP Superpriority Claims shall have priority over any and all other obligations, liabilities, and indebtedness of each Debtor other than the Carve-Out, including without limitation any and all administrative expense claims and unsecured claims against the Debtor or its estate in the Chapter 11 Case and any successor cases, at any time existing or arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to Sections 105, 326, 328, 330, 331, 364, 503(a), 503(b), 507(a), 507(b), 546(c) (subject to entry of a Final Order), 546(d), 726, 1113 and 1114 of the Bankruptcy Code, and any other provision of the Bankruptcy Code, as provided under Section 364(c)(1) of the Bankruptcy Code.  No lien or interest avoided and preserved for the benefit of the estate pursuant to Section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the DIP Superpriority Claims.<br><br><u>DIP Liens.</u> (a) As security for the full and timely payment of the DIP Facility, subject to the Carve-Out, the DIP Lender is hereby granted, pursuant to Sections 364(c)(2), (c)(3), and (d)(1) of the Bankruptcy Code, a first priority, senior, perfected priming lien upon the DIP Collateral (defined below), which liens shall constitute valid, enforceable, non-avoidable, fully perfected, and first-priority security interests in and liens upon all DIP Collateral (the "DIP Liens"). The DIP Liens securing the DIP Obligations are valid, automatically perfected, non-avoidable, senior in priority, and superior to any security, mortgage, collateral interest, lien, or claim to any of the DIP Collateral, except that the DIP Liens shall be subject to the Carve-Out as set forth in this Interim Order and shall otherwise be junior only to Permitted Prior Liens. Other than as set forth herein or in the DIP Documents, the DIP Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Chapter 11 Case or any successor cases and shall be valid and enforceable against any trustee appointed in the Chapter 11 Case or any successor cases, upon the conversion of any of the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code (or in any other successor case), and/or upon the dismissal of any of the Chapter 11 Case or successor cases.  The DIP Liens shall not be subject to Sections 510, 549, or 550 of the Bankruptcy Code. No lien or interest avoided and preserved for the benefit of the estate pursuant to Section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the DIP Liens. |
| **Carve Out**<br><br>Interim Order ¶12 | <u>Carve Out</u>. Notwithstanding anything in this Interim Order, the DIP Facility Documents, or any other order of this Court to the contrary, all claims and liens granted hereunder to or for the benefit of the DIP Lender, including the DIP Superpriority Claims and the DIP Liens, shall be subject to payment of the Carve-Out. As used in this Interim Order and the DIP Credit Agreement, the term "Carve-Out" means the (i) amounts payable pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable to the Clerk of the Bankruptcy Court, plus interest thereon; (ii) the amounts payable to Forshey & Prostok, LLP ("Forshey Prostok") as Debtor's bankruptcy counsel pursuant to Sections 327, 328 and 503(b), in an amount not to exceed $800,000 (plus any amount held by Forshey Prostok as a prepetition retainer); and (iii) the amounts payable to professionals other than Forshey Prostok employed at the expense of the Debtor's estate of this Chapter 11 Case pursuant to Sections 327, 328, 503(b), or 1103 of the Bankruptcy Code, |

| | |
|---|---|
| | in an amount not to exceed $200,000 (which amount has been fully funded as a prepetition retainer), or as otherwise provided in an approved Budget. |
| **Adequate Protection for Prepetition Lender**<br><br>Interim Order ¶ 3(a-e), | (a)  Adequate Protection Liens.  Pursuant to Sections 361, 363(e), and 364(d) of the Bankruptcy Code, as adequate protection of the interests of the Pre-Petition Lender against any Diminution in Value, the Debtor hereby grants to the Pre-Petition Lender a continuing, valid, binding, enforceable, and perfected postpetition security interests in and liens on all DIP Collateral (the "Adequate Protection Liens").<br><br>(b)  Priority of Adequate Protection Liens. The Adequate Protection Liens shall be subject to the Carve-Out and shall otherwise be junior (in order of priority) only to the DIP Liens.  The Adequate Protection Liens shall otherwise be senior to all other security interests in or liens on any of the Debtor's assets.<br><br> (c)  Except as provided herein, the Adequate Protection Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter in the Chapter 11 Case or any successor cases and shall be valid and enforceable against any trustee appointed in any of the Chapter 11 Case or any successor cases, or upon the dismissal of any of the Chapter 11 Case or successor cases.  The Adequate Protection Liens shall not be subject to Sections 510, 549, or 550 of the Bankruptcy Code.  No lien or interest avoided and preserved for the benefit of the estate pursuant to Section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the Pre-Petition Liens or the Adequate Protection Liens.<br><br>(d) Adequate Protection Superpriority Claim.  Subject and subordinate to the Carve- Out as set forth in this Interim Order, as further adequate protection of the interests of the Pre-Petition Lender in the Prepetition Collateral against any Diminution in Value, the Pre-Petition Lender is hereby granted as and to the extent provided by Section 507(b) of the Bankruptcy Code an allowed superpriority administrative expense claim in each of the Chapter 11 Case and any successor cases (the "Adequate Protection Superpriority Claim").<br><br>(e) Priority of the Adequate Protection Superpriority Claim.  Except as set forth herein, the Adequate Protection Superpriority Claim shall have priority over all administrative expense claims and unsecured claims against the Debtor or its estate, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to Sections 105, 326, 328, 330, 331, 503(a), 503(b), 507(a), 506(c) (subject to entry of the Final Order), 507(b), 546(c), 546(d), 726, 1113 and 1114 of the Bankruptcy Code; *provided, however,* that the Adequate Protection Superpriority Claim shall be subject to the Carve-Out as set forth in this Interim Order and junior to the DIP Claim, and subject the lien priorities set forth herein. |
| **Interest Rate**<br><br>DIP Credit Agreement §§ 1.2, 2.3 and 3.7 | Interest accrues daily on the principal amount outstanding at a rate per annum equal to the Prime Rate plus the Applicable Margin.<br><br>"Prime Rate" means the rate of interest announced, from time to time, within Wells Fargo Bank at its principal office in San Francisco as its "prime rate."<br><br>"Applicable Margin" means two percent (2%).<br><br>Upon the occurrence and during the continuation of an Event of Default, the Applicable Rate of interest in effect at such time with respect to the Obligations |

| | |
|---|---|
| | shall be increased by three percent (3%) per annum (the "Default Rate"). |
| **Events of Default**<br><br>DIP Credit<br>Agreement § 8.1 | The occurrence of any one or more of the following shall constitute an "Event of Default:"<br><br>(a) Borrower shall fail to pay any amount on the Obligations or provided for in any Loan Document when due and such failure shall not be cured within five (5) calendar days of when due (whether on any payment date, at maturity, by reason or acceleration, by notice of intention to prepay, by required prepayment or otherwise);<br><br>(b) Any representation, statement or warranty made or deemed made by the Borrower in any Loan Document or in any other certificate, document, report or opinion delivered in conjunction with any Loan Document to which it is a party, (i) shall not be true and correct in all material respects, or (ii) shall have been false or misleading in any material respect on the date when made or deemed to have been made (except to the extent already qualified by materiality, in which case it shall be true and correct in all respects and shall not be false or misleading in any respect);<br><br>(c) Borrower or any other party thereto other than the Lender shall be in violation, breach or default of, or shall fail to perform, observe or comply with any covenant, obligation or agreement set forth in any Loan Document and such violation, breach, default or failure shall not be cured within the applicable period set forth in the applicable Loan Documents; provided that, with respect to the affirmative covenants set forth in Article VI (other than Sections 6.2, 6.9, 6.11, 6.16 and 6.17 for which there shall be no cure period, unless otherwise set forth herein), there shall be a fifteen (15) calendar day cure period commencing from the earlier of (i) receipt by such Person of written notice of such breach, default, violation or failure, and (ii) the time at which such Person or any officer thereof knew or became aware, or should have known or been aware, of such failure, violation, breach or default;<br><br>(d) Any of the Loan Documents ceases to be in full force and effect, or any Lien created thereunder ceases to constitute a valid perfected first priority Lien on the Collateral, or the Lender ceases to have a valid perfected first priority security interest in any material portion of the Collateral;<br><br>(e) The Lender's administrative expense claim in the Bankruptcy Case becomes subject (or subordinate) to another administrative expense claim;<br><br>(f) One or more judgments or decrees is rendered against Borrower in an amount in excess of $10,000 individually or $25,000 in the aggregate at one time outstanding, which is/are not satisfied, stayed, bonded, vacated or discharged of record within thirty (30) calendar days of being rendered;<br><br>(g) (i) Any Change of Control occurs or any agreement or commitment to cause or that may result in any such Change of Control is entered into without the written consent of the Lender; (ii) any Material Adverse Effect or Material Adverse Change occurs; (iii) any Liability Event occurs, or (iv) Borrower ceases any material portion of its business operations as currently conducted;<br><br>(h) Any Indebtedness of Borrower is declared to be due and payable or is required to be prepaid (other than by a regularly scheduled payment) prior to the stated maturity thereof;<br><br>(i) The Lender receives any indication or evidence that Borrower may have directly or indirectly been engaged in any type of activity which, in the Lender's judgment, might result in forfeiture of any property to a Governmental Authority which shall have continued unremedied for a period of five (5) business days after written notice from the Lender;<br><br>(j) Borrower or any of its respective members or senior officers is criminally |

indicted or convicted under any law that could lead to a forfeiture of any portion of its respective assets;

(k) The Bankruptcy Case shall be converted to a case under Chapter 7 of the Bankruptcy Code or be dismissed or a motion requesting such relief shall have been filed by the Borrower;

(l) The Borrower files or supports, or the Bankruptcy Court enters an order confirming a proposed plan of reorganization or liquidation or sale of substantially all of the Borrower's assets that does not provide for the indefeasible payment in full and in cash of the Obligations, unless otherwise agreed in writing by the Lender in its sole discretion;

(m) Any attempt by the Borrower to obtain, or if any other party in interest obtains, an order of the Bankruptcy Court or other judgment, and the effect of such order or judgment is to, (i) invalidate, reduce or otherwise impair the Lender's claims, or (ii) amend, supplement, stay, vacate or otherwise modify the Revolving Facility or the Financing Orders without consent of the Lender;

(n) The Borrower requests approval of any post-petition financing, other than pursuant to the Revolving Facility, that would not immediately repay all Obligations, in full, in cash, on the date of the closing of such post-petition financing, unless otherwise agreed by the Lender;

(o) The entry of an order granting liens or claims that are senior or *pari passu* to the Liens granted in favor of the Lender under the Loan Documents;

(p) The Borrower supports or files a motion in support of any order granting liens or claims that are senior or pari passu to the Liens granted in favor of the Lender under the Loan Documents;

(q) The Borrower shall assert that any of the Liens securing the Obligations are invalid, or any such Liens granted to the Lender shall be determined to be invalid;

(r) Any report is filed by a patient care ombudsman or state long-term care ombudsman in the Bankruptcy Case indicating that patient care has significantly declined or has been materially compromised;

(s) Any creditor or party in interest shall be granted relief from the automatic stay with respect to any assets used in operation of the Borrower's business;

(t) The Borrower shall default in the due performance or observance by it of any term, covenant or agreement contained in the Interim Financing Order or the Final Financing Order;

(u) From and after the date of entry thereof, the Interim Financing Order or the Final Financing Order approving this Agreement and the Revolving Facility shall cease to be in full force and effect;

(v) A Final Financing Order approving this Agreement and the Revolving Facility has not been entered by the Bankruptcy Court within forty-five (45) days of the Petition Date, unless otherwise agreed to by the Lender;

(w) The Borrower applies for an order substituting any assets for all or any portion of the Collateral, or

(x) The Lease is determined to be terminated or otherwise invalid by a court of competent jurisdiction.

| **Termination**<br><br>DIP Credit Agreement §§1.2, 11.1 | <u>Termination by the Lender.</u>  Subject to the Lender's right to terminate and cease making Advances upon the occurrence and during the continuance of an Event of Default, this Agreement shall continue in full force and effect until the full performance and indefeasible payment in cash of all Obligations (other than indemnity obligations with respect to which no claim has been made), unless terminated sooner as provided in this Section 11.1.<br><br><u>Termination by Borrower.</u>  Borrower may terminate this Agreement at any time |

| | |
|---|---|
| | upon not less than thirty (30) calendar days' prior written notice to the Lender and upon full performance and indefeasible payment in full in cash of all Obligations (other than indemnity obligations with respect to which no claim has been made) on or prior to such 30th calendar day after receipt by the Lender of such written notice. Borrower may elect to terminate this Agreement in its entirety only. No section of this Agreement or type of Loan available hereunder may be terminated singly. |
| | All of the Obligations (other than indemnity obligations with respect to which no claim has been made) shall be immediately due and payable upon the Termination Date. |
| | "Termination Date" shall mean the earlier to occur of (a) the end of the Term, (b) any date on which the Lender accelerates the maturity of the Loans pursuant to Article VIII, or (c) the termination date stated in any notice of termination of this Agreement provided by Borrower in accordance with Section 11.1. |
| | "Term" shall mean the period commencing on the date set forth on the first page hereof and ending on the earlier to occur of (i) the effective date of a plan of reorganization of the Borrower confirmed by the Bankruptcy Court; (ii) consummation of a sale or other disposition of a material portion of the Borrower's assets pursuant to 11 U.S.C. 363 or otherwise; (iii) the Borrower's filing of a motion or other pleading seeking, or consenting to, conversion to a proceeding under Chapter 7 of the Bankruptcy Code; (iv) conversion to a proceeding under Chapter 7 of the Bankruptcy Code; (v) a dismissal by the Bankruptcy Court of the Borrower's Bankruptcy Case; (vi) the Borrower's filing of a motion or other pleading seeking the dismissal of the Bankruptcy Case under Section 1112 of the Bankruptcy Code or otherwise; (vii) twelve (12) months from Closing, or (viii) any date on which the Loans are accelerated during the continuance of an Event of Default. |
| **Modification of Automatic Stay**<br><br>Interim Order ¶ 7 | <u>Modification of the Automatic Stay</u>. The automatic stay provisions of Section 362 of the Bankruptcy Code and any other restriction imposed by order of the Court or applicable law are hereby modified without further notice, application, or order of the Court, but only to the extent necessary to permit the DIP Lender, subject in all respects to the DIP Facility Documents and this Interim Order, to perform any act authorized or permitted under or by virtue of this Interim Order: (i) to implement the DIP Facility authorized by this Interim Order and pursuant to the terms of the DIP Facility Documents; (ii) to take any act reasonably necessary to create, validate, evidence, attach, or perfect any DIP Lien, security interest, right, or claim in the DIP Collateral, and (iii) authorize the Debtor to pay, and the DIP Lender to retain and apply, payments made in accordance with the terms of this Interim Order. For the avoidance of doubt, upon the occurrence of an Event of Default and in the event the automatic stay has not otherwise terminated as it relates to the DIP Lender, the DIP Lender shall seek relief from the Court, which shall be heard on an emergency basis (which basis is agreed upon in advance by the Debtor) prior to taking any act otherwise prohibited by the automatic stay pursuant to section 362(a) of the Bankruptcy Code. |
| **Certain Stipulations, Releases and Waivers;**<br><br>Interim Order | *Validity, Perfection, and Priority of Pre-Petition Liens and Pre-Petition Obligations.* The Debtor acknowledges and agrees that as of the Petition Date (i) the Pre-Petition Liens on the Pre-Petition Collateral were valid, binding, enforceable, non-avoidable, and properly perfected and were granted to, or for the benefit of, the Pre-Petition Lender for fair consideration and reasonably equivalent value; (ii) the Pre-Petition Liens were senior in priority over any and all other liens on the Pre-Petition Collateral, subject only to liens senior by |

| | |
|---|---|
| ¶ J | operation of law or permitted by the Pre-Petition Credit Documents (solely to the extent any such liens were valid, properly perfected, non-avoidable, and senior in priority to the Pre-Petition Liens as of the Petition Date, the "<u>Permitted Liens</u>"); (iii) the Pre-Petition Obligations constitute legal, valid, binding, and non-avoidable obligations of the Debtor enforceable in accordance with the terms of the applicable Pre-Petition Credit Documents; (iv) no offsets, recoupments, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the Pre-Petition Liens or Pre-Petition Obligations exist, and no portion of the Pre-Petition Liens or Pre-Petition Obligations is subject to any challenge or defense including, without limitation, avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (v) the Debtor and its estate have no claims, objections, challenges, causes of action, and/or choses in action, including, without limitation, avoidance claims under Chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions for recovery or disgorgement, against the Pre-Petition Lender or any of its respective affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees arising out of, based upon or related to the Pre-Petition Credit Facility; (vi) the Debtor waives, discharges, and releases any right to challenge any of the Pre-Petition Obligations, the priority of the Debtor's obligations thereunder, and the validity, extent, and priority of the liens securing the Pre-Petition Obligations, and (vii) the aggregate value of the Pre-Petition Collateral exceeds the amount of the Pre-Petition Obligations and the claims of the Pre-Petition Lender arising under, or secured by, the Pre-Petition Credit Documents constitute allowed, secured claims within the meaning of Sections 502 and 506 of the Bankruptcy Code. |
| **Challenge Deadlines**<br><br>Interim Order ¶ 19(a) | The admissions, stipulations, agreements, releases, and waivers set forth in Paragraph J of this Interim Order (collectively, the "<u>Pre-Petition Stipulations</u>") are and shall be binding on the Debtor, any subsequent trustee, responsible person, examiner with expanded powers, any other estate representative, and all creditors and parties-in-interest and all of its successors in interest and assigns, including, without limitation, a Committee (if appointed), unless, and solely to the extent that, a party-in-interest with standing (other than the Debtor, as to which any Challenge (as defined herein) is irrevocably waived and relinquished) (i) has timely filed the pleadings, and timely commenced the proceeding required under the Bankruptcy Code, Bankruptcy Rules and Local Bankruptcy Rules challenging the Pre-Petition Stipulations (each such proceeding or pleading commencing a proceeding or other contested matter, a "<u>Challenge</u>") by no later than (A) for a Committee, (if appointed), sixty (60) days from the date of formation of a Committee (if appointed), or (B) seventy-five (75) days following the entry of the Interim Order for any other party in interest with derivative standing (the earlier to occur of (A) and (B), the "<u>Challenge Deadline</u>"), as such applicable date may be extended in writing from time to time in the sole discretion of the Pre-Petition Lender (with respect to the Pre-Petition Credit Documents), or by this Court for good cause shown pursuant to an application filed by a party-in-interest prior to the expiration of the Challenge Deadline, and (ii) this Court enters judgment in favor of the plaintiff or movant in any such timely commenced Challenge proceeding and any such judgment has become a final judgment that is not subject to any further review or appeal. Notwithstanding the foregoing, if a chapter 11 trustee is appointed or the Chapter 11 Case is converted to chapter 7 prior to the expiration of the Challenge Deadline, (i) the chapter 11 trustee or chapter 7 trustee, as applicable, shall have until the later of the Challenge Deadline or the tenth (10th) day after the appointment of the chapter 11 trustee or the conversion of the Chapter 11 Case to chapter 7, as applicable, to commence a Challenge, subject to any further extension by order of the Court for cause, and (ii) if the Committee has asserted a Challenge prior to the Challenge Deadline, the chapter 11 trustee or chapter 7 trustee will stand in the |

| | shoes of the Committee in such Challenge. |
|---|---|
| **Surcharge/Equities of the Case**<br><br>Interim Order ¶¶ 28-29 | Section 506(c) Claims. Subject to entry of a Final Financing Order, no costs or expenses of administration which have been or may be incurred in the Chapter 11 Case at any time shall be charged against the DIP Lender or the Pre-Petition Lender, or any of their respective claims, the DIP Collateral, or the Pre-Petition Collateral pursuant to Sections 105 or 506(c) of the Bankruptcy Code, or otherwise, without the prior written consent of the DIP Lender, or the Pre-Petition Lender, as applicable, and no such consent shall be implied from any other action, inaction, or acquiescence by any such agents or lenders.<br><br>Section 552(b). Subject to entry of a Final Financing Order, the Pre-Petition Lender shall be entitled to all of the rights and benefits of Section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under Section 552(b) of the Bankruptcy Code shall not apply to the Prepetition Lender, with respect to proceeds, product, offspring or profits of any of the Pre-Petition Collateral. |
| **Indemnification**<br><br>DIP Credit Agreement §13.4<br><br>Interim Order ¶ 25 | [T]he Pre-Petition Lender and the DIP Lender, and, solely in their capacities as such, each of their respective successors, assigns, affiliates parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, heirs, predecessors, successors, and assigns, shall be and hereby are indemnified and held harmless by the Debtor in respect of any claim or liability incurred in respect thereof or in any way related thereto, provided that no such parties will be indemnified for any cost, expense, or liability to the extent determined in a final, non-appealable judgment of a court of competent jurisdiction to have resulted primarily from such parties' gross negligence or willful misconduct. Except as provided herein, no exception or defense exists in contract, law, or equity as to any obligation set forth, as the case may be, in this Paragraph 25, in the Pre-Petition Credit Documents, or in the DIP Loan Documents, to the Debtor's obligation to indemnify and/or hold harmless the Pre-Petition Lender, or the DIP Lender, as the case may be. |

## THE PREPETITION CREDIT FACILITY

8.      The Debtor, as borrower, and eCapital Healthcare Corp. (f/k/a CNH Finance Fund I, L.P., "eCapital"), as lender (in such capacity, the "Pre-Petition Lender"), are parties to that certain Credit and Security Agreement, dated as of July 16, 2021 (as amended, restated, supplemented, or otherwise modified, the "Pre-Petition Credit Agreement," and collectively with the Loan Documents (as defined in the Pre-Petition Credit Agreement) and other related agreements and documents, the "Pre-Petition Credit Documents").

9.      Pursuant to the Pre-Petition Credit Agreement, the Pre-Petition Lender provided revolving credit and other financial accommodations to the Debtor pursuant to the Pre-Petition Loan Documents (the "Pre-Petition Credit Facility").

10.      The Pre-Petition Credit Facility provided the Debtor with Revolving Loan

Commitments (as defined in the Pre-Petition Credit Agreement) subject to, among other things, a Facility Cap of $10,000,000.  As of the Petition Date, the aggregate principal amount outstanding under the Pre-Petition Credit Facility was not less than $4,664,661.94 (collectively, with all other outstanding obligations allowable under the Pre-Petition Credit Facility, the "Pre-Petition Credit Obligations").

11.     As more fully set forth in the Pre-Petition Credit Documents, prior to the Petition Date, the Debtor granted to the Pre-Petition Lender a first priority security interest in and continuing lien on (the "Pre-Petition Liens") the Pre-Petition Collateral, which includes the Debtor's interest in all accounts and other personal property, subject only to the Permitted Liens (as such terms are defined in the Pre-Petition Credit Agreement).   All of the Debtor's cash, including any cash in deposit accounts of the Debtor, wherever located, constitutes Cash Collateral of the Pre-Petition Lender.

## OTHER SECURED CREDITORS

12.     Several regional taxing authorities under the umbrella of the Nacogdoches Appraisal District hold *ad valorem* tax liens on the Debtor's personal property.  In addition, the Debtor is party to various security agreements and capital leases secured by specific equipment, including the following:

| Secured Creditor | Collateral |
|---|---|
| GE Government Finance, Inc | Optima CT 660, Optima MR450, and Mobile Optima 220 X-Ray |
| Intuitive Surgical, Inc.; | da Vinci Xi Surgical System Robot |
| Med One Capital Funding, LLC; | TabloXT, Alpinion X-Cube 90, Alaris System Model 8015 Point of Care Units, 8100 LVP Alaris System Model 8100 LVP Pumping Modules, Alaris System Model 8110 Syringe Modules and 914-0170 IV Strands |
| Ortho-Clinical Diagnostics, Inc | 2 Vitros 5600 Integrated Systems |

## **ARGUMENT**

**A.      Entering into the DIP Facility is an Exercise of the Debtor's Sound Business Judgment**

13.      The Court should authorize the Debtor to enter the DIP Facility Documents and obtain access to the DIP Facility as an exercise of the Debtor's sound business judgment and in the interest of patient care and safety.

14.      Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances, as described in greater detail below. Provided that an agreement to obtain secured credit does not run afoul of the provisions of and policies underlying the Bankruptcy Code, courts routinely grant debtors considerable deference in acting in accordance with their sound business judgment in obtaining such credit. *See In re Estrada*, 16-80003-G3-11, 2016 WL 745536, at *3 (Bankr. S.D. Tex. Feb. 24, 2016) ("In determining whether to approve a motion to obtain credit, courts generally permit debtors in possession to exercise their basic business judgment consistent with their fiduciary duties."); *In re Barbara K. Enters., Inc.*, Case No. 08-11474, 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("Cases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party- in-interest").

15.      Moreover, the Court may appropriately take into consideration non-economic benefits to the Debtor offered by a proposed postpetition facility. For example, in *In re ION Media Networks, Inc.*, the Bankruptcy Court for the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are naturally
> motivated to obtain financing on the best possible terms, a business decision
> to obtain credit from a particular lender is almost never based purely on
> economic terms. Relevant features of the financing must be evaluated,
> including noneconomic elements such as the timing and certainty of closing,
> the impact on creditor constituencies, and the likelihood of a successful
> reorganization. This is particularly true in a bankruptcy setting where
> cooperation and established allegiances with creditor groups can be a vital part
> of building support for a restructuring that ultimately may lead to a confirmable
> reorganization plan. That which helps foster consensus may be preferable to a
> notionally better transaction that carries the risk of promoting unwanted conflict.

Case No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009).

16.     The Debtor's execution of the DIP Facility Documents is an exercise of its sound business judgment that warrants approval by the Court. The Debtor has determined that it will very likely return a higher value to stakeholders by continuing its business operations. However, to maintain adequate working capital for operations and for general corporate purposes, it requires immediate access to reasonably priced financing. The DIP Lender is willing to provide such financing.  As provided in the Declaration, the DIP Facility offered by the DIP Lender provided the most favorable credit facility the Debtor was able to find.  The Debtor has also determined that it is advantageous to enter into a DIP facility with a lender that already has a working relationship with the Debtor and on credit terms that are substantially similar to the prepetition credit facility.  Accordingly, the Debtor negotiated the DIP Facility with the DIP Lender in good faith, at arm's length, and with the assistance of outside counsel to obtain the required postpetition financing on terms favorable to the Debtor.

17.     The Debtor believes that the Court's consideration of non-economic factors, as permitted by *ION Media*, is especially appropriate here. The Debtor is a community hospital and has continuing care obligations to current and future patients. If the Debtor's access to DIP funding is denied, the Debtor will be forced to cease operations essentially immediately and with little warning. Such an event would lead to the layoff of hundreds of employees and place any overnight patients (the Debtor has 231 patient rooms) at unnecessary risk until their care can be transferred, which is not assured. Moreover, patients with already-scheduled procedures will be

unduly harmed by needing to reschedule their care with other providers. Such a cessation of operations and care will almost certainly eliminate any possibility of reorganizing and of providing any distribution to creditors above the value of its assets that secured creditors might receive in liquidation.

18.     Moreover, it is unlikely another lender would be in a position to provide as favorable a financing arrangement as currently available under the DIP Facility because (a) the DIP Lender (as the Pre-Petition Lender) currently holds a first priority perfected lien on substantially all of Debtor's assets and (b) the DIP Facility provides favorable terms to the Debtor which no other lender would be able to match under the circumstances. The Debtor submits that these factors provide additional and ample reason to approve the DIP Facility.

19.     Accordingly, the Debtor determined in its sound business judgment that the DIP Facility provides a greater amount of financing on more favorable terms than any other reasonably available alternative. Thus, the Debtor submits that entering into the DIP Facility Documents constitutes an exercise of its sound business judgment that should be approved by the Court.

**B.     The Roll-Up of the Prepetition Obligations is an Appropriate Exercise of the Debtor's Business Judgment and Should be Approved**

20.     The proposed DIP Facility proposes a Roll-Up of the Pre-Petition Obligations as set forth in more detail in the DIP Credit Agreement.

21.     In the instant case, the proposed Roll-Up is a sound exercise of the Debtor's business judgment for the following reasons:

(a)     The negotiation and subsequent granting of the Roll-Up is required as a condition for the DIP Lender to provide the liquidity necessary to continue the Debtor's operations;

(b)     The prepetition debt facility is a revolving line of credit that relies on generated accounts receivables as the basis for providing continued funding.  If the Roll-Up is denied but the post-petition financing is otherwise approved, on a post-petition basis, the Debtor will be required to rely solely on post-

petition generated accounts receivables to access funding. Even a brief reduction of accounts receivables generation would jeopardize the Debtor's ability to pay post-petition obligations as it would restrict the Debtor's ability to draw on the line of credit. On the other hand, if the DIP Lender is entitled to roll-up its prepetition obligations, the DIP Lender can look to all Eligible Receivables (as defined in the DIP Credit Agreement) from which to make its lending decision, whether those receivables were generated pre- or postpetition;

(c)   The DIP Lender already holds the senior lien on the DIP Collateral and, therefore, the positions of other creditors, both secured and unsecured will be unharmed;

(d)   The DIP Lender's prepetition liens appear to be properly secured and perfected. The DIP Lender does not appear to be using a Roll-Up for the purpose of correcting any prepetition perfection concerns;

(e)   The DIP Lender has required a Roll-Up as a condition to extending postpetition financing. If the Court were to deny the Roll-Up and the DIP Lender subsequently terminated the DIP Agreement, the Debtor would not have access to needed working capital funds, which possibly could cause the immediate cessation of the Debtor's operations and jeopardize patient care;

(f)   The Roll-Up is intended to continue postpetition the relationship the DIP Lender and Debtor have had prepetition. The Roll-Up thus offers advantages for the Debtor in accounting and practical efficiencies; and

(g)   Other creditors will be adequately protected because they will be entitled postpetition to the same priority vis-à-vis the DIP Collateral as they were prepetition.

22.     The terms of the Roll-Up in the DIP Facility are reasonable and necessary components of the DIP Facility. The DIP Facility—including the Roll-Up—represents the best financing option available to address the Debtor's liquidity needs under these circumstances. The terms and conditions of the DIP Facility are reasonable, appropriate, and reflective of the current market for debtor-in possession financing under these circumstances.

23.     Finally, similar debtor-in-possession financing facilities have been approved in a variety of cases in this and other districts, which included features similar to the proposed Roll-Up in the DIP Orders. *In re A'Gaci, LLC*, No. 19-51919 (RBK) (Bankr. W.D. Tex. Sep.

9, 2019) (Docket No. 144); *In re Fresh Acquisitions, LLC*, No. 21-30721 (HDH) (Bankr. N.D. Tex. Apr. 20, 2021) (authorizing the roll-up of approximately $500,000 prepetition debt and approximately $3 million of new money); *In re CiCis Holdings, Inc.*, No. 21-30146 (SGJ) (Bankr. N.D. Tex. Feb. 18, 2021) (authorizing roll-up of approximately $6 million of prepetition debt and approximately $3 million of new money); *In re Gulfport Energy Corp.*, No. 20-35562 (DRJ) (Bankr. S.D. Tex. Dec. 18, 2020) (authorizing roll-up of approximately $158 million of prepetition debt and approximately $105 million of new money); *In re Studio Movie Grill Holdings, LLC*, No. 20-32633 (SGJ) (Bankr. N.D. Tex. Dec. 1, 2020) (authorizing roll-up of approximately $48 million of prepetition debt and approximately $23.5 million of new money); *In re Lilis Energy Inc.*, No. 20-33274 (MI) (Bankr. S.D. Tex. Aug. 21, 2020) (authorizing roll-up of approximately $15 million of prepetition debt and approximately $15 million of new money); *In re Trivascular Sales LLC*, No. 20-31840 (SGJ) (Bankr. N.D. Tex. Aug. 20, 2020) (authorizing roll-up of approximately $100 million of prepetition debt and $30 million of new money); *In re Tuesday Morning Corp.*, Case No. 20-31476 (HDH) (Bankr. N.D. Tex. Jun. 26, 2020) (authorizing roll-up of approximately $48 million of prepetition debt and approximately $52 million of new money); *In re Unit Corp.*, No. 20-32740 (DRJ) (Bankr. S.D. Tex. Jun. 19, 2020) (authorizing roll-up of approximately $88 million of prepetition debt and approximately $36 million of new money); *In re Am. Comm. Lines*, Inc., No. 20-30981 (MI) (Bankr. S.D. Tex. Feb. 7, 2020) (authorizing roll-up of approximately $536 million of prepetition debt and approximately $6.4 million new money); *In re McDermott Int'l, Inc.*, No. 20-30336 (DRJ) (Bankr. S.D. Tex. Jan. 21, 2020) (authorizing roll-up of approximately $500 million of prepetition debt).

**C.    The Debtor Should be Authorized to Obtain Postpetition Financing on a Secured and Superpriority Basis**

24.    Section 364 of the Bankruptcy Code authorizes a debtor to obtain, in certain circumstances, postpetition financing on a secured or superpriority basis, or both. Specifically, section 364(c) of the Bankruptcy Code provides, in pertinent part, that the Court, after notice

and a hearing, may authorize a debtor that is unable to obtain credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code to obtain credit or incur debt:

> (1)    with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code];
>
> (2)    secured by a lien on property of the estate that is not otherwise subject to a lien, or
>
> (3)    secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

25.      To satisfy the requirements of section 364(c) of the Bankruptcy Code, a debtor need only demonstrate "by a good faith effort that credit was not available" to the debtor on an unsecured or administrative expense basis. *Bray v. Shenandoah Fed. Savs. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986). "The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Id.*; *see also Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority administrative expenses authorized where the debtor could not obtain credit as an administrative expense). When few lenders are likely to be able and willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom.*, *Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n. 4 (N.D. Ga. 1989); *see also Ames Dep't Stores*, 115 B.R. at 40 (approving financing facility and holding that the debtor made reasonable efforts to satisfy the standards of section 364(c) where it approached four lending institutions, was rejected by two, and selected the more favorable of the two offers it received).

26.      Section 364(d)(1) provides:

> The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that

is subject to a lien only if —

> (A) the trustee is unable to obtain such credit otherwise, and
>
> (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1).

27.      As of the date of the filing of the instant Motion, the Debtor has been unable to obtain sufficient postpetition financing in the form of unsecured credit, solely as an administrative expense, or secured by a junior or equal lien. General industry practice, especially in light of rising interest rates, which has reduced financing availability generally, precludes the Debtor from obtaining postpetition financing in the amount required on terms other than on a first priority, secured, and superpriority basis except as described above and in the DIP Agreement.

28.      Second, the Debtor needs the funds to be provided under the DIP Facility to preserve the value of its estate for the benefit of all creditors and other parties in interest. Absent the DIP Facility, the Debtor will be unable to operate its business or prosecute the Chapter 11 Case, which will threaten the Debtor's going concern value. Providing the Debtor with the liquidity necessary to preserve its going concern value through the pendency of the Chapter 11 Case is in the best interest of all stakeholders.

29.      Third, the terms of the DIP Facility Documents are reasonable and adequate to ensure the Debtor's ongoing ability to operate in Chapter 11. Indeed, the DIP Facility will provide the Debtor with sufficient and necessary liquidity to allow the Debtor to maintain its operations and relationships with key constituents during the Chapter 11 Case. Accordingly, the terms of the DIP Facility are reasonable and the DIP Facility is sufficient to support the Debtor's operations and restructuring activities through the pendency of the Chapter 11 Case.

30.     Fourth, the Debtor and the DIP Lender negotiated the DIP Facility in good faith and at arm's-length, and the Debtor's entry into the DIP Facility Documents is an exercise of its sound business judgment and is in the best interests of its estate, creditors, and other parties in interest.

31.     The Court should therefore (a) authorize the Debtor to provide the DIP Lender liens on the DIP Collateral as provided in section 364(c)(2), (3), and 364(d); and (b) grant the  DIP Obligations superpriority administrative expense status as provided for in section 364(c)(1) of the Bankruptcy Code.

**D.     The DIP Lender Should be Deemed a Good Faith Lender under Section 364(e) of the Bankruptcy Code.**

32.     Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Specifically, section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

33.     As explained herein, the DIP Facility is the result of the Debtor's reasonable and informed determination that the DIP Lender offered the most favorable terms on which to obtain needed postpetition financing, and of extended arm's-length, good faith negotiations between the Debtor and the DIP Lender. The terms and conditions of the DIP Facility are fair and reasonable, and the proceeds under the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code. Further, no consideration is being provided to any party to the DIP Facility other than as described herein. Accordingly, the Court should find that

the DIP Lender is a "good faith" lender within the meaning of section 364(e) of the Bankruptcy Code and is entitled to all of the protections afforded by that section.

**E.      The Debtor Requires Immediate Access to the DIP Facility**

34.      The Court may grant interim relief in respect of a motion filed pursuant to section 363(c) or 364 of the Bankruptcy Code where, as here, interim relief is "necessary to avoid immediate and irreparable harm to the estate pending a final hearing." FED. R. BANKR. P. 4001(b)(2) and (c)(2).

35.      The Debtor and its estate will suffer immediate and irreparable harm if the interim relief requested herein is not granted promptly. An extended delay in obtaining the DIP Facility would jeopardize the Debtor's ability to satisfy its postpetition obligations and provide safe patient care and would threaten the Debtor's viability; thus, causing significant harm to the Debtor's estates and creditors. Accordingly, the Debtor has an immediate need for access to the DIP Facility to, among other things, permit the orderly continuation of the operation of its business, to make payroll, and to satisfy other working capital and operational needs, all of which are required to preserve and maintain the Debtor's going concern value for the benefit of all parties in interest.

**F.      The Debtor Should be Authorized to Use Cash Collateral.**

36.      Section 363(c)(2)(A) of the Bankruptcy Code permits a debtor in possession to use cash collateral with the consent of the secured party.  Here, the DIP Lender consents to the use of Cash Collateral, both in its capacity as the DIP Lender and as the Pre-Petition Lender, subject to the terms and limitations set forth in the Interim Order.  As described above and in the Declaration, access to Cash Collateral on an interim basis is essential to the continued operation of the Debtor's business.  Thus, the use of Cash Collateral is in the best interests of the Debtor's estate and its stakeholders, including the Prepetition Lender and the DIP Lender and should be approved.

**REQUEST FOR FINAL HEARING**

37.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtor requests

that the Court set a date for the Final Hearing and set a deadline for filing objections to the

Motion prior to the Final Hearing.

**LIMITED NOTICE**

38.     Notice of this Motion has been provided to (a) the office of the United States

Trustee for the Northern District of Texas; (b) the holders of the twenty (20) largest unsecured

claims against the Debtor; (c) counsel for the PrePetition and DIP Lender; (d) parties that have

filed a UCC Financing Statement with respect to the Debtor's assets; (e) counsel for the

Nacogdoches Hospital District; and (f) all parties that have filed a Notice of Appearance herein

as set forth in the Certificate of Service below.  The Debtor submits that no other or further

notice need be provided.

**CONCLUSION**

39.     Accordingly, for all of the reasons set forth above, prompt entry of the Interim

Order is necessary to avoid immediate and irreparable harm to the Debtor's estate and is

consistent with, and warranted under, Bankruptcy Rule 4001(b)(2) and (c)(2).  In addition, to

implement the terms of the DIP Facility, the Debtor requests a waiver of the notice

requirements under Bankruptcy Rule 6004(a) and any stay of an order granting the relief

requested herein pursuant to Bankruptcy Rule 6004(h) or otherwise so that the Interim Order

may be immediately effective and enforceable upon its entry.

WHEREFORE, the Debtor respectfully requests entry of an order granting (a) the relief

requested herein and (b) such other and further relief as is just and proper.

Dated: November 19, 2023.                          Respectfully submitted,

                                                   /s/ *Lynda L. Lankford*
                                                   Jeff P. Prostok
                                                   State Bar No. 16352500
                                                   Lynda L. Lankford

State Bar No. 11935020
Dylan T.F. Ross
State Bar No. 24104435
FORSHEY & PROSTOK LLP
777 Main St., Suite 1550
Fort Worth, TX  76102
Telephone: 817-877-8855
Facsimile:  817-877-4151
jprostok@forsheyprostok.com
llankford@forsheyprostok.com
dross@forsheyprostok.com

PROPOSED ATTORNEYS FOR DEBTOR
AND DEBTOR IN POSSESSION

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing document was served upon the parties listed on the attached service list via United States Mail, first class postage prepaid, or via ECF electronic Notice, if available, on November 19, 2023.  I further certify that a true and correct copy of the foregoing document was additionally served via email upon the parties listed below on November 19, 2023:

Erin Schmidt, Trial Attorney
United States Trustee
erin.schmidt2@usdoj.gov

Elizabeth A. Young, Trial Attorney
United States Trustee
elizabeth.a.young@usdoj.gov

Ed Green, Esq.
Jake Gordon, Esq.
Foley & Lardner LLP
egreen@foley.com
jake.gordon@foley.com

/s/ *Lynda L. Lankford*
Lynda L. Lankford

L:\JPROSTOK\Lion Star Nacogdoches Hospital, LLC #6429\Pleadings\Motion - DIP and Cash Collateral 11.19.23.docx

# EXHIBIT "A"

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| LION STAR NACOGDOCHES HOSPITAL, | ) | Case No. 23- |
| LLC d/b/a NACOGDOCHES MEMORIAL | ) | |
| HOSPITAL, | ) | Chapter 11 Case |
| | ) | |
| Debtor. | ) | |

**INTERIM ORDER (I) AUTHORIZING THE DEBTOR TO OBTAIN POSTPETITION
FINANCING ON A SECURED, SUPERPRIORITY BASIS; (II) AUTHORIZING THE
DEBTOR TO USE CASH COLLATERAL; (III) SCHEDULING A FINAL HEARING;
(IV) MODIFYING THE AUTOMATIC STAY, AND (V) GRANTING RELATED
RELIEF[1]**

  **CAME ON FOR CONSIDERATION** Lion Star Nacogdoches Hospital, LLC (the

"Debtor") or ("Lion Star") with its *Motion for Entry of Interim and Final Orders (I) Authorizing*

*the Debtor to Obtain Postpetition Financing on a Secured, Superpriority Basis; (II) Authorizing*

---

[1] Capitalized terms not defined herein shall have the meaning ascribed to them in the Superpriority Debtor-In-Possession Credit and Security Agreement.

4872-2005-4929.8

*the Debtor to Use Cash Collateral; (III) Scheduling a Final Hearing; (IV) Modifying the*

*Automatic Stay, and (V) Granting Related* Relief (the "Motion"), filed in the above-captioned case,

seeking, among other things, entry of an interim order (this "Interim Order"), under Sections 105,

361, 362, 363(c)(2), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e) of Title 11 of the United

States Code (the "Bankruptcy Code"), Rules 2002, 4001, and 6003 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Court Rules of the United States

Bankruptcy Court for the Northern District of Texas (the "Local Bankruptcy Rules"): (i)

authorizing the Debtor to obtain postpetition financing on a secured superpriority basis; (ii)

authorizing the Debtor to use Cash Collateral; (iii) scheduling a final hearing pursuant to

Bankruptcy Rules 4001(b) and 4001(c), (iv) modifying the automatic stay, and (v) granting related

relief. The Bankruptcy Court conducted an interim hearing on [_____], 2023 (the "Interim

Hearing").

The Court, having considered the Motion and the evidence submitted at the Interim

Hearing and in accordance with Bankruptcy Rules 2002, 4001(b), (c), and (d), and Local

Bankruptcy Rule 9014, due and proper notice of the Motion and the Interim Hearing having been

given; and it appearing that approval of the interim relief requested in the Motion is necessary to

avoid immediate and irreparable harm to the Debtor and its bankruptcy estate pending the Final

Hearing, and all objections, if any, to the entry of this Interim Order having been withdrawn,

resolved or overruled by the Court; and after due deliberation and consideration, and for good and

sufficient cause appearing therefor:

**IN ADDITION TO ANY FINDINGS AND CONCLUSIONS ANNOUNCED ON
THE RECORD AT THE INTERIM HEARING, WHICH ARE INCORPORATED
HEREIN BY REFERENCE, THE COURT MAKES THE FOLLOWING FINDINGS OF
FACT AND CONCLUSIONS OF LAW:**

A.      Jurisdiction and Venue. The Court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334. Consideration of the Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2). Venue for the above-captioned chapter 11 case (the "Chapter 11 Case") and the proceeding on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

B.      Committee Formation/Trustee. An official committee of unsecured creditors (the "Committee") has not been appointed. No request for the appointment of a trustee or examiner has been made.

C.      Notice. The Debtor has provided sufficient notice of the Interim Hearing and the relief requested in the Motion to all necessary creditors and parties in interest.

D.      No Control. By virtue of any of the actions taken with respect to, in connection with, related to, or arising from the Pre-Petition Credit Documents, the DIP Lender does not control the Debtor or its properties or operations, have authority to determine the manner in which any Debtor's operations are conducted, or are control persons or insiders of the Debtor.

E.      No Credit Available on More Favorable Terms. The Debtor has been unable to obtain more favorable terms and conditions than those provided in this Interim Order: (a) adequate unsecured credit allowable under Section 503(b)(1) of the Bankruptcy Code as an administrative expense; (b) credit for money borrowed with priority over any or all administrative expenses of the kind specified in Sections 503(b) or 507(b) of the Bankruptcy Code, or (c) credit for money borrowed secured by a lien on property of the estate that is not otherwise subject to a lien. The Debtor is unable to obtain credit for borrowed money without granting the DIP Liens and the DIP Superpriority Claims (each defined below) to (or for the benefit of) the DIP Lender.

F.      Extension of Financing. The DIP Lender is willing and able to provide financing to the Debtor in accordance with the *Superpriority Debtor-In-Possession Credit and Security*

*Agreement* and all other related documents attached hereto as **Exhibit A** (collectively, the "DIP Facility Documents") and subject to (i) the entry of this Interim Order and (ii) findings by this Court that such financing is essential to the Debtor's estate (and the continued operations of the Debtor), that the DIP Lender is a good faith financier, and that the DIP Lender's claims, superpriority claims, security interests and liens and other protections granted pursuant to and in connection with this Interim Order will not be affected by any subsequent reversal, modification, vacatur, stay or amendment of, as the case may be, this Interim Order as provided in Section 364(e) of the Bankruptcy Code.

G.     Business Judgment and Good Faith Pursuant to Section 364(e). The terms and conditions of this Interim Order and the DIP Facility Documents are fair, reasonable, and the best available under the circumstances, reflect the Debtor's exercise of prudent business judgment, and are supported by reasonably equivalent value and consideration; all obligations incurred under this Interim Order and the DIP Facility Documents (collectively, the "DIP Obligations"), payments made, and transfers or grants of security set forth in this Interim Order and the DIP Facility Documents by the DIP Lender are granted to or for the benefit of the DIP Lender for fair consideration and reasonably equivalent value, and are granted contemporaneously with the making of the loans and/or commitments and other financial accommodations secured thereby; the terms of the DIP Facility Documents and all other related agreements and documents (collectively, the "DIP Facility") were negotiated in good faith and at arm's length among the DIP Lender and the Debtor, and the use of the proceeds to be extended under the DIP Facility will be so extended in good faith and for valid business purposes and uses, as a consequence of which the DIP Lender is entitled to the protection and benefits of Section 364(e) of the Bankruptcy Code.

H.     Relief Essential; Best Interest of Bankruptcy Estate. The relief provided in this

Interim Order is necessary, essential, and appropriate for the continued operation of the Debtor's business and the management and preservation of its assets and property. It is in the best interest of the Debtor's bankruptcy estate that the Debtor be allowed to enter into the DIP Facility Documents, incur the DIP Facility, grant the liens and claims contemplated herein and under the DIP Facility Documents to the DIP Lender, subject to the terms of this Interim Order.

      I.     <u>Roll-Up</u>. The DIP Roll-Up under the DIP Facility Documents reflects the Debtor's exercise of prudent business judgment consistent with its fiduciary duties. Without the DIP Roll-Up, the DIP Lender would not have provided the DIP Facility or extended credit to the Debtor. Further, the DIP Roll-Up (i) creates greater availability under the DIP Facility and (ii) benefits the Debtor and its estate because it enables the Debtor to obtain financing critical to administering this Chapter 11 Case and funding the Debtor's operations.

      J.     <u>Debtor's Stipulations</u>. After consultation with its attorneys and financial advisors, the Debtor, on its behalf and on behalf of its estate, admits, stipulates, acknowledges, and agrees as follows (paragraphs J(i) through J(xii) below are referred to herein, collectively, as the "<u>Debtor's Stipulations</u>"):

    i)    *Pre-Petition Credit Facility.* Pursuant to that certain Credit and Security Agreement, dated as of July 16, 2021 (as amended, restated, supplemented, or otherwise modified from time to time, the "<u>Pre-Petition Credit Agreement</u>," and collectively with the Loan Documents (as defined in the Pre-Petition Credit Agreement) and any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, supplemented, waived or otherwise modified from time to time, the "<u>Pre-Petition Credit Documents</u>"), among (i) the Debtor and (ii) eCapital (in such capacity, the "<u>Pre-Petition Lender</u>"), the Pre-Petition Lender provided revolving credit and other financial accommodations to the Debtor pursuant to the Pre-Petition Loan Documents (the "<u>Pre-Petition Credit Facility</u>").

    ii)    *Pre-Petition Obligations.* The Pre-Petition Credit Facility provided the Debtor with, among other things, the Revolving Loan Commitments (as defined in the Pre-Petition Credit Agreement). As of the date of filing of this Chapter 11 Case (the "<u>Petition Date</u>"), the aggregate principal amount

outstanding under the Pre-Petition Credit Facility was not less than $4,664,661.94 (collectively, together with accrued and unpaid interest, outstanding letters of credit and bankers' acceptances, any reimbursement obligations (contingent or otherwise) in respect of letters of credit and bankers' acceptances, any fees, expenses and disbursements (including, without limitation, attorneys' fees, accountants' fees, auditor fees, appraisers' fees and financial advisors' fees, and related expenses and disbursements), treasury, cash management, bank product and derivative obligations, indemnification obligations, guarantee obligations, and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Debtor's obligations pursuant to, or secured by, the Pre-Petition Credit Documents, including all interest, fees (including amendment fees), prepayment premiums, costs and other charges allowable under section 506(b) of the Bankruptcy Code, the "Pre-Petition Credit Obligations").

iii)   *Pre-Petition Liens and Pre-Petition Collateral.*  As more fully set forth in the Pre-Petition Credit Documents, prior to the Petition Date, the Debtor granted to the Pre-Petition Lender, for the benefit of itself, a first priority security interest in and continuing lien on (the "Pre-Petition Liens") the Pre-Petition Collateral, subject only to the Permitted Liens (as defined in the Pre-Petition Credit Agreement).

iv)   *Validity, Perfection, and Priority of Pre-Petition Liens and Pre-Petition Obligations.*  The Debtor acknowledges and agrees that as of the Petition Date (i) the Pre-Petition Liens on the Pre-Petition Collateral were valid, binding, enforceable, non-avoidable, and properly perfected and were granted to, or for the benefit of, the Pre-Petition Lender for fair consideration and reasonably equivalent value; (ii) the Pre-Petition Liens were senior in priority over any and all other liens on the Pre-Petition Collateral, subject only to liens senior by operation of law or permitted by the Pre-Petition Credit Documents (solely to the extent any such liens were valid, properly perfected, non-avoidable, and senior in priority to the Pre-Petition Liens as of the Petition Date, the "Permitted Liens"); (iii) the Pre-Petition Obligations constitute legal, valid, binding, and non-avoidable obligations of the Debtor enforceable in accordance with the terms of the applicable Pre-Petition Credit Documents; (iv) no offsets, recoupments, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the Pre-Petition Liens or Pre-Petition Obligations exist, and no portion of the Pre-Petition Liens or Pre-Petition Obligations is subject to any challenge or defense including, without limitation, avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (v) the Debtor and its estate have no claims, objections, challenges, causes of action, and/or choses in action, including, without limitation, avoidance claims under Chapter 5 of the Bankruptcy Code or

applicable state law equivalents or actions for recovery or disgorgement, against the Pre-Petition Lender or any of its respective affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees arising out of, based upon or related to the Pre-Petition Credit Facility; (vi) the Debtor waives, discharges, and releases any right to challenge any of the Pre-Petition Obligations, the priority of the Debtor's obligations thereunder, and the validity, extent, and priority of the liens securing the Pre-Petition Obligations, and (vii) the aggregate value of the Pre-Petition Collateral exceeds the amount of the Pre-Petition Obligations and the claims of the Pre-Petition Lender arising under, or secured by, the Pre-Petition Credit Documents constitute allowed, secured claims within the meaning of Sections 502 and 506 of the Bankruptcy Code.

v)    *Cash Collateral.*  All of the Debtor's cash, including any cash in deposit accounts of the Debtor, wherever located, constitutes Cash Collateral of the Pre-Petition Lender.

vi)    *Default by the Debtor.*  The Debtor acknowledges and stipulates that it is in default of its obligations under the Pre-Petition Credit Documents as a result of the commencement of this Chapter 11 Case, and that an Event of Default has occurred under the Pre-Petition Credit Documents; provided, the DIP Lender rights related to declaring an Event of Default under other provisions of the Pre-Petition Credit Documents are fully reserved.

K.    Findings regarding postpetition financing:

i)    *Request for Postpetition Financing.*  The Debtor seeks authority to (i) use Cash Collateral on the terms described herein, and (ii) enter into the DIP Credit Agreement on the terms described herein and in the DIP Facility Documents, to administer its Chapter 11 Case, and to fund the Debtor's operations. At the Final Hearing, the Debtor will seek final approval of the DIP Facility and use of Cash Collateral pursuant to a proposed final order (the "<u>Final Order</u>"), which shall be in form and substance acceptable to the DIP Lender.  Notice of the Final Hearing and Final Order will be provided in accordance with this Interim Order.

ii)    *Need for Postpetition Financing and Use of Cash Collateral.*  The Debtor has an immediate and critical need to use Cash Collateral on an interim basis and to obtain credit on an interim basis pursuant to the DIP Facility in order to, among other things, enable the orderly continuation of its operations and administer and preserve the value of its estate.  The ability of the Debtor to maintain business relationships with its vendors, suppliers, and customers, to pay its employees, and otherwise finance its operations requires the availability of working capital from the DIP Facility and the use of Cash Collateral, the absence of either of which would immediately and irreparably harm the Debtor, its estate, and parties-in-interest.  The Debtor does not have sufficient available sources of working capital and financing

to operate its businesses or maintain its properties in the ordinary course of business without the DIP Facility and use of Cash Collateral.

iii)  *No Credit Available on More Favorable Terms*.  The DIP Facility is the best source of debtor-in-possession financing available to the Debtor.  Given its current financial condition, financing arrangements, and capital structure, the Debtor has been and continues to be unable to obtain financing from sources other than the DIP Lender on terms more favorable than the DIP Facility.  The Debtor is unable to obtain unsecured credit allowable under Section 503(b)(1) of the Bankruptcy Code as an administrative expense. The Debtor has also been unable to obtain: (i) unsecured credit solely having priority over that of administrative expenses of the kind specified in Sections 503(b), 507(a) and 507(b) of the Bankruptcy Code; (ii) credit secured solely by a lien on property of the Debtor and its estate that is not otherwise subject to a lien, or (iii) credit secured solely by a junior lien on property of the Debtor and its estate that is subject to a lien.

iv)  *Use of Proceeds of the DIP Facility*.  As a condition to entry into the DIP Credit Agreement, the extension of credit under the DIP Facility and the authorization to use Cash Collateral, the Pre-Petition Lender requires, and the Debtor has agreed, that proceeds of the DIP Facility shall be used, in each case in a manner consistent with the terms and conditions of this Interim Order and the DIP Facility Documents and in accordance with the Budget (as the same may be modified from time to time consistent with the terms of the DIP Facility Documents) and subject to such variances as permitted in the DIP Credit Agreement.

v)  *Application of Proceeds of Collateral*.  As a condition to entry into the DIP Credit Agreement, the extension of credit under the DIP Facility and authorization to use Cash Collateral, the Debtor and the DIP Lender have agreed that as of and commencing on the date of the Interim Hearing, the Debtor shall apply the proceeds of DIP Collateral in accordance with this Interim Order and the Budget.

vi)  *Roll-up of Pre-Petition Obligations into Obligations*.  The DIP Lender would not otherwise consent to the use of its Cash Collateral or the subordination of its liens to the DIP Liens, and the DIP Lender would not be willing to provide the DIP Facility or extend credit to the Debtor thereunder without the inclusion of the DIP Roll-Up in the DIP Obligations. Moreover, the reduction of the Pre-Petition Obligations upon entry of this Interim Order and, upon entry of the Final Order, the roll-up of all outstanding Pre-Petition Obligations into DIP Obligations will enable the Debtor to obtain urgently needed financing that they need to administer this Chapter 11 Case and fund its operations.

vii)  *Certain Conditions to DIP Facility*. The DIP Lender's willingness to make the DIP Loan is conditioned upon, among other things: (i) the Debtor

Page **8** of **31**

obtaining Court approval to enter into the DIP Loan Documents and to incur all of the respective obligations thereunder, and to confer upon the DIP Lender all applicable rights, powers, and remedies thereunder in each case as modified by this Interim Order; (ii) the provision of adequate protection of the Pre-Petition Lender's interests in the Pre-Petition Collateral pursuant to Sections 361, 363, and 364 of the Bankruptcy Code, and (iii) the granting of continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in the DIP Collateral (as defined below) to the DIP Lender, as security for the prompt payment of the DIP Facility and all other obligations of the Debtor under the DIP Loan Documents.

L.      **Sections 506(c) and 552(b).**  In light of: (i) the DIP Lender's agreement that its liens and superpriority claims shall be subject to the Carve-Out, (a) subject to the entry of a Final Order, the DIP Lender is entitled to a waiver of any "equities of the case" exception under Section 552(b) of the Bankruptcy Code, and (ii) subject to the entry of a Final Financing Order, the DIP Lender is entitled to a waiver of the provisions of Section 506(c) of the Bankruptcy Code.

**NOW, THEREFORE**, upon the Motion and the record before this Court with respect to the Motion, including the record made during the Interim Hearing, and good and sufficient cause appearing therefor, **IT IS ORDERED, ADJUDGED, AND DECREED** that:

1.      <u>Motion Granted.</u> The Motion is granted on an interim basis in accordance with the terms and conditions set forth in this Interim Order. Any objections to the Motion with respect to the entry of this Interim Order to the extent not withdrawn, waived, or otherwise resolved, and all reservation of rights included therein, are hereby denied and overruled.

2.      <u>DIP Facility.</u>

(a)      The Debtor is expressly and immediately authorized to enter into the DIP Facility Documents and to incur the obligations thereunder and to perform in accordance with the DIP Facility in accordance with and subject to this Interim Order, the Interim DIP Budget, and the DIP Facility Documents, to enter into, execute and/or deliver all DIP Facility Documents and all other instruments, certificates, agreements and documents, and to take all actions, which may be

reasonably required or otherwise necessary for the performance by the Debtor under the DIP

Facility Documents, including the creation and perfection of the DIP Liens described and provided

for herein. The Debtor is hereby immediately authorized to borrow up to the interim amount of

$1,300,000 plus the Roll Up Amount (as defined in the DIP Credit Agreement) of the total

available $10,000,000 under the DIP Facility, which funds shall be used solely as expressly

provided in this Interim Order and the Interim DIP Budget attached hereto as Exhibit "B." The

DIP Facility shall (i) be evidenced by the books and records of the DIP Lender, this Interim Order,

and the DIP Facility Documents; (ii) bear interest and incur fees at the rates set forth in the DIP

Facility Documents; (iii) be secured in the manner specified below and under the applicable DIP

Facility Documents; (iv) be payable in accordance with the applicable DIP Facility Documents;

and (v) otherwise be governed by the terms set forth in this Interim Order and the DIP Facility

Documents.

(b)      The Debtor shall pay to the DIP Lender principal and interest as such payments

come due as provided in the DIP Facility Documents and in accordance with the procedures set

forth therein. In consideration of the financial accommodations made by the DIP Lender under this

Order and the DIP Facility Documents, in accordance with Paragraph 3 of this Order and the

Interim DIP Budget, the Debtor is hereby authorized, without further order of this Court and as set

forth in the DIP Facility Documents, to pay to the DIP Lender all reasonable fees and charges

provided for in the DIP Facility Documents.

(c)      Except as otherwise set forth in the DIP Facility Documents, the DIP Lender shall

not have any obligation to make any loan or advance under the DIP Facility Documents, unless all

of the conditions precedent to the making of such extensions of credit under the applicable DIP

Facility Documents and this Interim Order have been satisfied in full or waived by the DIP Lender

in its respective sole discretion.

(d)     The DIP Facility Documents may from time to time be amended, modified, or supplemented by the parties thereto without notice or a hearing if: (a) the amendment, modification, or supplement is: (i) in accordance with the DIP Facility Documents; (ii) beneficial to the Debtor; (iii) not prejudicial in any material respect to the rights of third parties, and (iv) does not increase the amount of the DIP Facility or extend the "Termination Date" (as defined in the DIP Facility Documents); (b) the amendment, modification or supplement is filed with the Court, and (c) a copy (which may be provided through electronic mail or facsimile) of the substantially final amendment, modification or supplement is provided to the U.S. Trustee at least three (3) days (or such shorter period agreed to by the U.S. Trustee) prior to the effective date of such amendment, modification or supplement. Except as otherwise provided in this paragraph, no waiver, modification, or amendment of any of the provisions of any DIP Facility Documents shall be effective unless set forth in writing, signed on behalf of the Debtor, and with the necessary consents required under and executed in accordance with the DIP Facility Documents, and approved by the Court on notice.

(e)     To the extent that the terms of this Order, or a final order, conflict with the terms of the DIP Facility Documents, the terms of this Order or a final order will control.

3.     <u>Use of Cash Collateral</u>. Subject to the terms and conditions of this Interim Order, the DIP Facility, and the DIP Facility Documents and in accordance with the Budget (subject to such variances as permitted in the DIP Facility Documents), the Debtor is authorized to use Cash Collateral until the Termination Date (as defined herein).  Nothing in this Interim Order shall authorize the disposition of any assets of the Debtor or its estates outside the ordinary course of business or the Debtor's use of any Cash Collateral or other proceeds resulting therefrom, except

as permitted in this Interim Order (subject to the Carve-Out), the DIP Facility, the DIP Facility

Documents, and in accordance with the Budget (subject to such variances as permitted in the DIP

Facility Documents).

(a)     Adequate Protection Liens.  Pursuant to Sections 361, 363(e), and 364(d) of the

Bankruptcy Code, as adequate protection of the interests of the Pre-Petition Lender against any

Diminution in Value, the Debtor hereby grants to the Pre-Petition Lender a continuing, valid,

binding, enforceable, and perfected postpetition security interests in and liens on all DIP Collateral

(the "Adequate Protection Liens").

(b)     Priority of Adequate Protection Liens. The Adequate Protection Liens shall be

subject to the Carve-Out and shall otherwise be junior (in order of priority) only to the DIP Liens.

The Adequate Protection Liens shall otherwise be senior to all other security interests in or liens

on any of the Debtor's assets.

(c)     Except as provided herein, the Adequate Protection Liens shall not be made subject

to or *pari passu* with any lien or security interest heretofore or hereinafter in the Chapter 11 Case

or any successor cases and shall be valid and enforceable against any trustee appointed in any of

the Chapter 11 Case or any successor cases, or upon the dismissal of any of the Chapter 11 Case

or successor cases.  The Adequate Protection Liens shall not be subject to Sections 510, 549, or

550 of the Bankruptcy Code.  No lien or interest avoided and preserved for the benefit of the estate

pursuant to Section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the Pre-

Petition Liens or the Adequate Protection Liens.

(d)     Adequate Protection Superpriority Claim.  Subject and subordinate to the Carve-

Out as set forth in this Interim Order, as further adequate protection of the interests of the Pre-

Petition Lender in the Prepetition Collateral against any Diminution in Value, the Pre-Petition

Lender is hereby granted as and to the extent provided by Section 507(b) of the Bankruptcy Code an allowed superpriority administrative expense claim in each of the Chapter 11 Case and any successor cases (the "Adequate Protection Superpriority Claim").

(e)    Priority of the Adequate Protection Superpriority Claim.  Except as set forth herein, the Adequate Protection Superpriority Claim shall have priority over all administrative expense claims and unsecured claims against the Debtor or its estate, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to Sections 105, 326, 328, 330, 331, 503(a), 503(b), 507(a), 506(c) (subject to entry of the Final Order), 507(b), 546(c), 546(d), 726, 1113 and 1114 of the Bankruptcy Code; *provided, however*, that the Adequate Protection Superpriority Claim shall be subject to the Carve-Out as set forth in this Interim Order and junior to the DIP Claim, and subject the lien priorities set forth herein.

4.    Adequate Protection Reservation.  Subject to the Carve-Out as set forth in this Interim Order, nothing herein shall impair or modify the application of Section 507(b) of the Bankruptcy Code in the event that the adequate protection provided hereunder to the Prepetition Lender is insufficient to compensate for any diminution in value of its interest in the Pre-Petition Collateral.  The receipt by the Pre-Petition Lender of the adequate protection provided herein shall not be deemed an admission that the interests of the Pre-Petition Lender are adequately protected. Further, this Interim Order shall not prejudice or limit the rights of the Pre-Petition Lender to seek additional relief with respect to the use of Cash Collateral or for additional adequate protection in a manner consistent with the Pre-Petition Credit Documents, and all parties-in-interests' rights are reserved with respect thereto.

4872-2005-4929.8

5.      <u>Budget Maintenance</u>.  The use of borrowings under the DIP Facility and Cash

Collateral shall be in accordance with the Budget depicting on a weekly basis, cash revenues,

receipts, expenses and disbursements, net cash flows, inventory receipts and other items set forth

therein, for the first thirteen (13) week period following the Effective Date (as defined in the DIP

Facility Documents) which shall be in form and substance satisfactory to, and approved by the

DIP Lender in its sole discretion prior to the Effective Date.  The Budget shall be updated by the

Debtor (with the consent and/or at the reasonable request of the DIP Lender) from time to time in

accordance with the DIP Facility Documents.  No such updated, modified, or supplemented budget

shall be effective until so approved (which approval shall be deemed given unless the DIP Lender

objects in writing (for which email shall suffice) to Debtor's counsel within five (5) business days

following actual receipt thereof), and once approved, shall thereafter be deemed the "<u>Budget</u>";

*provided, however,* that in the event that the DIP Lender and the Debtor cannot agree as to an

updated, modified or supplemented budget, the prior approved Budget shall continue in effect for

this Chapter 11 Case, and such disagreement shall give rise to an Event of Default under the DIP

Credit Agreement and this Interim Order once the period covered by the prior approved Budget

has terminated.  A copy of any Budget (or updated Budget) shall be delivered to counsel for a

Committee (if appointed) and the U.S. Trustee after (or if) it has been approved by the DIP Lender.

6.      <u>Budget Compliance</u>.  The Debtor shall at all times comply with the Budget, subject

to the variances set forth in the DIP Credit Agreement.  The Debtor shall provide all reports and

other information as required in the DIP Credit Agreement (subject to the applicable grace periods

provided therein).  The Debtor's failure to comply with the Budget (including the variances set

forth in the DIP Credit Agreement and in this Interim Order) or to provide the reports and other

information required in the DIP Credit Agreement and this Interim Order shall constitute an Event

of Default (as defined herein) following the expiration of any applicable cure period set forth in the DIP Credit Agreement or in this Interim Order.

(i)      By no later than 5:00 p.m. (prevailing Eastern Time) on November 30, 2023 and every second Thursday thereafter, the Debtors shall deliver to the DIP Lender a variance report (in substantially the same format as the Budget) showing actual cash receipts, disbursements and other applicable information for the immediately preceding calendar week (ending on the immediately preceding Friday) noting therein all variances and including explanations for all such variances, on a line-item basis, from values set forth for such period(s) in the Budget or the most current Budget, as applicable (each, a "Variance Report"), provided, that each Variance Report delivered on a Testing Date (as defined herein) shall include a cumulative variance report (in substantially the same format as the Initial Approved Budget) showing actual cash receipts, disbursements and other applicable information for the immediately preceding week period (ending on the immediately preceding Friday) (the "Budget Period;" provided, that for the first four weeks following the Petition Date, the Budget Period shall begin on the Petition Date and end on the Testing Date), noting therein all variances and including explanations for all such variances, on a line-item and aggregate basis, from values set forth for such period(s) in the most current approved Budget.

(ii)      Budget Covenants.  The permitted variances listed below (collectively, the "Permitted Variances") shall be tested on a rolling four-week basis, which shall first be reported on November 30, 2023, and on the Thursday of every second week thereafter (with respect to the immediately preceding Budget Period) (each such date, a "Testing Date").  The budget-related covenants under this Section 6(d) are collectively referred to herein as the "Budget Covenants".

7.    <u>Modification of the Automatic Stay.</u> The automatic stay provisions of Section 362 of the Bankruptcy Code and any other restriction imposed by order of the Court or applicable law are hereby modified without further notice, application, or order of the Court, but only to the extent necessary to permit the DIP Lender, subject in all respects to the DIP Facility Documents and this Interim Order, to perform any act authorized or permitted under or by virtue of this Interim Order: (i) to implement the DIP Facility authorized by this Interim Order and pursuant to the terms of the DIP Facility Documents; (ii) to take any act reasonably necessary to create, validate, evidence, attach, or perfect any DIP Lien, security interest, right, or claim in the DIP Collateral, and (iii) authorize the Debtor to pay, and the DIP Lender to retain and apply, payments made in accordance with the terms of this Interim Order.  For the avoidance of doubt, upon the occurrence of an Event of Default and in the event the automatic stay has not otherwise terminated as it relates to the DIP Lender, the DIP Lender shall seek relief from the Court, which shall be heard on an emergency basis (which basis is agreed upon in advance by the Debtor) prior to taking any act otherwise prohibited by the automatic stay pursuant to section 362(a) of the Bankruptcy Code.

8.    <u>DIP Lender's Fees and Expenses</u>.  Without duplication of amounts required to be paid pursuant to the DIP Facility Documents, upon entry of this Interim Order, the Debtor shall pay in cash all fees, expenses, and disbursements payable to the DIP Lender.  The post-petition payment of the fees, expenses, and disbursements set forth in the foregoing sentence shall be made within ten (10) days (which time period may be extended by the applicable professional in its sole discretion) upon the receipt by the Debtor, the creditors' committee (if any) and the U.S. Trustee (the "<u>Review Period</u>") of invoices therefor (the "<u>Invoiced Fees</u>") and without the necessity of filing formal fee applications, including such amounts arising before or after the Petition Date.  The invoices for such Invoiced Fees shall include (i) a summary of the work performed during the

relevant compensation period; (ii) the name of, hourly rate (if applicable) of, and number of hours worked by each professional and paraprofessional who worked on the matter during the relevant compensaton period; and (iii) the total fee amount being requested.  The Debtor, the  Committee (if any), and the U.S. Trustee may object to any portion of the Invoiced Fees within the Review Period by written notice to the applicable professional or by filing with the Court a motion or other pleading, on at least ten (10) days prior written notice to the applicable DIP Lender and the applicable professional of any hearing on such motion or other pleading, setting forth the specific objections to the disputed Invoiced Fees in reasonable narrative detail and the bases for such objections; *provided*, that payment of any undisputed portion of Invoiced Fees shall be paid within the time frame set forth above and shall not be delayed based on any objections thereto; *provided*, *further*, that the applicable parties shall endeavor in good faith to consensually resolve any dispute prior to the filing of any such motion or pleading.

9.     DIP Superpriority Claims. Subject and subordinate to the Carve-Out as set forth in this Interim Order, upon entry of this Interim Order, the DIP Lender is hereby granted, pursuant to Section 364(c)(1) of the Bankruptcy Code, allowed superpriority administrative expense claims in the Chapter 11 Case and any successor cases (collectively, the "DIP Superpriority Claims") for all DIP Obligations.  Except as set forth herein, the DIP Superpriority Claims shall have priority over any and all other obligations, liabilities, and indebtedness of each Debtor other than the Carve-Out, including without limitation any and all administrative expense claims and unsecured claims against the Debtor or its estate in the Chapter 11 Case and any successor cases, at any time existing or arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to Sections 105, 326, 328, 330, 331, 364, 503(a), 503(b), 507(a), 507(b), 546(c) (subject to entry of a Final Order), 546(d), 726, 1113 and 1114 of

the Bankruptcy Code, and any other provision of the Bankruptcy Code, as provided under Section 364(c)(1) of the Bankruptcy Code.  No lien or interest avoided and preserved for the benefit of the estate pursuant to Section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the DIP Superpriority Claims.

      10.    <u>DIP Liens</u>.

    (a)    As security for the full and timely payment of the DIP Facility, subject to the Carve-Out, the DIP Lender is hereby granted, pursuant to Sections 364(c)(2), (c)(3), and (d)(1) of the Bankruptcy Code, a first priority, senior, perfected priming lien upon the DIP Collateral (defined below), which liens shall constitute valid, enforceable, non-avoidable, fully perfected, and first-priority security interests in and liens upon all DIP Collateral (the "<u>DIP Liens</u>"). The DIP Liens securing the DIP Obligations are valid, automatically perfected, non-avoidable, senior in priority, and superior to any security, mortgage, collateral interest, lien, or claim to any of the DIP Collateral, except that the DIP Liens shall be subject to the Carve-Out as set forth in this Interim Order and shall otherwise be junior only to Permitted Prior Liens. Other than as set forth herein or in the DIP Facility Documents, the DIP Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Chapter 11 Case or any successor cases and shall be valid and enforceable against any trustee appointed in the Chapter 11 Case or any successor cases, upon the conversion of any of the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code (or in any other successor case), and/or upon the dismissal of any of the Chapter 11 Case or successor cases.  The DIP Liens shall not be subject to Sections 510, 549, or 550 of the Bankruptcy Code.  No lien or interest avoided and preserved for the benefit of the estate pursuant to Section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the DIP Liens.

4872-2005-4929.8

(b)     Subject to the Carve-Out, "DIP Collateral" shall mean the Debtor's right, title, and interest in and to the following, whether now owned or hereafter created, acquired or arising, and wherever located:

(i)     all Accounts (including healthcare insurance receivables) and related property;

(ii)    all of the Debtor's deposit accounts;

(iii)   all books and records, whether or not related to any Collateral;

(iv)    all other personal property and fixtures of Debtor, including all goods, inventory, Equipment, furniture, fixtures, General Intangibles (including, without limitation, payment intangibles and software), chattel paper (whether tangible or electronic), supporting obligations, investment property, financial assets, documents, instruments (including any promissory notes), securities, securities accounts, contract rights or rights to payment of money, leases, permits, license agreements, franchise agreements, commercial tort claims, stock in direct and indirect subsidiaries, machinery, cash, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), Intellectual Property, copyrights, trademarks, patents, and tradestyles, and

(v)     any and all claims, rights, and interests in any of the above and all substitutions for, additions, attachments, accessories, accessions, and improvements to Superpriority Debtor-in-Possession Credit and Security Agreement, and replacements, products, proceeds, and insurance proceeds of any or all of the foregoing.

(c)     Except as expressly permitted in the respective DIP Facility Documents or this Interim Order, and absent full payment and satisfaction of all obligations of the Debtor under the DIP Facility, the Debtor shall not (i) grant or impose any liens on the DIP Collateral or (ii) except as permitted in the respective DIP Facility Documents, prime or seek to prime the DIP Liens and shall not offer any other parties any lien on the DIP Collateral. In addition, the Debtor shall not incur, create, assume, become, or be liable in any manner with respect to, or permit to exist, any secured indebtedness, except as expressly permitted under the DIP Facility Documents and the Budget, and this Interim Order.

(d)     Subject to the Carve-Out, the DIP Liens shall not be subject to Sections 510, 549, or 550 of the Bankruptcy Code. No lien or interest avoided and preserved for the benefit of any estate pursuant to Section 551 of the Bankruptcy Code shall be made *pari passu* with or senior to the DIP Liens.

11.     <u>Collateral Covenants.</u> The Debtor shall not sell, transfer, lease, encumber, or otherwise dispose of any portion of the DIP Collateral except in the ordinary course of business and other than as permitted in the DIP Facility Documents without the prior written order of the Bankruptcy Court and no such consent shall be implied from any other action, inaction or acquiescence by the DIP Lender or an order of this Court.

12.     <u>Carve Out.</u> Notwithstanding anything in this Interim Order, the DIP Facility Documents, or any other order of this Court to the contrary, all claims and liens granted hereunder to or for the benefit of the DIP Lender, including the DIP Superpriority Claims and the DIP Liens, shall be subject to payment of the Carve-Out. As used in this Interim Order and the DIP Credit Agreement, the term "<u>Carve-Out</u>" means the (i) amounts payable pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable to the Clerk of the Bankruptcy Court, plus interest thereon; (ii) the amounts payable to Forshey & Prostok, LLP ("<u>Forshey Prostok</u>") as Debtor's bankruptcy counsel pursuant to Sections 327, 328 and 503(b), in an amount not to exceed $800,000 (plus any amount held by Forshey Prostok as a prepetition retainer); and (iii) the amounts payable to professionals other than Forshey Prostok employed at the expense of the Debtor's estate of this Chapter 11 Case pursuant to Sections 327, 328, 503(b), or 1103 of the Bankruptcy Code, in an amount not to exceed $200,000 (which amount has been fully funded as a prepetition retainer), or as otherwise provided in an approved Budget.

4872-2005-4929.8

13.     <u>Termination of DIP Financing.</u> The Debtor's authorization to use the DIP Facility shall immediately terminate upon the occurrence of a "Termination Event", which shall mean the earliest to occur of (i) 30 days after the entry of this Interim Order (unless a Final Order approved by the DIP Lender has been entered as of such date); (ii) the expiration of five (5) business days (the "<u>Default Notice Period</u>") following the provision of written notice to the Debtor (with a copy of such notice provided to counsel for the Debtor and the U.S. Trustee) upon the occurrence of an Event of Default (as defined in the DIP Facility Documents) and such Event of Default remains uncured at the expiration of such Default Notice Period unless the Bankruptcy Court determines no such Event of Default has occurred following the filing of a motion or proceeding during such Default Notice Period requesting such a determination; (iii) the occurrence of a Maturity Date as that term is defined in the DIP Facility Documents, and (d) the date on which neither this Interim Order nor the Final Order is in full force and effect. The DIP Lender shall have no further obligation to fund hereunder if a Chapter 11 trustee is appointed or an examiner with enlarged powers is appointed.

14.     <u>Perfection of Liens.</u> This Interim Order shall be sufficient and conclusive evidence of the creation, validity, perfection, and priority of the DIP Liens without the necessity of executing, filing, or recording any mortgage, security agreement, pledge agreement, financing statement, or other instrument or document, or the taking of any other act that otherwise may be required under state or federal law, rule, or regulation of any jurisdiction to validate or perfect the DIP Liens or to entitle the DIP Lender to the priorities granted herein. The Debtor may execute, and the DIP Lender is hereby authorized to execute, file, and/or record mortgages, security agreements, pledge agreements, financing statements, and/or other instruments or documents to evidence the DIP Liens, and the Debtor is hereby authorized, promptly upon a demand by the DIP

Lender made in accordance with the terms of the DIP Facility Documents, to execute, file, and/or record any such mortgages, security agreements, pledge agreements, financing statements, or other instruments or documents as the DIP Lender may request; provided, however, that no such execution, filing, or recordation shall be necessary or required in order to create or perfect the DIP Liens, and further, if the DIP Lender, in its sole discretion, shall choose to execute, file, and/or record such mortgages, security agreements, pledge agreements, financing statements, or other instruments or documents, or otherwise confirm perfection of such DIP Liens, all such instruments and documents shall be deemed to have been filed or recorded as of the Petition Date. A copy of this Interim Order may, at the discretion of the DIP Lender, be filed with or recorded in any filing or recording office in addition to or in lieu of such mortgages, security agreements, pledge agreements, financing statements, or other instruments or documents, and each and every federal, state, and local governmental agency, department, or office is hereby directed to accept a copy of this Interim Order and any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by this Interim Order and the DIP Facility Documents, for filing and recording, and to deem this Interim Order to be in proper form for filing and recording. Notwithstanding the foregoing, pursuant to any applicable law, the DIP Lender is hereby authorized (but not required) to file or record financing statements and other filing or recording documents or instruments with respect to the DIP Collateral and DIP Liens as applicable, without the Debtor's signature in such form and in such offices as the DIP Lender determines appropriate to perfect the security interests of the DIP Lender under the DIP Facility Documents and this Interim Order, and the DIP Lender is authorized to use collateral descriptions such as "all personal property" or "all assets," in each case "whether now owned or hereafter acquired," words

4872-2005-4929.8

of similar import or any other description the DIP Lender so choose in any such financing statements.

15.     <u>Limitation of Liability.</u> In determining to extend credit under the DIP Facility, or in exercising any rights or remedies pursuant to this Interim Order and the DIP Facility Documents, the DIP Lender shall not be deemed to be in control of the Debtor's operations or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtor (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601, *et seq.*, as amended, or any similar federal or state statute).

16.     <u>Collateral Rights</u>. Except as expressly permitted in this Interim Order and the DIP Facility Documents, in the event that any person or entity that holds a lien or security interest in DIP Collateral that is junior or subordinate to the DIP Liens in such DIP Collateral receives or is paid the proceeds of such DIP Collateral, or receives any other payment with respect thereto from any other source, prior to payment in full and in cash and the complete satisfaction of the DIP Facility, such junior or subordinate lienholder shall be deemed to have received, and shall hold, the proceeds of any such DIP Collateral in trust for the DIP Lender, and shall immediately turnover such proceeds to the DIP Lender for application in accordance with this Interim Order and the DIP Facility Documents.

17.     <u>Credit Bidding</u>.  In connection with any sale process authorized by the Court, (i) the DIP Lender and (ii) subject to entry of a Final Order, the DIP Lender or any assignee or designee of any of the foregoing, shall be authorized to credit bid, consistent with the applicable DIP Facility Documents and/or Pre-Petition Credit Documents, some or all of its claims for its respective priority collateral (each a "<u>Credit Bid</u>") pursuant to Section 363(k) of the Bankruptcy

Code.  Subject to entry of a Final Order, the DIP Lender and the Pre-Petition Lender shall be deemed a "Qualified Bidder" with respect to its rights to acquire all or any of the assets by Credit Bid

18.    <u>Survival of Interim Order</u>. The provisions of this Interim Order and any actions taken pursuant hereto (a) shall survive the entry of any order: (i) confirming any chapter 11 plan in this Chapter 11 Case; (ii) converting the Chapter 11 Case to a successor case, or (iii) dismissing the Chapter 11 Case, and (b) shall continue in full force and effect notwithstanding the entry of any such order, and the claims, liens, and security interests granted pursuant to this Interim Order shall maintain its priority as provided by this Interim Order until all of the DIP Facility approved hereunder are indefeasibly paid in full and discharged in accordance with this Interim Order and the DIP Facility Documents.

19.    <u>Effect of Stipulations on Third Parties</u>.

(a)    *Generally*.  The admissions, stipulations, agreements, releases, and waivers set forth in Paragraph J of this Interim Order (collectively, the "<u>Pre-Petition Stipulations</u>") are and shall be binding on the Debtor, any subsequent trustee, responsible person, examiner with expanded powers, any other estate representative, and all creditors and parties-in-interest and all of its successors in interest and assigns, including, without limitation, a Committee (if appointed), unless, and solely to the extent that, a party-in-interest with standing (other than the Debtor, as to which any Challenge (as defined herein) is irrevocably waived and relinquished) (i) has timely filed the pleadings, and timely commenced the proceeding required under the Bankruptcy Code, Bankruptcy Rules and Local Bankruptcy Rules challenging the Pre-Petition Stipulations (each such proceeding or pleading commencing a proceeding or other contested matter, a "<u>Challenge</u>") by no later than (A) for a Committee, (if appointed), sixty (60) days from the date of formation of

4872-2005-4929.8

a Committee (if appointed), or (B) seventy-five (75) days following the entry of the Interim Order

for any other party in interest with derivative standing (the earlier to occur of (A) and (B), the

"Challenge Deadline"), as such applicable date may be extended in writing from time to time in

the sole discretion of the Pre-Petition Lender (with respect to the Pre-Petition Credit Documents),

or by this Court for good cause shown pursuant to an application filed by a party-in-interest prior

to the expiration of the Challenge Deadline, and (ii) this Court enters judgment in favor of the

plaintiff or movant in any such timely commenced Challenge proceeding and any such judgment

has become a final judgment that is not subject to any further review or appeal.  Notwithstanding

the foregoing, if a chapter 11 trustee is appointed or the Chapter 11 Case is converted to chapter 7

prior to the expiration of the Challenge Deadline, (i) the chapter 11 trustee or chapter 7 trustee, as

applicable, shall have until the later of the Challenge Deadline or the tenth (10th) day after the

appointment of the chapter 11 trustee or the conversion of the Chapter 11 Case to chapter 7, as

applicable, to commence a Challenge, subject to any further extension by order of the Court for

cause, and (ii) if the Committee has asserted a Challenge prior to the Challenge Deadline, the

chapter 11 trustee or chapter 7 trustee will stand in the shoes of the Committee in such Challenge.

(b)     *Binding Effect*.  To the extent no Challenge is timely commenced by

the Challenge Deadline, or to the extent such proceeding does not result in a final and non-

appealable judgment or order of this Court that is inconsistent with the Pre-Petition Stipulations,

then, without further notice, motion, or application to, order of, or hearing before, this Court and

without the need or requirement to file any proof of claim, the Pre-Petition Stipulations shall,

pursuant to this Interim Order, become binding, conclusive, and final on any person, entity, or

party in interest in the Chapter 11 Case, and its successors and assigns, and in any successor case

for all purposes and shall not be subject to challenge or objection by any party-in-interest,

including, without limitation, a trustee, responsible individual, examiner with expanded powers, or other representative of the Debtor's estate. Notwithstanding anything to the contrary herein, if any such proceeding is timely commenced, the Pre-Petition Stipulations shall nonetheless remain binding on all other parties-in-interest and preclusive as provided in subparagraph (a) above except to the extent that any Pre-Petition Stipulations are expressly the subject of a timely filed Challenge, which Challenge is successful as set forth in a final judgment as provided in subparagraph (a) above. To the extent any such Challenge proceeding is timely commenced, the Pre-Petition Lender shall be entitled to payment of the reasonable and documented related costs and expenses, including, but not limited to, reasonable and documented attorneys' fees, incurred under the Pre-Petition Credit Documents in defending themselves in any such proceeding as adequate protection. Upon a successful Challenge brought pursuant to this paragraph, the Court may fashion any appropriate remedy. If, as a result of any successful Challenge, the Pre-Petition Lender is required to disgorge, turn over, or otherwise pay to the estate of the Debtor any amount with the effect that the claim of such Pre-Petition Lender is reinstated as a Pre-Petition Obligation, such amount so paid to the Debtor shall be immediately paid to the DIP Lender for application and payment of the DIP Obligations.

20.    <u>Cash Collection</u>.  From and after the date of the entry of this Interim Order, all collections and proceeds of any DIP Collateral or services provided by Debtor and all Cash Collateral that shall at any time come into the possession, custody, or control of Debtor, or to which Debtor is now or shall become entitled at any time, shall be promptly deposited in the same lock-box and/or deposit accounts into which the collections and proceeds of the Pre-Petition Collateral were deposited under the Pre-Petition Credit Documents (or in such other accounts as are designated by the DIP Lender from time to time) (collectively, the "<u>Cash Collection</u>

4872-2005-4929.8

Accounts"), which accounts (except as otherwise set forth in the DIP Credit Agreement) shall be subject to the sole dominion and control of the DIP Lender. All proceeds and other amounts in the Cash Collection Accounts shall be remitted to the DIP Lender for application in accordance with the DIP Facility Documents and this Interim Order. Unless otherwise agreed to in writing by the DIP Lender, or otherwise provided for herein, the Debtor shall maintain no accounts except those identified in any cash management order entered by the Court (a "Cash Management Order"). The Debtor and the financial institutions where the Debtor's Cash Collection Accounts are maintained (including those accounts identified in any Cash Management Order) are authorized and directed to remit, without offset or deduction, funds in such Cash Collection Accounts upon receipt of any direction to that effect from the DIP Lender.

21.    No Third-Party Rights.  Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary.

22.    Subsequent Reversal or Modification.  This Interim Order is entered pursuant to, *inter alia*, Section 364 of the Bankruptcy Code and Bankruptcy Rules 4001(b) and (c), granting the DIP Lender all protections afforded by Section 364(e) of the Bankruptcy Code. If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated, or stayed, that action will not affect (i) the validity of any obligation, indebtedness, or liability incurred hereunder by the Debtor to the DIP Lender, or (ii) the validity and enforceability of any lien, claim, obligation, or priority authorized or created under this Interim Order or pursuant to the DIP Facility Documents as of such date. Notwithstanding any such reversal, stay, modification, or vacatur, any postpetition indebtedness, obligation, or liability incurred by the Debtor to the DIP Lender, prior to written notice being delivered to the DIP Lender, of the effective date of such action, shall be

4872-2005-4929.8

governed in all respects by the original provisions of this Interim Order, and the DIP Lender shall be entitled to all the rights, remedies, privileges, and benefits granted herein and in the DIP Facility Documents with respect to all such indebtedness, obligations, or liability.

23.     <u>No Waiver</u>. This Interim Order shall not be construed in any way as a waiver or relinquishment of any rights that the DIP Lender may have to bring or be heard on any matter brought before this Court.

24.     <u>Binding Effect; Successors and Assigns</u>. Except as otherwise provided in the DIP Facility Documents, the provisions of this Interim Order shall be binding upon and inure to the benefit of the DIP Lender, the Debtor, and their respective successors and assigns (including any trustee or fiduciary hereafter appointed or elected as a legal representative of the Debtor, its estate, or with respect to the property of its estate) whether in this Chapter 11 Case, in any successor case, or upon dismissal of any this Chapter 11 Case or successor case; provided, however, that the DIP Lender shall have no obligation to extend any financing to, or permit the use of cash collateral or DIP Collateral by, any chapter 7 or chapter 11 trustee or similar representative person appointed for the Debtor's estate.

25.     <u>Indemnification</u>.

a)     The DIP Lender has acted in good faith, and without negligence or violation of public policy or law, in respect of all actions taken by them in connection with or related in any way to negotiating, implementing, documenting, or obtaining the requisite approvals of the DIP Facility, including in respect of the granting of the DIP Liens and the Adequate Protection Liens, any challenges or objections to the DIP Facility, and all documents related to any and all transactions contemplated by the foregoing. Accordingly, the Pre-Petition Lender and the DIP Lender, and, solely in their capacities as such, each of their respective successors, assigns, affiliates

parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, heirs, predecessors, successors, and assigns, shall be and hereby are indemnified and held harmless by the Debtor in respect of any claim or liability incurred in respect thereof or in any way related thereto, provided that no such parties will be indemnified for any cost, expense, or liability to the extent determined in a final, non-appealable judgment of a court of competent jurisdiction to have resulted primarily from such parties' gross negligence or willful misconduct. Except as provided herein, no exception or defense exists in contract, law, or equity as to any obligation set forth, as the case may be, in this Paragraph 25, in the Pre-Petition Credit Documents, or in the DIP Loan Documents, to the Debtor's obligation to indemnify and/or hold harmless the Pre-Petition Lender, or the DIP Lender, as the case may be.

26.     <u>No Proof of Claim.</u> The DIP Lender shall not be required to file proofs of claim in this Chapter 11 Case or any successor case in order to maintain its respective claims with respect to the DIP Facility, all of which shall be due and payable in accordance with this Interim Order, and the DIP Facility Documents, without the necessity of filing any such proof of claim; the statements of claim in respect of the respective DIP Facility set forth in this Interim Order, together with the evidence accompanying the Motion, and presented at the Interim Hearing, are deemed sufficient to and do constitute proofs of claim in respect of such obligations and such secured status.

27.     <u>Monitoring of Collateral.</u> The DIP Lender and its consultants and advisors shall be given reasonable access to the Debtor's books, records, assets, and properties.

28.     <u>Section 506(c) Claims.</u>  Subject to entry of a Final Financing Order, no costs or expenses of administration which have been or may be incurred in the Chapter 11 Case at any time

shall be charged against the DIP Lender or the Pre-Petition Lender, or any of their respective claims, the DIP Collateral, or the Pre-Petition Collateral pursuant to Sections 105 or 506(c) of the Bankruptcy Code, or otherwise, without the prior written consent of the DIP Lender, or the Pre-Petition Lender, as applicable, and no such consent shall be implied from any other action, inaction, or acquiescence by any such agents or lenders.

29. <u>Section 552(b)</u>. Subject to entry of a Final Financing Order, the Pre-Petition Lender shall be entitled to all of the rights and benefits of Section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under Section 552(b) of the Bankruptcy Code shall not apply to the Prepetition Lender, with respect to proceeds, product, offspring or profits of any of the Pre-Petition Collateral.

30. <u>Order Effective Immediately.</u> Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, 9024, or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry, and there shall be no stay of execution or effectiveness of this Interim Order.

31. <u>Final Hearing.</u> The Debtor will file a proposed final order and Budget by ___, 2023. Pursuant to Bankruptcy Rule 4001(d)(2), any objection to the entry of a Final Order on the Motion must be filed on or before ___, 2023 (the "<u>Objection Deadline</u>"). Objections shall be in writing and shall be filed with the Clerk of the Bankruptcy Court so that any such objections are received on or before the Objection Deadline. The Final Hearing to consider entry of the Final Order and final approval of the DIP Facility is scheduled for _____, 2023, at __:__ __ __m at room [__], U.S. Courthouse, 501 W. Tenth Street, Fort Worth, Texas 76102 and through the Court's Cisco WebEx Meeting application at [__].

32.     <u>Service of this Interim Order.</u> Within five (5) business days upon entry of this Interim Order, the Debtor shall serve, by United States mail, first-class postage prepaid, notice of the entry of this Interim Order and of the Final Hearing (the "<u>Final Hearing Notice</u>"), together with copies of this Interim Order and the Motion, on all creditors and parties in interest included on the Creditor Matrix filed in this Chapter 11 Case.

33.     <u>Retention of Jurisdiction.</u> The Bankruptcy Court has and will retain jurisdiction to interpret and enforce this Interim Order according to its terms.

### END OF ORDER ###

Order Submitted By:

[___]

L:\JPROSTOK\Lion Star Nacogdoches Hospital, LLC #6429\Pleadings\Proposed Interim Order FP 11.19.23 3 pm.docx

4872-2005-4929.8

# Exhibit A to Interim Order

## DIP CREDIT AGREEMENT

## **See Exhibit B**

# EXHIBIT "B"

**Nacogdoches Memorial Hospital**
**13 Week Cash Flow Projection**
**Sunday, November 19, 2023**

| Week Ending | 11/24/23 | 12/01/23 | 12/08/23 | 12/15/23 | 12/22/23 | 12/29/23 | 01/05/24 | 01/12/24 | 01/19/24 | 01/26/24 | 02/02/24 | 02/09/24 | 02/16/24 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning Cash | - | - | 1,800 | 11,800 | 61,800 | 39,800 | 109,800 | 1,600 | 21,600 | 88,600 | 126,600 | 13,400 | 198,400 |
| Draws | 1,825,000 | 1,250,000 | 2,425,000 | 800,000 | 1,750,000 | 1,000,000 | 1,855,000 | 800,000 | 1,700,000 | 1,000,000 | 1,725,000 | 1,000,000 | 1,500,000 |
| Total Cash Inflow | 1,825,000 | 1,250,000 | 2,425,000 | 800,000 | 1,750,000 | 1,000,000 | 1,855,000 | 800,000 | 1,700,000 | 1,000,000 | 1,725,000 | 1,000,000 | 1,500,000 |
| Salaries & Wages | 1,150,000 |  | 1,150,000 |  | 1,150,000 |  | 1,050,000 |  | 1,050,000 |  | 1,050,000 |  | 1,050,000 |
| Benefits | 155,000 | 155,000 | 155,000 | 155,000 | 155,000 | 155,000 | 155,000 | 155,000 | 155,000 | 155,000 | 155,000 | 155,000 | 155,000 |
| Insurance | 42,000 |  | 35,000 |  | 42,000 |  | 35,000 |  |  |  | 42,000 |  | 35,000 |
| Contract Labor | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 |
| Physician Payroll |  | 350,000 |  | 170,000 |  | 350,000 |  | 170,000 |  | 350,000 |  | 170,000 |  |
| Supplies | 140,000 | 140,000 | 140,000 | 140,000 | 140,000 | 140,000 | 130,000 | 130,000 | 130,000 | 130,000 | 130,000 | 130,000 | 130,000 |
| Physician Fees | 60,000 | 60,000 | 60,000 | 60,000 | 60,000 | 60,000 | 60,000 | 60,000 | 60,000 | 60,000 | 60,000 | 50,000 | 50,000 |
| Purchased Services | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 |
| Equipment Rent |  |  | 50,000 |  |  |  |  |  | 50,000 |  |  |  |  |
| Building Rent |  | 64,200 |  |  |  |  | 64,200 |  |  |  | 64,200 |  |  |
| Marketing |  |  |  |  |  |  |  |  |  |  |  |  |  |
| Repairs & Maintenance | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 |
| Utilities | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 |
| Other Operating | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 35,000 | 35,000 | 35,000 | 35,000 | 35,000 | 35,000 | 35,000 |
| Property Taxes |  |  |  |  |  |  |  |  |  |  |  |  |  |
| Interest Payments | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 |
| ER |  | 254,000 |  |  |  |  | 254,000 |  |  |  | 154,000 |  |  |
| UC/Chirp Fees/LPPF |  |  | 600,000 |  |  |  |  |  |  |  |  |  |  |
| Patient Refunds | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 |
| Fixed Assets |  |  |  |  |  |  |  |  |  |  |  |  |  |
| Travel Expenses | 13,000 |  |  |  | 13,000 |  |  |  | 13,000 |  |  |  | 13,000 |
| Deposits |  |  |  | (100,000) | 100,000 |  |  |  |  |  |  |  |  |
| DIP Fees | 30,000 | 50,000 | 50,000 | 50,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 |  | 25,000 | 25,000 | 25,000 |
| Trustee Fees |  |  |  |  |  |  |  |  |  | 144,000 |  |  |  |
| Legal/Professional |  |  |  |  |  | 200,000 |  |  |  |  | 200,000 |  |  |
| Total Cash Outlays | 1,825,000 | 1,248,200 | 2,415,000 | 750,000 | 1,772,000 | 930,000 | 1,963,200 | 780,000 | 1,633,000 | 962,000 | 1,838,200 | 815,000 | 1,623,000 |
| Net Change in Cash | - | 1,800 | 10,000 | 50,000 | (22,000) | 70,000 | (108,200) | 20,000 | 67,000 | 38,000 | (113,200) | 185,000 | (123,000) |
| Ending Cash | - | 1,800 | 11,800 | 61,800 | 39,800 | 109,800 | 1,600 | 21,600 | 88,600 | 126,600 | 13,400 | 198,400 | 75,400 |

# EXHIBIT "B"

**SUPERPRIORITY DEBTOR-IN-POSSESSION
CREDIT AND SECURITY AGREEMENT**


**between**


**LION STAR NACOGDOCHES HOSPITAL, LLC**

**as the Borrower**


**and**


**eCAPITAL HEALTHCARE CORP.**


**as the Lender**


**Dated as of
[        ], 2023**

## SUPERPRIORITY DEBTOR-IN-POSSESSION
## CREDIT AND SECURITY AGREEMENT

### Table of Contents

Page

I.   DEFINITIONS ................................................................................................................ 2

    1.1   General Terms .................................................................................................... 2
    1.2   Specific Terms .................................................................................................... 2
    1.3   Other Definitional and Interpretative Provisions ............................................ 23
    1.4   Time is of the Essence ..................................................................................... 23

II.   ADVANCES, PAYMENT AND INTEREST ................................................................ 23

    2.1   Advances; Full-Roll of Pre-Petition Obligations ............................................ 23
    2.2   Evidence of Obligations; Maturity .................................................................. 25
    2.3   Interest ............................................................................................................. 26
    2.4   Revolving Facility Disbursements; Requirement to Deliver Borrowing
            Certificate .............................................................................................. 26
    2.5   Revolving Facility Collections; Repayment; Borrowing Availability  and
            Lockbox .................................................................................................. 27
    2.6   Promise to Pay; Manner of Payment ............................................................... 29
    2.7   Repayment of Excess Advances ...................................................................... 29
    2.8   Payments by the Lender ................................................................................... 30
    2.9   Grant of Security Interest; Collateral .............................................................. 30
    2.10  Collateral Administration ................................................................................ 31
    2.11  Power of Attorney ........................................................................................... 34
    2.12  Setoff Rights .................................................................................................... 34

III.   FEES AND OTHER CHARGES ................................................................................. 35

    3.1   Facility Fee ....................................................................................................... 35
    3.2   Unused Line Fee ............................................................................................... 35
    3.3   Collateral Management Fee .............................................................................. 35
    3.4   Termination Fee ................................................................................................ 35
    3.5   Computation of Fees; Lawful Limits ............................................................... 36
    3.6   Default Rate of Interest .................................................................................... 36

IV.   CONDITIONS PRECEDENT ...................................................................................... 37

    4.1   Conditions to Closing and Advances ............................................................... 37
    4.2   Waivers of Conditions to Advances ................................................................. 38

V.   REPRESENTATIONS AND WARRANTIES .............................................................. 39

    5.1   Organization and Authority .............................................................................. 39
    5.2   Loan Documents ............................................................................................... 39

4874-6257-0384.6

| | | |
|---|---|---|
| 5.3 | Subsidiaries, Capitalization and Ownership Interests | 39 |
| 5.4 | Properties | 40 |
| 5.5 | Other Agreements | 40 |
| 5.6 | Litigation | 40 |
| 5.7 | Labor Matters | 40 |
| 5.8 | Tax Returns, Governmental Reports | 41 |
| 5.9 | Financial Statements and Reports | 41 |
| 5.10 | Compliance with Law | 41 |
| 5.11 | Intellectual Property | 41 |
| 5.12 | Licenses and Permits | 42 |
| 5.13 | Disclosure | 42 |
| 5.14 | Existing Indebtedness; Investments, Guarantees and Certain Contracts | 42 |
| 5.15 | Agreements with Affiliates | 43 |
| 5.16 | Insurance | 43 |
| 5.17 | Names, Location of Offices, Records and Collateral | 43 |
| 5.18 | Non-Subordination | 43 |
| 5.19 | Accounts | 44 |
| 5.20 | Healthcare Law Compliance Representations | 44 |
| 5.21 | Reliance on Representations; Survival | 47 |
| 5.22 | Compliance with Environmental Requirements; No Hazardous Substances | 47 |
| 5.23 | Material Contracts | 48 |
| **5.24** | **Third-Party Payor Billing Numbers** | 48 |
| **5.25** | **Financing Orders** | 49 |
| **5.26** | **DIP Order Notices** | 49 |
| **5.27** | **Superpriority Administrative Expense Claims** | 49 |
| **5.28** | **DIP Liens** | 49 |
| 5.29 | Use of Proceeds. | 49 |
| **VI.** | **AFFIRMATIVE COVENANTS** | 49 |
| 6.1 | Financial Statements, Reports and Other Information | 49 |
| 6.2 | Late Fee. | 53 |
| 6.3 | Payment of Obligation | 53 |
| 6.4 | Conduct of Business and Maintenance of Existence and Assets | 53 |
| 6.5 | Compliance with Legal, Tax and Other Obligations | 54 |
| 6.6 | Insurance | 54 |
| 6.7 | True Books | 55 |
| 6.8 | Inspection; Period Audits | 55 |
| 6.9 | Further Assurances; Post Closing | 56 |
| 6.10 | Payment of Indebtedness | 56 |
| 6.11 | Lien Terminations | 56 |
| 6.12 | Use of Proceeds | 56 |
| 6.13 | Collateral Documents; Security Interest in Collateral | 56 |
| 6.14 | Taxes and Other Charges | 57 |
| 6.15 | Hazardous Substances | 58 |
| 6.16 | Licensed Facilities | 58 |
| 6.17 | Healthcare Operations | 58 |

4874-6257-0384.6

6.18 Bankruptcy Matters ................................................................................................ 60

VII. NEGATIVE COVENANTS ............................................................................................ 60

7.1 Financial Covenants ................................................................................................ 60
7.2 No Indebtedness Other Than Permitted Indebtedness ....................................... 60
7.3 No Liens Other Than Permitted Liens .................................................................. 60
7.4 Investments, New Facilities or Collateral; Subsidiaries..................................... 61
7.5 Prohibited Payments............................................................................................... 61
7.6 Transactions with Affiliates .................................................................................. 61
7.7 Organizational Documents; Fiscal Year; Dissolution; Use of Proceeds ............ 62
7.8 Asset Sales............................................................................................................... 63
7.9 Management ............................................................................................................. 63
7.10 Restrictive Agreements .......................................................................................... 63
7.11 Modifications of Certain Agreements ................................................................... 63
7.12 Deposit Accounts .................................................................................................... 64
7.13 Truth of Statements ............................................................................................... 64
7.14 IRS Form 8821 ........................................................................................................ 64
7.15 Third Party Payor Programs ................................................................................. 64
7.16 Filing of Motions and Applications....................................................................... 64
7.17 Interim and Final Financing Orders ..................................................................... 65
7.18 Bankruptcy Actions ................................................................................................ 65

VIII. EVENTS OF DEFAULT .................................................................................................. 65

8.1 Events of Default..................................................................................................... 65
8.2 Acceleration and Suspension or Termination of Commitments ........................ 68

IX. RIGHTS AND REMEDIES AFTER DEFAULT ............................................................ 68

9.1 Rights and Remedies .............................................................................................. 68
9.2 Application of Proceeds .......................................................................................... 69
9.3 Application of Payments Following Default ......................................................... 70
9.4 Rights and Remedies not Exclusive ...................................................................... 70

X. WAIVERS AND JUDICIAL PROCEEDINGS .............................................................. 70

10.1 Waivers.................................................................................................................... 70
10.2 Delay; No Waiver or Defaults................................................................................ 71
10.3 Jury Waiver ............................................................................................................. 71
10.4 Cooperation in Discovery and Litigation ............................................................. 71

XI. EFFECTIVE DATE AND TERMINATION .................................................................. 72

11.1 Effectiveness and Termination .............................................................................. 72
11.2 Survival ................................................................................................................... 73

XII. ASSIGNMENTS AND PARTICIPATIONS .................................................................. 73

iii

12.1     Assignments ................................................................................................... 73

XIII.    MISCELLANEOUS ....................................................................................................... 73

13.1     Governing Law; Jurisdiction; Service of Process; Venue ............................. 73
13.2     Binding Effect of Loan Documents................................................................ 73
13.3     Revival of Obligations................................................................................... 74
13.4     Indemnity....................................................................................................... 74
13.5     Notice ............................................................................................................ 75
13.6     Severability; Captions; Counterparts; Facsimile Signatures ............................. 75
13.7     Expenses ........................................................................................................ 76
13.8     Entire Agreement .......................................................................................... 76
13.9     The Lender Approvals.................................................................................... 77
13.10    USA Patriot Act.............................................................................................. 77

ANNEX I

Financial and Loan Covenants

## **EXHIBITS**

Exhibit A        -        Borrowing Certificate

Exhibit B        -        Compliance Certificate

Exhibit C        -        Budget

## **SCHEDULES**

Schedule 2.4        -        Borrower's Account for Funding Wires

Schedule 2.5        -        Borrower's Deposit Accounts

Schedule 5.3        -        Organizational Information

Schedule 5.4        -        Real Property Owned or Leased

Schedule 5.6        -        Litigation

Schedule 5.16        -        Insurance

Schedule 5.17A        -        Corporate Names

Schedule 5.17B        -        Business and Collateral Locations

Schedule 5.20        -        Exceptions to Healthcare Law Compliance Representations

Schedule 5.23        -        Material Contracts

Schedule 5.24        -        Third-Party Payor Billing Numbers

Schedule 7.3        -        Liens

4874-6257-0384.6

## SUPERPRIORITY DEBTOR-IN-POSSESSION
## CREDIT AND SECURITY AGREEMENT

THIS SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AND SECURITY AGREEMENT (this "**Agreement**") dated as of [      ], 2023, is entered into by and between LION STAR NACOGDOCHES HOSPITAL, LLC, a Texas limited liability company (together, the "**Borrower**"), as Borrower, being debtor and debtor-in-possession in a case pending under Chapter 11 of the Bankruptcy Code (the "**Bankruptcy Case**"), and eCAPITAL HEALTHCARE CORP., a Delaware corporation, f/k/a CNH FINANCE FUND I, L.P., a Delaware limited partnership (the "**Lender**").

## RECITALS

**WHEREAS**, on [__], 2023 (the "**Petition Date**"), the Borrower filed a voluntary petition with the Bankruptcy Court for the [__] district of Texas. The Borrower has continued to be in possession of its assets and in the management of its business pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

**WHEREAS**, the Borrower has requested and the Lender has agreed to make available to the Borrower a secured debtor-in-possession revolving credit facility in the maximum principal amount of $10,000,000.00 (the "**Revolving Facility**") to provide the Borrower with the funds necessary for it to meet its working capital needs, professional fees and expenses, and other expenses set forth in the Budget upon the terms and conditions set forth herein and subject to the approval of the Bankruptcy Court;

**WHEREAS**, prior to the Petition Date, the Lender provided financing to the Borrower pursuant to the Pre-Petition Credit Agreement (as defined herein);

**WHEREAS**, as of the close of business on [__], 2023, the Lender under the Pre-Petition Credit Agreement was owed $[__] in the outstanding principal with respect to Loans (as such term is defined in the Pre-Petition Credit Agreement) plus interest, fees, costs and expenses and all other Pre-Petition Obligations under the Pre-Petition Credit Agreement;

**WHEREAS**, the Pre-Petition Obligations, under and as defined in the Pre-Petition Credit Agreement, are secured by a security interest in certain existing and after-acquired assets of the Borrower as more fully set forth in the Pre-Petition Credit Agreement and such security interest is perfected and, with certain exceptions, as described in the Pre-Petition Credit Agreement has priority over other security interests;

**WHEREAS**, the Lender's willingness to extend financial accommodations to the Borrower as more fully set forth in this Agreement and the other Loan Documents, is done solely as an accommodation to the Borrower and at the Borrower's request and in furtherance of the Borrower enterprise;

**WHEREAS**, to secure the Borrower's obligations hereunder, the Borrower will grant to the Lender, valid, perfected and enforceable superpriority Liens, senior to all other security interests in the Collateral, approved pursuant to Sections 364(c)(1) and (d)(1) of the Bankruptcy

Code, which Liens are a material and necessary condition of the Lender's willingness to provide the credit contemplated herein; and

WHEREAS the Lender is willing to make the Revolving Facility available to the Borrower upon the terms and subject to the conditions set forth herein.

## AGREEMENT

NOW THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt and adequacy of which hereby are acknowledged, the Borrower and the Lender hereby agree as follows:

## I.  DEFINITIONS

### 1.1    General Terms

For purposes of this Agreement, in addition to the definitions above and elsewhere in this Agreement, the terms listed below shall have the meanings set forth.  All capitalized terms used which are not specifically defined shall have meanings provided in Article 9 of the UCC to the extent the same are used or defined therein.  Unless otherwise specified herein, any agreement or contract referred to herein shall mean such agreement as modified, amended or supplemented from time to time.  Unless otherwise specified, as used in the Loan Documents or in any certificate, report, instrument or other document made or delivered pursuant to any of the Loan Documents, all accounting terms not defined elsewhere in this Agreement shall have the meanings given to such terms in and shall be interpreted in accordance with GAAP applied on a basis consistent with the most recent audited consolidated financial statements of the Borrower delivered to the Lender on or prior to the Closing Date.

### 1.2    Specific Terms

"Account Debtor" shall mean "account debtor," as defined in Article 9 of the UCC, and any other obligor in respect of an Account.

"Accounts" shall mean all of Borrower's (i) accounts (as that term is defined in the UCC), (ii) Payment Intangibles, and (iii) all other rights of payment, collection or reimbursement (whether owed directly to Borrower or assigned to Borrower by a patient or other third party), whenever due, that arose out of, or will arise out of, the rendering of services, the provision of room, board or other daily living assistance, or the sale, assignment, lease or license of Equipment, prosthetics, pharmaceutical or other Goods, whether before or after the date of this Agreement and including, all of Borrower's rights of payment, collection or reimbursement with respect to such services from any insurer, federal or state government agency or other third party; whether billed on a fee for service, monthly per patient capitation charge or any other basis, whether or not the accounts, payment intangibles, or rights of payment, collection or reimbursement have been invoiced or billed, written off, partially paid, currently assigned to collection agencies or other third party service vendors. Without limiting the foregoing, Accounts shall also include all monies due or to become due to Borrower and obligations to Borrower in any form (whether arising in connection with contracts, contract rights, Instruments, or Chattel Paper), in each case whether or not earned by performance, now or hereafter in existence, and all documents of title

4874-6257-0384.6

or other documents representing any of the foregoing, and all collateral security and guarantees of any kind, now or hereafter in existence, given by any Person with respect to any of the foregoing.

**"Accrediting Organization"** shall mean any Person from which Borrower has received an accreditation as of the Closing Date or thereafter.

**"ACH"** shall mean automated clearing house.

**"Advance"** shall mean a borrowing under the Revolving Facility. Any amounts paid by the Lender on behalf of the Borrower or any Guarantor under any Loan Document shall also be an Advance for purposes of this Agreement. Each Advance shall increase the principal amount outstanding hereunder.

**"Affiliate"** shall mean, as to any Person, any other Person (a) that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such Person, (b) who is a director or officer (i) of such Person, (ii) of any Subsidiary of such Person, or (iii) of any Person described in clause (a) above with respect to such Person, and (c) which, directly or indirectly through one or more intermediaries, is the beneficial or record owner (as defined in Rule 13d-3 of the Securities Exchange Act of 1934, as amended, as the same is in effect on the date hereof) of ten percent (10%) or more of any class of the outstanding voting stock, securities or other equity or ownership interests of such Person. For purposes of this definition, the term "control" (and the correlative terms "controlled by" and "under common control with") shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the administrative management or policies (even without the power to direct or cause the direction of the clinical/medical management or policies), whether through ownership of securities or other interests, by contract or otherwise.

**"Applicable Margin"** shall mean two and percent (2.00 %).

**"Applicable Rate"** shall mean the sum of (i) the Applicable Margin, (ii) the Prime Rate, and (iii) if applicable, the Default Rate, expressed as a percentage.

**"Availability"** shall mean the Revolving Loan Limit less all Revolving Loans outstanding less cash on hand, minus any reserves against Availability imposed by the Lender in its discretion.

**"Bankruptcy Case"** shall have the meaning assigned to that term in the preamble of this Agreement.

**"Bankruptcy Code"** shall mean Title 11 of the United States Code entitled "Bankruptcy," as the same may be amended, modified or supplemented from time to time, and any successor statute thereto.

**"Bankruptcy Court"** means the United States Bankruptcy Court for the [__] District of Texas or any other bankruptcy court having jurisdiction over the bankruptcy case from time to time.

4874-6257-0384.6

"**Books and Records**" shall mean the Borrower's books and records specifically relating to Accounts, including, but not limited to, ledgers, records indicating, summarizing, or evidencing the Borrower's Accounts and all computer programs, disc or tape files, printouts, runs, and other computer prepared information with respect to the foregoing and any software necessary to operate the same.

"**Borrower**" shall mean the entity described in the first paragraph of this Agreement and each of its successors and permitted assigns.

"**Borrowing Base**" shall mean, as of any date of determination:

(a)    the Net Collectible Value of Eligible Receivables of the Borrower, as such Net Collectible Value is determined by the Lender with reference to the most recent Borrowing Certificate, other factors deemed relevant by the Lender and otherwise in accordance with the Agreement; provided, however, that if as of such date of determination the most recent Borrowing Certificate is of a date more than four (4) Business Days before such date, the Borrowing Base shall be determined by Lender; *minus*

(b)    the amount of any Carve-Outs, reserves, or adjustments against the Borrowing Base provided for in this Agreement or determined by the Lender from time to time.

"**Borrowing Certificate**" shall mean a Borrowing Certificate substantially in the form of Exhibit A.

"**Borrowing Date**" shall have the meaning assigned to that term in Section 2.4.

"**Budget**" shall mean the Budget attached hereto as Exhibit C to this Agreement, in form and substance satisfactory to the Lender and approved by the Bankruptcy Court.  It is understood that the Budget attached hereto as Exhibit C will be updated in accordance with Section 6.1(d)(vi). Any amended or restated Budget shall be in form and substance satisfactory to Lender; however, for purposes of calculating compliance with the Budget and providing a Budget-to-actual presentation, the initial expenses and revenues for the relevant time periods as set forth in the earliest Budget shall be used and not the expenses and revenues for such time period as may be set forth in any subsequently amended or restated Budget.

"**Business Day**" shall mean any day other than a Saturday, Sunday, Good Friday, or other day on which the Federal Reserve or the Lender is closed.

"**Capital Lease**" shall mean, as to any Person, a lease or any interest in any kind of property or asset by that Person as lessee, that is, should be or should have been recorded as a "capital lease" of such person in accordance with GAAP.

"**Capitalized Lease Obligations**" shall mean all obligations of any Person under Capital Leases, in each case, taken at the amount thereof accounted for as a liability in accordance with GAAP.

"**CARES Escrow Agreement**" shall have the meaning assigned to that term in the Hospital Asset Purchase Agreement.

"**CARES Escrow Funds**" shall mean the funds deposited in escrow with Commercial Bank of Texas, N.A. or other agent mutually agreeable to Borrower and Old Operator in the initial amount of $6,000,000 pursuant to the CARES Escrow Agreement (as defined in the Hospital Asset Purchase Agreement).

"**Carve-Outs**" has the meaning set forth in the Financing Orders, including monthly payment of Professional Fees pursuant to an interim order.

"**Cash Advance Loan**" means any loan, debt, advance, merchant cash advance, business cash advance, ACH business loan, or other indebtedness or financing arrangement (whether such financing is on or off-balance sheet, secured or unsecured) incurred by Borrower based on or to be repaid by Account proceeds or Borrower's other revenue, or by ACH pull or withholding from any of Borrower's Controlled Deposit Accounts, other than the Operating Accounts.

"**CERCLA**" shall mean the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C.A. § 9601 *et seq*., as the same may be amended from time to time.

"**Change of Control**" shall mean any of the following: (a) the occurrence of a merger, consolidation, reorganization, recapitalization or share or interest exchange, sale or transfer or any other transaction or series of transactions as a result of which the owners, directly or indirectly, of a majority of Borrower's voting stock or voting power as of the date hereof cease to be entitled to control the Borrower, or (b) the resignation, termination, replacement, death, disability or any other event the result of which is the failure of the existing senior management of Borrower to function in its current capacities, unless, (i) in the case of a replacement, the replacement is reasonably acceptable to the Lender, or (ii) in all other cases a replacement reasonably satisfactory to the Lender is identified and engaged within 30 days following such event, or (c) the sale, assignment, transfer, lease, conveyance or other disposition of all or substantially all of Borrower's assets to, or a consolidation or merger with or into, any other Person, other than any such transaction where immediately thereafter the surviving Person is a direct or indirect subsidiary of Borrower.

"**Closing**" shall mean the date of the initial Advance under the Revolving Facility.

"**Closing Date**" shall mean the date the Closing occurs.

"**Collateral**" shall mean, collectively and each individually, all collateral or security identified in Section 2.9, together with any additional collateral or security now or hereafter granted to Lender by Borrower pursuant to a Loan Document.

"**Collateral Management Fee**" shall have the meaning assigned to the term in Section 3.3.

"**Collection Bank**" shall mean a depository bank identified on the United States trustee's list of authorized depositories, and otherwise acceptable to the Lender in its discretion.

"**Commercial Deposit Account**" shall mean a deposit account established and maintained in Borrower's name, which is used solely to collect payments with respect to Borrower's Accounts and other Collateral, other than payments with respect to Governmental Receivables.

"**Compliance Certificate**" shall have the meaning assigned to the term in Section 6.1(a).

"**Concentration Account**" shall have the meaning assigned to the term in Section 2.5.

"**Contingent Obligation**" shall mean, with respect to any Person, any direct or indirect liability of such Person:  (a) with respect to any Indebtedness of another Person (a "**Third Party Obligation**") if the purpose or intent of such Person incurring such liability, or the effect thereof, is to provide assurance to the obligee of such Third Party Obligation that such Third Party Obligation will be paid or discharged, or that any agreement relating thereto will be complied with, or that any holder of such Third Party Obligation will be protected, in whole or in part, against loss with respect thereto; (b) with respect to any undrawn portion of any letter of credit issued for the account of such Person or as to which such Person is otherwise liable for the reimbursement of any drawing; or (c) for any obligations of another Person pursuant to any guaranty (other than a guaranty of the Obligations or any part thereof) or pursuant to any agreement to purchase, repurchase or otherwise acquire any obligation or any property constituting security therefor, to provide funds for the payment or discharge of such obligation or to preserve the solvency, financial condition or level of income of another Person.  The amount of any Contingent Obligation shall be equal to the amount of the obligation so guaranteed or otherwise supported or, if not a fixed and determinable amount, the maximum amount so guaranteed or otherwise supported.

"**Control Agreements**" shall mean each deposit account control agreement, deposit account instructions, and service agreement or similar agreements on each Deposit Account, Operating Account, and, if applicable, the master collections account established by Borrower in accordance with Section 2.5(b).

"**Controlled Deposit Accounts**" shall mean each Commerical Deposit Account, Governmental Deposit Account, Operating Account, and if applicable, the master collections account established by Borrower in accordance with Section 2.5(b).

"**Current Ratio**" shall mean Borrower's ratio of current assets (determined in accordance with GAAP), to current liabilities (also determined in accordance with GAAP). For this purpose, the outstanding balance of the Revolving Facility shall be deemed to be a current liability

"**Date of Service**" of an Account shall mean the earliest date the healthcare service for which the Account is payable was rendered, the healthcare-related Equipment, prosthetics, pharmaceuticals, or other goods for which the Account is payable were delivered, or the room, board or other daily living assistance for which the Account payable was provided.

"**Debtor Relief Law**" shall mean, collectively, the Bankruptcy Code and all other applicable liquidation, conservatorship, bankruptcy, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws from time to time in effect affecting the rights of creditors generally, as amended from time to time.

"**Default Rate**" shall have the meaning assigned to the term in Section 3.7.

"**Disposition**" or "**Dispose**" means the sale, transfer, license, lease or other disposition (including any sale and leaseback transaction or dispositions effected by any corporate division), whether in one transaction or in a series of transactions, of any property (including, without

limitation, any equity interests) by any Person (or the granting of any option or other right to do any of the foregoing), including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"**Distribution**" shall mean (a) any dividend or other distribution (whether in cash, securities or other property) on any equity interest in the Borrower (except those payable solely in its equity interests of the same class), (b) any payment by the Borrower on account of (i) the purchase, redemption, retirement, defeasance, surrender, cancellation, termination or acquisition of any equity interests in the Borrower or any claim respecting the purchase or sale of any equity interest in the Borrower, or (ii) any option, warrant or other right to acquire any equity interests in the Borrower, (iii) amounts owed by Borrower to any Affiliate of the Borrower, and (c) any loan or advance to an Affiliate of Borrower.

"**Dollars**" or "**$**" shall mean the lawful and freely transferrable currency of the United States of America.

"**Eligible Billed Receivables**" shall mean each Account (other than Eligible Unbilled Receivables) arising in the ordinary course of the Borrower's business, which meets the following criteria:

a.      it is subject to a valid perfected first priority security interest in favor of the Lender, subject to no other Lien (other than Permitted Liens);

b.      it is evidenced by an invoice, statement, electronic submission or other documentary evidence satisfactory to the Lender, which has been submitted to the Account Debtor for payment in accordance with applicable Law;

c.      it is in substantial compliance and conformance with any requisite procedures, requirements and regulations governing payment by such Account Debtor with respect to such Account, and, if due from a Medicaid/Medicare Account Debtor, is properly payable directly to Borrower;

d.      any portion thereof that is payable by a beneficiary, recipient or subscriber individually and not directly by a third-party obligor acceptable to the Lender shall not be included as an Eligible Billed Receivable;

e.      it does not arise out of services rendered to, room, board or other daily living assistance provided to, a sale made to, or out of any other transactions between Borrower or any of its Subsidiaries and, one or more Affiliates of Borrower or any of its Subsidiaries;

f.      it is outstanding for no more than 150 days after the Date of Service with respect to such Account; provided that if more than fifty percent (50%) in Net Collectible Value of the Accounts payable by any one Third-Party Payor are outstanding for more than 150 days after such Accounts' Date of Service, no Accounts payable by such Third-Party Payor shall be Eligible Billed Receivables;

g.      no covenant, agreement, representation or warranty with respect to such Accounts contained in any Loan Documents has been breached and remains uncured;

h.      to the extent the Account Debtor for such Account is solvent and has a claims-paying ability rating by A.M. Best Company, such rating shall be "A" or better; or to the extent the Account Debtor for such Account does not have a claims-paying ability rating

i.      by A.M. Best Company or its claims-paying ability is not rated "A" or better, such Account Debtor is otherwise creditworthy as determined by Lender in its sole discretion, and there are no proceedings or actions which are threatened or pending against any Account Debtor thereunder which might result in any Material Adverse Change in such Account Debtor's financial condition or the collectability of Accounts with respect to such Account Debtor;

j.      arises out of a completed, bona fide sale, assignment, lease, license and related delivery of Goods, provision of room, board or other daily living assistance, or rendering of services by Borrower in the ordinary course of business, in accordance with applicable Law, and in accordance with the terms and conditions of all purchase orders, contracts, certifications, participations, certificates of need and other agreements and documents relating thereto or forming a part of the contract between Borrower and the Account Debtor;

k.      it does not represent the sale of Goods or rendering of services to an Account Debtor with respect to which the obligation of payment by the Account Debtor is or may be conditional for any reason whatsoever, including, accounts arising with respect to Goods that were (i) not sold on an absolute basis, (ii) sold on a bill-and-hold sale basis, (iii) sold on a consignment sale basis, (iv) sold on a guaranteed sale basis, (v) sold on a sale or return basis, or (vi) sold on the basis of any other similar understanding, and is not evidenced by Chattel Paper or an Instrument of any kind and has not been reduced to judgment;

l.      it does not represent amounts payable to the Borrower for the use (whether through leasing or otherwise) of the Borrower's employees by third parties;

m.      it is not payable under worker's compensation laws or insurance, automobile insurance whether a no-fault law or otherwise, does not represent a census capitation payment or a claim for a personal injury and is not a Self-Pay Account;

n.      the applicable Account Debtor for such Account is not a Governmental Authority, unless all applicable statutes, ordinances or regulations respecting the assignment of such Account have been complied with; provided, however, neither Borrower nor Lender will be required to comply with any filing or notice requirements under the Assignment of Claims Act (31 U.S.C. § 3727);

o.      any portion of an Account that is subject to any offset, credit (including any resource or other income credit or offset), lien, deduction, defense, discount, chargeback, freight claim, allowance, adjustment, dispute or counterclaim is not for a liquidated amount or is contingent in any respect or for any reason (except to the extent that the same is taken into consideration in determining Net Collectible Value) shall not be included as an Eligible Billed Receivable;

p.      except for deductions taken into consideration in determining Net Collectible Value, there is no agreement with an Account Debtor for any deduction from such Accounts, except for discounts or allowances made in the ordinary course of business for prompt payment,

4874-6257-0384.6

all of which discounts or allowances are reflected in the calculation of the face value of each invoice related thereto, such that only the discounted amount of such Accounts after giving effect to such discounts and allowances shall be considered an Eligible Billed Receivable;

q.      no return, rejection or repossession of Goods or services related to it has occurred;

r.      the Account Debtor with respect thereto has its principal place of business or chief executive offices within the continental United States and the Account is payable to Borrower in US dollars;

s.      Borrower has not agreed to accept and has not accepted any non-cash payment for such Account;

t.      if the Account Debtor is the Medicaid Program, the Account is not in a "Medicaid Pending" status, and

u.      such Account meets such specifications and requirements other than as set forth above, which may from time to time be established by Lender, in Lender's sole discretion, by written notice to the Borrower.

**"Eligible Receivables"** shall mean Eligible Billed Receivables and Eligible Unbilled Receivables and shall include such additional Accounts as may be permitted from time to time by the Lender at the request of Borrower.

**"Eligible Unbilled Receivables"** shall mean each Account meeting all of the criteria of Eligible Billed Receivable (and otherwise acceptable to Lender in Lender's sole discretion), except:

a.      clause (b) of the definition of "Eligible Billed Receivables" shall be restated as follows: "it does not remain unbilled for longer than the thirtieth (30th) day of the month following the month in which the Date of Service occurred;"

b.      clause (f) of the definition of "Eligible Billed Receivables" shall be restated as follows: "it is outstanding for no more than 150 days after the Date of Service with respect to such Account; provided that if more than fifty percent (50%) in Net Collectible Value of the Accounts payable by any one Third-Party Payor are outstanding for more than 150 days after such Accounts' Date of Service, no Accounts payable by such Third-Party Payor shall be Eligible Unbilled Receivables;" and

c.      the eligible unbilled portion of any such Accounts shall include amounts earned on each day prior to issuance of any invoice in an amount equal to the rate per patient per day established under the applicable Government Contract; provided that (i) the Lender in its discretion may from time to time determine the liquidity factors and reserves applicable to Advances made on any such Accounts, and (ii) the aggregate amount of Eligible Unbilled Receivables included in the Borrowing Base shall be adjusted monthly based on the amounts actually billed with respect to such Accounts.

**"Environmental Laws"** shall mean all federal, state, local, and foreign laws now or hereafter in effect relating to pollution or protection of the environment, including laws relating to emissions, discharges, releases, or threatened releases of pollutants, contaminants, chemicals, or industrial, toxic, or hazardous substances or wastes or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, removal, transport, or handling of pollutants, contaminants, chemicals, or industrial, toxic, or hazardous substances or wastes, and any and all regulations, notices, or demand letters issued, entered, promulgated, or approved thereunder.

**"Equipment"** shall mean "equipment" as defined in Article 9 of the UCC.

**"ERISA"** shall mean the Employee Retirement Income Security Act of 1974, as the same may be amended, modified or supplemented from time to time, and any successor statute thereto, and any and all rules or regulations promulgated from time to time thereunder.

**"Event of Default"** shall mean the occurrence of any event set forth in Article VIII.

**"Facility Cap"** mean the maximum principal amount that may be outstanding hereunder which amount shall initially be Ten Million Dollars ($10,000,000), subject to such increases as may be made pursuant to Section 2.1(c).

**"Facility Fee"** shall have the meaning set forth in Section 3.1.

**"Final Financing Order"** shall mean an order that is entered by the Bankruptcy Court in the Bankruptcy Case pursuant to Sections 364(c) and (d) of the Bankruptcy Code and Bankruptcy Rule 4001(c), in form and substance that are satisfactory to the Lender, approving the Loan Documents, and which order shall, among other things (i) have been entered on such prior notice as is required by applicable Law and any applicable orders of the Bankruptcy Court, (ii) authorize the extensions of credit in respect of the Revolving Facility in the amounts and on the terms and conditions set forth herein, (iii) grant the Superpriority Claim and other Liens on Collateral referred to herein and in the other Loan Documents (subject to the Carve-Outs), and (iv) approve the payment by the Borrower of the Obligations.

**"Financing Orders"** shall mean the Interim Financing Order, the Final Financing Order, and any amendments or modifications thereto entered by the Bankruptcy Court in the Bankruptcy Case.

**"GAAP"** shall mean generally accepted accounting principles in the United States of America in effect from time to time as applied by nationally recognized accounting firms.

**"General Intangible"** shall mean "general intangible" as defined in Article 9 of the UCC.

**"Government Contract"** shall mean all contracts (including all amendments thereto) relating to the payment of Government Receivables (a) with the United States government or with any agency or instrumentality thereof, or (b) with any State or Territory of the United States or the District of Columbia or with any agency or instrumentality thereof.

4874-6257-0384.6

"**Governmental Authority**" shall mean any federal, state, municipal, national, local or other governmental department, court, commission, board, bureau, agency or instrumentality or political subdivision thereof, or any entity or officer exercising executive, legislative or judicial, regulatory or administrative functions of or pertaining to any government or any court, in each case, whether of the United States or a state, territory or possession thereof, a foreign sovereign entity or country or jurisdiction or the District of Columbia.

"**Governmental Deposit Account**" shall mean a deposit account established and maintained in Borrower's name, which is used to collect payments with respect to Borrower's Governmental Receivables

"**Governmental Receivable**" shall mean any Account that is the obligation of the United States of America, or any State or Territory of the United States of America, and the District of Columbia, or any of their respective agencies, whether under the Medicaid or Medicare program established pursuant to the Social Security Act or any other federal healthcare program, including, without limitation, TRICARE (formerly known as CHAMPUS) and CHAMPVA and whether or not the Account is the primary obligation of such government or agency.

"**Guarantor**" shall mean any guarantor of the Obligations or any part thereof, including any guarantor of the accuracy of any one or more representations or warranties of Borrower contained in this Agreement. As of the Closing Date there is no Guarantor.

"**Guaranty**" shall mean any obligation, contingent or otherwise, of such Person directly or indirectly guaranteeing any Indebtedness or other obligation of any other Person and, without limiting the generality of the foregoing, any obligation, direct or indirect, contingent or otherwise, of such Person (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation (whether arising by virtue of partnership arrangements, by agreement to keep-well, to purchase assets, goods, securities or services, to take-or-pay, or to maintain financial statement conditions or otherwise), or (b) entered into for the purpose of assuring in any other manner the obligee of such Indebtedness or other obligation of the payment thereof or to protect such obligee against loss in respect thereof (in whole or in part), *provided, however,* that the term Guaranty shall not include endorsements for collection or deposit in the ordinary course of business. The term "**Guaranty**" used as a verb has a corresponding meaning. The term "**Guaranties**" shall mean the plural of Guaranty.

"**Hazardous Substances**" shall mean petroleum and petroleum products and compounds containing them, including gasoline, diesel fuel and oil; explosives, flammable materials; radioactive materials; polychlorinated biphenyls and compounds containing them; lead and lead-based paint; asbestos or asbestos-containing materials; underground or above-ground storage tanks, whether empty or containing any substance; any substance the presence of which is prohibited by any Environmental Laws; any contaminant, pollutant, waste or substance that is likely to cause immediately or at some future time harm or degradation to the surrounding environment or risk to human health; toxic mold, any substance that requires special handling; and any other material or substance now or in the future defined, classified or listed as a "hazardous substance," "hazardous material," "hazardous waste," "toxic substance," "toxic pollutant," "contaminant," "pollutant", "radioactive", "dangerous" or other words of similar import within the meaning of any Environmental Law, including: (a) any "hazardous substance" defined as such in

(or for purposes of) CERCLA, or any so-called "superfund" or "superlien" Law, including the judicial interpretation thereof; (b) any "pollutant or contaminant" as defined in 42 U.S.C.A. § 9601(33); (c) any material now defined as "hazardous waste" pursuant to 40 C.F.R. Part 260; (d) any petroleum or petroleum by-products, including crude oil or any fraction thereof; (e) natural gas, natural gas liquids, liquefied natural gas, or synthetic gas usable for fuel; (f) any "hazardous chemical" as defined pursuant to 29 C.F.R. Part 1910; (g) any toxic or harmful substances, wastes, materials, pollutants or contaminants (including, without limitation, asbestos, polychlorinated biphenyls, flammable explosives, radioactive materials, infectious substances, materials containing lead-based paint or raw materials which include hazardous constituents), and (h) any other toxic substance or contaminant that is subject to any Environmental Laws or other past or present requirement of any Governmental Authority. Notwithstanding the foregoing, Hazardous Substances shall not include substances in kinds and amounts commonly used in the operation of businesses of similar kind and nature to the business engaged in by Borrower in accordance with all applicable Laws (including, but not limited to, Environmental Laws) and prudent business management practices and in a manner that does not result in any contamination of all or any portion of properties utilized by such Borrower.

"**Hazardous Substances Contamination**" shall mean contamination (whether now existing or hereafter occurring) of the improvements, buildings, facilities, personalty, soil, groundwater, air or other elements on or of the relevant property by Hazardous Substances, or any derivatives thereof, or on or of any other property as a result of Hazardous Substances, or any derivatives thereof, generated on, emanating from or disposed of in connection with the relevant property.

"**Healthcare Laws**" shall mean all applicable Laws relating to the possession, control, warehousing, marketing, sale and distribution of pharmaceuticals, the operation of medical or senior housing facilities (such as, but not limited to, nursing homes, skilled nursing facilities, rehabilitation hospitals, intermediate care facilities and adult care facilities), patient healthcare, patient healthcare information, patient abuse, the quality and adequacy of medical care, rate setting, Equipment, personnel, operating policies, fee splitting, including, without limitation, (a) all federal and state fraud and abuse laws, including, without limitation, the federal Anti-Kickback Statute (42 U.S.C. §1320a-7b(6)), the Stark Law (42 U.S.C. §1395nn), the civil False Claims Act (31 U.S.C. §3729 et seq.), (b) TRICARE; (c) HIPAA; (d) Medicare; (e) Medicaid; (f) the Patient Protection and Affordable Care Act (P.L. 111-1468); (g) The Health Care and Education Reconciliation Act of 2010 (P.L. 111-152); (h) quality, safety and accreditation standards and requirements of all applicable state laws or regulatory bodies; (i) all laws, policies, procedures, requirements and regulations pursuant to which Healthcare Permits are issued, and (j) any and all other applicable health care laws, regulations, manual provisions, policies and administrative guidance, each of (a) through (j) as may be amended from time to time.

"**Healthcare Permit**" shall mean a Permit (a) issued or required under Healthcare Laws applicable to the business of Borrower or any of its Subsidiaries or necessary in the possession, ownership, warehousing, marketing, promoting, sale, labeling, furnishing, distribution or delivery of goods or services under Healthcare Laws applicable to the business of Borrower or any of its Subsidiaries; (b) issued by any Person from which Borrower has, as of the Closing Date, received an accreditation, and/or (c) issued or required under Healthcare Laws applicable to the ownership or operation of any business location of Borrower.

"**HIPAA**" shall mean the Health Insurance Portability and Accountability Act of 1996, as the same may be amended, modified or supplemented from time to time, and any successor statute thereto, and any and all rules or regulations promulgated from time to time thereunder.

"**HIPAA Compliant**" shall mean that the applicable Person is in compliance with each of the applicable requirements of the so-called "Administrative Simplification" provisions of HIPAA, and is not and could not reasonably be expected to become the subject of any civil or criminal penalty, process, claim, action or proceeding, or any administrative or other regulatory review, survey, process or proceeding (other than routine surveys or reviews conducted by any government health plan or other accreditation entity) that could result in any of the foregoing or that could reasonably be expected to adversely affect such Person's business, operations, assets, properties or condition (financial or otherwise), in connection with any actual or potential violation by such Person of the provisions of HIPAA.

"**Hospital**" shall mean any healthcare facility (including any assisted living facility, skilled nursing facility or short- or long-term rehabilitation facility) operated or owned or leased by Borrower or any of its Subsidiaries, including, without limitation, the Nacogdoches Memorial Hospital Building (1024 N. Mound St., Nacogdoches, Texas), the Nacogdoches Diagnostic Center (1023 N. Mound St., Suites A, B and H, Nacogdoches, Texas), the Cecil Bomar Rehabilitation Center (707 Woods St., Nacogdoches, Texas), the Care First Clinic - Garrison (49 South Hwy. 59, Nacogdoches, Texas), and the Accounting/IS Building (914 Raguet St., Nacogdoches, Texas).

"**Hospital Asset Purchase Agreement**" shall mean the document by that name by and between Borrower and Old Operator dated as of July 14, 2021 as the same may be amended, restated, supplemented or otherwise modified from time to time.

"**Indebtedness**" of a Person shall mean at any date, without duplication, (a) all obligations of such Person for borrowed money; (b) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments,; (c) all obligations of such Person to pay the deferred purchase price of property or services, except trade accounts payable arising and paid on a timely basis and in the ordinary course of business; (d) all Capital Leases of such Person; (e) all non-Contingent Obligations of such Person to reimburse any bank or other Person in respect of amounts paid under a letter of credit, banker's acceptance or similar instrument; (f) all equity securities of such Person subject to repurchase or redemption other than at the sole option of such Person; (g) all obligations secured by a Lien on any asset of such Person, whether or not such obligation is otherwise an obligation of such Person; (h) "earnouts," purchase price adjustments, profit sharing arrangements, deferred purchase money amounts and similar payment obligations or continuing obligations of any nature of such Person arising out of purchase and sale contracts; (i) all Indebtedness of others guaranteed by such Person; (j) off-balance sheet liabilities and/or Pension Plan or Multiemployer Plan liabilities of such Person, and (k) obligations arising under non-compete agreements.

"**Indemnified Persons**" shall have the meaning assigned to the term in Section 13.4.

"**Intellectual Property**" shall mean, with respect to any Person, all patents, patent applications and like protections, including improvements divisions, continuation, renewals, reissues, extensions and continuations in part of the same, trademarks, trade names, trade styles,

4874-6257-0384.6

trade dress, service marks, logos and other business identifiers and, to the extent permitted under applicable Law, any applications therefor, whether registered or not, and the goodwill of the business of such Person connected with and symbolized thereby, copyright rights, copyright applications, copyright registrations and like protections in each work of authorship and derivative works, whether published or unpublished, technology, know-how and processes, operating manuals, trade secrets, computer hardware and software, rights to unpatented inventions and all applications and licenses therefor, used in or necessary for the conduct of business by such Person and all claims for damages by way of any past, present or future infringement of any of the foregoing.

"**Interim Financing Order**" shall mean the interim order by the Bankruptcy Court in the Bankruptcy Case under Sections 364(c) and (d) of the Bankruptcy Code and Bankruptcy Rule 4001(c), in form and substance satisfactory in all respects to the Lender: (i) authorizing the Borrower to enter into this Agreement and the transactions contemplated hereunder; (ii) approving the terms and conditions of this Agreement; (iii) granting to the Lender super-priority over any and all administrative expenses, secured claims, and unsecured claims, now existing or hereafter arising, including administrative expenses of the kind specified in or ordered pursuant to 11 U.S.C. §§ 105, 326, 327, 328, 330, 331, 361, 362, 363, 364, 365, 503, 506, 507(a), 507(b), 546, 552, 726, 1113, 1114 or any other provision of the Bankruptcy Code or otherwise (the "**Superpriority Claim**"); (iv) granting to the Lender a first priority lien and security interest in all assets of the Borrower; (v) including a prohibition applicable to any governmental authority or other party from exercising rights of set-off or recoupment against any account that arises from and after the filing of the bankruptcy petition; (vi) including a prohibition against using the proceeds of the loan to initiate or prosecute any claims, causes of action, adversary proceedings or other litigation against the Lender or any of its officers, directors, equity holders, employees or affiliates; (vii) including a prohibition against using the proceeds of the loan to object, contest, or raise in any proceeding any defense to the validity, perfection, priority, extent or enforceability of this Agreement or the liens contemplated thereby or taking any action that would be injurious to the Lender's interests; (viii) ordering that all government payments owing to the Borrower be paid to a Controlled Account; (ix) granting relief from the automatic stay to permit the Lender to take any action permitted under this Agreement; (x) ordering that the Borrower pay the Lender at the initial Closing all of the Lender's due diligence and legal counsel fees related to the financing and all fees required by this Agreement; (x) determining that the "equities of the case" exception in Section 552(b) of the Bankruptcy Code will not apply to or limit the Lender's security interest in the proceeds, product, offspring or profits of the Collateral, and (x) including such other provisions as to the Lender or the Lender's counsel may require or approve.

"**Landlord Waiver and Consent**" shall mean a waiver/consent in form and substance reasonably satisfactory to Lender from the owner/lessor of the Hospital and any other premises not owned by Borrower at which billing operations are conducted or Books and Records are maintained or, at the request of Lender, any of the Collateral is now or hereafter located, for the purpose of providing Lender access to such Collateral, in each case as such may be modified, amended or supplemented from time to time and subordinating in favor of Lender any claims that the owner/lessor may have against Borrower or against any of the Collateral.

"**Laws**" shall mean any and all federal, state, provincial, territorial, municipal, local and foreign statutes, laws, judicial decisions, regulations, ordinances, rules, judgments, orders, decrees,

4874-6257-0384.6

codes, injunctions, permits, governmental agreements and governmental restrictions, whether now or hereafter in effect, which are applicable to the Borrower in any particular circumstance. "**Laws**" includes, without limitation, Environmental Laws.

"**Lease**" shall have the meaning assigned to the term in Section 6.1.

"**Liability Event**" shall mean any event, fact, condition or, circumstance or series thereof (i) in or for which such the Borrower becomes liable or otherwise responsible for any amount owed or owing to any Medicaid or Medicare program by a provider under common ownership with Borrower or any provider owned by such Borrower pursuant to any applicable Law after the failure of any such provider to pay any such amount when owed or owing;  (ii) in which Medicaid or Medicare payments to Borrower are lawfully set-off against payments to such or any other Borrower to satisfy any liability of or for any amounts owed or owing to any Medicaid or Medicare program by the Borrower, a provider under common ownership with Borrower, or any provider owned by such Borrower pursuant to any applicable Law, or (iii) any of the foregoing under clauses (i) or (ii) in each case pursuant to statutory or regulatory provisions that are similar to any applicable Law.  Notwithstanding the foregoing, a "Liability Event" shall not exist unless it could reasonably be expected to have a Material Adverse Effect.

"**Lien**" shall mean any mortgage, pledge, security interest, encumbrance, restriction, lien, or charge of any kind (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement or any lease in the nature thereof), or any other arrangement pursuant to which title to the property is retained by or vested in some other Person for security purposes.  For the purposes of this Agreement and the other Loan Documents, Borrower or any Subsidiary shall be deemed to own subject to a Lien any asset which it has acquired or holds subject to the interest of a vendor or lessor under any conditional sale agreement, Capital Lease or other title retention agreement relating to such asset.

"**Loan**" or "**Loans**" shall mean, individually and collectively, all Advances under the Revolving Facility.

"**Loan Documents**" shall mean, collectively and each individually, this Agreement, any documents that provide, as security for all or any portion of the Obligations, a Lien on any assets in favor of Lender, the Controlled Deposit Agreements, the Uniform Commercial Code Financing Statements and all other documents or instruments necessary to create or perfect the Liens in the Collateral, the Borrowing Certificates, the Compliance Certificates, the Financing Orders, and all other agreements, documents, instruments and certificates heretofore or hereafter executed or delivered to Lender in connection with any of the foregoing or the Loans, as the same may be amended, modified or supplemented from time to time; all of which shall be in form and substance acceptable to Lender in its sole discretion.

"**Material Adverse Effect**" or "**Material Adverse Change**" shall mean any event, act, condition or occurrence of whatever nature (including any adverse determination in any litigation, arbitration, or governmental investigation or proceeding), whether singly or in conjunction with any other event or events, act or acts, condition or conditions, occurrence or occurrences, whether or not related, which results, directly or indirectly in (a) a material adverse change in, or a material adverse effect upon, any of (i) the Borrower's condition (financial or otherwise), operations,

business, properties or prospects; (ii) the rights and remedies of Lender under any Loan Document, or the ability of Borrower to perform any of its obligations under any Loan Document to which it is a party; (iii) the legality, validity or enforceability of any Loan Document; (iv) the existence, perfection or priority of any security interest granted in any Loan Document; (v) the value of any material Collateral, or (vi) the use or scope of any Healthcare Permits; (b) a material impairment to the likelihood that Eligible Receivables in general will be collected and paid in the ordinary course of business of Borrower and upon the same schedule and with the same frequency as Borrower's recent collections history, or (c) the imposition of a fine against or the creation of any liability of Borrower to any Governmental Authority that is not subject to a Permitted Contest.

"**Material Contracts**" shall have the meaning set forth in Section 5.23.

"**Medicaid**" shall mean that certain program of medical assistance, funded jointly by the federal government and the states, for impoverished individuals who are aged, blind and/or disabled, and/or members of families with dependent children, which program is more fully described in Title XIX of the Social Security Act (42 U.S.C. §§ 1396 *et seq.*) and the regulations promulgated thereunder, or any successor program.

"**Medicaid Pending**" shall mean that an application for Medicaid payment on behalf of a patient has not yet been approved by Medicaid.

"**Medicaid Program**" shall mean a medical assistance program administered by a state agency and approved by the Federal Centers for Medicare and Medicaid Services (formerly the federal Health Care Financing Administration) pursuant to the terms of Title XIX of the Social Security Act, codified at 42 U.S.C. 1396 *et seq.*

"**Medicaid/Medicare Account Debtor**" shall mean any Account Debtor which is (i) the United States of America acting under the Medicaid or Medicare program established pursuant to the Social Security Act or any other federal healthcare program, including, without limitation, TRICARE and CHAMPVA; (ii) any state or the District of Columbia acting pursuant to a health plan adopted pursuant to Title XIX of the Social Security Act or any other state healthcare program, or (iii) any agent, carrier, administrator or intermediary for any of the foregoing.

"**Medicare**" shall mean that certain federal program providing health insurance for eligible elderly and other individuals, under which physicians, hospitals, skilled nursing homes, home health care and other providers are paid for certain covered services they provide to the beneficiaries of such program, which program is more fully described in Title XVIII of the Social Security Act (42 U.S.C. §§ 1395 *et seq.*) and the regulations promulgated thereunder, or any successor program.

"**Net Collectible Value**" shall mean the amount that Lender reasonably expects from time to time to be collected with respect to Eligible Receivables from third-party payors within 150 days of the Date of Service taking into account historical and recent collection rates for each payor class (*e.g.*, Medicare, Medicaid, commercial, etc.), entitled to reimbursement pursuant to any contract or arrangement between Borrower and the applicable Account Debtor(s), offsets, historical returns, rebates, discounts, credits and allowances, and other factors that affect the collectability of Eligible Receivables.

**"Net Operating Cash Flow"** shall mean the difference between (a) cash received in the Borrower's Commercial Deposit Accounts and Governmental Deposit Account; and (b) cash disbursements, except for (i) Interest, Fees, and other payments to Lender in cash; (ii) deposits paid to public utility companies as ordered by the Bankruptcy Court; (iii) fees paid to the United States Trustee; and (iv) fees and expenses paid to all restructuring-related professionals, including attorneys and restructuring advisors, for the Borrower, the Lender, and the committee for unsecured creditors (if one is appointed).

**"Net Proceeds"** means, with respect to any event, (a) the cash proceeds received in respect of such event including (i) any cash received in respect of any non-cash proceeds (including any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise, but excluding any interest payments), but only as and when received; (ii) in the case of a casualty, insurance proceeds, and (iii) in the case of a condemnation or similar event, condemnation awards and similar payments, minus; (b) the sum of (i) all reasonable fees and out-of-pocket expenses paid to third parties (other than Affiliates) in connection with such event; (ii) in the case of a sale, transfer or other disposition of an asset (including pursuant to a sale and leaseback transaction or a casualty or a condemnation or similar proceeding), the amount of all payments required to be made as a result of such event to repay Indebtedness (other than Loans) secured by such asset or otherwise subject to mandatory prepayment as a result of such event, and (iii) the amount of all taxes paid (or reasonably estimated to be payable) and the amount of any reserves established to fund contingent liabilities reasonably estimated to be payable, in each case during the year that such event occurred or the next succeeding year and that are directly attributable to such event (as determined reasonably and in good faith by a Financial Officer of the applicable Borrower).

**"Notice Period"** shall have the meaning set forth in Section 9.1.

**"Obligations"** shall mean all present and future obligations, Indebtedness and liabilities of the Borrower to the Lender at any time and from time to time of every kind, nature and description, direct or indirect, secured or unsecured, joint and several, absolute and contingent, due or to become due, matured or unmatured, now existing or hereafter arising, contractual or tortious, liquidated or unliquidated, under any of the Loan Documents or under applicable Law including, without limitation, all applicable fees, charges and expenses and/or all amounts paid or advanced by the Lender on behalf of or for the benefit of the Borrower for any reason at any time, including obligations that accrue after the commencement of the Bankruptcy Case.

**"Old Operator"** shall mean Nacogdoches County Hospital District d/b/a Nacogdoches Memorial Hospital.

**"Operating Account"** shall mean a deposit account established and maintained in the Borrower's name, which is used to receive Advances or for Borrower's operating disbursements.

**"Organizational Documents"** shall mean, with respect to any Person other than a natural person, the documents by which such Person was organized (such as a certificate of incorporation, certificate of limited partnership or articles of organization, and including, without limitation, any certificates of designation for preferred stock or other forms of preferred equity) and which relate to the internal governance of such Person (such as by-laws, a partnership agreement or an

4874-6257-0384.6

operating, limited liability company or members agreement), including any and all shareholder agreements or voting agreements relating to the capital stock or other equity interests of such Person.

**"Payroll Account"** shall mean a deposit account established and maintained in Borrower's name, which is used solely to hold any and all amounts to be used by such Borrower for payroll, payroll taxes and other employee wage and benefit payments, and which does not contain monies allocated for any other purpose.

**"Permit"** shall mean all Borrower's governmental licenses, authorizations, provider numbers, supplier numbers, registrations, permits, drug or device authorizations and approvals, certificates, franchises, qualifications, accreditations, consents and approvals required under applicable Law and required for such Borrower to carry on its business as now conducted, including, without limitation, Healthcare Permits.

**"Permitted Contest"** shall mean, with respect to any tax obligation or other obligation allegedly or potentially owing from Borrower or its Subsidiary to any governmental tax authority or other third party, a contest maintained in good faith by appropriate proceedings promptly instituted and diligently conducted and with respect to which such reserve or other appropriate provision, if any, as shall be required in conformity with GAAP shall have been made on Borrower's books and records and financial statements; provided, however, that (a) compliance with the obligation that is the subject of such contest is effectively stayed during such challenge; (b) the Borrower and its Subsidiaries' title to, and its right to use, the Collateral is not adversely affected thereby and the Lender's Lien and priority on the Collateral are not adversely affected, altered or impaired thereby; (c) the Borrower has given prior written notice to Lender of Borrower's or its Subsidiary's intent to so contest the obligation; (d) the Collateral or any part thereof or any interest therein shall not be in any danger of being sold, forfeited or lost by reason of such contest by Borrower or its Subsidiaries; (e) Borrower has given Lender notice of the commencement of such contest and upon request by Lender, from time to time, notice of the status of such contest by such Borrower and/or confirmation of the continuing satisfaction of this definition; (f) a final determination of such contest could not result in Lender's Lien and its priority on the Collateral being adversely affected, altered or impaired, and (g) upon a final determination of such contest, the Borrower and its Subsidiaries shall promptly comply with the requirements thereof.

**"Permitted Indebtedness"** shall mean:  (i) Indebtedness under the Loan Documents; (ii) any Indebtedness existing on the Petition Date; (iii) Capitalized Lease Obligations incurred after the Closing Date and secured only by the Equipment being leased pursuant to such Capitalized Lease Obligations; (iv) a purchase-money obligation, as defined in Section 9-103(a) of the UCC, provided that the aggregate amount thereof outstanding at any time shall not exceed $10,000; (v) Indebtedness in connection with advances made by an equity holder in order to cure any Event of Default of the financial and loan covenants set forth on Annex I; provided, however, that such Indebtedness shall be on an unsecured basis, subordinated in right of repayment and remedies to all of the Obligations and to all of the Lender's rights and in form and substance satisfactory to Lender; (vi) accounts payable to trade creditors and current operating expenses incurred in the ordinary course of business and paid on a timely basis; (vii) borrowings incurred in the ordinary course of business and not exceeding $10,000 individually or in the aggregate outstanding at any

one time; provided, however, that such Indebtedness shall be on an unsecured basis, subordinated in right of repayment and remedies to all of the Obligations and to all of the Lender's rights and in form and substance satisfactory to the Lender; (viii) Indebtedness in the form of insurance premiums financed through the applicable insurance company, and (ix) any other Indebtedness to which the Lender may expressly consent in writing prior to its incurrence, which consent shall be in the sole discretion of Lender.

"**Permitted Liens**" shall mean: (a) deposits or pledges of cash to secure obligations under worker's compensation, social security or similar Laws, or under unemployment insurance (but excluding Liens arising under ERISA, or, with respect to any Pension Plan or Multiemployer Plan, the Code) pertaining to the Borrower's or its Subsidiary's employees, if any; (b) deposits or pledges of cash to secure bids, tenders, contracts (other than contracts for the payment of money or the deferred purchase price of property or services), leases, statutory obligations, surety and appeal bonds and other obligations of like nature arising in the ordinary course of business; (c) carrier's, warehousemen's, mechanic's, workmen's, materialmen's or other like Liens on Collateral, other than any Collateral which is part of the Borrowing Base, arising in the ordinary course of business with respect to obligations which are not due, or which are being contested pursuant to a Permitted Contest; (d) Liens on Collateral, other than Accounts, for taxes or other governmental charges not at the time delinquent or thereafter payable without penalty or the subject of a Permitted Contest; (e) attachments, appeal bonds, judgments and other similar Liens on Collateral other than Accounts, for sums not exceeding $25,000 in the aggregate arising in connection with court proceedings; provided, however, that the execution or other enforcement of such Liens is effectively stayed and the claims secured thereby are the subject of a Permitted Contest; (f) Liens and encumbrances in favor of Lender under the Loan Documents; (g) Liens on Collateral, other than Collateral which is part of the Borrowing Base, existing on the date hereof and set forth on Schedule 7.3; (h) any Lien on any Equipment securing Indebtedness permitted under subpart (iii) of the definition of Permitted Indebtedness, provided, however, that such Lien attaches concurrently with or within twenty (20) days after the acquisition thereof; (i) any Liens that are expressly subordinated to Lender under a Financing Order and are subject to the Bankruptcy Case's automatic stay, and (j) any other Liens to which Lender may expressly consent in writing, which consent shall be in the sole discretion of Lender.

"**Permitted Modifications**" shall mean (a) such amendments or other modifications to Borrower's or Subsidiary's Organizational Documents as are required under this Agreement or by applicable Law and fully disclosed to the Lender within ten (10) days after such amendments or modifications have become effective, and (b) such amendments or modifications to Borrower's or Subsidiary's Organizational Documents (other than those involving a change in the name of Borrower or Subsidiary or involving a reorganization of Borrower or Subsidiary under the laws of a different jurisdiction) that would not adversely affect the rights and interests of the Lender and fully disclosed to Lender within ten (10) days after such amendments or modifications have become effective.

"**Permitted Variance**" shall mean a variance of no more than twelve and one half percent (12.5%) between the projected Net Operating Cash Flow as set forth and the actual Net Operating Cash Flow.

4874-6257-0384.6

"**Person**" shall mean any natural person, corporation, limited liability company, professional association, limited partnership, general partnership, joint stock company, joint venture, association, company, trust, bank, trust company, land trust, business trust or other organization, whether or not a legal entity, and any Governmental Authority or any other entity of whatever nature.

"**Petition Date**" shall have the meaning assigned to that term in the Recitals.

"**Pre-Petition Aggregate Exposure**" shall mean the aggregate sum of the Loans made pursuant to the Pre-Petition Credit Agreement plus interest, fees, costs and expenses arising thereunder.

"**Pre-Petition Credit Agreement**" shall mean, as amended, modified or supplemented from time to time, that certain Credit and Security Agreement between Lion Star Nacogdoches Hospital, LLC as the Borrower, and eCapital Healthcare Corp., f/k/a CNH Finance Fund I, L.P. as the Lender, dated as of July 16, 2021. "**Pre-Petition Loans**" means the "Loans" as defined in the Pre-Petition Credit Agreement.

"**Pre-Petition Obligations**" shall mean, collectively, the "Obligations" (as defined in the Pre-Petition Credit Agreement) arising under the Pre-Petition Credit Agreement.

"**Prepayment Event**" means:

(a) any Disposition (including pursuant to a sale and leaseback transaction) of any assets of Borrower;

(b) any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of, any assets of Borrower or any Subsidiary, or

(c) the incurrence by Borrower of any Indebtedness (other than Permitted Indebtedness) for borrowed money.

"**Prime Rate**" shall mean a fluctuating interest rate per annum equal at all times to the rate of interest announced, from time to time, within Wells Fargo Bank at its principal office in San Francisco as its "prime rate," with the understanding that the "prime rate" is one of Wells Fargo Bank's base rates (not necessarily the lowest of such rates) and serves as the basis upon which effective rates of interest are calculated for those loans making reference thereto and is evidenced by the recording thereof after its announcement in such internal publications as Wells Fargo Bank may designate; provided that Lender may, upon prior written notice to the Borrower, choose a reasonably comparable index or source to use as the basis for the Prime Rate, and further provided, that in no event shall the Prime Rate be lower than the Prime Rate on the Closing Date, and further provided, that each change in the fluctuating interest rate shall take effect simultaneously with the corresponding change in the Prime Rate.

"**Related Property**" shall mean, with respect to each Account, the following: (i) all records of any nature evidencing or related to the Account, including contracts, invoices, charges slips, credit memoranda, notes and other instruments and other documents, books, records and other information (including computer data) (ii) all security interests or liens and property subject thereto

from time to time purporting to secure payment of such Account, whether pursuant to the contract related to such Account or otherwise, including all rights of stoppage in transit, replevin, reclamation, Supporting Obligations and Letter of Credit Rights, and all claims of lien filed or held by Borrower on personal property; (iii) all rights to any Goods whose sale gave rise to such Account, including returned or repossessed Goods; (iv) all Instruments, Documents, Chattel Paper and General Intangibles arising from, related to or evidencing such Account; (v) all UCC financing statements covering any collateral securing payment of such Account; (vi) all guaranties and other agreements or arrangements of whatever character from time to time supporting or securing payment of such Account whether pursuant to the contract related to such Account or otherwise; and (vii) all proceeds and amounts received or receivable arising from any of the foregoing..

**"Revolving Facility"** shall have the meaning assigned to such term in the recitals.

**"Revolving Loan"** shall mean the aggregate of the loans made pursuant to Section 2.1(a).

**"Revolving Loan Limit"** shall mean, at any time, the lesser of (a) the Facility Cap and (b) eighty-five percent (85%) of the Borrowing Base.

**"Self-Pay Account"** shall mean an Account payable by the individual receiving medical goods or services or by an individual (as opposed to a third-party insurance company, Medicare, Medicaid, or similar entity) responsible for such payment on behalf of the individual receiving medical goods or services.  Self-pay accounts shall also include any co-pays and deductibles payable by such individuals.

**"Software Interface Fee"** shall have the meaning assigned to the term in Section 3.5.

**"Subordinated Debt"** shall mean any Indebtedness of Borrower incurred pursuant to the terms of the Subordinated Debt Documents and with the prior written consent of Lender, all of which documents must be in form and substance acceptable to Lender in its sole discretion.

**"Subordinated Debt Documents"** shall mean any documents evidencing or securing Indebtedness governed by a Subordination Agreement, all of which documents must be in form and substance acceptable to Lender in its sole discretion.

**"Subordination Agreement"** shall mean each agreement between Lender and another creditor of Borrower, as the same may be amended, supplemented, restated, or otherwise modified from time to time in accordance with the terms thereof, pursuant to which Indebtedness or other obligations owing from Borrower or the Liens securing such Indebtedness granted by Borrower to such creditor are subordinated in any way to the Obligations and the Liens created under the Loan Documents, the terms and provisions of such Subordination Agreements to have been agreed to by and be acceptable to Lender in the exercise of its sole discretion, which may include requirements that the Subordinated Debt (i) not mature prior to the end of the Term, and (ii) not require any payment other than interest during the Term, and (iii) will receive no payments following an Event of Default.

**"Subsidiary"** shall mean (i) as to Borrower, any Person in which more than fifty percent (50%) of all equity, membership, partnership or other ownership interests is owned directly or indirectly by Borrower through one or more of its Subsidiaries, and (ii) as to any other Person, any

4874-6257-0384.6

Person in which more than fifty percent (50%) of all equity, membership, partnership or other ownership interests is owned directly or indirectly by such Person through one or more of such Person's Subsidiaries. Unless the context otherwise requires, each reference to a Subsidiary shall be a reference to a Subsidiary of the Borrower.

"**Term**" shall mean the period commencing on the date set forth on the first page hereof and ending on the earlier to occur of (i) the effective date of a plan of reorganization of the Borrower confirmed by the Bankruptcy Court; (ii) consummation of a sale or other disposition of a material portion of the Borrower's assets pursuant to 11 U.S.C. 363 or otherwise; (iii) the Borrower's filing of a motion or other pleading seeking, or consenting to, conversion to a proceeding under Chapter 7 of the Bankruptcy Code; (iv) conversion to a proceeding under Chapter 7 of the Bankruptcy Code; (v) a dismissal by the Bankruptcy Court of the Borrower's Bankruptcy Case; (vi) the Borrower's filing of a motion or other pleading seeking the dismissal of the Bankruptcy Case under Section 1112 of the Bankruptcy Code or otherwise; (vii) twelve (12) months from Closing, or (viii) any date on which the Loans are accelerated during the continuance of an Event of Default.

"**Termination Date**" shall mean the earlier to occur of (a) the end of the Term, (b) any date on which the Lender accelerates the maturity of the Loans pursuant to Article VIII, or (c) the termination date stated in any notice of termination of this Agreement provided by Borrower in accordance with Section 11.1.

"**Termination Fee**" shall mean the amount equal to two percent (2.0%) of the Facility Cap.  The Termination Fee is an "Obligation," as that term is defined herein.

"**Test Period**" shall have the meaning assigned to that term in Annex I.

"**Third Party Payor**" shall mean Medicare, Medicaid, TRICARE, and other state or federal health care programs, Blue Cross and/or Blue Shield, private insurers, managed care plans, and any other Person or entity which presently or in the future maintains Third Party Payor Programs.

"**Third-Party Payor Programs**" shall mean all payment and reimbursement programs, sponsored by a Third-Party Payor, in which the Borrower participates.

"**TRICARE**" shall mean the program administered pursuant to 10 U.S.C. Section 1071 et. seq., Sections 1320a-7 and 1320a-7a of Title 42 of the United States Code and the regulations promulgated pursuant to such statutes.

"**UCC**" and "**Uniform Commercial Code**" shall mean the Uniform Commercial Code of the State of Texas or of any other state the laws of which are required to be applied in connection with the perfection of security interests in any Collateral.

"**United States**" and "**U.S.**" shall mean the United States of America.

"**Unused Line Fee**" shall have the meaning assigned to the term in Section 3.2.

4874-6257-0384.6

### 1.3      Other Definitional and Interpretative Provisions

References in this Agreement to "Articles", "Sections", "Annexes", "Exhibits", or "Schedules" shall be to Articles, Sections, Annexes, Exhibits or Schedules of or to this Agreement unless otherwise specifically provided.  Any term defined herein may be used in the singular or plural.  "Include," "includes," and "including" shall be deemed to be followed by "without limitation."  Except as otherwise specified or limited herein, references to any Person include the successors and assigns of such Person.  References "from" or "through" any date mean, unless otherwise specified, "from and including" or "through and including," respectively.  Unless otherwise specified herein, the settlement of all payments and fundings hereunder between or among the parties hereto shall be made in lawful money of the United States and in immediately available funds.  Unless otherwise specified herein, all amounts (including, for the avoidance of doubt, for purposes of calculating the Borrowing Base) shall be calculated in Dollars.  References to any statute or act shall include all related current regulations and all amendments and any successor statutes, acts, and regulations.  All amounts used for purposes of financial calculations required to be made herein shall be without duplication.  References to any statute or act, without additional reference, shall be deemed to refer to federal statutes and acts of the United States.  References to any agreement, instrument, or document shall include all schedules, exhibits, annexes, and other attachments thereto.  As used in this Agreement, the meaning of the term "material" or the phrase "in all material respects" is intended to refer to an act, omission, violation, or condition which reflects or could reasonably be expected to result in a Material Adverse Effect.  References to capitalized terms that are not defined herein but are defined in the UCC shall have the meanings given them in the UCC.  All references herein to times of day shall be references to daylight or standard time, as applicable, in New York City.

### 1.4      Time is of the Essence

Time is of the essence in Borrower's performance under this Agreement and all other Loan Documents.

## II.  ADVANCES, PAYMENT AND INTEREST

### 2.1      Advances; Roll Up of Pre-Petition Obligations

(a)      <u>Advances</u>. Subject to the provisions of this Agreement, Lender shall make Advances to Borrower under the Revolving Facility from time to time during the Term, and not more than once per each week unless agreed to by Lender and subject to the processing fees set forth in Section 2.4; provided that, notwithstanding any other provision of this Agreement (but subject to the provisions of this Section 2.1(a)), the principal amount at any one time outstanding under the Revolving Facility shall not exceed the Revolving Loan Limit. The Revolving Facility is a revolving credit facility, which may be drawn, repaid, and redrawn from time to time as permitted under this Agreement. Any determination as to whether there is availability within the Borrowing Base for Advances shall be made by Lender in its discretion and is final and binding upon Borrower. Unless otherwise permitted by Lender, each Advance requested by Borrower shall be in an amount of at least $25,000. Subject to the provisions of this Agreement, Borrower may request

Advances under the Revolving Facility up to and including the Availability. Lender may, in Lender's sole discretion, withhold from Advances made to Borrower such amounts as may be necessary to pay interest on the Revolving Facility and other Obligations hereunder. In addition, Advances under the Revolving Facility automatically may, in the discretion of Lender, be made for the payment of interest on the Revolving Facility and other Obligations on the date when due to the extent of Availability and as provided for herein.

(b)      Roll-Up. Effective immediately upon the making of an Advance under this Agreement (such date, the "Roll-Up Date"), and without any further action by any party to this Agreement or the other Loan Document, the Bankruptcy Court or any other Person, (i) the Pre-Petition Obligations shall be automatically deemed to constitute Loans under this Agreement (on a dollar-for-dollar basis) (such Loans, the "Rolled-Up Loans") which shall be due and payable in accordance with the terms and conditions set forth in this Agreement as if originally funded hereunder on the date of such Advance (such aggregate amount advance, the "Roll-Up Amount") and (ii) from and after the Roll-Up Date, Pre-Petition Obligations shall be automatically and irrevocably reduced by the Roll-Up Amount.

(c)      The Lender shall have the right to establish and readjust from time to time, in its sole discretion, reserves (without duplication of other reserves) against the Borrowing Base, which reserves shall have the effect of reducing the amounts otherwise eligible to be disbursed to Borrower under the Revolving Facility pursuant to this Agreement.

(d)      The Borrower may, from time to time, repay all or part of the outstanding Advances under the Revolving Facility in accordance with the terms of this Agreement, with such repaid amounts eligible to be redrawn under the terms of the Agreement.

(e)      The Facility Cap may, at Borrower's request and with the consent of Lender, which consent shall be in the Lender's sole discretion, be increased. In the event that the Facility Cap is increased, Borrower shall pay to Lender a Facility Fee in an amount equal to one percent (1.0%) of the amount by which the Facility Cap is increased.

(f)      Lender may in its sole discretion make one or more Advances in excess of Availability. The making of any Advance(s) in excess of Availability shall not be deemed an acknowledgement that any additional such Advance(s) will be made or may be required to be made; nor shall any such Advance(s) be deemed to establish any course of conduct, waiver, or estoppel that would obligate Lender to make any further such Advance or prevent Lender from treating Borrower's failure to repay such Advance(s) as a Default or an Event of Default. Each time an Advance causes the principal balance under the Revolving Facility to exceed the Availability (whether because of an intentional Advance in excess of Availability or a reduction in the Borrowing Base or otherwise), Lender may charge an over-advance fee of ten percent (10%) of the amount by which the principal balance exceeds the Availability as a result of such Advance. Such over-advance fee shall be in addition to any other fees, charges or other provisions that may increase the Applicable Rate of interest hereunder and the assessment or collection of such over-advance fee shall not, unless

Lender specifically agrees in writing to the contrary, prevent Lender from considering any such over-advance arising from a reduction in the Borrowing Base, or the circumstances giving rise to any over advance, from being a Default or an Event of Default. The over-advance fee shall be paid on the first Business Day of each week if the amount outstanding hereunder is in excess of the Availability at any time during the immediately preceding week.

(g)     Borrower may request from time to time certain otherwise non-Eligible Receivables to be included as Eligible Receivables for purposes of calculating Availability. If after underwriting such non-Eligible Receivables, Lender determines in its sole discretion to include them as Eligible Receivables, Borrower shall pay to Lender an additional underwriting fee in an amount equal to two percent (2%) of the Borrowing Base attributable to such non-Eligible Receivables at such time as such Accounts are included in the Borrowing Base.  In addition, Lender may, in its sole discretion require an amendment to this Agreement including additional representations, warranties or covenants, as a condition for including such non-Eligible Receivables as Eligible Receivables.

**2.2      Evidence of Obligations; Maturity**

(a)     The Lender shall maintain, in accordance with its usual practice, electronic or written records evidencing the outstanding Obligations to the Lender, including, without limitation, the amounts of principal, interest, fees and other amounts payable and paid to the Lender from time to time under this Agreement.

(b)     The entries made in the electronic or written records maintained pursuant to subsection (a) above shall be *prima facie* evidence of the existence and amounts of the Obligations therein recorded absent manifest and demonstrable error; provided, however, that the failure of the Lender to maintain such records or any error therein shall not in any manner affect the obligations of the Borrower to repay the Obligations in accordance with their terms.  Subject to the foregoing, Advances under the Revolving Facility may also be evidenced by a promissory note, payable to the order of the Lender, duly executed and delivered by Borrower and dated as of the date hereof, evidencing the aggregate indebtedness of the Borrower to the Lender resulting from Advances under the Revolving Facility, from time to time. The Lender hereby is authorized, but is not obligated, to enter the amount of each Advance under the Revolving Facility and the amount of each payment or prepayment principal or interest thereon in the appropriate spaces on the reverse of or on an attachment to the promissory note.  The Lender may account to Borrower from time to time with a statement of Advances under the Revolving Facility, the amounts outstanding hereunder, and charges and payments made pursuant to this Agreement, and in the absence of manifest and demonstrable error, such accounting rendered by the Lender shall be deemed final, binding and conclusive unless the Lender is notified by the Borrower in writing to the contrary within thirty (30) days of receipt of each accounting, which notice shall be deemed an objection only to items specifically objected to therein.

(c)    All amounts outstanding hereunder, and other Obligations shall be due and payable in full, if not earlier in accordance with this Agreement or the Financing Orders, on the Termination Date.

## 2.3    Interest

Interest shall accrue daily on the principal amount outstanding from time to time hereunder at a rate per annum equal to the Prime Rate plus the Applicable Margin calculated on the basis of a 360-day year and adjusted for the actual number of days elapsed in each interest calculation period. Interest shall be payable by Borrower monthly in arrears but in no event later than the first day of each calendar month following the Closing Date. Interest payments shall, at the discretion of the Lender, be made (i) by application of funds in the Concentration Account as set forth in Section 2.5, (ii) by an Advance on the Revolving Facility, as set forth in Section 2.1, without any further action by Borrower, or (iii) upon two Business Days' notice, directly by Borrower. Interest shall continue to accrue on the principal amount outstanding from time to time until the irrevocable payment in full in cash of the Obligations and termination of this Agreement. Any accrued but unpaid interest shall be added to the Obligations and increase the principal amount outstanding hereunder on the first Business Day of each month.

## 2.4    Revolving Facility Disbursements; Requirement to Deliver Borrowing Certificate

So long as no Event of Default shall have occurred and be continuing, the Borrower may give the Lender written notice requesting an Advance under the Revolving Facility by delivering to Lender not later than 9:30 a.m. (New York City time) on the same Business Day but not more than three (3) Business Days before the proposed borrowing date of such requested Advance (the "**Borrowing Date**"), a completed Borrowing Certificate and relevant supporting documentation satisfactory to the Lender in its discretion, which shall (i) specify the proposed Borrowing Date of such Advance which shall be a Business Day; (ii) specify the principal amount of such requested Advance; (iii) certify the matters specified therein; and (iv) specify the amount of any Medicare or Medicaid recoupments and/or recoupments of any third-party being sought, requested or claimed, or, to the Borrower's knowledge, threatened against Borrower or the Borrower's Affiliates.  In the event that the Borrower do not request an Advance during any two (2) consecutive calendar weeks, the Borrower shall, on the last Business Day of the second such week (and more frequently if the Lender shall so request) until the Obligations are indefeasibly paid in cash in full and this Agreement is terminated, deliver to the Lender a completed Borrowing Certificate.  On each Borrowing Date, the Borrower authorizes the Lender to disburse the proceeds of the requested Advance to the appropriate Borrower's account(s) as set forth on Schedule 2.4 (or to such other account as to which the appropriate Borrower shall expressly instruct the Lender in writing), in all cases for credit by the recipient of such proceeds to the Borrower, via Federal funds wire transfer no later than 4:00 p.m. (New York City time); provided, however, if any amounts are then due to the Lender on account of any interest, fees or expense reimbursements pursuant to the Loan Documents at the time such Advance is requested, the Lender is authorized (but not required) to reduce the proceeds to Borrower with respect to such Advance by the amount of such interest, fees or expense reimbursements and to retain such amounts as payment of such interest, fees or expense reimbursements.  It is understood and agreed that Lender shall have no responsibility for the application of proceeds disbursed pursuant to Schedule 2.4.  Lender shall charge a processing

fee of $150.00 for the first Advance of each calendar week and $450.00 for each additional Advance during such calendar week.

**2.5    Revolving Facility Collections; Repayment; Borrowing Availability and Lockbox**

(a)    The Borrower shall establish and maintain at a Collection Bank and at Borrower's expense:

(i)    a Governmental Deposit Account, which shall be subject to a deposit account instructions agreement or similar agreement between Borrower, Lender and a Collection Bank;

(ii)    a Commercial Deposit Account, which shall be subject to a blocked deposit account control agreement between Borrower, Lender and a Collection Bank;

(iii)    an Operating Account, which shall be subject to a springing deposit account control agreement between Borrower, Lender and a Collection Bank; and

(iv)    a Payroll Account, which shall not be subject to a deposit account control agreement.

(b)    The Control Agreements on the Governmental Deposit Account and Commercial Deposit Account shall instruct the Collection Bank to transfer, on each Business Day, all funds on deposit therein to (i) a deposit account established and maintained by Lender or an Affiliate of Lender at such bank as Lender may communicate to the Collection Bank from time to time (the "**Concentration Account**"), or (ii) a master collections account established and maintained in the name of Borrower, which is subject to a blocked deposit account control agreement between Borrower, Lender and a Collection Bank, which causes all funds on deposit in such master collections account to be transferred to the Concentration Account on each Business Day.

(c)    Borrower hereby agrees to (i) identify its Governmental Deposit Account as the "pay to" address on all invoices sent to each payor of Borrower's Governmental Receivables, and (ii) identify its Commercial Deposit Account as the "pay to" address on all invoices sent to each payor of Borrower's other Accounts and Collateral not constituting Governmental Receivables. Borrower further agrees not to (A) change such directives to payors without the prior written consent of Lender, (B) terminate any Controlled Deposit Account or Control Agreement, or (C) terminate or modify, or attempt to terminate or modify, the standing transfer order in any Controlled Deposit Agreement.

(d)    Borrower hereby acknowledges and agrees that any violation of this Section 2.5 would be an Event of Default hereunder, would cause irreparable harm to the Lender for which there would be no adequate remedy at law, and agrees and consents to entry of an order by a court of competent jurisdiction granting the Lender specific performance of the terms and provisions of this Agreement as to Borrower. At the request of Lender, Borrower shall also enter into a lockbox agreement with the Collection Bank providing for the receipt of deposits at an address specified in such lockbox agreement and the deposit of funds received at such address to the applicable Controlled Deposit Account.

4874-6257-0384.6

(e)     To the extent that any Account collections or any other cash payments received by Borrower or an Affiliate of Borrower are not sent directly to the appropriate Controlled Deposit Account, such collections and proceeds shall be held in trust for the benefit of the Lender and immediately remitted (and in any event within one (1) Business Day), in the form received (or, with respect to cash, by check or wire transfer), to the appropriate Controlled Deposit Account for immediate transfer to the Concentration Account. Borrower acknowledges and agrees that compliance with the terms of this Section 2.5 is an essential term of this Agreement, and that, in addition to and notwithstanding any other rights Lender may have hereunder under any other Loan Document, under applicable Law or equity, upon each and every failure by Borrower or any Affiliates of Borrower to cause collections with respect to Accounts or any other cash payments to Borrower to be deposited into the appropriate Controlled Deposit Account as set forth in this Section 2.5, Lender shall be entitled, subject to the last sentence of this subsection (e), to assess Borrower with a non-compliance fee in an amount equal to ten percent (10%) of the amount of such collections or other cash payments; provided that such non-compliance fee shall be in addition to any other fees, charges or other provisions that may increase the Applicable Rate of interest hereunder and the assessment or collection of such non-compliance fee shall not, unless Lender specifically agrees in writing to the contrary, prevent Lender from considering any such non-compliance to be a Default or an Event of Default.  Notwithstanding the foregoing, prior to the assessment of any such non-compliance fee Lender shall give Borrower notice of the of failure to deposit Account collections or any other cash payments received by Borrower or an Affiliate of Borrower in the appropriate Controlled Deposit Account and Borrower shall have one (1) Business Day following such notice to make the required deposit; provided, however, if Lender gives Borrower notice of failure to deposit Account collections or any other cash payments received by Borrower or an Affiliate of Borrower in the appropriate Controlled Deposit Account more than five (5) times in any 12-month period, no further notices will need to be sent to Borrower by Lender before Lender may assess such non-compliance fee.

(f)     For purposes of calculating interest, all funds transferred to the Lender's Concentration Account shall be subject to a four (4) Business Day clearance period and all interest accruing on such funds during such clearance period shall accrue for the benefit of Lender. All funds transferred to the Concentration Account shall be applied to reduce the Obligations hereunder in the following order of priority: (i) payment of any fees and expense reimbursements due to Lender under the Loan Documents, (ii) any of Borrower's Obligations not included in items (iii) and (iv) below, (iii) to any interest then due and owing hereunder, and (iv) to the principal amount outstanding hereunder. For purposes of determining Availability, all funds transferred to the Concentration Account in accordance with this Section shall be applied in accordance with the foregoing sentence as of the date of the transfer.

(g)     If there is a positive balance in favor of Borrower in the Concentration Account, such positive balance shall not accrue interest in favor of Borrower, but shall be available to Borrower in accordance with the terms of this Agreement.

(h)     At all times, Borrower and its Affiliates shall direct all collections or proceeds it receives on Accounts or from other Collateral to either the Government Deposit Account (with respect to collections on Governmental Receivables) or the Commercial Deposit Account (with respect to all other collections and proceeds), or such other account(s) as may be specified by Lender from time to time and in the manner specified by Lender so long as any amounts are

outstanding under the Revolving Facility.  In addition, Borrower and its Affiliates shall deposit in the Commercial Deposit Account any payments received by Borrower or its Affiliates from Old Operator pursuant to Section 1.09 of the Hospital Asset Purchase Agreement, or from the CARES Escrow Funds.

(i)      Borrower shall provide Lender with all information (including user identifications and passwords) necessary for Lender to have online view-only access to all information regarding Borrower's deposit accounts.

(j)      Schedule 2.5 identifies each of Borrower's deposit accounts, the depository bank at which such accounts are maintained, the type of Control Agreements on such accounts (if any), and the second lien secured party to such Control Agreements (if any).

### 2.6    Promise to Pay; Manner of Payment

The Borrower promises to pay principal, interest, and all other amounts payable hereunder, or under any other Loan Document, without any right of rescission and without any deduction whatsoever, including any deduction for any setoff, counterclaim, or recoupments, and notwithstanding any damage, to, defects in or destruction of the Collateral or any other event, including obsolescence of any property or improvements. All payments in respect of interest, principal, fees, or other Obligations shall be made by Borrower, at Lender's sole discretion: (i) by application of available funds in the Concentration Account pursuant to Section 2.5; (ii) by application of Advances under the Revolving Facility pursuant to Section 2.1, or (iii) upon two Business Days' notice, directly by Borrower. If the Lender requests payment in accordance with clause (iii) of the immediately preceding sentence, the Borrower shall make such payment by wire transfer on the date when due, without offset or deduction for the counterclaim, in U.S. Dollars, in immediately available funds to such account as may be indicated in writing by the Lender to the Borrower. Any payment received after 4:00 p.m. on the date when due shall be deemed received on the following Business Day.  Whenever any payment hereunder shall be stated to be due or shall become due and payable on a day other than a Business Day, the due date thereof shall be extended to, and such payment shall be made on, the next succeeding Business Day, and such extension of time in such case shall be included in the computation of payment of any interest (at the interest rate then in effect during such extension) and/or fees, as the case may be.

### 2.7    Repayment of Excess Advances

Subject to the following sentence, any balance of Advances under the Revolving Facility outstanding at any time in excess of the Revolving Loan Limit shall be immediately due and payable by the Borrower upon reasonable demand (or, if such over-advance was created as a result of the Lender's adjustment of the advance rates for Availability or eligibility criteria, then within five (5) Business Days, unless such adjustment by the Lender was the result of any misrepresentation or fraud of Borrower, in which case there shall be no grace period and any such over-advance shall be immediately due and payable), whether or not an Event of Default has occurred or is continuing and shall be paid in the manner specified in Section 2.6.  Notwithstanding the foregoing, if the Lender intentionally makes an Advance that is in excess of Availability, such Advance shall be repaid within five (5) Business Days of a demand for repayment or when it is otherwise required to be repaid pursuant to other Sections of this Agreement.

**2.8**     **Payments by the Lender**

Should any amount, interest, or other Obligation required to be paid under any Loan Document remain unpaid after it is due and payable and after the expiration of any cure period, if applicable, such amount may be paid by the Lender, which payment shall be deemed a request for an Advance under the Revolving Facility as of the date such payment is due, and the Borrower irrevocably authorize disbursements of any such funds to the Lender by way of direct payment of the relevant amount, interest or other Obligations.  No payment or prepayment of any amount by the Lender or any other Person shall entitle any Person to be subrogated to the rights of the Lender under any Loan Document unless and until the Obligations have been fully performed and paid irrevocably in cash and this Agreement has been terminated.  Any sums expended by the Lender as a result of Borrower's or any Guarantor's failure to pay, perform, or comply with any Loan Document or any of the Obligations may be charged to the Borrower's account as an Advance under the Revolving Facility and added to the Obligations and thereby increase the principal amount outstanding hereunder.

**2.9**     **Grant of Security Interest; Collateral**

(a)     To secure the payment and performance of the Obligations, and without limiting any grant of any Lien and security interest in any other Loan Document, the Borrower, upon entry of the Interim Financing Order or the Final Financing Order, as applicable, hereby grant to the Lender a continuing security interest in and Lien upon, and pledge to the Lender, all of its right, title and interest in and to the following, whether now owned or hereafter created, acquired or arising, wherever located, and subject to Section 2.9(b), whether acquired before or after the date hereof (collectively and each individually, the "**Collateral**"):

(i)                             All Accounts (including healthcare insurance receivables) and Related Property;

(ii)                            All CARES Escrow Funds and the CARES Escrow Agreement

(iii)                           The Hospital Asset Purchase Agreement

(iv)                           all of the Borrower's deposit accounts and cash;

(v)                            all Books and Records, whether or not related to any Collateral;

(vi)                           all of Borrower's other personal property and fixtures, including all Goods, Inventory, Equipment, furniture, General Intangibles (including Payment Intangibles and Software), Chattel Paper (whether tangible or electronic), Supporting Obligations, Investment Property, Financial Assets, Documents, Instruments (including any Promissory Notes), Securities, Securities Accounts, contract rights or rights to payment of money, leases, Permits, license agreements, franchise agreements, Commercial Tort Claims, stock in direct and indirect subsidiaries, machinery, cash, Letter-

4874-6257-0384.6

of-Credit Rights (whether or not the letter of credit is evidenced by a writing), Intellectual Property, copyrights, trademarks, patents, and tradestyles; and

(vii) any and all claims, rights, and interests in any of the above and all substitutions for, additions, attachments, accessories, accessions, and improvements to and replacements, products, proceeds, and insurance proceeds of any or all of the foregoing.

(b) The Liens and security interests granted to the Lender above or under the Financing Orders shall be valid, binding, continuing, enforceable, non-avoidable, and automatically and properly perfected first-priority security interests and Liens. Under Section 364(c)(2) of the Bankruptcy Code, the Lender has been granted a first-priority Lien on all Collateral not encumbered as of the Petition Date. Under Section 364(d) of the Bankruptcy Code, the Lender has been granted a first-priority priming Lien on all Collateral encumbered as of the Petition Date. Borrower authorizes the Lender to file or record financing statements and other filing or recording documents or instruments with respect to the Collateral in such form and in such offices as the Lender determines appropriate to perfect the security interests of the Lender under this Agreement. Borrower authorizes the Lender to use collateral descriptions such as "all personal property" or "all assets" in each case "whether now owned or hereafter acquired", or using words of similar import.

(c) Pursuant to the Financing Orders, the Liens granted in favor of the Lender in all of the Collateral shall be perfected without the recordation of any UCC financing statements, notices of Liens or other instruments of assignment. Notwithstanding the foregoing, the Borrower further agree that the Lender is authorized to file or record financing statements with respect to the Collateral without the signatures of Borrower in such form and in such offices as the Lender reasonably determines appropriate to further evidence the perfection of the security interests of the Lender under this Agreement and to use the collateral description "all assets of the Debtor" in any such financing statements.

(d) The Liens, lien priority, administrative priorities and other rights and remedies granted to the Lender in the Financing Orders and the other Loan Documents shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of debt by the Borrower (pursuant to Section 364 of the Bankruptcy Code or otherwise), or by any other act or omission whatsoever until the full performance and irrevocable payment in full in cash of the Obligations and termination of this Agreement.

**2.10 Collateral Administration**

(a) All Collateral (except funds required to be deposited in the Controlled Deposit Accounts) will at all times be kept by the Borrower at the locations set forth on Schedule 5.17B and shall not, without concurrent written notice to the Lender, be moved therefrom and in any case shall not be located (as that term is used in Section 9-301(2) of the UCC) outside the continental United States.

4874-6257-0384.6

(b)      The Borrower shall keep accurate and complete records of its Accounts and all payments and collections thereon and shall submit such records to the Lender on such periodic basis as the Lender may request.  After the occurrence and during the continuance of an Event of Default, and upon the Lender's request, the Borrower shall execute and deliver to the Lender formal written assignments of all of its Accounts weekly or daily as the Lender may request, including all Accounts created since the date of the last assignment, together with copies of claims, invoices and/or other information related thereto.  To the extent that collections from such assigned Accounts exceed the amount of the Obligations, such excess amount shall not accrue interest in favor of the Borrower, but shall be available to the Borrower upon the Borrower's written request.

(c)      The Lender shall have the right at all times after the occurrence and during the continuance of an Event of Default after expiration of all applicable cure periods to notify (i) Account Debtors owing Accounts to the Borrower other than Medicaid/Medicare Account Debtors that its Accounts have been assigned to the Lender and to collect such Accounts directly in its own name and to charge collection costs and expenses, including reasonable attorneys' fees, to Borrower, and (ii) Medicaid/Medicare Account Debtors that the Borrower has waived any and all defenses and counterclaims it may have or could interpose in any action or procedure brought by the Lender to obtain a court order recognizing the collateral assignment or security interest and lien of the Lender in and to any Account or other Collateral and that the Lender is seeking or may seek to obtain a court order recognizing the collateral assignment or security interest and lien of the Lender in and to any Account or Collateral and that the Lender is seeking or may seek to obtain a court order recognizing the collateral assignment or security interest and lien of the Lender in and to all Accounts and other Collateral payable by Medicaid/Medicare Account Debtors.

(d)      As and when determined by the Lender in its distrection, the Lender shall have the right to perform the searches described in clauses (i) and (ii) below against the Borrower and the Guarantors (the results of which are to be consistent with the Borrower's representations and warranties under this Agreement), at the Borrower's reasonable expense:  (i) UCC searches with the Secretary of State and local filing offices of each jurisdiction where Borrower maintains its respective executive offices, a place of business or assets or in which it is organized, and (ii) bankruptcy, judgment, federal, state and local tax lien and litigation searches, in each jurisdiction in which such actions, or Liens may be recorded.

(e)      Borrower (i) shall provide prompt written notice to its current bank to transfer all items, collections and remittances to the Concentration Account, (ii) shall direct each Account Debtor to make payments to the appropriate Controlled Deposit Account as set forth in Section 2.5, and Borrower hereby authorizes Lender, upon any failure to send such notices and directions within ten (10) days after the date of this Agreement (or ten (10) days after the Person becomes an Account Debtor), to send any and all similar notices and directions to such Account

4874-6257-0384.6

Debtors, and (iii) shall do anything further that may be lawfully required by Lender to secure Lender and effectuate the intentions of the Loan Documents.

(f)      As of the Closing Date, Borrower has no ownership interest in any Chattel Paper (as defined in Article 9 of the UCC), letter of credit rights, commercial tort claims, Instruments, documents, or Investment Property (other than equity interests in any Subsidiaries of Borrower disclosed on Schedule 5.3) and Borrower shall give notice to Lender promptly (but in any event not later than the delivery by Borrower of the next Borrowing Certificate required pursuant to Section 2.4 above) upon the acquisition by Borrower of any such Chattel Paper, letter of credit rights, commercial tort claims, Instruments, documents, Investment Property. No Person other than any Lender has "control" (as defined in Article 9 of the UCC) over any deposit account, Investment Property (including Securities Accounts and Commodities Accounts), Letter of Credit Rights or electronic Chattel Paper in which Borrower has any interest (except for such control arising by operation of law in favor of any bank or securities intermediary or commodities intermediary with whom any deposit account, Securities Account or Commodities Account of Borrower is maintained).

(g)      Borrower shall deliver to Lender all tangible Chattel Paper and all Instruments and Documents owned by Borrower and constituting part of the Collateral duly endorsed and accompanied by duly executed instruments of transfer or assignment, all in form and substance satisfactory to Lender. Borrower shall provide Lender with "control" (as defined in Article 9 of the UCC) of all electronic Chattel Paper owned by Borrower and constituting part of the Collateral by having Lender identified as the assignee on the records pertaining to the single authoritative copy thereof and otherwise complying with the applicable elements of control set forth in the UCC. Borrower also shall deliver to Lender all security agreements securing any such Chattel Paper and securing any such Instruments. Borrower will mark conspicuously all such Chattel Paper and all such Instruments and Documents with a legend, in form and substance satisfactory to Lender, indicating that such Chattel Paper and such Instruments and Documents are subject to the security interests and Liens in favor of Lender created pursuant to this Agreement and the Loan Documents.

(h)      The Borrower shall deliver to the Lender all letters of credit on which Borrower is the beneficiary and which give rise to letter of credit rights owned by Borrower which constitute part of the Collateral in each case duly endorsed and accompanied by duly executed instruments of transfer or assignment, all in form and substance satisfactory to the Lender.  Borrower shall take any and all actions as may be necessary or desirable, or that the Lender may reasonably request, from time to time, to cause the Lender to obtain exclusive "control" (as defined in Article 9 of the UCC) of any such letter of credit rights in a manner acceptable to the Lender.

(i)      The Borrower shall promptly advise the Lender upon Borrower becoming aware that it has any interests in any commercial tort claim that constitutes part of

4874-6257-0384.6

the Collateral, which such notice shall include descriptions of the events and circumstances giving rise to such commercial tort claim and the dates such events and circumstances occurred, the potential defendants with respect such commercial tort claim and any court proceedings that have been instituted with respect to such commercial tort claims, and the Borrower shall, with respect to any such commercial tort claim, execute and deliver to the Lender such documents as the Lender shall request to perfect, preserve or protect the Liens, rights and remedies of the Lender with respect to any such commercial tort claim.

(j)      After the occurrence and during the continuance of an Event of Default, after all applicable cure periods and compliance with the Notice Period and related procedures set forth in the Interim Financing Order, (a) the Lender may elect to exercise any and all of the rights and remedies of Borrower under the Permits, without any interference from Borrower, and Borrower shall cooperate in causing the Governmental Authorities, contractors, or purchasers and lessees to comply with all the terms and conditions of the Licenses, and, (b) if and to the extent permitted by law and the terms of the Permits, the Lender may, at its option, take over and enjoy the benefits of the Permits, exercise Borrower's rights under the Permits, and perform all acts in the same manner and to the same extent as Borrower might do.

(k)      The Borrower shall furnish to the Lender from time to time any statements and schedules further identifying or describing the Collateral and any other information, reports or evidence concerning the Collateral as the Lender may reasonably request from time to time.

### 2.11    Power of Attorney

Borrower hereby appoints the Lender as its attorney, with power (a) to endorse the name of such Borrower on any checks, notes, acceptances, money orders, drafts, or other forms of payment or security that may come into Lender's possession; (b) to sign the name of such Borrower on any invoice or bill of lading relating to any Accounts, inventory, or other Collateral; (c) to perfect Lender's security interest or lien in any Collateral, including filing financing statements, without such Borrower's signature, covering part or all of the Collateral in such jurisdictions as Lender shall determine to be advisable; (d) verify the validity, amount or any other matter relating to the Collateral by mail, telephone, telecopy or otherwise, and (e) do such other and further acts and deeds in the name of such Borrower that the Lender may reasonably deem necessary or desirable to enforce its right with respect to any Collateral.  The appointment of Lender as attorney-in-fact for Borrower is coupled with an interest and is irrevocable prior to full payment in cash of all Obligations.

### 2.12    Setoff Rights

During the continuance of any Event of Default, the Lender is hereby authorized by the Borrower at any time or from time to time, with reasonably prompt subsequent notice to the Borrower (any prior or contemporaneous notice being hereby expressly waived) to set off, appropriate and to apply, any and all (a) balances held by the Lender or any of the Lender's

Affiliates for the account of the Borrower or any of its Subsidiaries (regardless of whether such balances are then due to the Borrower or its Subsidiaries), and (b) other property at any time held or owing by Lender to or for the credit or for the account of Borrower or any of its Subsidiaries, against and on account of any of the Obligations.

## III. FEES AND OTHER CHARGES

### 3.1    Facility Fee

On the Closing Date, and as a condition of Closing, the Borrower shall pay to the Lender one percent (1.0%) of the Facility Cap as a nonrefundable fee (such fee and the fee payable pursuant to Section 2.1(e) are referred to here in as the "**Facility Fee**").

### 3.2    Unused Line Fee

The Borrower shall pay to the Lender monthly an unused line fee (the "**Unused Line Fee**") in an amount equal to  eight and one third basis points (*i.e.*, 0.0833%) per month of the difference derived by subtracting (i) the average daily balance under the Revolving Facility outstanding during the preceding month, from (ii) the Facility Cap.  The Unused Line Fee shall be payable monthly in arrears but in no event later than the first day of each successive calendar month (starting with the first full calendar month following the Closing Date). The final payment shall be pro-rated to the date of payment in full and shall be paid on that date as part of the Obligations.

### 3.3    Collateral Management Fee

The Borrower shall pay the Lender as additional interest a monthly collateral management fee (the "**Collateral Management Fee**") for monitoring and servicing the Revolving Facility, equal to one fourth of one percent (i.e., 0.25%) per month, calculated on the basis of the average daily balance under the Revolving Facility outstanding during the preceding month.  The Collateral Management Fee shall be payable monthly in arrears but in no event later than the first calendar day of each successive calendar month (starting with the first full calendar month following the Closing Date). The final payment shall be pro-rated to the date of payment in full and shall be paid on that date as part of the Obligations.

### 3.4    Termination Fee

Upon a termination of the Revolving Facility for any reason, Borrower shall pay Lender (in addition to the then outstanding principal, accrued interest and other Obligations (other than indemnity obligations with respect to which no claim has been made) relating to the Revolving Facility pursuant to the terms of this Agreement and any other Loan Documents), as yield maintenance for the loss of bargain and not as a penalty, an amount equal to the Termination Fee. Notwithstanding any other provision of any Loan Document, no Termination Fee as described above shall be due and payable if (i) Borrower refinances the Obligations (in whole or in part) with Lender (which, for purposes of this Section 3.4, shall include Lender and any of its parents, subsidiaries or Affiliates), (ii) this Agreement terminates in accordance with its terms at the end of its Term, or (iii) Borrower terminates this Agreement within ten (10) days after Borrower provides

written notice to Lender of a default by Lender hereunder, and such default by Lender remains uncured as of the date of such termination.

### 3.5    Software Interface Fee

Upon the first occurrence of an Event of Default, Borrower shall pay to Lender a nonrefundable fee of $5,000 for the setup and implementation of the software interface used by Lender to calculate the Borrowing Base. Payment of the setup fee shall be made, at the discretion of Lender: (i) by application of available funds in the Concentration Account pursuant to Section 2.5, (ii) by application of Advances under the Revolving Facility pursuant to Section 2.1, or (iii) upon two Business Days' notice, directly by Borrower.

Commencing with the first calendar month in which an Event of Default occurs, Borrower shall pay Lender a monthly software interface fee (the "**Software Interface Fee**") for maintaining and servicing the software interface used by Lender to calculate the Borrowing Base, equal to $1,000 per month. The Software Interface Fee shall be payable monthly in arrears but in no event later than the first day of each successive calendar month. Payment of the Software

### 3.6    Computation of Fees; Lawful Limits

All fees hereunder shall be computed on the basis of a year of 360 days and for the actual number of days elapsed in each calculation period, as applicable. In no contingency or event whatsoever, whether by reason of acceleration or otherwise, shall the interest and other charges paid or agreed to be paid to the Lender for the use, forbearance, or detention of money hereunder exceed the maximum rate permissible under applicable Law which a court of competent jurisdiction shall, in a final determination, deem applicable hereto. If, due to any circumstance whatsoever, fulfillment of any provision hereof, at the time performance of such provision shall be due, shall exceed any such limit, then the obligation to be so fulfilled shall be reduced to such lawful limit, and, if the Lender has received interest or any other charges of any kind which might be deemed to be interest under applicable Law in excess of the maximum lawful rate, then such excess shall be applied first to any unpaid fees and charges hereunder, then to unpaid principal balance owed by the Borrower hereunder, and if the then remaining excess interest is greater than the previously unpaid principal balance, the Lender shall promptly refund such excess amount to the Borrower and the provisions hereof shall be deemed amended to provide for such permissible rate. The terms and provisions of this Section 3.6 shall control to the extent any other provision of any Loan Document is inconsistent herewith.

### 3.7    Default Rate of Interest

Upon the occurrence and during the continuation of an Event of Default, the Applicable Rate of interest in effect at such time with respect to the Obligations shall be increased by three percent (3%) per annum (the "**Default Rate**"). Such increase shall be in addition to any other specific charges provided for herein for noncompliance with specific provisions of this Agreement.

Superpriority Debtor-in-Possession Credit and Security Agreement, Page 36

### 3.8 Structuring Fee

On the Closing Date, Borrower shall pay Lender one and two-tenths of one percent (1.2%) of the Facility Cap as a nonrefundable structuring fee, which shall be deemed fully earned and paid upon Closing.

## IV. CONDITIONS PRECEDENT

### 4.1 Conditions to Closing and Advances

The obligations of the Lender to consummate the transactions contemplated herein and to make any Advance under the Revolving Facility are subject to the satisfaction, in the discretion of the Lender, of the following:

(a)     The Bankruptcy Court shall have entered the Interim Financing Order in the Bankruptcy Case, and such order shall be in full force and effect and shall not have been vacated, reversed, modified, or stayed in any respect (and, if such order is the subject of a pending appeal, motion for reconsideration, rehearing, etc., no further performance of any obligation of any party shall have been stayed pending appeal or motion);

(b)     The Lender shall have received, reviewed and approved the Budget and any amendments and restatements thereof;

(c)     The Borrower and the Lender shall have executed and delivered this Agreement;

(d)     The Lender shall have received, in form and substance reasonably satisfactory to Lender, validity and support agreements from each person authorized to sign Borrowing Certificates and, if different, the chief financial officer of the Borrower;

(e)     The Borrower shall have established Controlled Deposit Accounts and Lender shall have received fully executed Control Agreements in accordance with Section 2.5 prior to entry of the Final Financing Order;

(f)     Borrower shall have established Controlled Deposit Accounts and Lender shall have received fully executed Control Agreements, all in accordance with Section 2.5;

(g)     Borrower shall have delivered to Lender, in form and substance acceptable to Lender in Lender's sole discretion collateral assignment of the CARES Escrow Agreement;

(h)     The Borrower shall have executed and delivered to the Lender an IRS Form 8821 in form acceptable to Lender naming Tax Guard as appointee;

4874-6257-0384.6

(i)      The Lender shall have received (i) copies of all insurance policies required by Section 6.6; (ii) a copy of the declarations page for such insurance policies, and (iii) certificates of insurance confirming that the Lender has been named as sole beneficiary, loss payee or additional insured, as appropriate, in each case prior to entry of the Final Financing Order;

(j)      The Borrower shall have delivered to the Lender a Borrowing Certificate in the form of Exhibit A executed by an authorized officer of Borrower;

(k)      No Event of Default shall have occurred and be continuing, or no Event of Default would exist after the Lender's disbursement of the Advance;

(l)      Each of the representations and warranties made by the Borrower under this Agreement shall be accurate in all material respects on and as of the date the Advance is requested as if made on and as of such date, before and after giving effect to such Advance;

(m)      Other than the filing of the Bankruptcy Case, no event shall have occurred which has had or could reasonably be expected to have a Material Adverse Effect;

(n)      Immediately after giving effect to the requested Advance, the aggregate outstanding principal amount of Advances under the Revolving Facility shall not exceed the Revolving Loan Limit;

(o)      All payments required under any management agreement with any entity that is not a Borrower shall be subordinated to the Obligations of Borrowers hereunder;

(p)      The Lender shall have received such other documents, certificates, information as the Lender may reasonably request, all in form and substance reasonably satisfactory to the Lender, and

(q)      The Lender shall have received all fees, charges and expenses payable to Lender on or prior to the date of the Advance pursuant to the Loan Documents and the Interim Financing Order, except for the Facility Fee as provided above, which will be accrued.

**4.2      Waivers of Conditions to Advances**

No waiver of any of the foregoing conditions to an Advance or the making of an Advance by the Lender, notwithstanding the failure of any of the foregoing conditions to be met as of the date of such Advance, shall not be deemed to constitute a waiver by the Lender of any such conditions with respect to any future requested Advance.

4874-6257-0384.6

## V.  REPRESENTATIONS AND WARRANTIES

In order to induce the Lender to enter into this Agreement and to advance funds to Borrower, Borrower represents and warrants as of the date hereof, the Closing Date, and each Borrowing Date as follows:

### 5.1    Organization and Authority

Borrower is a limited liability company, is duly organized, validly existing and in good standing under the laws of Texas and no other jurisdiction, and Borrower (i) has all requisite corporate or other organizational power and authority to own its properties and assets and to carry on its business as now being conducted and as contemplated in the Loan Documents; (ii) is duly qualified to do business in every jurisdiction in which failure so to qualify could reasonably be expected to have a Material Adverse Effect, and (iii) has requisite power and authority, subject to entry of the Financing Orders, (A) to execute, deliver and perform the Loan Documents to which it is a party and all amendments thereto; (B) to borrow hereunder; (C) to consummate the transactions contemplated under the Loan Documents, and (D) to grant the Liens with regard to the Collateral pursuant to the Loan Documents to which it is a party subject to the Bankruptcy Court approval.

### 5.2    Loan Documents

The execution, delivery and performance by the Borrower of the Loan Documents to which it is a party, and the consummation of the transactions contemplated thereby, including the grants of Liens and security interests in the Collateral, subject to entry of the Financing Orders, (i) have been duly authorized by all requisite action of the Bankruptcy Court or the Borrower and have been duly executed and delivered by or on behalf of Borrower, and (ii) do not violate any provisions of (A) applicable Law, (B) any order of any Governmental Authority binding on the Borrower or any of the Borrower's properties the effect of which could reasonably be expected to have a Material Adverse Effect, or (C) the certificate of incorporation or bylaws (or any other equivalent governing agreement or document) of the Borrower, or any agreement between the Borrower and its shareholders, members, partners or equity owners or among any such shareholders, members, partners or equity owners.  When executed and delivered, each of the Loan Documents to which each the Borrower is a party will constitute the legal, valid and binding obligation of such Borrower, enforceable against such Borrower in accordance with its terms.

### 5.3    Subsidiaries, Capitalization and Ownership Interests

The Borrower has no Subsidiaries.  Schedule 5.3 also states the authorized and issued capitalization of the Borrower, the number and class of equity securities and/or ownership, voting or partnership interests issued and outstanding of Borrower and the record and beneficial owners thereof (including options, warrants and other rights to acquire any of the foregoing). The outstanding equity securities and/or ownership, voting or partnership interests of Borrower have been duly authorized and validly issued and are fully paid and nonassessable, and each Person listed on Schedule 5.3 owns beneficially and of record all of the equity securities and/or ownership, voting or membership interests it is listed as owning free and clear of any Liens other than

Permitted Liens. Except as listed on Schedule 5.3, the Borrower do not own an interest in or participates or engages in any joint venture, partnership or similar arrangements with any Persons.

### 5.4 Properties

Borrower (i) is the sole owner and has good, valid and marketable title to, or a valid leasehold interest in, all of its material properties and assets, including the Collateral, whether personal or real, subject to no transfer restrictions or Liens of any kind except for Permitted Liens, and (ii) is in compliance in all material respects with each lease to which it is a party or otherwise bound except for such noncompliance as would not reasonably be expected to have a Material Adverse Effect. Schedule 5.4 lists all real properties (and their locations) owned or leased by or to the Borrower. The Borrower enjoys peaceful and undisturbed possession under all such leases, and such leases are all the leases necessary for the operation of such properties and assets, are valid and subsisting, and are in full force and effect.

### 5.5 Other Agreements

Other than with respect to the Bankruptcy Case and claims stayed thereunder, no Borrower is (i) a party to any judgment, order or decree or any agreement, document or instrument, or subject to any restriction, which would materially adversely affect its ability to execute and deliver, or perform under, any Loan Document or to pay the Obligations, or (ii) in default in the performance, observance or fulfillment of any obligation, covenant or condition contained in any agreement, document or instrument to which it is a party or to which any of its properties or assets are subject, which default, if not remedied within any applicable grace or cure period could reasonably be expected to have a Material Adverse Effect, nor is there any event, fact, condition or circumstance which, with notice or passage of time or both; would constitute or result in a conflict, breach, default or event of default under, any of the foregoing which, if not remedied within any applicable grace or cure period could reasonably be expected to have a Material Adverse Effect.

### 5.6 Litigation

There is no action, suit, proceeding or investigation pending or, to Borrower's knowledge, threatened against Borrower that (i) could reasonably be expected to affect the validity of any of the Loan Documents or the right of Borrower to enter into any Loan Document or to consummate the transactions contemplated thereby or (ii) could reasonably be expected to be or have, either individually or in the aggregate, any Material Adverse Change or Material Adverse Effect. Borrower is not a party or subject to any order, writ, injunction, judgment or decree of any Governmental Authority that could reasonably be expected to have a Material Adverse Effect except as so identified in Schedule 5.6.

### 5.7 Labor Matters

There are no strikes, slowdowns, work stoppages, lockouts, grievances, other collective bargaining or labor related disputes pending or, to Borrower's knowledge, threatened against Borrower. All payments due from Borrower, or for which any claim may be made against any of them, on account of wages and employee and retiree health and welfare insurance and other benefits have been paid or accrued as a liability on its books, as the case may be. The provisions

4874-6257-0384.6

of any collective agreement are consistent with applicable industry standards respecting wage rates, benefits and working rules. No Borrower is in breach of any provision of any collective agreement to which it is a party. The consummation of the transactions contemplated by the Loan Documents will not give rise to a right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which it is a party or by which it is bound.

### 5.8 Tax Returns, Governmental Reports

The Borrower (i) has filed all material federal, state, foreign (if applicable) and local tax returns and other reports which are required by law to be filed by such Borrower, and (ii) has paid all taxes, assessments, fees and other governmental charges, including, without limitation, payroll and other employment-related taxes, in each case that is due and payable.

### 5.9 Financial Statements and Reports

All financial information and statements relating to Borrower that have been or may hereafter be delivered to the Lender by Borrower are accurate and complete in all material respects consistently applied with prior periods. No Borrower has any material obligations or liabilities of any kind not disclosed in such financial information or statements or the Bankruptcy Case, and since the date of the most recent financial statements submitted to Lender, there has not occurred any Material Adverse Change, Material Adverse Effect, Liability Event or, to the Borrower's knowledge, any other event or condition that could reasonably be expected to have a Material Adverse Effect or Liability Event, excluding the Bankruptcy Case.

### 5.10 Compliance with Law

Borrower (i) is in substantial compliance with all Laws applicable to the Borrower or Borrower's business, assets, or operations, and (ii) is not in violation of any order of any Governmental Authority or other board or tribunal, except where noncompliance or violation would not reasonably be expected to have a Material Adverse Effect. There is no event, fact, condition, or circumstance which, with notice or passage of time, or both, would constitute or result in any noncompliance with, or any violation of, any of the foregoing, in each case except where noncompliance or violation would not reasonably be expected to have a Material Adverse Effect. No Borrower has received any notice that Borrower is not in compliance in any respect with any of the requirements of any of the foregoing.

### 5.11 Intellectual Property

Borrower owns, is licensed to use, or otherwise has the right to use all Intellectual Property that is material to the condition (financial or other), business, or operations of Borrower, except as would not reasonably be expected to have a Material Adverse Effect. Except as would not reasonably be expected to have a Material Adverse Effect, Borrower is the sole and exclusive owner of the entire and unencumbered right, title and interest in and to each such registered Intellectual Property (or application therefor) purported to be owned by such Borrower, free and clear of any Liens (except for Permitted Liens) or licenses in favor of third parties or agreements or covenants not to sue such third parties for infringement. All registered Intellectual Property of Borrower is duly and properly registered, filed or issued in the appropriate office and jurisdictions for such registrations, filings or issuances, except where the failure to do so would not reasonably

be expected to have a Material Adverse Effect. To Borrower's knowledge, it conducts its business without infringement or claim of infringement of any Intellectual Property rights of others and there is no infringement or claim of infringement by others of any Intellectual Property rights of such Borrower, which infringement or claim of infringement could reasonably be expected to have a Material Adverse Effect.

### 5.12   Licenses and Permits

Without limitation of anything contained in Section 5.20, Borrower is in substantial compliance with and has all Permits necessary or required by applicable Law or Governmental Authority for the operation of its businesses except where the failure to be in compliance would not reasonably be expected to have a Material Adverse Effect. All of the foregoing are in full force and effect and not in known conflict with the rights of others except where the failure to be in compliance would not reasonably be expected to have a Material Adverse Effect. No Borrower is (i) in breach of or default under the provisions of any of the foregoing, nor is there any event, fact, condition or circumstance which, with notice or passage of time or both, would constitute or result in a conflict, breach, Default or Event of Default under, any of the foregoing which, if not remedied within any applicable grace or cure period could reasonably be expected to have a Material Adverse Effect, or (ii) a party to or subject to any agreement, instrument or restriction that is so unusual or burdensome that it might have a Material Adverse Effect.

### 5.13   Disclosure

No Loan Document nor any other agreement, document, certificate, or statement furnished to the Lender by or on behalf of Borrower in connection with the transactions contemplated by the Loan Documents, when taken as a whole contains any untrue statement of material fact or omits to state any fact necessary to make the statements therein not materially misleading in light of current circumstances. All financial projections delivered to the Lender by the Borrower has been prepared on the basis of the assumptions stated therein. Such projections represent Borrower's best estimate of such Borrower's future financial performance, and such assumptions are believed by Borrower to be fair and reasonable in light of current business conditions.

### 5.14   Existing Indebtedness: Investments, Guarantees, and Certain Contracts

Except as permitted by the Loan Documents, the Borrower (i) has no outstanding Indebtedness other than Permitted Indebtedness; (ii) is not subject or party to any mortgage, note, indenture, indemnity or guarantee of, with respect to or evidencing any Indebtedness of any other Person other than in connection with a Permitted Lien, or (iii) does not own or hold any equity or long-term debt investments in, and do not have any outstanding advances to or any outstanding guarantees for the obligations of, or any outstanding borrowings from, any Person. Borrower has performed all material obligations required to be performed by Borrower pursuant to or in connection with its outstanding Indebtedness and the items permitted by the Loan Documents, and there has occurred no breach, default, or event of default under any document evidencing any such items or any fact, circumstance, condition or event which, with the giving of notice or passage of time or both, would constitute or result in a breach, default or event of default thereunder. Borrower has not agreed to pay any other Indebtedness in priority to the Obligations.

### 5.15    Agreements with Affiliates

Except for transactions permitted under Section 7.6, there are no existing or proposed material agreements, arrangements, understandings, or transactions between Borrower and any of its officers, members, managers, directors, stockholders, partners, other interest holders, employees or Affiliates, or any members of its respective immediate families.

### 5.16    Insurance

Borrower has in full force and effect such insurance policies as are customary in its industry and as may be required pursuant to Section 6.5.  All such insurance policies as in force on the date of this Agreement are listed and described on Schedule 5.16.

### 5.17    Names, Location of Offices, Records and Collateral

During the preceding five years, the Borrower has not conducted business under or used any name (whether corporate, partnership, or assumed), other than as shown on Schedule 5.17A.  The Borrower are the sole owners of all of its names listed on Schedule 5.17A, and any and all business done, and invoices issued in such names are Borrower's sales, business and invoices. Borrower maintains its places of business and chief executive offices only at the locations set forth on Schedule 5.17B.  Schedule 5.17B also identifies all of the addresses (including warehouses) at which any of the Collateral is located or Books and Records of Borrower regarding any Collateral are kept and identifying which Collateral and which Books and Records are kept at each location, the nature of such location (*e.g.*, leased business location operated by the Borrower, third party warehouse, consignment location, processor location, etc.) and the name and address of the third party owning and/or operating such location.  No Collateral and no Books and Records in connection therewith or in any way relating thereto or that evidence the Collateral are located at any other location except for what may be stored in offsite, remotely accessible computer storage.  All of the Collateral is and shall remain located (as that term is used in Section 9-301(2) of the UCC) only in the continental United States.

### 5.18    Non-Subordination

(a)    The Obligations are not subordinated in any way to any other obligations of Borrower or to the rights of any other Person.

(b)    Upon the entry of each Financing Order by the Bankruptcy Court, the Obligations of the Borrower will constitute allowed Superpriority Claims (subject only to the Carve-Out), having priority in payment over all other administrative expenses and unsecured claims against the Borrower now existing or hereafter arising, of any kind or nature whatsoever, including without limitation, all administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 328, 503(b), 506(c), 507(a), 507(b), 546(c), 726 and 1114 of the Bankruptcy Code.

(c)    The security interests granted in this Agreement will, upon the entry of each Financing Order by the Bankruptcy Court, be prior to all other interests and Liens with respect to the Collateral.

**5.19    Accounts**

In determining which Accounts are Eligible Receivables, the Lender may rely on all statements and representations made by the Borrower with respect to any Account.  Unless otherwise indicated in writing to the Lender, each Account of Borrower that is included on a Borrowing Certificate as an Eligible Receivable (i) is genuine and in all respects what it purports to be and is not evidenced by a judgment; (ii) meets the criteria for an Eligible Receivable as set forth in the definition of that term; (iii) there are no facts, events or occurrences which in any way impair the validity or enforceability thereof or materially reduce the amount payable thereunder from the face amount of the claim or invoice and statements delivered to Lender with respect thereto, except to the extent the same is reflected in the calculation of Net Collectible Value, and (iv) Borrower has disclosed to Lender on each Borrowing Certificate the amount of all Accounts of Borrower for which Medicare is the Account Debtor and for which payment has been denied and subsequently appealed, and Borrower are properly pursuing all available appeals in respects of such Accounts.

**5.20    Healthcare Law Compliance Representations**

To induce the Lender to enter into this Agreement and to make credit accommodations contemplated hereby, the Borrower hereby represent and warrant that all of the information regarding the Borrower and the Hospital set forth in Schedule 5.20 is true, complete and correct, and that, except as disclosed in Schedule 5.20, the following statements are true, complete and correct:

(a)    <u>Healthcare Permits</u>.  Borrower has (i) each Healthcare Permit and other rights from, and has made all declarations and filings with, all applicable Governmental Authorities, all self-regulatory authorities and all courts and other tribunals necessary to engage in the ownership, management and operation of the Hospital or the assets of Borrower, and (ii) no knowledge that any Governmental Authority is considering limiting, suspending or revoking any such Healthcare Permit. All such Healthcare Permits are valid and in full force and effect and Borrower is in compliance with the terms and conditions of all such Healthcare Permits.

(b)    <u>Specific Licensing.</u> The Hospital is duly licensed under the applicable Laws of the state where the facility is located. The licensed bed or unit capacity of each such facility is shown on Schedule 5.19. Borrower has not granted to any third party the right to reduce the number of licensed beds, persons served or units in any of the health care facilities operated by Borrower or the right to apply for approval to move any and all of the licensed beds, persons served or units in the Hospital to any other location and there are no proceedings or contemplated to reduce the currently active number of licensed beds, persons served or units in the Hospital.

(c)    <u>Accreditation</u>.  Borrower has received and maintains accreditation in good standing and without impairment by all applicable Accrediting Organizations, to the extent required by law (including any equivalent regulation) or the terms of any Lease pertaining to the Hospital. Borrower has not received any notice or

communication from any Accrediting Organization that the Hospital is (i) subject to or is required to file a plan of correction with respect to any accreditation survey, or (ii) in danger of losing its accreditation due to a failure to comply with a plan of correction

(c)    Leases. The Lease has been approved by all necessary Governmental Authorities, if any. Under applicable Healthcare Laws in the state in which the Hospital is located, the reimbursement rate of the Borrower under applicable Third-Party Payor participation agreements is not affected by the rental rates under the Lease. The rentals provided for under the Lease comply with all applicable Healthcare Laws and do not exceed the sums permitted to be paid under applicable Healthcare Laws.

(d)    Participation Agreements/Provider Status/Cost Reports.    There is no investigation, audit, claim review, or other action pending or, to the knowledge of Borrower, threatened which could result in a revocation, suspension, termination, probation, restriction, limitation, or non-renewal of any Third-Party Payor participation agreement or provider number or other Healthcare Permit or result in Borrower's exclusion from any Third-Party Payor Program, nor has Borrower or any Third Party Payor Program made any decision not to renew any participation agreement or provider agreement or other Healthcare Permit related to the Hospital, nor is there any action pending or threatened to impose material intermediate or alternative sanctions with respect to the Hospital. Borrower, and, to Borrower's knowledge, its contractors, have properly and legally billed all intermediaries and Third-Party Payors for services rendered with respect to the Hospital and have maintained its records to reflect such billing practices. Except with respect to funds escrowed pursuant to the Hospital Asset Purchase Agreement, no funds relating to Borrower are now, or, to Borrower's knowledge will be, withheld by any Third-Party Payor. Borrower has or has the right to use the requisite participation agreement or provider number or other Healthcare Permit to bill the Medicare program and the respective Medicaid programs in the state or states in which Borrower operates and all other Third-Party Payor Programs (including Medicare) which have historically accounted for any portion of the revenues of the Hospital. All Medicare, Medicaid, and private insurance cost reports and financial reports submitted by Borrower are and will be materially accurate and complete and have not been and will not be misleading in any material respects and have been and will be submitted on a timely basis. No cost reports for the Hospital remain "open" or unsettled for longer than historically indicated periods and there are no Medicare, Medicaid or other Third-Party Payor Program reimbursement audits or appeals pending with respect to the Hospital or Borrower..

(e)    No Violation of Healthcare Laws.   Neither the Hospital or Borrower are in violation of any applicable Laws, except where any such violation would not have a Material Adverse Effect. Borrower is HIPAA Compliant. The Hospital has not received a statement of deficiencies or survey violation of a "Level A" (or equivalent) or worse (with respect to assisted living facilities), or a tag level of "G" or higher with respect to any skilled nursing facility, within the past three years for which a plan of correction has not been filed with the applicable state authority.

The Hospital is not currently subject to any plan of correction that has not been accepted by or is currently the subject of a review by the applicable state authority. Borrower has not received notice of any charges of patient abuse..

(f)    <u>Proceedings</u>.    Neither Borrower nor the Hospital is subject to any proceeding, suit or, to Borrower's knowledge, investigation by any federal, state or local government or quasi-governmental body, agency, board or authority or any other administrative or investigative body (including the Office of the Inspector General of the United States Department of Health and Human Services): (i) which may result in the imposition of a fine, alternative, interim or final sanction, a lower reimbursement rate for services rendered to eligible patients which has not been provided for on its financial statements, or which would have a Material Adverse Effect on Borrower or the operation of the Hospital; (ii) which could result in the revocation, transfer, surrender, suspension or other impairment of the operating certificate, provider agreement or Healthcare Permits of the Hospital; (iii) which pertains to or requests any voluntary disclosure pertaining to a potential overpayment matter involving the submission of claims to such payor by Borrower; or (iv) which pertains to any state or federal Medicare or Medicaid cost reports or claims filed by Borrower (including any reimbursement audits), or any disallowance by any commission, board or agency in connection with any audit of such cost reports..

(g)    <u>Hill Burton</u>.    Except for Governmental Receivables, Borrower is not or will be a participant in any federal program whereby any federal, state or local government or quasi-governmental body, agency, board or other authority may have the right to recover funds by reason of the advance of federal funds, including those authorized under the Hill-Burton Act (42 U.S.C. 291, et seq.)

(h)    <u>Fraud and Abuse</u>.

(i)    Borrower has not, or to its knowledge has been alleged to have, and no owner, officer, manager, employee or Person with a "direct or indirect ownership interest" (as that phrase is defined in 42 C.F.R. §420.201) in Borrower has, engaged in any of the following: (1) knowingly and willfully making or causing to be made a false statement or representation of a material fact in any application for any benefit or payment under any Healthcare Laws; (2) knowingly and willfully making or causing to be made any false statement or representation of a material fact for use in determining rights to any benefit or payment under any Healthcare Laws; (3) failing to disclose knowledge by a claimant of the occurrence of any event affecting the initial or continued right to any benefit or payment under any Healthcare Laws on its own behalf or on behalf of another, with intent to secure such benefit or payment fraudulently; (4) knowingly and willfully soliciting or receiving any remuneration (including any kickback, bribe or rebate), directly or indirectly, overtly or covertly, in cash or in kind or offering to pay such remuneration (I) in return for referring an individual to a Person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part by any Healthcare Laws, or (II) in return for purchasing, leasing or ordering or arranging for or recommending the purchasing, leasing or ordering of any good, facility, service, or item for which payment may be made in whole or in part by any Healthcare Laws; (5) presenting or causing

to be presented a claim for reimbursement for services that is for an item or services that was known or should have been known to be (I) not provided as claimed, or (II) false or fraudulent; or (6) knowingly and willfully making or causing to be made or inducing or seeking to induce the making of any false statement or representation (or omitting to state a fact required to be stated therein or necessary to make the statements contained therein not misleading) of a material fact with respect to (I) the Hospital in order that the Hospital may qualify for Governmental Authority certification, or (II) information required to be provided under 42 U.S.C. § 1320a-3. All contractual arrangements to which Borrower is a party are in compliance with all Healthcare Laws.

(ii)     Borrower has not, or to its knowledge has been alleged to have, and no owner, officer, manager, employee or Person with a "direct or indirect ownership interest" (as that phrase is defined in 42 C.F.R. §420.201) in Borrower has: (1) had a civil monetary penalty assessed against him or her pursuant to 42 U.S.C. §1320a-7a or is the subject of a proceeding seeking to assess such penalty; (2) been excluded from participation in a Federal Health Care Program (as that term is defined in 42 U.S.C. §1320a-7b) or is the subject of a proceeding seeking to assess such penalty, or has been "suspended" or "debarred" from selling products to the U.S. government or its agencies pursuant to the Federal Acquisition Regulation, relating to debarment and suspension applicable to federal government agencies generally (48 C.F.R. Subpart 9.4), or other applicable Laws; (3) been convicted (as that term is defined in 42 C.F.R. §1001.2) of any of those offenses described in 42 U.S.C. §1320a-7b or 18 U.S.C. §§669, 1035, 1347, 1518 or is the subject of a proceeding seeking to assess such penalty; (4) been involved or named in a U.S. Attorney complaint made or any other action taken pursuant to the False Claims Act under 31 U.S.C. §§3729-3731 or qui tam action brought pursuant to 31 U.S.C. §3729 et seq.; (5) been made a party to any other action by any governmental authority that may prohibit it from selling products to any governmental or other purchaser pursuant to any applicable Law; or (6) become subject to any federal, state, local governmental or private payor civil or criminal investigations or inquiries, proceedings, validation review, program integrity review or statement of charges involving or related to its compliance with Healthcare Laws or involving or threatening its participation in Medicare, Medicaid or other Third-Party Payor Programs or its billing practices with respect thereto.

### 5.21    Reliance on Representations; Survival

Borrower makes the representations and warranties contained herein with the knowledge and intention that the Lender is relying and will rely thereon.  All such representations and warranties will survive the execution and delivery of this Agreement and the making of the Advances under the Revolving Facility.  No investigation or inquiry made by or on behalf of the Lender nor knowledge by Lender which is in any fashion inconsistent with the representations and warranties contained herein, shall in any way (i) affect or lessen the representations and warranties made and entered into by the Borrower hereunder, or (ii) reduce or in any way affect the Lender's rights with respect to a breach of such representations and warranties.

### 5.22    Compliance with Environmental Requirements; No Hazardous Substances

(a)     The Borrower has no knowledge of (i) the presence of any Hazardous Substance on any of the real property where the Borrower conduct operations or have personal property; (ii) any on site spills, releases, discharges, disposal or

4874-6257-0384.6

storage of Hazardous Substances that have occurred or are presently occurring on any of such real property or where any Collateral is located, or (iii) any spills, releases, discharges or disposal of Hazardous Substances that have occurred or are presently occurring on any other real property as a result of the conduct, action or activities of the Borrower.

(b)      No property now owned or leased by the Borrower is on the National Priorities List promulgated pursuant to CERCLA, or CERCLIS (as defined in CERCLA) or any similar state list or is the subject of federal, state or local enforcement actions or, to the knowledge of such Borrower, other investigations which may lead to claims against Borrower for clean-up costs, remedial work, damage to natural resources or personal injury claims, including, without limitation, claims under CERCLA.

For purposes of this Section 5.22, the Borrower shall be deemed to include any business or business entity (including a corporation) that is, in whole or in part, a predecessor of the Borrower.

### 5.23    Material Contracts

Except for the Organizational Documents and the other agreements set forth on Schedule 5.23 (collectively with the Organizational Documents, the "**Material Contracts**"), there are no (a) employment agreements covering the management of the Borrower; (b) collective bargaining agreements or other similar labor agreements covering any employees of Borrower; (c) agreements for managerial, consulting or similar services to which the Borrower is a party or by which it is bound; (d) agreements regarding the Borrower, its assets or operations or any investment therein to which any of its equity holders is a party or by which it is bound; (e) real estate leases, Intellectual Property licenses or other lease or license agreements to which the Borrower is a party, either as lessor or lessee, or as licensor or licensee (other than licenses arising from the purchase of "off the shelf" products); (f) customer, distribution, marketing or supply agreements to which the Borrower is a party, in each case with respect to the preceding clauses (a) through (f) requiring payment of more than [$25,000] in any year; (g) partnership agreements to which the Borrower is a general partner or joint venture agreements to which Borrower is a party, or (h) any other agreements or instruments to which the Borrower is a party, and the breach, nonperformance or cancellation of which, or the failure of which to renew, could reasonably be expected to have a Material Adverse Effect.  Schedule 5.23 sets forth, with respect to each real estate lease agreement to which the Borrower is a party (as a lessee), the address of the subject property and the annual rental (or, where applicable, a general description of the method of computing the annual rental).  The consummation of the transactions contemplated by the Loan Documents will not give rise to a right of termination in favor of any party to any Material Contract (other than Borrower), except for such Material Contracts the noncompliance with which would not reasonably be expected to have a Material Adverse Effect.

### 5.24    Third-Party Payor Billing Numbers

The numbers under which the Borrower bills Third-Party Payors are listed on Schedule 5.24 and all such billing numbers have been issued to Borrower and not to any Affiliate

4874-6257-0384.6

of the Borrower and not to any unaffiliated third party; and the Borrower has not allowed any Person that is not a borrower hereunder to use such billing numbers for any purpose.

### 5.25   Financing Orders

The Financing Orders are in full force and effect and are not subject to a pending appeal, motion for leave to appeal, or other proceeding to set aside such orders, and such Financing Orders have not been reversed, modified, stayed or vacated absent the Lender's written consent.

### 5.26   DIP Order Notices

The Bankruptcy Case was commenced on the Petition Date in accordance with applicable law and proper and all legally required notice thereof and the proper notice for (i) the motion seeking approval of the Loan Documents and the Interim Financing Order and Final Financing Order; (ii) the hearing for the approval of the Interim Financing Order, and (iii) the hearing for the approval of the Final Financing Order, have been or will be timely given.

### 5.27   Superpriority Administrative Expense Claims

After the entry of the Interim Financing Order, and pursuant to and to the extent permitted in the Interim Financing Order and the Final Financing Order, the Obligations will constitute allowed Superpriority Claims.

### 5.28   DIP Liens

After the entry of the Interim Financing Order and pursuant to and to the extent provided in the Final Financing Order, the Obligations will be secured by a valid and perfected superpriority Lien on all of the Collateral, subject only to the Liens and priorities of other claims (if any) as provided by the Financing Orders.

### 5.29   Use of Proceeds.

The Proceeds of the Loans have been used in and will be used, whether directly or indirectly in compliance with Section 6.12.

## VI.   AFFIRMATIVE COVENANTS

Borrower covenants and agrees that, until full performance and satisfaction, and payment in full in cash, of all the Obligations (other than indemnity obligations with respect to which no claim has been made) and termination of this Agreement::

### 6.1   Financial Statements, Reports and Other Information

(a)   <u>Financial Reports</u>.  Borrower shall furnish to Lender (i) as soon as available and in any event within one hundred twenty (120) days after the end of each fiscal year of Borrower, Borrower's annual financial statements, including the notes thereto, consisting of a balance sheet at the end of such completed fiscal year and the related income statements, retained earnings, cash flows and owners' equity for

such completed fiscal year, reviewed and approved without qualification by an independent certified public accounting firm satisfactory to Lender and accompanied by related management letters, if available, and (ii) within thirty (30) days after the end of each calendar month, Borrower's unaudited financial statements consisting of a balance sheet and income statements, retained earnings, cash flows and owners' equity as of the end of such calendar month. All such financial statements shall be prepared in accordance with GAAP consistently applied with prior periods. With each such financial statement, Borrower shall also deliver a compliance certificate of its chief executive officer or chief financial officer in the form set forth in Exhibit B (a "**Compliance Certificate**") showing compliance with all financial and loan covenants set forth in Annex I. In addition to the above financial reports, Borrower shall furnish to Lender as soon as available and in any event within ten (10) days after the end of each calendar month, statements from Borrower's bank showing all account activity for the preceding calendar month.

(b)     Accounts Receivable Aging Schedules.  Borrower shall furnish to Lender as soon as available, and in any event within ten (10) days after the end of each calendar month, detailed accounts receivable and accounts payable aging schedules as of the end of such month, in a form satisfactory to Lender.

(c)     Forms 941.  Within thirty (30) days following the end of each calendar quarter, Borrower shall furnish Lender with a copy of all IRS Forms 941 required to be filed by Borrower with respect to the quarter then ended.

(d)     Other Materials.  Borrower shall furnish to the Lender as soon as available, and in any event within fifteen (15) calendar days after the preparation or issuance thereof or at such other time as set forth below:

(i)          *Communications with Equity Owners*. Any reports, returns, information, notices and other materials that Borrower shall send or be required to send to all of its stockholders, members, partners or other equity owners at any time;

(ii)          *Cost Reports*. All Medicare and Medicaid cost reports and other document and materials filed by or on behalf of Borrower and any other reports, materials or other information regarding or otherwise relating to Medicaid or Medicare prepared by, for or on behalf of Borrower;

(iii)          *Medicare/Medicaid Documents*.  Any other reports, materials or other information regarding or otherwise relating to Medicaid or Medicare prepared by, for, or on behalf of, Borrower or any of its Subsidiaries, including (A) copies of licenses and permits required by any applicable federal, state, foreign or local law, statute ordinance or regulation or Governmental Authority for the operation of its business, (B) Medicaid or Medicare provider numbers and agreements, (C) state surveys pertaining to the Hospital, (D) participating agreements relating to medical plans and (E) copies of all

4874-6257-0384.6

Medicare or Medicaid surveys, or other surveys or reviews conducted by any government health plan or other accreditation entity;

(iv)     *Monthly Reports*.  Within ten (10) calendar days after the end of each calendar month for such month, (A) a report of the status of all payments, denials and appeals of all Medicaid and/or Medicare Accounts; (B) a sales and collection report (including credits issued) in a form satisfactory to the Lender and such reports shall show a reconciliation to the amounts reported in the monthly financial statements, and (C) a report of census and occupancy percentage;

(v)     *Insurance Renewals*.  Prior to the expiration date of each of the insurance policies required to be maintained pursuant to Section 6.6, proof of the renewal of each such insurance policy together with copies of the declarations page for each such renewed policy;

(vi)     *Accountants Communications*.  Promptly upon receipt thereof, copies of any reports submitted to the Borrower by its independent accountants in connection with any interim audit of the books of Borrower and copies of each management control letter provided by such independent accountants;

(vii)     *Budget*.  On or before 12:00 pm EST on the fourth Business Day of each week, commencing with the first week following the Petition Date, the Borrower shall deliver to the Lender (i) a report comparing, on a line-item basis, actual cash receipts and disbursements against cash receipts and disbursements set forth in the previously delivered Budget, and (ii) an updated Budget for the proceeding thirteen-week period. Such updated Budget(s), in each case in form and substance satisfactory to the Lender, once approved by the Lender, shall become the Budget for all purposes going forward hereunder until a subsequent Budget is submitted and approved by the Lender.

(viii)     *Documents Requested by the Lender*.  Such additional information, documents, statements, reports and other materials as the Lender may reasonably request from a credit or security perspective or otherwise from time to time, including, but not limited to, periodic receivable and payable aging reports, payroll tax information, dilution analyses, origination reports and default/charge off reports.

(e)     Notices.  The Borrower shall promptly notify the Lender in writing of (i) any pending litigation, suit, investigation, arbitration, formal dispute resolution proceeding or administrative proceeding brought against or initiated by Borrower or otherwise affecting or involving or relating to Borrower or any of its property or assets;  (ii) any Event of Default, which notice shall specify the nature and status thereof, the period of existence thereof and what action is proposed to be taken with respect thereto; (iii) any other development, event, fact, circumstance or condition that could reasonably be expected to have a Material Adverse Effect, in each case describing the nature and status thereof and the action proposed to be taken with respect thereto; (iv) any matter(s) affecting the value, enforceability or collectability of any of the Collateral, including without limitation, post-petition claims or disputes in the amount of $25,000 or more, singly or in the aggregate, in

Superpriority Debtor-in-Possession Credit and Security Agreement, Page 51

existence at any one time; (v) receipt of any notice or request from any Governmental Authority or governmental payor regarding any liability or claim of liability outside the ordinary course of business, or (vi) termination of any executive manager of any facility owned, operated or leased by Borrower.

(f)     <u>Consents</u>.  Borrower shall obtain and deliver from time to time all required consents, approvals and agreements from such third parties as the Lender shall determine are necessary or desirable in its discretion (as communicated to Borrower by written notice) for the protection of its Collateral and that are reasonably satisfactory to the Lender with respect to the Loan Documents and the transactions contemplated thereby or any of the Collateral, including, without limitation, landlord waivers with respect to leases entered into after the Closing Date.

(g)     <u>Operating Budget</u>.  Borrower shall furnish to the Lender prior to the Closing Date a Budget setting forth the Borrower's projected cash receipts and disbursements and the Loans projected to be outstanding on a weekly basis for a period of thirteen-weeks, commencing with the week Closing occurs. On the fourth Business Day of each calendar week, the Borrower will provide the Lender with (i) a report comparing, on a line-item basis, actual cash receipts and disbursements against cash receipts and disbursements set forth in the previously delivered Budget, and (ii) an updated Budget for the proceeding thirteen-week period. At the request of the Lender, the Borrower shall furnish to the Lender month by month projected operating budgets, annual projections, balance sheets and cash flow reports of and for Borrower for any requested period (including an income statement for each month). All reports and Budgets delivered under this Section 6.1(g) shall be prepared in accordance with GAAP and consistently applied with prior periods.

(h)     <u>Healthcare Notices</u>.  Borrower shall notify the Lender within three (3) Business Days (but in any event prior to Borrower submitting any requests for advances of reserves or escrows or fundings of credit facility proceeds under this Agreement) following the occurrence of any facts, events or circumstances known to Borrower, whether threatened, existing or pending, that would make any of the representations and warranties contained in Section 5.20 untrue, incomplete or incorrect (together with such supporting data and information as shall be necessary to fully explain to the Lender the scope and nature of the fact, event or circumstance), and shall provide to Lender within 2 Business Days of Lender's request, such additional information as the Lender shall request regarding such disclosure.

(i)     <u>Notices with Respect to Lease</u>. In connection with Hospital Facility Lease Agreement between Old Operator and Borrower to be effective as of the "Effective Time" on the "Closing Date" as such terms are defined in the Hospital Asset Purchase Agreement (the "**Lease**"), Borrower shall:

(i)     notify Lender within one (1) Business Day of any default, event of default, or alleged default or event of default in connection with the Lease;

(ii)    notify Lender within one (1) Business Day of any termination of the Lease; and

(iii)   at Lender's request, provide Lender with evidence satisfactory to Lender of Borrower's payment of all rent due under the Lease on a monthly basis within one (1) Business Day of such payment.

### 6.2     Late Fee

Notwithstanding any other provision of this Agreement, in the event any of the financial statements or other reports or documents due by Borrower under this Section 6.2 are not timely delivered to the Lender, Borrower shall pay the Lender a late fee equal to $150 per day until such statements or reports are delivered to the Lender.  Such late fee shall be in addition to any other fees, charges or other provisions that may increase the Applicable Rate of interest hereunder and the assessment or collection of such late fee shall not, unless the Lender specifically agrees in writing to the contrary, prevent the Lender from considering any such non-timely delivery to be an Event of Default.

### 6.3     Payment of Obligation

Borrower (a) will pay and discharge, on a timely basis as and when due, all of its postpetition obligations and liabilities, except for such obligations and/or liabilities (i) that may be the subject of a Permitted Contest, and (ii) the nonpayment or nondischarge of which could not reasonably be expected to have a Material Adverse Effect or result in a Lien against any Collateral, except for Permitted Liens, (b) without limiting anything contained in the foregoing clause (a), pay all postpetition amounts due and owing in respect of taxes (including without limitation, payroll and withholdings tax liabilities) on a timely basis as and when due, and in any case prior to the date on which any fine, penalty, interest, late charge or loss may be added thereto for nonpayment thereof, (c) will maintain, and cause each Subsidiary to maintain, in accordance with GAAP, appropriate reserves for the accrual of all of its respective obligations and liabilities, and (d) will not breach or permit any Subsidiary to breach, or permit to exist any default under, postpetition the terms of any lease, commitment, contract, instrument or obligation to which it is a party, or by which its properties or assets are bound in any material respect.  Notwithstanding the foregoing, Borrower shall make full and timely payment in cash of the principal of and interest on the Loans, Advances and all other Obligations when due and payable.

### 6.4     Conduct of Business and Maintenance of Existence and Assets

Borrower shall (i) engage principally in the same or similar lines of business substantially as heretofore conducted, (ii) collect its Accounts in the ordinary course of business, (iii) maintain all of its material properties, assets and Equipment used or useful in its business in good repair, working order and condition (normal wear and tear excepted and except as may be disposed of in the ordinary course of business and in accordance with the terms of the Loan Documents and otherwise as determined by Borrower using commercially reasonable business judgment), and shall promptly make or cause to be made all repairs, replacements and other improvements in connection therewith that are necessary or desirable to such end, (iv) from time

to time make all necessary or desirable repairs, renewals and replacements thereof, as determined by Borrower using commercially reasonable business judgment, (v) maintain and keep in full force and effect its existence, (vi) maintain and keep in full force and effect, in good standing, and free from restrictions, probations, conditions or known conflicts which would materially impair Borrower's business, all qualifications to do business in each jurisdiction in which the ownership or lease of property or the nature of its business makes such qualification necessary, and (vii) maintain and keep in full force and effect all Healthcare Permits necessary under Healthcare Laws to continue to receive reimbursement under all Third-Party Payor Programs in which Borrower participates as of the date of this Agreement.

**6.5    Compliance with Legal, Tax and Other Obligations**

Borrower shall (i) substantially comply with all Laws applicable to it or its business, assets or operations, (ii) file its tax returns (including any informational returns) and pay all taxes (including bed taxes), assessments, fees, governmental charges, claims for labor, supplies, rent and all other obligations or liabilities of any kind, as and when due and payable, except liabilities being contested in a Permitted Contest; however, all payroll taxes payable in connection with each payroll shall be paid or funds shall set aside in a reserve in an amount adequate to pay all such payroll taxes contemporaneously with the payment of such payroll, and (iii) perform in accordance with its terms each contract, agreement or other arrangement to which it is a party or by which it or any of the Collateral is bound, in each case, except where the failure to comply with any of the foregoing provisions of this Section 6.5 could reasonably be expected not to have a Material Adverse Effect

**6.6    Insurance**

(a)    The Borrower shall (i) keep all of its insurable properties and assets adequately insured in all material respects against losses, damages and hazards as are customarily insured against by businesses engaging in similar activities or owning similar assets or properties and at least the minimum amount required by applicable Law, including, without limitation, medical malpractice and professional liability insurance, as applicable; (ii) maintain business interruption insurance, (iii) maintain general public liability insurance at all times against liability on account of damage to persons and property having such limits, deductibles, exclusions and co-insurance and other provisions as are customary for a business engaged in activities similar to those of Borrower, and (iv) maintain insurance under all applicable workers' compensation laws.  All of the insurance policies referenced above shall be (x) satisfactory in form and substance to the Lender in its discretion and (y) placed with insurers having an A.M. Best policyholder rating acceptable to the Lender in its discretion.  Borrower agrees that they shall not alter, amend, modify or cancel its insurance policies without thirty (30) Business Days prior written notice to the Lender unless such alteration, amendment, modification or cancellation, shall be in compliance with the requirements set forth above.  The insurance policies referenced in clauses (i) and (ii) shall name the Lender as a loss payee thereunder.  The insurance policies referenced in clause (iii) shall name the Lender as an additional insured thereunder.

4874-6257-0384.6

(b)      In the event Borrower fails to provide the Lender with evidence of the insurance coverage required by this Agreement, the Lender may purchase insurance at Borrower's expense to protect the Lender's interests in the Collateral.  This insurance may, but need not, protect the Borrower's interests.   The coverage purchased by the Lender may not pay any claim made by the Borrower or any claim that is made against the Borrower in connection with the Collateral.  The Borrower may later cancel any insurance purchased by the Lender, but only after providing the Lender with evidence that the Borrower has obtained insurance as required by this Agreement.  If the Lender purchases insurance for the Collateral in accordance with this Section 6.6(b), the Borrower will be responsible for the costs of that insurance to the fullest extent provided by law, including interest and other charges imposed by the Lender in connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance.  The costs of the insurance may be added to the Obligations.  The costs of the insurance may be more than the cost of insurance such Borrower is able to obtain on its own.

### 6.7    True Books

Borrower shall (i) keep true, complete and accurate books of record and accounts in accordance with commercially reasonable business practices in which true and correct entries are made of all of its dealings and transactions in all material respects; (ii) set up and maintain on its books such reserves with respect to doubtful accounts and all taxes, assessments, charges, levies and claims and with respect to its business, and include such reserves in its quarterly as well as year-end financial statements; and (iii) maintain its Books and Records separate from the books and records of its members, managers, shareholders, Affiliates and any other Person..

### 6.8    Inspection; Period Audits

Borrower shall permit the representatives of Lender, from time to time during normal business hours, upon reasonable notice but not more than once in any twelve-month period, to (i) visit and inspect any of its offices or properties or any other place where Collateral is located to inspect the Collateral and/or to examine or audit all of Borrower's books of account, records, reports and other papers; (ii) make copies and extracts therefrom, and (iii) discuss the Borrower's business, operations, prospects, properties, assets, liabilities, condition and/or Accounts with the Borrower's officers, managers, and independent public accountants (the performance of the foregoing activities is referred to herein as a "site audit").  In addition, the Lender may conduct "desk audits" of the Borrower at the Lender's offices no more frequently than monthly by (i) reviewing and inspecting such books and records of Borrower as Lender may require the Borrower to transmit to Lender, and (ii) discussing the Borrower's business, operations, prospects, properties, assets, liabilities, condition and/or Accounts with the Borrower's officers, managers and independent public accountants. Each of the Borrower's officers, managers and accountants are authorized to discuss any matter relating to the foregoing with Lender at any time.  At the completion of each site audit, Borrower shall pay Lender an audit fee of $1,200.00 per auditor per day (provided, however, the Lender shall utilize the services of only one auditor per day for its site audits) and the Borrower shall reimburse the Lender for all reasonable site audit-related out-of-pocket expenses.  At the completion of each desk audit, the Borrower shall pay the Lender an audit fee of $2,000.00 and the Borrower shall reimburse the Lender for all reasonable desk audit-related

out-of-pocket expenses. Notwithstanding the foregoing, upon the occurrence and during the continuance of an Event of Default, there shall be no restrictions on the number of auditors that the Lender may use or number of times that the Lender may perform the activities described in this Section 6.8 nor shall the Lender be required to give prior notice to the Borrower of any visit to inspect the Borrower's books and records or to discuss any matter with the Borrower's officers, managers or independent public accountants, provided that such visit shall not materially impair with the Borrower's ability to operate its business.

### 6.9    Further Assurances; Post Closing

At Borrower's cost and expense, the Borrower shall (i) within five (5) Business Days after the Lender's reasonable request, take such further actions, and duly execute and deliver such further agreements, assignments, instructions or documents and do such further acts and things as may be necessary or proper in the reasonable opinion of the Lender to carry out more effectively the provisions and purposes of this Agreement and the Loan Documents, and (ii) upon the exercise by the Lender or any of its Affiliates of any power, right, privilege or remedy pursuant to any Loan Documents or under applicable Law or at equity which requires any consent, approval, registration, qualification or authorization of any Person, including without limitation a Governmental Authority, execute and deliver, or cause the execution and delivery of, all applications, certificates, instruments and other documents that the Lender or its Affiliate may be required to obtain for such consent, approval, registration, qualification or authorization.

### 6.10    Payment of Indebtedness

Except as otherwise prescribed in the Loan Documents, the Borrower shall pay, discharge or otherwise satisfy at or before maturity (subject to applicable grace periods and, in the case of trade payables, to ordinary course payment practices) all of its material postpetition Indebtedness, except when the amount or validity thereof is being contested in a Permitted Contest.

### 6.11    Lien Terminations

If Liens other than Permitted Liens exist, Borrower immediately shall take, execute and deliver all actions, documents and instruments necessary to release and terminate such Liens.

### 6.12    Use of Proceeds

Borrower shall use the proceeds of the Loans solely for (a) transaction fees incurred in connection with the Loan Documents; and (b) for working capital needs of the Borrower through the Bankruptcy Case in accordance with the Approved Budget. No portion of the proceeds of the Loans will be used for family, personal, agricultural or household use, or for any purpose prohibited by the Financing Orders or the Bankruptcy Code or any other order of the Bankruptcy Court.

### 6.13    Collateral Documents; Security Interest in Collateral

Borrower hereby acknowledges that subject to Bankruptcy Court approval Lender is authorized to file UCC-1 Financing Statements with respect to the Collateral, and any amendments or continuations relating thereto, without the signatures of the Borrower in such

jurisdictions as the Lender, from time to time determines appropriate. Borrower hereby ratifies, confirms and consents to any such filings made by Lender prior to the date hereof. Borrower hereby agrees to take any actions reasonably requested by the Lender that are necessary to evidence Lender's security interest in the Collateral, including, without limitation, executing additional documents or financing statements. Borrower shall not allow any financing statement (other than that filed by or on behalf of Lender and other than Permitted Liens) to be on file in any public office covering any Collateral or the proceeds thereof. At the request of the Lender, Borrower shall defend the Collateral and the Lender's perfected first priority Lien thereon against all claims and demands of all Persons at any time claiming the same or any interest therein adverse to the Lender, and pay all reasonable costs and expenses (including, without limitation, reasonable in-house documentation and diligence fees and reasonable legal expenses and reasonable attorneys' fees and expenses) in connection with such defense, which may at the Lender's discretion be added to the Obligations and increase the principal amount outstanding hereunder.

### 6.14   Taxes and Other Charges

All payments and reimbursements to the Lender made under any Loan Document shall be free and clear of and without deduction for all taxes, levies, imposts, deductions, assessments, charges or withholdings, and all liabilities with respect thereto of any nature whatsoever, excluding taxes to the extent imposed on the Lender's net income. If Borrower shall be required by law to deduct any such amounts from or in respect of any sum payable under any Loan Document to the Lender, then the sum payable to the Lender shall be increased as may be necessary so that, after making all required deductions, the Lender receives an amount equal to the sum it would have received had no such deductions been made. Notwithstanding any other provision of any Loan Document, if at any time after the Closing (i) any change in any existing law, regulation, treaty or directive or in the interpretation or application thereof; (ii) any new law, regulation, treaty or directive (whether or not having the force of law) from any Governmental Authority (A) subjects Lender to any tax, levy, impost, deduction, assessment, charge or withholding of any kind whatsoever with respect to any Loan Document, or changes the basis of taxation of payments to Lender of any amount payable thereunder (except for net income taxes, or franchise taxes imposed in lieu of net income taxes, imposed generally by federal, state or local taxing authorities with respect to interest or facility fees or other fees payable hereunder or changes in the rate of tax on the overall net income of Lender), or (B) imposes on Lender any other condition or increased cost in connection with the transactions contemplated thereby or participations therein; and the result of any of the foregoing is to increase the cost to Lender of making or continuing any Loan hereunder or to reduce any amount receivable hereunder, then, in any such case, the Borrower shall promptly pay to Lender any additional amounts necessary to compensate Lender, on an after-tax basis, for such additional cost or reduced amount as determined by the Lender. If the Lender becomes entitled to claim any additional amounts pursuant to this Section 6.14 it shall promptly notify Borrower of the event by reason of which Lender has become so entitled, and each such notice of additional amounts payable pursuant to this Section 6.14 submitted by the Lender to Borrower shall, absent manifest error, be final, conclusive and binding for all purposes. For purposes of this Section, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to

Basel III, shall in each case be deemed to be a "change in any applicable Law", regardless of the date enacted, adopted or issued.

### 6.15 Hazardous Substances

(a)     If any release or disposal of Hazardous Substances shall occur or shall have occurred on any real property or any other assets of Borrower, Borrower will cause the prompt containment and removal of such Hazardous Substances and the remediation of such real property or other assets as is necessary to comply with all Environmental Laws and to preserve the value of such real property or other assets.

(b)     Borrower will provide the Lender within thirty (30) days after written demand therefor with a bond, letter of credit or similar financial assurance evidencing to the reasonable satisfaction of the Lender that sufficient funds are available to pay the cost of removing, treating and disposing of any Hazardous Substances or Hazardous Substances Contamination and discharging any assessment which may be established on any property as a result thereof, such demand to be made, if at all, upon the Lender's reasonable business determination that the failure to remove, treat or dispose of any Hazardous Substances or Hazardous Substances Contamination, or the failure to discharge any such assessment could reasonably be expected to have a Material Adverse Effect.

### 6.16 Licensed Facilities

(a)     If required under applicable Healthcare Laws, Borrower has and shall maintain in full force and effect a valid CON for no less than the number of beds and units in the Hospital as of the date of this Agreement. Borrower shall maintain any applicable CON free from restrictions or known conflicts which would materially impair the use or operation of the Hospital for its current use, and shall not permit any CON to become provisional, probationary or restricted in any way. Borrower that is the owner of the fee simple real estate for the Hospital shall be the owner of the CON, if any, relating to the Hospital.

(b)     Borrower shall not do (or suffer to be done by Borrower or any Affiliate of Borrower) any of the following without Lender's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed: (1) replace or transfer all or any part of the Hospital's units or beds to another site or location; (2) transfer or demise any CON or other Healthcare Permit or rights thereunder to any Person (other than Lender) or to any location other than the Hospital to which such CON or Healthcare Permit pertains; or (3) pledge or hypothecate any CON or other Healthcare Permit as collateral security for any indebtedness other than indebtedness to Lender.

### 6.17 Healthcare Operations

(a)     Borrower will:

(i)                              timely file or cause to be timely filed (after giving effect to any extension duly obtained), all notifications, reports, submissions, Permit

renewals and reports (other than cost reports as provided in Section 6.17(a)(ii) below) of every kind whatsoever required by Healthcare Laws (which reports will be materially accurate and complete in all respects and not misleading in any respect and shall not remain open or unsettled); and

(ii)             timely file or cause to be timely filed (after giving effect to any extension duly obtained), all cost reports required by Healthcare Laws, which reports shall be materially accurate and complete in all respects and not misleading in any material respect and which shall not remain open or unsettled, except in accordance with applicable settlement appeals procedures that are timely and diligently pursued and except for any processing delays of any Governmental Authority.

(b)     Borrower will maintain in full force and effect, and free from restrictions, probations, conditions or known conflicts which would materially impair the use or operation of the Hospital for its current use, all Healthcare Permits necessary under Healthcare Laws to carry on the business of Borrower as it is conducted on the Closing Date.

(c)     Borrower will not suffer or permit to occur any of the following:

(i)             any transfer of a Healthcare Permit or rights thereunder to any Person (other than the Borrower or the Lender) or to any location other than a location approved by Lender in advance in writing;

(ii)             any pledge or hypothecation of any Healthcare Permit as collateral security for any indebtedness other than indebtedness to the Lender;

(iii)             any rescission, withdrawal, revocation, amendment or modification of or other alteration to the nature, tenor or scope of any Healthcare Permit without the Lender's prior written consent, including, without limitation, (A) any change to the authorized units/beds and persons served capacity of the Hospital and/or the number of units/beds and persons served approved by the applicable Governmental Authority, and (B) any transfer all or any part of the Hospital's authorized units or beds to another site or location;

(iv)             any voluntary transfer of any resident of the Hospital to any other facility, unless such transfer is at the request of the resident (without economic incentives being given to the resident by an Affiliate of Borrower) or its payor or is for reasons relating to non-payment or the health, required level of medical care or safety of the resident to be transferred; or

(v)             any fact, event or circumstance for which notice to the Lender is required under Sections 5.20 and 6.1(h).

(d)     Borrower will maintain a corporate health care regulatory compliance program.

4874-6257-0384.6

(e)      Borrower will at all times be, and cause all Managers to be, HIPAA Compliant.

(f)      If the Hospital is currently accredited by an Accrediting Organization, the Borrower will (i) maintain such accreditation in good standing and without limitation or impairment; (ii) promptly submit to the Accrediting Organization a plan of correction for any deficiencies listed on any accreditation survey report, and (iii) cure all such deficiencies within such time frame as is necessary to preserve and maintain in good standing and without limitation or impairment such accreditation.

### 6.18    Bankruptcy Matters

Borrower will promptly, following the receipt thereof, deliver to the Lender copies of all letters of intent, expressions of interest, offers to purchase or draft purchase agreements (together with subsequent drafts with material substantive changes) with respect to any sale under Section 363 of the Bankruptcy Code.

## VII.    NEGATIVE COVENANTS

Borrower covenants and agrees that, until full performance and satisfaction, and payment in full in cash, of all the Obligations (other than indemnity obligations with respect to which no claim has been made) and termination of this Agreement:

### 7.1    Financial Covenants

Borrower shall not violate the financial and loan covenants set forth on Annex I to this Agreement, which is incorporated herein and made a part hereof. Borrower shall comply with the Approved Budget, subject to the Permitted Variance and as set forth in the Financing Orders.

### 7.2    No Indebtedness Other Than Permitted Indebtedness

Borrower will not, and will not permit any Subsidiary to, directly or indirectly, create, incur, assume, guarantee or otherwise become or remain directly or indirectly liable with respect to, any Indebtedness, except for Permitted Indebtedness.  Borrower will not permit any Subsidiary to, directly or indirectly, create, assume, incur or suffer to exist any Contingent Obligations.

### 7.3    No Liens Other Than Permitted Liens

Borrower shall not create, incur, assume or suffer to exist any Lien upon, in or against, or pledge of, any of the Collateral or any of its properties or assets or any of its shares, securities or other equity or ownership or partnership interests, whether now owned or hereafter acquired, except Permitted Liens.

4874-6257-0384.6

### 7.4    Investments, New Facilities or Collateral; Subsidiaries

Borrower, directly or indirectly, shall not (i) purchase, own, hold, invest in or otherwise acquire obligations or stock or securities of, or any other interest in, or all or substantially all of the assets of, any Person or any joint venture whether by merger, consolidation, outright purchase or otherwise, (ii) make or permit to exist any loans, advances or guarantees to or for the benefit of any Person or assume, guarantee, endorse, contingently agree to purchase or otherwise become liable for or upon or incur any obligation of any Person (other than those created by the Loan Documents and Permitted Indebtedness and other than (A) trade credit extended in the ordinary course of business, (B) advances for business travel and similar temporary advances made in the ordinary course of business to officers, directors and employees, (C) deposits to landlords and (D) the endorsement of negotiable instruments for deposit or collection or similar transactions in the ordinary course of business), (iii) purchase, own, operate, hold, invest in or otherwise acquire any facility, property or assets or any Collateral that is not located at the locations set forth on Schedule 5.17B unless Borrower shall provide to Lender at least thirty (30) Business Days prior written notice, or (iv) acquire or own any material assets other than the Hospital. Borrower shall have no Subsidiaries other than such Subsidiaries existing at Closing.

### 7.5    Prohibited Payments

(a)      So long as Borrower is in Default or an Event of Default exists under this Agreement, Borrower shall not make any (i) Distribution or (ii) payment of management fees or Subordinated Debt in violation of the applicable Subordination Agreement.

(b)      [Borrower shall not pay any Distribution, management fees, or Subordinated Debt payments described in subsection (a) above, if such payment would cause an Event of Default. For purposes of this Section 7.5, a Distribution, payment of a management fee or payment of Subordinated Debt described in subsection (a) above will be deemed to cause an Event of Default only if such payment, if included in the most recently completed calculation of (A) the Fixed Charge Coverage Ratio (as defined in Annex I), would have caused such Fixed Charge Coverage Ratio to be less than 1.00 to 1.00, or (B) the Current Ratio (as defined in Annex I), would have caused such Current Ratio to be less than 1.00 to 1.00.]

### 7.6    Transactions with Affiliates

Borrower shall not enter into or consummate any transactions of any kind with any of its Affiliates other than: (i) salary, bonus, employee stock option and other compensation to and employment arrangements with directors, officers or employees in the ordinary course of business, provided, that no payment of any bonus shall be permitted if an Event of Default has occurred and is continuing or would be caused by or result from such payment, (ii) payments permitted pursuant to Section 7.5, (iii) transactions that Lender or its Affiliates are a party to, (iv) payments (other than those referenced in cause (i) above) permitted under and pursuant to written agreements entered into by and between Borrower and one or more of its Affiliates that (A) both reflect and constitute transactions on overall terms at least as favorable to Borrower as would be the case in an arm's-

length transaction between unrelated parties of equal bargaining power, (B) do not grant a security interest in the Collateral to any Affiliate of Borrower, (C) contain payment obligations, if any, that are subordinate to the Obligations, and (D) do not involve a loan to any Affiliate of any Borrower, (v) transactions that create Accounts that are payable to Borrower by any Affiliate of Borrower, which do not exceed $50,000 in the aggregate, and (vi) loans or instruments payable by Borrower to any Affiliate of Borrower, which are classified as short-term debt and do not exceed $50,000 in the aggregate, provided, that notwithstanding the foregoing Borrower shall not enter into, consummate, or perform with respect to any transactions or agreement pursuant to which it becomes a party to any mortgage, note, indenture or guarantee evidencing any Indebtedness of any of its Affiliates or otherwise to become responsible or liable, as a guarantor, surety or otherwise, pursuant to an agreement for any Indebtedness of any such Affiliate other than Permitted Indebtedness. Borrower shall not comingle its funds or other assets with any funds or assets of any of its Affiliates, or any other Person, in such a manner that it will be costly or difficult to segregate, ascertain or identify Borrower's individual assets from those of any of its members, shareholders, or partners (as applicable), its Affiliates, the Affiliates of any of its members, shareholders, or partners (as applicable), or any other Person. For avoidance of doubt, the limitations set forth in this Section shall not apply with respect to payments of salary, bonus, employee stock option and other compensation to and employment arrangements with directors, officers (including any executive officer) or employees in the ordinary course of business, provided, that no payment of any bonus shall be permitted if an Event of Default has occurred and is continuing or would be caused by or result from such payment, but payments of regular salary, reimbursements of expenses, reasonable expense allowances and other normal forms of compensation shall be allowed even if an Event of Default has occurred and is continuing or would be caused by or result from such payment, subject, however to Section 7.9.

**7.7     Organizational Documents; Fiscal Year; Dissolution; Use of Proceeds**

Borrower shall not (i) change its name, state of formation, or amend, modify, restate or change its certificate of incorporation or formation or bylaws or similar charter documents in a manner that would be materially adverse to Lender and, in any event, without the prior consent of Lender, (ii) change its fiscal year, unless Borrower demonstrates to Lender's satisfaction compliance with the covenants contained herein for both the fiscal year in effect prior to any change and the new fiscal year period by delivery to Lender of appropriate interim and annual pro forma, historical and current compliance certificates for such periods and such other information as Lender may reasonably request, (iii) amend, alter or suspend or terminate or make provisional in any material way, any Permit without the prior written consent of Lender, which consent shallnot be unreasonably withheld, (iv) wind up, liquidate or dissolve (voluntarily or involuntarily) or commence or suffer any proceedings seeking to wind up, liquidate or dissolve or that would result in any of the foregoing, (v) use any proceeds of any Advance for "purchasing" or "carrying" "margin stock" as defined in Regulations U, T or X of the Board of Governors of the Federal Reserve System, or (vi) fail either to hold itself out to the public as a legal entity separate and distinct from any other Person or to conduct its business in its own name or its registered trade name, in order not (a) to mislead others as to the identity with which such other party is transacting business, or (b) suggest that it is responsible for the debts of any third party (including any of its members, managers, partners and shareholders or Affiliates, or any general partner, principal or Affiliate thereof.

4874-6257-0384.6

### 7.8    Asset Sales

Borrower shall not, without the prior written approval of Lender, directly or indirectly sell, convey, transfer, assign, license, lease (that has the effect of a disposition) or otherwise dispose of (including any merger or consolidation or upon any condemnation, eminent domain or similar proceedings) to any Person, in one transaction or a series of related transactions, any permitted contracts with Third-Party Payors, Books and Records (except for the removal of patient records at the request of such patient), or any assets of Borrower with a value greater than $100,000 or which constitute all or substantially all of an operating unit of Borrower or any other assets (including intellectual property) of Borrower outside of the ordinary course of business. Borrower shall not, directly or indirectly, transfer or assign any contract, patient relationship, or other business relationship, or right to provide services, Goods, room or board to any Affiliate of Borrower. Borrower shall not let any contract, patient relationship, or other business relationship be terminated or expire if at any time following such termination or expiration, such contract, patient relationship or other business relationship is reinstated with any Affiliate of Borrower.

### 7.9    Management

Borrower shall not pay any compensation or other amounts to senior management of Borrower in excess of such amounts as are usual and customary for companies in similar businesses and of a similar size..

### 7.10    Restrictive Agreements

Borrower will not, and will not permit any Subsidiary to, directly or indirectly (a) enter into or assume any agreement (other than the Loan Documents and any agreements for purchase money debt permitted under clause (iii) of the definition of Permitted Indebtedness) prohibiting the creation or assumption of any Lien upon its properties or assets, whether now owned or hereafter acquired, or (b) create or otherwise cause or suffer to exist or become effective any consensual encumbrance or restriction of any kind (except as provided by the Loan Documents) on the ability of any Subsidiary to: (i) pay or make Distributions to Borrower or any Subsidiary; (ii) pay any Indebtedness owed to Borrower or any Subsidiary; (iii) make loans or advances to Borrower or any Subsidiary; or (iv) transfer any of its property or assets to Borrower or any Subsidiary; provided, that, any agreements for purchase money debt shall not prohibit (x) the creation or assumption of any Lien upon any assets or properties to secure the Obligations or (y) the repayment of the Obligations.

### 7.11    Modifications of Certain Agreements

Other than with respect to Permitted Modifications, Borrower will not, and will not permit any Subsidiary to, directly or indirectly, amend, terminate or otherwise modify any Material Contract or the Lease, without Lender's prior written consent (which Lender may give or withhold in Lender's sole discretion), which amendment, termination or modification in any case: (a) is contrary to the terms of this Agreement or any other Loan Document; (b) could reasonably be expected to be adverse to the rights, interests or privileges of the Lender or its ability to enforce the same; (c) results in the imposition or expansion in any material respect of any obligation of or restriction or burden on Borrower or any Subsidiary; or (d) reduces in any material respect any

rights or benefits of Borrower or any Subsidiaries (it being understood and agreed that any such determination shall be in the discretion of the Lender). Borrower shall, prior to entering into any amendment, termination or other modification of any of the foregoing documents, deliver to Lender reasonably in advance of the execution thereof, any final or execution copy of amendments, terminations or other modifications to such documents, and Borrower agrees not to take, nor permit any of its Subsidiaries to take, any such action with respect to any such documents without obtaining such approval from Lender.

### 7.12 Deposit Accounts

Borrower shall not make any changes to its deposit accounts, Controlled Deposit Accounts or establish new deposit accounts or change the passwords or user identification information with respect thereto in such a fashion as would result in the Lender not having on-line access to view all information regarding all of the Borrower's deposit accounts and Controlled Deposit Accounts or having control of all of the Borrower's deposit accounts through deposit account control agreements.

### 7.13 Truth of Statements

Borrower shall not furnish to the Lender any certificate or other document that contains any untrue statement of a material fact or that omits to state a material fact necessary to make it not misleading in light of the circumstances under which it was furnished.

### 7.14 IRS Form 8821

Borrower shall not materially alter, amend, restate, or otherwise modify, or withdraw, terminate or re-file any IRS Form 8821 required to be delivered pursuant to the Conditions Precedent in Section 4.1.

### 7.15 Third Party Payor Programs

Neither the Hospital, nor Borrower, shall, other than in the ordinary course of the Borrower's business, change the terms of any Third-Party Payor Programs or its normal billing payment and reimbursement policies and procedures with respect thereto (including, without limitation, the amount and timing of finance charges, fees and write-offs) without prior written notice of such change to the Lender. Borrower shall provide to the Lender, upon request, an accurate, complete and current list of all participation agreements with Third Party Payors with respect to the business of Borrower. Borrower shall not fail to comply with all requirements, contracts, conditions and stipulations applicable to Borrower in order to maintain in good standing and without default or limitation all such participation agreements.

### 7.16 Filing of Motions and Applications

Borrower shall not, without the prior written consent of the Lender, apply to the Bankruptcy Court for authority to (i) take any action that is prohibited by the terms of any of the Loan Documents, or (ii) refrain from taking any action that is required to be taken by the terms of any of the Loan Documents or the Financing Orders.

4874-6257-0384.6

### 7.17    Interim and Final Financing Orders

Borrower shall not:

(a)    seek or consent to exist at any time any modification, stay, vacation or amendment of the Interim Financing Order (until such time as the Final Financing Order is entered) and the Final Financing Order, except for modifications and amendments joined in or agreed to in writing by the Lender; or

(b)    seek the use of "Cash Collateral" (as defined in the Financing Orders) in a manner inconsistent with the terms of the Financing Orders without the prior written consent of the Lender; or

(c)    seek or consent to exist at any time a priority for any administrative expense or unsecured claim against Borrower (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expenses of the kind specified in Sections 105, 326, 328, 503(b), 506(c), 507(a), 507(b), 546(c), 552(b), 726 and 1114 of the Bankruptcy Code) or any superpriority claim which is equal or superior to the priority of the Lender in respect of the Obligations, except as expressly permitted by the Financing Orders; or

(d)    prior to the date on which the Obligations have been paid in full, pay any administrative expenses, except administrative expenses incurred in accordance with the Carve-Out, the Budget or the Financing Orders.

### 7.18    Bankruptcy Actions

The Borrower shall not seek, consent to, or permit to exist, without the prior written consent of the Lender, any order granting authority (a) to take any action (i) that is prohibited by the terms of this Agreement or the Financing Orders, or (ii) that proposes to sell, use, dispose of, transfer, or in any way negatively impact the value of the Collateral, or (b) to refrain from taking any action that is required to be taken by such documents.

## VIII.   EVENTS OF DEFAULT

### 8.1    Events of Default

The occurrence of any one or more of the following shall constitute an "Event of Default:"

(a)    Borrower shall fail to pay any amount on the Obligations or provided for in any Loan Document when due and such failure shall not be cured within five (5) calendar days of when due (whether on any payment date, at maturity, by reason or acceleration, by notice of intention to prepay, by required prepayment or otherwise);

(b)    Any representation, statement or warranty made or deemed made by the Borrower in any Loan Document or in any other certificate, document, report or

opinion delivered in conjunction with any Loan Document to which it is a party, (i) shall not be true and correct in all material respects, or (ii) shall have been false or misleading in any material respect on the date when made or deemed to have been made (except to the extent already qualified by materiality, in which case it shall be true and correct in all respects and shall not be false or misleading in any respect);

(c)     Borrower or any other party thereto other than the Lender shall be in violation, breach or default of, or shall fail to perform, observe or comply with any covenant, obligation or agreement set forth in any Loan Document and such violation, breach, default or failure shall not be cured within the applicable period set forth in the applicable Loan Documents; provided that, with respect to the affirmative covenants set forth in Article VI (other than Sections 6.2, 6.9, 6.11, 6.16 and 6.17 for which there shall be no cure period, unless otherwise set forth herein), there shall be a fifteen (15) calendar day cure period commencing from the earlier of (i) receipt by such Person of written notice of such breach, default, violation or failure, and (ii) the time at which such Person or any officer thereof knew or became aware, or should have known or been aware, of such failure, violation, breach or default;

(d)     Any of the Loan Documents ceases to be in full force and effect, or any Lien created thereunder ceases to constitute a valid perfected first priority Lien on the Collateral, or the Lender ceases to have a valid perfected first priority security interest in any material portion of the Collateral;

(e)     The Lender's administrative expense claim in the Bankruptcy Case becomes subject (or subordinate) to another administrative expense claim;

(f)     One or more judgments or decrees is rendered against Borrower in an amount in excess of $10,000 individually or $25,000 in the aggregate at one time outstanding, which is/are not satisfied, stayed, bonded, vacated or discharged of record within thirty (30) calendar days of being rendered;

(g)     (i) Any Change of Control occurs or any agreement or commitment to cause or that may result in any such Change of Control is entered into without the written consent of the Lender; (ii) any Material Adverse Effect or Material Adverse Change occurs; (iii) any Liability Event occurs, or (iv) Borrower ceases any material portion of its business operations as currently conducted;

(h)     Any Indebtedness of Borrower is declared to be due and payable or is required to be prepaid (other than by a regularly scheduled payment) prior to the stated maturity thereof;

(i)     The Lender receives any indication or evidence that Borrower may have directly or indirectly been engaged in any type of activity which, in the Lender's judgment, might result in forfeiture of any property to a Governmental Authority

which shall have continued unremedied for a period of five (5) business days after written notice from the Lender;

(j)      Borrower or any of its respective members or senior officers is criminally indicted or convicted under any law that could lead to a forfeiture of any portion of its respective assets;

(k)      The Bankruptcy Case shall be converted to a case under Chapter 7 of the Bankruptcy Code or be dismissed or a motion requesting such relief shall have been filed by the Borrower;

(l)      The Borrower files or supports, or the Bankruptcy Court enters an order confirming a proposed plan of reorganization or liquidation or sale of substantially all of the Borrower's assets that does not provide for the indefeasible payment in full and in cash of the Obligations, unless otherwise agreed in writing by the Lender in its sole discretion;

(m)      Any attempt by the Borrower to obtain, or if any other party in interest obtains, an order of the Bankruptcy Court or other judgment, and the effect of such order or judgment is to, (i) invalidate, reduce or otherwise impair the Lender's claims, or (ii) amend, supplement, stay, vacate or otherwise modify the Revolving Facility or the Financing Orders without consent of the Lender;

(n)      The Borrower requests approval of any post-petition financing, other than pursuant to the Revolving Facility, that would not immediately repay all Obligations, in full, in cash, on the date of the closing of such post-petition financing, unless otherwise agreed by the Lender;

(o)      The entry of an order granting liens or claims that are senior or *pari passu* to the Liens granted in favor of the Lender under the Loan Documents;

(p)      The Borrower supports or files a motion in support of any order granting liens or claims that are senior or pari passu to the Liens granted in favor of the Lender under the Loan Documents;

(q)      The Borrower shall assert that any of the Liens securing the Obligations are invalid, or any such Liens granted to the Lender shall be determined to be invalid;

(r)      Any report is filed by a patient care ombudsman or state long-term care ombudsman in the Bankruptcy Case indicating that patient care has significantly declined or has been materially compromised;

(s)      Any creditor or party in interest shall be granted relief from the automatic stay with respect to any assets used in operation of the Borrower's business;

(t)      The Borrower shall default in the due performance or observance by it of any term, covenant or agreement contained in the Interim Financing Order or the Final Financing Order;

4874-6257-0384.6

(u)     From and after the date of entry thereof, the Interim Financing Order or the Final Financing Order approving this Agreement and the Revolving Facility shall cease to be in full force and effect;

(v)     A Final Financing Order approving this Agreement and the Revolving Facility has not been entered by the Bankruptcy Court within forty-five (45) days of the Petition Date, unless otherwise agreed to by the Lender;

(w)     The Borrower applies for an order substituting any assets for all or any portion of the Collateral, or

(x)     The Lease is determined to be terminated or otherwise invalid by a court of competent jurisdiction.

### 8.2     Acceleration and Suspension or Termination of Commitments

Upon the occurrence and during the continuance of an Event of Default, notwithstanding any other provision of any Loan Documents, the Lender may by notice to the Borrower (i) terminate the Lender's obligations under this Agreement and/or (ii) by notice to the Borrower declare all or any portion of the Obligations to be due and payable immediately (except in the case of an Event of Default under Section 8.1(g), in which event all of the foregoing shall automatically and without further act by the Lender be due and payable). If the Revolving Facility is accelerated for any reason, the Lender may, at its sole discretion, elect to exclude all or a portion of the Eligible Unbilled Receivables from the definition of Eligible Receivables. If the Lender so elects, such Eligible Unbilled Receivables shall not be included in the calculation of the Borrowing Base.

## IX. RIGHTS AND REMEDIES AFTER DEFAULT

### 9.1     Rights and Remedies

(a)     In addition to the acceleration provisions set forth in Article VIII above, upon the occurrence and continuation of an Event of Default, following the giving of not less than five (5) business days' advance written notice by the Lender to such parties and in the manner set forth in the Interim Financing Order (the "**Default Notice Period**") and subject to the procedures set forth in such Interim Financing Order (and after any applicable cure period set forth herein, which shall be coterminous with and not incremental to the Notice Period), the Lender shall have the right to exercise any and all rights, options and remedies provided for in any Loan Document, under the UCC or at law or in equity, including, without limitation, the right to (i) apply any property of Borrower received or held by the Lender to reduce the Obligations in such manner as the Lender may deem advisable; (ii) foreclose the Liens created under the Loan Documents; (iii) realize upon, take possession of and/or sell any Collateral or securities pledged with or without judicial process; (iv) exercise all rights and powers with respect to the Collateral as Borrower might exercise (other than with respect to Collateral consisting of Accounts owed or owing by Medicaid/Medicare Account Debtors

absent a court order or compliance with applicable Law); (v) collect and send notices regarding the Collateral with or without judicial process; (vi) at the Borrower's expense, require that all or any part of the Collateral be assembled and made available to the Lender at any reasonable place designated by the Lender; (vii) reduce or otherwise change the Facility Cap; (viii) engage, on behalf of the Borrower, a third-party to service and collect the Borrower's receivables, including billing and rebilling Third-Party Payors as well as the patients to the extent of their obligations thereunder, and/or (ix) relinquish or abandon any Collateral or securities pledged or any Lien thereon.  Notwithstanding any provision of any Loan Document, the Lender shall have the right, at any time that Borrower fail to do so, and from time to time, without prior notice, to: (i) obtain insurance covering any of the Collateral to the extent required hereunder; (ii) pay for the performance of any Obligations; (iii) discharge taxes or liens on any of the Collateral that are in violation of any Loan Document unless such taxes or liens are the subject of a Permitted Contest, and (iv) pay for the maintenance and preservation of the Collateral.  Such expenses and advances shall be added to the Obligations and increase the principal amount outstanding hereunder, until reimbursed to the Lender and shall be secured by the Collateral, and such payments by the Lender shall not be construed as a waiver by the Lender of any Event of Default or any other rights or remedies of the Lender.

(b)     Borrower agrees that notice received by it at least ten (10) calendar days before the time of any intended public sale, or the time after which any private sale or other disposition of Collateral is to be made, shall be deemed to be reasonable notice of such sale or other disposition.  If permitted by applicable Law, any perishable Collateral which threatens to speedily decline in value or which is sold on a recognized market may be sold immediately by the Lender without prior notice to Borrower.  At any sale or disposition of Collateral or securities pledged, the Lender may (to the extent permitted by applicable Law) purchase all or any part thereof free from any right of redemption by Borrower which right is hereby waived and released.  Borrower covenants and agrees not to, and not to permit or cause any of its Subsidiaries to, interfere with or impose any obstacle to the Lender's exercise of its rights and remedies with respect to the Collateral.  The Lender, in dealing with or disposing of the Collateral or any part thereof, shall not be required to give priority or preference to any item of Collateral or otherwise to marshal assets or to take possession or sell any Collateral with judicial process.

**9.2    Application of Proceeds**

In addition to any other rights, options and remedies the Lender has under the Loan Documents, the UCC, at law or in equity, all dividends, interest, rents, issues, profits, fees, revenues, income and other proceeds collected or received from collecting, holding, managing, renting, selling, or otherwise disposing of all or any part of the Collateral or any proceeds thereof upon exercise of its remedies hereunder shall be applied in the following order of priority, after payment of the Carve-Outs then due: (i) first, to the payment of all reasonable out-of-pocket costs and expenses of such collection, storage, lease, holding, operation, management, sale, disposition or delivery and of conducting Borrower's business and of maintenance, repairs, replacements,

4874-6257-0384.6

alterations, additions and improvements of or to the Collateral, and to the payment of all sums which the Lender may be required or may elect to pay, if any, for taxes, assessments, insurance and other charges upon the Collateral or part thereof, and all other payments that the Lender may be required or authorized to make under any provision of this Agreement (including, without limitation, in each such case, reasonable in-house documentation and diligence fees and legal expenses, search, audit, recording, professional and filing fees and expenses and reasonable attorneys' fees and all expenses, reasonable expert witness fees, liabilities and advances made or incurred in connection therewith, whether litigation is commenced or not); (ii) second, to the payment of all Obligations as provided herein, (iii) third, to the satisfaction of Indebtedness secured by any subordinate security interest of record in the Collateral if written notification of demand therefor is received before distribution of the proceeds is completed, provided, that, if requested by the Lender, the holder of a subordinate security interest shall furnish reasonable proof of its interest, and unless it does so, the Lender need not address its claims; and (iv) fourth, to the payment of any surplus then remaining to Borrower, unless otherwise provided by law or directed by a court of competent jurisdiction, provided that Borrower shall be liable for any deficiency if such proceeds are insufficient to satisfy the Obligations or any of the other items referred to in this Section.

### 9.3    Application of Payments Following Default

Following the occurrence and continuance of an Event of Default, the Lender may, notwithstanding Section 9.2, apply any and all payments received by the Lender in respect of the Obligations, and any and all proceeds of Collateral received by the Lender, in such order as the Lender may from time to time elect, subject to the Carve-Outs.

### 9.4    Rights and Remedies not Exclusive

The Lender shall have the right in accordance with the terms hereof, in its discretion to determine which rights, Liens and/or remedies Lender may at any time pursue, relinquish, subordinate or modify, and such determination will not in any way modify or affect any of the Lender's rights, Liens or remedies under any Loan Document, applicable Law or equity. The enumeration of any rights and remedies in any Loan Document is not intended to be exhaustive, and all rights and remedies of the Lender described in any Loan Document are cumulative and are not alternative to or exclusive of any other rights or remedies which the Lender otherwise may have. The partial or complete exercise of any right or remedy shall not preclude any other further exercise of such or any other right or remedy.

## X. WAIVERS AND JUDICIAL PROCEEDINGS

### 10.1    Waivers

Except as expressly provided for herein, the Borrower hereby waives setoff, counterclaim, demand, presentment, protest, all defenses with respect to any and all instruments and all notices and demands of any description, and the pleading of any statute of limitations as a defense to any demand under any Loan Document. The Borrower hereby waive any and all defenses and counterclaims it may have or could interpose in any action or procedure brought by the Lender to obtain an order of court recognizing the assignment of, or Lien of the Lender in and

to, any Collateral, whether or not payable by a Medicaid/Medicare Account Debtor. With respect to any action hereunder, the Lender conclusively may rely upon, and shall incur no liability to Borrower in acting upon, any request or other communication that the Lender reasonably believes to have been given or made by a person authorized on the Borrower's behalf, whether or not such person is listed on the incumbency certificate delivered pursuant to Section 4.1. In each such case, Borrower hereby waive the right to dispute the Lender's action based upon such request or other communication, absent manifest error.

### 10.2    Delay; No Waiver or Defaults

No course of action or dealing, renewal, release or extension of any provisions of any Loan Document, or single or partial exercise of any such provision, or delay, failure or omission on the Lender's part in enforcing any such provision shall affect the liability of the Borrower or operate as a waiver of such provision or affect the liability of the Borrower or preclude any other or further exercise of such provision. No waiver by any party to any Loan Document of any one or more defaults by any other party in the performance of any of the provisions of any Loan Document shall operate or be construed as a waiver of any future default, whether of a like or different nature, and each such waiver shall be limited solely to the express terms and provisions of such waiver. Notwithstanding any other provision of any Loan Document, by completing the Closing under this Agreement and/or by making Advances, the Lender does not waive any breach of any representation or warranty of under any Loan Document, and all of the Lender's claims and rights resulting from any such breach or misrepresentation are specifically reserved.

### 10.3    Jury Waiver

EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION ARISING UNDER THE LOAN DOCUMENTS OR IN ANY WAY CONNECTED WITH OR INCIDENTAL TO THE DEALINGS OF THE PARTIES WITH RESPECT TO THE LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED THEREBY, WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE. EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENTS OF THE PARTIES TO THE WAIVER OF THEIR RESPECTIVE RIGHTS TO TRIAL BY JURY.

### 10.4    Cooperation in Discovery and Litigation

In any litigation, arbitration or other dispute resolution proceeding relating to any Loan Document, the Borrower waives any and all defenses, objections and counterclaims they may have or could interpose with respect to (i) any of its directors, officers, employees or agents being deemed to be employees or managing agents of Borrower for purposes of all applicable Law or court rules regarding the production of witnesses by notice for testimony (whether in a deposition, at trial or otherwise); (ii) the Lender's counsel examining any such individuals as if under cross-examination and using any discovery deposition of any of them as if it were an

evidence deposition, and/or (iii) using all commercially reasonable efforts to produce in any such dispute resolution proceeding, at the time and in the manner requested by the Lender, all Persons, documents (whether in tangible, electronic or other form) and/or other things under its control and relating to the dispute.

## XI. EFFECTIVE DATE AND TERMINATION

### 11.1    Effectiveness and Termination

(a)    <u>Termination by the Lender</u>.  Subject to the Lender's right to terminate and cease making Advances upon the occurrence and during the continuance of an Event of Default, this Agreement shall continue in full force and effect until the full performance and indefeasible payment in cash of all Obligations (other than indemnity obligations with respect to which no claim has been made), unless terminated sooner as provided in this Section 11.1.

(b)    <u>Termination by Borrower</u>.  Borrower may terminate this Agreement at any time upon not less than thirty (30) calendar days' prior written notice to the Lender and upon full performance and indefeasible payment in full in cash of all Obligations (other than indemnity obligations with respect to which no claim has been made) on or prior to such 30th calendar day after receipt by the Lender of such written notice.  Borrower may elect to terminate this Agreement in its entirety only.  No section of this Agreement or type of Loan available hereunder may be terminated singly.

(c)    <u>Effectiveness of Termination</u>.  All of the Obligations (other than indemnity obligations with respect to which no claim has been made) shall be immediately due and payable upon the Termination Date.  All undertakings, agreements, covenants, warranties and representations of Borrower contained in the Loan Documents shall survive any such termination and the Lender shall retain its Liens in the Collateral and the Lender shall retain all of its rights and remedies under the Loan Documents notwithstanding such termination until all Obligations have been irrevocably discharged or paid, in full, in immediately available funds, including, without limitation, all Obligations under Section 3.4 and the terms of any fee letter resulting from such termination.  Notwithstanding the foregoing or the payment in full of the Obligations, the Lender shall not be required to terminate its Liens in the Collateral unless, with respect to any loss or damage the Lender may incur as a result of dishonored checks or other items of payment received by the Lender from Borrower or any Account Debtor and applied to the Obligations, the Lender shall, at its option, (i) have received a written agreement satisfactory to the Lender, executed by the Borrower and, if the Borrower's financial condition at that time is weaker than it is as of the date hereof, by any Person whose loans or other advances to Borrower are used in whole or in part to satisfy the Obligations, indemnifying Lender from any such loss or damage, or (ii) have retained cash Collateral or other Collateral for such period of time as the Lender, in its discretion, may deem necessary to protect the Lender from any such loss or damage.

### 11.2    Survival

All obligations, covenants, agreements, representations, warranties, waivers and indemnities made by Borrower in any Loan Document shall survive the execution and delivery of the Loan Documents, the Closing, the making of the Advances and any termination of this Agreement until all Obligations (other than indemnity obligations with respect to which no claim has been made) are fully performed and indefeasibly paid in full in cash.  Notwithstanding the foregoing sentence of this Section 11.2, the obligations and provisions of Sections 3.6, 10.1, 10.4, 13.1, 13.3, 13.4, 13.7 and 13.10 shall survive termination of the Loan Documents and any payment, in full or in part, of the then-outstanding Obligations.

## XII.    ASSIGNMENTS AND PARTICIPATIONS

### 12.1    Assignments

The Lender may at any time assign its rights and obligations hereunder and under all other Loan Documents to an assignee approved by the Bankruptcy Court.

## XIII.    MISCELLANEOUS

### 13.1    Governing Law; Jurisdiction; Service of Process; Venue

The Loan Documents shall be governed by and construed in accordance with the internal substantive laws of the State of Texas without giving effect to its choice of law provisions. So long as the Bankruptcy Case is pending, any judicial proceeding against Borrower with respect to the Obligations, any Loan Documents or any related agreement shall be brought in the Bankruptcy Court, and thereafter, any judicial proceeding shall be brought in any federal or state court of competent jurisdiction located in the State of Texas. By execution and delivery of each Loan Document to which it is a party, Borrower and the Lender (i) accepts the non-exclusive jurisdiction of the aforesaid courts and irrevocably agrees to be bound by any judgment rendered thereby; (ii) waives personal service of process; (iii) agrees that service of process upon it may be made by certified or registered mail, return receipt requested, pursuant to Section 13.5; (iv) waives any objection to jurisdiction and venue of any action instituted hereunder and agrees not to assert any defense based on lack of jurisdiction, venue or convenience, and (v) agrees that this loan was made in Texas, that the Lender has accepted in Texas the Loan Documents executed by the Borrower and has disbursed Advances under the Loan Documents in Texas.  Nothing shall affect the right of the Lender to serve process in any manner permitted by law.  All parties acknowledge that they participated in the negotiation and drafting of this Agreement and that, accordingly, no party shall move or petition a court construing this Agreement to construe it more stringently against one party than against any other.

### 13.2    Binding Effect of Loan Documents

The Loan Documents shall inure to the benefit of the Lender, its assignees, Participants and all future holders of the Obligations and/or any of the Collateral, and each of its respective successors and assigns.  Each Loan Document shall be binding upon the Persons other than the Lender that are parties thereto and their respective successors and assigns, and no such Person may assign, delegate or transfer any Loan Document or any of its rights or obligations

thereunder without the prior written consent of the Lender. No rights are intended to be created under any Loan Document for the benefit of any Person who is not a party to such Loan Document. Nothing contained in any Loan Document shall be construed as a delegation to the Lender of any other Person's duty of performance. BORROWER ACKNOWLEDGES AND AGREES THAT THE LENDER AT ANY TIME AND FROM TIME TO TIME MAY (I) DIVIDE AND RESTATE ANY NOTE, AND/OR (II) SELL, ASSIGN OR GRANT PARTICIPATING INTERESTS IN OR TRANSFER ALL OR ANY PART OF ITS RIGHTS OR OBLIGATIONS UNDER ANY LOAN DOCUMENT, THE OBLIGATIONS AND/OR THE COLLATERAL TO OTHER PERSONS (EACH SUCH TRANSFEREE, ASSIGNEE OR PURCHASER, A "**TRANSFEREE**"), subject to Bankruptcy Court approval, if applicable.

### 13.3   Revival of Obligations

To the extent that any payment made or received with respect to the Obligations is subsequently invalidated, determined to be fraudulent or preferential, set aside or required to be repaid to a trustee, debtor in possession, receiver, custodian or any other Person under any Debtor Relief Law, common law or equitable cause or any other law, then the Obligations intended to be satisfied by such payment (whether or not previously terminated) shall be revived and shall continue as if such payment had not been received by the Lender. Any payments received with respect to such revived Obligations shall be credited and applied in such manner and order, as the Lender shall decide in its discretion.

### 13.4   Indemnity

The Borrower shall indemnify the Lender, its Affiliates and its respective managers, members, officers, employee, Affiliates, agents, representatives, successors, assigns, accountants and attorneys (collectively, the "**Indemnified Persons**") from and against any and all liability, obligations, losses, damages, penalties, actions, judgments, suits, reasonable out-of-pocket costs, expenses and disbursements of any kind of nature whatsoever (including, without limitation, reasonable fees and disbursements of counsel, expert witness fees, and reasonable in-house documentation and diligence fees and reasonable legal expenses) which may be imposed on, incurred by or asserted against any Indemnified Person with respect to or arising out of, or in any way relating to any litigation, proceeding or investigation instituted or conducted by any Person with respect to any aspect of, or any transaction contemplated by or referred to in, or any matter related to, any Loan Document or any agreement, document or transaction contemplated thereby, whether or not such Indemnified Person is a party thereto, except to the extent that any of the foregoing (i) arises out of the gross negligence or willful misconduct of any Indemnified Person or (ii) arises out of a dispute between or among any Indemnified Persons. No Indemnified Person shall have any liability (whether direct or indirect, in contract, tort or otherwise) to the Borrower or any of its affiliates, subsidiaries or any shareholders or creditors of the foregoing for or in connection with the transactions contemplated hereby, except to the extent such liability is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted solely from such Indemnified Person's gross negligence or willful misconduct. In no event, however, shall any Indemnified Person be liable on any theory of liability for any special, indirect, consequential or punitive damages. If any Indemnified Person uses in-house counsel for any purpose for which the Borrower is responsible to pay or indemnify, the Borrower expressly agrees that its indemnification obligations include reasonable charges for such work commensurate with

the fees that would otherwise be charged by outside legal counsel selected by Indemnified Person in its discretion for the work performed.  The Lender agrees to give the Borrower reasonable notice of any event of which the Lender becomes aware for which indemnification may be required under this Section 13.4, and the Lender may elect (but is not obligated) to direct the defense thereof, provided that the selection of counsel shall be subject to Borrower's consent which consent shall not be unreasonably withheld or delayed.  Any Indemnified Person may in its reasonable discretion, take such actions, as it deems necessary and appropriate to investigate, defend or settle any event or take other remedial or corrective actions with respect thereto as may be necessary for the protection of such Indemnified Person or the Collateral.  Notwithstanding the foregoing, if any insurer agrees to undertake the defense of an event (an "**Insured Event**"), the Lender agrees not to exercise its right to select counsel to defend the event if that would cause Borrower's insurer to deny coverage; provided, however, that the Lender reserves the right to retain counsel to represent any Indemnified Person with respect to an Insured Event at its sole cost and expense.  To the extent that the Lender obtains recovery from a third party other than an Indemnified Person of any of the amounts that Borrower has paid to the Lender pursuant to the indemnity set forth in this Section 13.4, then Lender shall promptly pay to such Borrower the amount of such recovery.

### 13.5    Notice

Any notice or request under any Loan Document shall be given to any party to this Agreement at such party's address set forth beneath its signature on the signature page to this Agreement, or at such other address as such party may hereafter specify in a notice given in the manner required under this Section 13.5.  Any notice or request hereunder shall be given only by, and shall be deemed to have been received upon:  (i) registered or certified mail, return receipt requested, on the date on which such received as indicated in such return receipt, (ii) delivery by a nationally recognized overnight courier, one (1) Business Day after deposit with such courier, or (iii) pdf or other electronic transmission, in each case upon telephone or further electronic communication from the recipient acknowledging receipt (whether automatic or manual from recipient), as applicable. Any notice or request under any Loan Document or otherwise pursuant to any applicable law which is given to one Borrower will be deemed to be notice (or, if applicable, a request) to Borrower.

### 13.6    Severability; Captions; Counterparts; Facsimile Signatures

If any provision of any Loan Document is adjudicated to be invalid under applicable Laws, such provision shall be inapplicable to the extent of such invalidity without affecting the validity or enforceability of the remainder of the Loan Documents which shall be given effect so far as possible.  The captions in the Loan Documents are intended for convenience and reference only and shall not affect the meaning or interpretation of the Loan Documents.  The Loan Documents may be executed in one or more counterparts (which taken together, as applicable, shall constitute one and the same instrument) and by facsimile, pdf or other transmission, and such facsimile signatures shall be considered original executed counterparts.  Each party to this Agreement agrees that it will be bound by its own electronic signature and that it accepts the electronic signature of each other party.

4874-6257-0384.6

### 13.7    Expenses

The Borrower shall pay, whether or not the Closing occurs, all reasonable usual and customary costs and expenses incurred by the Lender and/or its Affiliates, including, without limitation reasonable, documentation and diligence fees and expenses, all search, audit, appraisal, recording reasonable professional and filing fees and expenses and all other actual out-of-pocket charges and expenses (including, without limitation, UCC and judgment and tax lien searches and UCC filings and fees for post-Closing UCC and judgment and tax lien searches and audit expenses), and reasonable attorneys' fees and expenses, incurred (i) in any effort to enforce, protect or collect payment of any Obligation or to enforce any Loan Document or any related agreement, document or instruments; (ii) in connection with entering into, negotiating, preparing, reviewing and executing the Loan Documents and/or any related agreements, documents or instruments; (iii) arising in any way out of administration of the Obligations; (iv) in connection with instituting, maintaining, preserving, enforcing and/or foreclosing on the Lender's Liens in any of the Collateral or securities pledged under the Loan Documents, whether through judicial proceedings or otherwise; (v) in defending or prosecuting any actions, claims or proceedings arising out of or relating to the Lender's transactions with the Borrower; (vi) in seeking, obtaining or receiving any advice with respect to its rights and obligations under any Loan Document and any related agreement, document or instrument; (vii) in connection with any modification, restatement, supplement, amendment, waiver or extension of any Loan Document and/or any related agreement, document or instrument, and/or (viii) in connection with all actions, visits, audits and inspections undertaken by the Lender or its Affiliates pursuant to the Loan Documents, subject to the provisions of Section 6.7.  In addition, the Borrower shall pay the Lender a wire fee of $25.00 with respect to each domestic wire transfer of funds by the Lender to or for the benefit of Borrower. All of the foregoing shall be charged to Borrower's account and shall be part of the Obligations. If the Lender or any of its Affiliates uses in-house counsel for any purpose under any Loan Document for which Borrower are responsible to pay or indemnify, Borrower expressly agree that its Obligations include reasonable charges for such work commensurate with the fees that would otherwise be charged by outside legal counsel selected by the Lender or such Affiliate in its discretion for the work performed.  Without limiting the foregoing, Borrower shall pay all taxes (other than taxes based upon or measured by the Lender's income or revenues or any personal property tax), if any, in connection with the transactions contemplated by this Agreement and the Loan Documents and the filing and/or recording of any documents and/or financing statements.

### 13.8    Entire Agreement

This Agreement and the other Loan Documents to which Borrower are a party constitute the entire agreement between the Borrower and the Lender with respect to the subject matter hereof and thereof, and supersede all prior agreements and understandings, if any, relating to the subject matter hereof or thereof.  Any promises, representations, warranties or guarantees not herein contained and hereafter made shall have no force and effect unless in writing signed by the Borrower and the Lender, provided, however, additional covenants, representations, warranties and guarantees will be enforceable if executed by the party against whom enforcement is sought. No provision of this Agreement may be changed, modified, amended, restated, waived, supplemented, discharged, canceled or terminated orally or by any course of dealing or in any other manner other than by an agreement in writing signed by the Lender and Borrower.  Each party hereto acknowledges that it has been advised by counsel in connection with the negotiation

and execution of this Agreement and is not relying upon oral representations or statements inconsistent with the terms and provisions hereof. Any schedule may be amended from time to time by the Borrower with the consent of the Lender, which consent shall not be unreasonably withheld if the revised schedule does not evidence any violation of the covenants in Articles VI or VII.

### 13.9   The Lender Approvals

Any approval, consent, waiver or satisfaction of the Lender with respect to any matter that is subject of any Loan Document (i) shall not be effective unless it is in writing and (ii) unless expressly provided herein to the contrary, may be granted or withheld by the Lender in its sole discretion.

### 13.10   Sale of Ineligible Receivables.

Notwithstanding anything to the contrary in this Agreement, with respect to Ineligible Receivables, the Lender hereby consents and authorizes the Borrower to sell such receivables free and clear of any lien(s) or claim(s) by the Lender (each such sale, an "Ineligible Receivables Sale"), provided that such sale must be on terms and conditions reasonably acceptable to Lender and that such sale must result in Net Proceeds in an aggregate amount equal to or exceeding One Million Five Hundred Thousand Dollars ($1,500,000). Promptly upon receipt of an offer to purchase Ineligible Receivables, Borrower shall send such offer to Lender. Prior to the entry into any agreements relating to an Ineligible Receivables Sale, Borrower must obtain written consent from Lender (for which email shall suffice) which consent shall not be unreasonably withheld and, to the extent required by the Bankruptcy Code, approval by the Bankruptcy Court.

In the event, and on each occasion that, any Net Proceeds are received by or on behalf of Borrower in respect of any Ineligible Receivables Sale, twenty percent (20%) of such Net Proceeds shall be promptly distributed to the Lender and the remaining eighty percent (80%) of such Net Proceeds shall become unencumbered working capital of the Borrowers. Any Net Proceeds received by Lender as a result of an Ineligible Receivables Sale shall be used to pay down the Pre-Petition Obligations until such time as the Pre-Petition Obligations have been paid in full at which point such Net Proceeds shall be used to pay down the Obligations.

### 13.11   USA Patriot Act

The Borrower shall not (a) be or become subject at any time to any law, regulation, or list of any government agency (including, without limitation, the U.S. Office of Foreign Asset Control list) that prohibits or limits the Lender from making any advance or extension of credit to Borrower or from otherwise conducting business with the Borrower, or (b) fail to provide documentary and other evidence of Borrower's or its corporate officers' identities as may be requested by the Lender at any time to enable the Lender to verify the Borrower's identity or to comply with any applicable Laws, including, without limitation, Section 326 of the USA Patriot Act of 2001, 31 U.S.C. § 5318. The Lender hereby notifies Borrower that pursuant to the requirements of the USA Patriot Act, it is required to obtain, verify and record certain information and documentation that identifies the Borrower, which information includes the name and address

of Borrower and such other information that will allow the Lender to identify Borrower in accordance with the USA Patriot Act.

**[SIGNATURES APPEAR ON THE FOLLOWING PAGES]**

4874-6257-0384.6

IN WITNESS WHEREOF, each of the parties has duly executed this Superpriority Debtor-in-Possession Credit and Security Agreement as of the date first written above.

LION STAR NACOGDOCHES HOSPITAL, LLC,
a Texas limited liabilitiy company


By:_____
Name:  S. Sean Fowler
Title:  CEO

Address for Notice:
Lion Star Nacogdoches Hospital, LLC
1204 North Mound Street
Nacogdoches, TX 75961
Attention:  Sean Fowler, Chief Executive Officer

Telephone:  (949) 235-5914
Email:  ssfowler2019@outlook.com

With copy to (which shall not constitute notice):

Address for Notice:
Lion Star Group, LLC
5351 N. Eagle View Drive
Lehi, UT 84043
Attention:  Sean Fowler, Chief Executive Officer

Reed, Claymon, Meeker & Hargett, PLLC
5608 Parkcrest Drive, Suite 200
Austin, TX 78731
Attention: Kevin Reed, Esq

Telephone:  (512) 660-5962
Email:  kreed@rcmhlaw.com

LENDER:

eCAPITAL HEALTHCARE CORP.,
a Delaware corporation,
f/k/a CNH FINANCE FUND I, L.P.
a Delaware Limited Partnership


By: _____
Name:  Timothy Peters
Title:    Authorized Signatory

Address for Notice:
eCapital Healthcare Corp.
20807 Biscayne Blvd, Suite 203
Aventura, FL 33180
Attention: Legal Department

Telephone: (203) 266-3210
Email: EHCLegal@ecapital.com

With copy to (which shall not constitute notice):

Kincaid, Frame & Associates Co., LPA
6151 Wilson Mills Road, Suite 310
Highland Heights, OH 44143
Attention: Alexander Frame

Telephone: (440) 352-1000
Email: aframe@kincaidframe.com

And

Foley & Lardner LLP
500 Woodward Avenue, Suite 2700
Detroit, Michigan, 48226
Attention: Jake Gordon

Telephone: (248) 943-6484
Email: jake.gordon@foley.com

ANNEX I

Financial and Loan Covenants

## EXHIBITS

Exhibit A          -          Borrowing Certificate

Exhibit B          -          Compliance Certificate

Exhibit C          -          Budget

## SCHEDULES

Schedule 2.4          -          Borrower's Account for Funding Wires

Schedule 2.5          -          Borrower's Deposit Accounts

Schedule 5.3          -          Organizational Information

Schedule 5.4          -          Real Property Owned or Leased

Schedule 5.6          -          Litigation

Schedule 5.16          -          Insurance

Schedule 5.17A          -          Corporate Names

Schedule 5.17B          -          Business and Collateral Locations

Schedule 5.20          -          Exceptions to Healthcare Law Compliance Representations

Schedule 5.23          -          Material Contracts

Schedule 5.24          -          Third-Party Payor Billing Numbers

Schedule 7.3          -          Liens

## ANNEX I

## FINANCIAL AND LOAN COVENANTS

**1.      Current Ratio**

At the end of each month commencing with December 2023, Borrower's Current Ratio shall not be less than 1.00 to 1.00.

**"Current Ratio"** shall mean Borrower's ratio of current assets (determined in accordance with GAAP), to current liabilities (also determined in accordance with GAAP). For this purpose, the outstanding balance of the Revolving Facility shall be deemed to be a current liability.

**2.      Budget Covenant**

The Budget Covenant as defined in the Interim Financing Order.

**3.      Loan Turnover Rate**

At the end of each calendar month commencing with December 2023, the amount calculated by dividing (a) the average outstanding principal balance of the Revolving Facility for the applicable Test Period[1] by (b) the result achieved by dividing (i) the sum of all collections received in the Controlled Deposit Account during the applicable Test Period with respect to all of Borrower's Accounts by (ii) the number of days in such Test Period, shall not be greater than 50.

For purposes of the covenants set forth in this Annex I, capitalized terms shall have the following meanings set forth below, or if not set forth below, the meanings set forth in Article I.

.

---

[1] "Test Period" shall mean, on any date, the most recently ended three consecutive calendar months.

Annex I, Page 1

**EXHIBIT A**

**BORROWING CERTIFICATE**
**Dated as of _____, 2023**

The undersigned hereby certifies to eCapital Healthcare Corp., a Delaware corporation, f/k/a CNH Finance Fund I, L.P. (the "**Lender**") that:

1.      I am certifying the following facts and making and delivering this Borrowing Base Certificate pursuant to that certain Superpriority Debtor-in-Possession Credit and Security Agreement, dated as of [              ], 2023 (as the same may be, amended, restated, supplemented, or otherwise modified from time to time, the "Credit Agreement") between LION STAR NACOGDOCHES HOSPITAL, LLC, a Texas limited liability company (collectively, the "Borrower") and the Lender.  Capitalized terms used in this certificate have the same meaning as set forth in the Credit Agreement.

2.      All information contained in this Borrowing Base Certificate is true, correct, and complete as of the date hereof.  All representations and warranties made by the Borrower in the Credit Agreement are true and correct on and as of the date hereof as if such representations and warranties had been made as of the date hereof.

3.      No Event of Default has occurred and is continuing or will exist after giving effect to the Advance requested hereby.

4.      The Borrower has performed and complied with all agreements and conditions required under Article IV of the Credit Agreement to be performed or complied with by it on or prior to the funding of the Advance requested hereby.

5.      There have been no modifications to reimbursement rates or other contractual arrangements that would adversely affect the valuation or collectability of the Accounts.  There are no offsets, setoffs, counterclaims, disputes or defenses of any kind from any Account Debtor against any Account classified as an Eligible Receivable.  All Accounts classified as Eligible Receivables and Ineligible Receivables in this Borrowing Base Certificate are properly so classified.

6.      The Borrower has directed all Account Debtors to deliver all payments on the Accounts to the proper Controlled Deposit Account (including any Lockbox Account) as specified in the Credit Agreement and has identified such Controlled Deposit Account as the account to which all payments are to be sent on all invoices for Accounts with Dates of Service after the date of the Credit Agreement.  All Accounts reflected in the Borrower's most recently submitted Accounts Receivable Aging Report are the subject of properly and validly billed invoices for services provided and goods sold by the Borrower in the ordinary course of business.  The aging buckets in this Borrowing Base Certificate reflect the number of days the Accounts have been

4874-6257-0384.6

outstanding subsequent to its respective Dates of Service.  All collections on Accounts have been applied to the proper invoices resulting in accurate aging totals for each aging bucket.  There are no known duplicate or fictitious claims or invoices included in the Accounts.  The Borrower has not diverted or permitted to be diverted any such payments on Accounts to a deposit account other than the proper Controlled Deposit Account as required by Section 2.5 of the Credit Agreement. No collections on Accounts have been received that have not been applied to reduce the Accounts.

7.      All Accounts are owned by the undersigned, free and clear of all liens, security interests, claims, charges, or trusts, legal or equitable, now existing or which might arise with the passage of time, other than Permitted Liens.

8.      The Borrower has deposited all state and federal payroll withholding taxes required with respect to each payroll period through the most recent payroll period.

9.      After the Lender makes the Advance requested hereby, the aggregate amount of the Loan will not exceed the Revolving Loan Limit.

**BORROWER:**

[__]


By: _____
Name:
Title:

4874-6257-0384.6

**EXHIBIT B**

**COMPLIANCE CERTIFICATE**
**Dated as of _____, 2023**

This Compliance Certificate is delivered by LION STAR NACOGDOCHES HOSPITAL, LLC, a Texas limited liability company (the "Borrower"), in accordance with the Superpriority Debtor-in-Possession Credit and Security Agreement dated as of [   ],   2023,   between   the Borrower and eCapital Healthcare Corp., a Delaware corporation, f/k/a CNH Finance Fund I, L.P. (the "Lender") (as amended, supplemented or modified from time to time, the "Credit Agreement").  All capitalized terms not defined herein have the meanings given them in the Credit Agreement and other Loan Documents.

The undersigned hereby certifies that:

(a)     The financial statements delivered with this certificate in accordance with Section 6.1 of the Credit Agreement fairly present in all material respects the results of operations and financial condition of Borrower as of the dates and the accounting periods covered by such financial statements;

(b)     I have reviewed the terms of the Credit Agreement and have made, or caused to be made under my supervision, a review in reasonable detail of the transactions and financial condition of Borrower during the accounting period covered by such financial statements;

(c)     Such review has not disclosed the existence during or at the end of such accounting period, and I have no knowledge of the existence as of the date hereof, of any condition or event that constitutes an Event of Default, except as set forth in Schedule 1 attached hereto, which includes a description of the nature and period of existence of such Event of Default and what action Borrower has taken, is undertaking and proposes to take with respect thereto;

(e)     Except as noted on Schedule 2 attached hereto, the undersigned has no knowledge of any federal or state tax liens having been filed against Borrower or any Collateral;

(f)     Except as noted on Schedule 3 attached hereto, the undersigned has no knowledge of any failure of Borrower to make required payments of withholding or other tax obligations during the accounting period to which the attached statements pertain or any subsequent period.

(g)     Except as described in the Credit Agreement or the schedules thereto, or on Schedule 4 attached hereto, and the Bankruptcy Case and the disputed matters concerning the Lease as disclosed in the Bankruptcy Case, the undersigned has no knowledge of any current, pending or threatened:

(i)     litigation against Borrower;

(ii)     inquiries, investigations or proceedings concerning the business affairs, practices, licensing or reimbursement entitlements of Borrower, and

4874-6257-0384.6

(iii)     default by Borrower under any material contract to which it is a party, including, without limitation, any leases.

(h)     The Borrower is in compliance with the financial and loan covenants contained in Annex I of the Credit Agreement, as demonstrated by the calculation of such covenants below, except as set forth below; in determining such compliance, the following calculations have been made: [See attached worksheets].  Such calculations and the certifications contained therein are true, correct and complete.

**BORROWER:**

LION STAR NACOGDOCHES HOSPITAL, LLC, a Texas limited liability company

By: _____
Name:
Title:

4874-6257-0384.6

### Schedules to Compliance Certificate

Schedule 1 – Non-Compliance with Covenants

Schedule 2 – Federal or State Tax Liens

Schedule 3 – Unpaid Tax or Withholding Obligations

Schedule 4 –Pending Litigation, Inquiries or Investigations; Defaults under Material Contracts

Worksheet(s) for Financial or Other Covenant Calculations

4874-6257-0384.6

**Current Ratio Worksheet (Attachment to Compliance Certificate)**

1.  Current Assets as of the end of the most recent month:                $_____

2.  Current Liabilities as of the end of the most recent month:          $_____

3.  Ratio of Line 1 to Line 2:                                                              _____

4.  Minimum Current Ratio:                                                            1.0 to 1.0

5.  In compliance:                                                                       YES  -  NO

[To Be Supplemented Prior To Execution]

Exhibit B (Compliance Certificate), Page 4

**EXHIBIT C**

**Budget**

[To Be Supplemented Prior To Execution]

**SCHEDULE 2.4**

**Borrower's Account for Funding Wires**

[To Be Supplemented Prior To Execution]

## SCHEDULE 2.5

### Borrower's Deposit Accounts

[To Be Supplemented Prior To Execution]

## SCHEDULE 5.3

### Organizational Information

LION STAR NACOGDOCHES HOSPITAL, LLC, a limited liability company organized under the laws of the State of Texas.

The Borrower has no subsidiaries.

The number and class of equity securities issued and outstanding of Borrower and the record and beneficial owners thereof (including options, warrants and other rights to acquire any of the foregoing) are as follows:

**SCHEDULE 5.4**

**Real Property Owned or Leased**

## SCHEDULE 5.6

### Litigation

### JUDGMENTS

[To Be Supplemented Prior To Execution]

## SCHEDULE 5.16

### Insurance

[To Be Supplemented Prior To Execution]

## SCHEDULE 5.17A

## Corporate Names

[TO COME

# SCHEDULE 5.17B

## Business and Collateral Locations

[___]

**SCHEDULE 5.20**

**Exceptions to Healthcare Law Compliance Representations**

[To Be Supplemented Prior To Execution]

## SCHEDULE 5.23

## Material Contracts

[TO COME]

[To Be Supplemented Prior To Execution]

SCHEDULE 5.24

Third-Party Payor Billing Numbers

[To Be Supplemented Prior To Execution]

SCHEDULE 7.3

Liens

[To Be Supplemented Prior To Execution]

**Lion Star Nacogdoches Hospital, LLC**
**First Day Service List**
**Client # 6429**

Lion Star Nacogdoches Hospital, LLC
Attn:  S. Sean Fowler, CEO
5608 Parkcrest Dr., Suite 200
Austin, TX 78731

Office of The United States Trustee
Earle Cabell Federal Building
1100 Commerce Street, Room 976
Dallas, TX 75242

SCG Capital Corp. (GE Finance)
74 West Park Place
Stamford, CT 06901

Internal Revenue Service
Centralized Insolvency Operations
PO Box 21126
Philadelphia, PA 19114-0326

Internal Revenue Service
Special Procedures Staff
Mail Code 5020-DAL
1100 Commerce St., Room 9B8
Dallas, TX 75242

GE Capital
PO Box 641419
Pittsburgh, PA 15264

Med One Capital Funding, LLC
10712 S 1300 East
Sandy, UT 84094

Intuitive Surgical, Inc.
1020 Kifer Rd.
Sunnyvale, CA 94086

Hill-Rom Company, Inc.
1020 West County Road F
St. Paul, MN 55126

US Med Equip
PO Box 4339
Houston, TX 77210

Werfen USA LLC
PO Box 6214
Pittsburgh, PA 15251

Abio Med, Inc.
PO Box 6214
Boston, MA 02212

Nacogdoches Tax Assessor-Collector
Attn: Kim Morton
Nacogdoches County Court House
101 W Main St., Suite 100
Nacogdoches, TX 75961

Kenneth Jurist

AT&T
Attn: Abdi Abdulahi
PO Box 105414
Atlanta, GA 30348

Banner State Emergency Phy PA
Attn: Mark McGrew
5000 Ambassador Caffery Pkwy
Bldg. 15, Suite A
Lafayette, LA 70508

Beckman Coulter, Inc.
Attn: Kevin Thomas
Dept. CH 10164
Palatine, IL 60055

Biomerieux, Inc. - St. Louis
Attn: Kate Kohlschein
PO Box 500308
St. Louis, MO 63150

Biotronik, Inc.
Attn: Angela Stanfield
PO Box 205421
Dallas, TX 75320

Cerner Health Services, Inc.
Attn: Robert Gonzales
PO Box 959156
St. Louis, MO 63195

EDF, Inc.
Attn: LaKendra Davis
PO Box 74007029
Chicago, IL 60674

Garlic Media Management LLC
Attn: Will Feldman
1195 S Lipan St., Unit A
Denver, CO 80223

Gjerset & Lorez, LLP
Attn: Tammy Sullivan
2801 Via Fortuna
Austin, TX 78746

Gordon Food
Attn: Chris Pitcher
PO Box 88029
Chicago, IL 60680

Matheson Tri-Gas
Attn: Rayanne Hayes
Dept. 3028
PO Box 123028
Dallas, TX 75312

Medline Industries, Inc.
Attn: Tina Ridley
Dept. 1080
PO Box 121080
Dallas, TX 75312

Medtronic Xomed
Attn: Mike Maday
PO Box 848086
Dallas, TX 75284

Medygate, Inc.
Attn: Dariush Yaghoubi
447 S. Robertson Blvd., #204
Beverly Hills, CA 90211

SCC Soft Computer
Attn: Tarrah Veilleux
5400 Tech Data Dr.
Clearwater, FL 33760

SCI Solutions
Attn: Bernie Gay
PO Box 735381
Dallas, TX 75373

Stericycle, Inc.
Attn: Rodney Dickens
PO Box 6575
Carol Stream, IL 60197

TRS Managed Services, LLC
Attn: Caleb English, CFO
5001 Founders Way, Suite L10
Rogers, AR 72758

Wipfli, LLP
Attn: David M. Hersch
PO Box 3160
Milwaukee, WI 53201

Young's Professional Svc
Attn: Brian Young
200 Greenleaves Blvd., Suite 5
Mandeville, LA 70448

Nacogdoches County Hospital Dist.
1018 N Mound St, Suite 105
Nacogdoches, TX 75965

Nacogdoches County Hospital Dist.
c/o Deborah Williamson/P. Huffstickler
112 E Pecan St., Suite 1800
San Antonio, TX 78205

Nacogdoches Shopping Center, LLC
136 S Broadway
White Plains, NY 10605

Patton Brothers
Attn: Florence Patton
412 Bostwick St.
Nacogdoches, TX 75965

Healthcare Property Solutions, LLC
33870 Crown Colony Dr.
Avon, OH 44011

Cavitch, Familo & Durkin Co. LPA
Attn: Harold O. Maxfield, Jr.
1300 E Ninth St., 20th Floor
Cleveland, OH 44114

Brenda Bowman Motes
105 Grandview Blvd.
Montgomery, TX 77356

Nacogdoches County Aging
Committee, Inc.
1601 W Austin St.
Nacogdoches, TX 75964

Ortho-Clinical Diagnostics, Inc.
1001 US Highway 202
Raritan, NJ 08869

Nacogdoches County Hospital Dist.
c/o Alexandria R. Rahn
Dykema Gossett PLLC
1717 Main Street, Suite 4200
Dallas, TX 75201

eCapital Healthcare Corp.
c/o Foley & Lardner LLP
500 Woodward Avenue, Suite 2700,
Detroit, MI 48226-3489

eCapital Healthcare Corp.
20807 Biscayne Blvd
Suite 203
Aventura, FL 33180

Texas Comptroller
PO Box 13528
Austin, TX 78711

Nacogdoches Central Appraisal District
216 W Hospital St,
Nacogdoches, TX 75961