Jeff P. Prostok
State Bar No. 16352500
Lynda L. Lankford
State Bar No. 11935020
Dylan T.F. Ross
State Bar No. 24104435
FORSHEY & PROSTOK LLP
777 Main St., Suite 1550
Fort Worth, TX  76102
Telephone: 817-877-8855
Facsimile:  817-877-4151
jprostok@forsheyprostok.com
llankford@forsheyprostok.com
dross@forsheyprostok.com

PROPOSED ATTORNEYS FOR DEBTOR
AND DEBTOR IN POSSESSION

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| LION STAR NACOGDOCHES HOSPITAL, | § | Case No. 23-43535-mxm11 |
| LLC d/b/a NACOGDOCHES MEMORIAL | § | |
| HOSPITAL, | § | |
| | § | |
| Debtor. | § | |
| | § | |

## DECLARATION OF EDMUND C. KING IN SUPPORT OF FIRST DAY MOTIONS

I, Edmund C. King, state and declare as follows:

1.      I am over 18 years of age, of sound mind, and fully competent to make this

Declaration.  If called upon to testify, I could and would competently testify to the matters set

forth herein.

2.      I am the Chief Administrative Officer of Lion Star Nacogdoches Hospital, LLC

d/b/a Nacogdoches Memorial Hospital (the "Debtor").  I have been in that position since the

Debtor acquired and took over the operations of the Debtor.  In my capacity as the Chief

Administrative Officer, I am the authorized representative of the Debtor in this bankruptcy case.

3.      Based upon my personal knowledge of the Debtor and its business operations, ownership, history, industry, and book and records, and based upon information contained in the Debtor's books and records, I am qualified to make this Declaration on behalf of the Debtor. Some of the information contained herein is based upon my review of data regularly compiled by the Debtor in the ordinary course of its business.

4.      This Declaration is being submitted to give an overview of the Debtor's business, its reasons for filing this chapter 11 case and in support of the facts in the Debtor's First-Day Motions (collectively, the "Motions")[1], including:

   a. *Debtor's Emergency Motion for Interim and Final Orders Authorizing the Debtor to Maintain Existing Cash Management System, Bank Accounts, Checks and Business Forms* [Docket No. 7] (the "Cash Management Motion");

   b. *Debtor's Emergency Motion for Entry of an Order (i) Authorizing the Debtor to Renew, Amend, Supplement, Extend, or Purchase Insurance Policies and (ii) Granting Related Relief* [Docket No. 8] (the "Insurance Motion");

   c. *Debtor's Motion Pursuant to 11 U.S.C. § 366(b) for an Interim and Final Orders (I) Prohibiting Utility Companies From Altering, Refusing or Discontinuing Service, (II) Deeming Utility Companies Adequately Assured of Future Performance, and (III) Establishing Procedures for Determining Adequate Assurance of Payment* [Docket No. 9] (the "Utility Motion");

   d. *Debtor's Motion for Order Authorizing the Debtor to Pay Prepetition Wages, Employee Benefits, And Insurance Premiums* [Docket No 10] (the "Wage Motion");

   e. *Debtor's Emergency Motion for Interim and Final Orders (I) Authorizing the Debtor to Obtain Postpetition Financing on a Secured, Superpriority Basis; (II) Authorizing the Debtor to Use Cash Collateral; (III) Scheduling a Final Hearing; (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* [Docket Nos. 11, 12] (the "DIP Motion").

## ABOUT THE DEBTOR

5.      Lion Star Nacogdoches Hospital, LLC d/b/a Nacogdoches Memorial Hospital (the "Debtor") is a Texas limited liability company. The Debtor is the owner and operator of the

---

[1] Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to such terms in the applicable Motions.

Nacogdoches Memorial Hospital located at 1204 Mound Street, Nacogdoches, Texas (the "<u>Hospital</u>"). Along with general preventative and primary medical care, the Hospital provides emergency care, surgeries, cardiac care, and maternity care to the community at its 231-patient room facility.  The Hospital serves the East Texas communities in and around Nacogdoches County. The Hospital is the only Level III Trauma Center in Deep East Texas.  The Hospital's Breast Care Center's Mammography Facility is accredited by The American College of Radiology, and its Cecil R. Bomar Rehabilitation Center is an internationally accredited Center of Excellence for rehabilitation.  The Hospital employs more than 600 health care providers and support staff.



### a) <u>A Brief History of the Hospital</u>

6.      The Hospital has provided services for the Nacogdoches County communities for more than 90 years.  Formerly known as the City Memorial Hospital, the Hospital opened on December 11, 1928. At the time of its opening, the City Memorial Hospital was owned by the City of Nacogdoches and had 28 beds.



7.    By an act of the Texas Legislature on June 12, 1967, House Bill #1248 established the Nacogdoches County Hospital District (the "District"). The District is governed by an elected Board of Directors and managed by an Executive Director. On May 6, 1968, ownership of the City Memorial Hospital was transferred to the District and the name of the Hospital was changed to Nacogdoches Memorial Hospital.

8.    Into the 2010s, the Hospital faced deteriorating financial condition.  By 2019, the District was in severe financial distress.  Because of significant financial problems and substantial debts, the District decided it was in its best interest, and the best interests of the communities the Hospital serves, to sell the operations of the Hospital and its various ancillary healthcare clinics and facilities, and to lease the buildings housing such facilities to the buyer.

**b)  The Debtor Purchases the Hospital from the District**

9.    In early 2021, the Debtor submitted a letter of intent to acquire the operations of the Hospital and its related facilities.  On or about July 16, 2021, the Debtor and the District entered into that certain *Hospital Asset Purchase Agreement* (the "HAPA").  Pursuant to the HAPA, the District transferred the operations and management control of the Hospital and facilities to the Debtor.

10.     The Debtor and the District also entered into that certain *Hospital Facility Lease Agreement* dated July 16, 2021 (the "Facility Lease").  Pursuant to the Facility Lease, the District leased to the Debtor the Nacogdoches Memorial Hospital Building (1204 N. Mound St.), the Nacogdoches Diagnostic Center (1023 N. Mound St., Suites A, B And H), the Cecil Bomar Rehabilitation Center (707 Woods St.), the Care First Clinic - Garrison (149 South Hwy. 59), and the Accounting/Finance Building (914 Raguet St.).[2] The Facility Lease is a triple net lease of properties outright owned by the District.  In lieu of monthly rent, the Debtor is required to provide a minimum of $9,000,000 of charity measured in gross billed charges.[3]

11.     For the real property not owned *fee simple* by the District, the Debtor and the District entered those certain *sublease/leasehold assignment agreements* (collectively, the "Subleases").  Pursuant to the Subleases, the District also leased to the Debtor the Purchasing Receiving Building (801 North St.), the Elliott Building (1018 N. Mound St.), the Coussons Building (1002 N. Mound St.), and the Care First Clinic (1106/1108 South St.).

12.     Additionally, as part of the sale/purchase transaction, the Debtor and the District entered into that certain *Transition and Administrative Services Agreement* (the "Transition Agreement").  The Transition Agreement was necessary because when a hospital is acquired via asset purchase there is a period of time prior to issuance of a new hospital license, new National Provider Identification (NPI) number, CMS provider number (PTAN), Medicaid number (AIS), and allow for interim transfer of accounts receivable to the Debtor from the District's government payor accounts receivable account.[4] During this transition period it is the ordinary course of business for the buyer to use the same bank account as the seller. This arrangement necessitated a daily reconciliation of what entity received which deposit. This is referred to as the "Due To/Due From Account."

---

[2] The buildings leased pursuant to the Facility Lease are collectively referred to as the "Leased Properties."
[3] The Debtor provides on average approximately $34,000,000 of charity measured in gross billed charges per year.
[4] As a general rule, the process of obtaining the aforementioned items takes up to twelve (12) months.

c) **The Debtor's Financial Structure**

13.     The Debtor's pre-petition secured lender is eCapital Healthcare Corp. f/k/a CNH Finance Fund I, L.P. ("EHC").  EHC extended the Debtor a $10,000,000 line of credit secured by all of the Debtor's assets, including its accounts receivable.  As of the Petition Date, the outstanding principal balance owed to EHC was approximately $4,664,662.

14.     EHC has agreed to provide post-petition debtor-in-possession financing to the Debtor as more fully described in the DIP Motion filed as one of the First Day Motions.

d) **The District's Interference in the Debtor's Operations of the Hospital**

15.     The District's creation under state statute and constitution was for the purpose of providing medical and hospital care for the District's needy inhabitants.  By operation of the HAPA, the District assigned that obligation to the Debtor, though it retained the *responsibility* under the statute.  Therefore, there exists a special relationship between the Debtor and the District.

16.     In acquiring the Hospital, the Debtor was aware that it undertook the operations of a distressed, run-down hospital burdened with years of poor management, government penalties, and the economic problems caused by the COVID-19 pandemic.  Every industry benchmark reflects that the turnaround of a bad hospital facility can take up to two years under the best of circumstances. The Debtor was prepared to undertake this task.  However, the Debtor did not foresee the constant and sustained interference of the District in the Debtor's control and management of the affairs of the Hospital.

17.     As part of the HAPA, the Debtor purchased the "accounts receivable of the Hospital Operations, and prepaid accounts and license of the Hospital operations, to the extent assignable…" Despite this, the District submitted an application and received approximately $3,400,000 from the federal Health Resources and Services Administration Provider Relief Fund – Phase 4 Revenue.  The federal Department of Health and Human Services (the "HHS") mandated that this funding was to "help healthcare providers keep their doors open, address

workforce challenges, and make up for the lost revenues and increased expenses caused by the pandemic," and that the "providers can use these funds for salaries, recruitment, or retention; supplies such as N95 or surgical masks; equipment like ventilators or improved filtration systems; capital investments; information technology; and other expenses related to prevent, prepare for, or respond to COVID-19." But instead of providing the funds to the Debtor, the District withheld the funds to extract concessions from the Debtor on various issues and forced a reduction of $1,000,000 in the amounts due the Debtor – funds which the District has not utilized for the purpose mandated by the HHS.

18.     Additionally, pursuant to the Transition Agreement, the District was to collect the government payments and remit the funds to the Debtor for the Hospital's services. However, the District failed to fulfill its obligations and inappropriately withheld approximately $900,000 in fees due the Debtor from the Due To/Due From Account. The District eventually acknowledged that the amount withheld should be paid to the Debtor.

19.     On October 12, 2023, the Debtor filed a lawsuit against the District in the 45th Judicial District Court of Nacogdoches County, Texas, in Cause No. C2338992 (the "State Court Action"). By the State Court Action the Debtor, *inter alia*, sought the recovery of sums unlawfully withheld by the District.

### e)  The District's Alleged Defaults of the Facility Lease

20.     On February 1, 2023, the District sent a Notice of Default and alleged that the Debtor had not paid certain property taxes and that it had not provided a Financial Audit Letter.

21.     The Debtor had paid all required property taxes. Moreover, the Facility Lease does not require the Debtor to provide Financial Audit Letters. Nevertheless, on February 24, 2023, the Debtor provided the District with an Accountant's Review Report Letter.

22.     On August 8, 2023, the District issued a notice to the Debtor demanding that the Debtor produce, within two weeks, a Financial Audit Report, and a host of other information. The

Debtor disagreed that the information demanded by the District is required by the Facility Lease. Nevertheless, the Debtor provided all of the requested information.

23.     Lastly, on October 13, 2023, the District issued a notice of default of the Facility Lease to the Debtor and alleged that the Debtor was not paying debts as they come due and is thus in default of the Facility Lease.  The Debtor denies that it is in default of the Facility Lease.

### f)  The Mediation

24.     The Debtor and the District agreed to participate in mediation to try to resolve their disputes.  As part of the agreement to mediate, the parties entered into a Rule 11 agreement to stay all actions.  On November 10, 2023, the Debtor and the District participated in mediation.  The mediation was unsuccessful.

25.     On November 17, 2023 (the "Petition Date"), to avoid the District's clear objective to dispossess the Debtor from the Hospital, the Debtor filed a voluntary petition under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") seeking the protection of the automatic stay under the Bankruptcy Code to provide the Debtor with an opportunity to resolve the disputes between it and the District, and to assist with reorganizing its finances to facilitate the turnaround of the Hospital for the benefit of the Nacogdoches County communities.

### THE CASH MANAGEMENT MOTION

26.     By the Cash Management Motion, the Debtor seeks the continued use of its existing bank accounts and cash management system and flow so not to cause any interruptions in the collection of revenue and payment to vendors.

27.     The Debtor's prepetition secured lender, eCapital Healthcare Corp. ("eCapital" or "DIP Lender") is also providing the Debtor with post-petition debtor in possession financing (the "DIP Facility").  The DIP Facility calls for the Debtor to maintain its existing cash management system as it had prepetition.

28.     All of the Debtor's bank accounts are with Prosperity Bank.

29.     There are three separate accounts where incoming funds are paid into:

(a) Commercial Account – private insurance or patient direct pays are paid into this account.  This account is subject to a Despoit Control Agreement with eCapital (the "Blocked DACA");

(b) Government Account – government imbursements or payments are paid into this account.  This account is subject to a Deposit Account Instructions and Service Agreement with eCapital (the "DAISA");

(c) NMPG Account – payments to physician billings are paid into this account.

30.     Under the DIP Facility, like the prepetition credit facility, on each business day, all funds in the Government Account and the NMPG Account are swept into the Commercial Account in accordance with the DAISA, and then all funds in the Commercial Account are wire transferred into an account owned by eCapital at Wells Fargo Bank in accordance with the Blocked DACA.

31.     Based upon the draw requests by the Debtor to eCapital, eCapital will deposit the amounts as requested into the Debtor's Operating Account.  This Operating Account is subject to a Deposit Account Control Agreement (Springing) with eCapital (the "Springing DACA," and together with the Blcoked DACA and the DAISA, the "Control Agreements"). From the Operating Account, the Debtor transfer funds to four separate disbursement accounts as needed.

32.     The continued use of the existing Cash Management System is critical.  A material disruption of the Cash Management system will strain relations with parties who are vital to the Debtor's Business.  The established Deposit Accounts are vital to ensure the continued uninterrupted incoming funds.  Further, maintaining the Cash Management Systems is a requirement under the DIP Facility.  The Debtor cannot continue to operate post-petition without the DIP Facility.  Accordingly, the Debtor requests that the Court grant the Cash Management Motion and give the Debtor the authority to continue the use of the Cash Management System, including the use of the Debtor's existing Bank Accounts and Business Forms to ensure it has sufficient working capital to maintain the operations of the Hospital without interruptions in the care of patients.

**THE INSURANCE MOTION**

33.      By the Insurance Motion seeks the authority to maintain, renew, or supplement its insurance policies and honor all obligations in respect thereof.

34.      The Debtor maintains twelve (12) Insurance Policies that are administered by various third-party Insurance Carriers.  The Insurance Policies provide general liability, professional liability, auto, D&O, workers' compensation, and property coverage.  All of the policies are essential to the ongoing operation of the Hospital.

35.      The Insurance Policies are annual policies, and the policies require renewal at various times of the year.  The continuation and renewal of the Insurance Policies, and the purchase of new policies, as needed, are essential and part and parcel to the Debtor's operations and are necessary to the preservation of the value of the Debtor's assets.  Moreover, in many instances, insurance coverage is required by applicable laws and regulations, including the U.S. Trustee's requirement that a debtor maintain adequate insurance coverage.

36.      The nature of the Debtor's business in operating the Hospital makes it essential for the Debtor to maintain the Insurance Policies on an ongoing and uninterrupted basis.  Non-payment of insurance obligations could result in one or more of the Insurance Carries to terminate a policy or decline to renew.  If any of the Insurance Policies were to lapse, the Debtor would be exposed to substantial liability or property damage, to the detriment of all parties in interest in this case.

37.      Because the Debtor has a number of polices addressing different issues that require attention at different times throughout the year, to avoid incurring the costs of coming to Court to ask for authority to act on a piecemeal basis, the Debtor requests that the Court grant the Insurance Motion and authorize the Debtor to manage and administer its insurance needs in the ordinary course of business.

**THE UTILITY MOTION**

38.     In connection with the operation of its business, the Debtor obtains electricity,

water, gas, telephone, internet, waste disposal, and similar Utility Services from different Utility

Companies.  Uninterrupted Utility Services are critical to the operation of a hospital.

39.     By the Utility Motion, the Debtor seeks an order from the Court to prohibit the

Utility Companies from altering, refusing, or discontinuing services by deeming the Utility

Companies adequate assured of future performance.

40.     Section 366(c) of the Bankruptcy Code permits a utility provider to alter, refuse,

or discontinue utility service if a chapter 11 debtor has not provided "satisfactory" adequate

assurance of payment within thirty (30) days after the date of its bankruptcy filing.  "[A]ssurance

of payment" under the Bankruptcy Code includes cash deposit, a letter of credit, a certificate of

deposit, surety bond, or prepayment of utility consumption.

41.     Although the Debtor may not have been current on all of their payments to Utility

Companies prior to the Petition Date, the Debtor believes it will be able to pay post-petition

utility charges when due.  The case generated by operations and the DIP Facility the Debtor has

secured will enable the Debtor to pay its post-petition expenses as they come due.  The

charges for future Utility Services are included in the DIP Facility budget.  Therefore, the risk of

non-payment to the Utility Companies is low.

42.     Additionally, the Debtor is proposing to deposit $100,000 in Adequate Assurance

Despoit into a segregated bank account within twenty-five (25) days of the Petition on behalf of

all Utility Companies.  $100,000 is approximately two-weeks' average monthly cost for Utility

Services.  The Adequate Assurance Deposit will be held in the Adequate Assurance Account for

the duration of the Debtor's chapter 11 case and available to be used to cure post-petition

defaults in payments to the Utility Companies.

43.     The Debtor believes the Adequate Assurance Deposit along with the Debtor's ability to pay for Utility Services with the help of the DIP Facility constitute "adequate assurance of payment" within the meaning of section 366 of the Bankruptcy Code.

44.     In the event a Utility Company objects to the Debtor's proposed adequate assurance of payment as being inadequate, the Debtor is proposing certain "Objection Procedures" as set forth in the Utility Motion to provide a fair and reasonable process for determining any dispute may arise with a Utility Company over the Debtor's provision of adequate assurance of payment.

45.     With the proposed adequate assurance of payment in the form of ability to pay post-petition and the Adequate Assurance Deposit, and a proposed fair and reasonable process to address any objections the Utility Companies the Utility Companies' rights are protected and the Debtor requests that the Court grant the Utility Motion.

## THE WAGES MOTION

46.     By the Utility Motion, the Debtor seeks the authorization, but not the requirement, to (a) pay its employees their prepetition wages and salaries in the gross amount of approximately $1,100,000; (b) remit approximately $79,900 representing the employers' share of payroll taxes relating to the prepetition salaries and wages; (c) remit approximately $175,000 in withholding from the employees' gross pay to the appropriate taxing authority; (d) permit the Debtor to honor the employees' use, post-petition, of paid time off, holidays, and sick leave days that accrued prepetition; (e) reimburse the employees for expenses incurred on behalf of the Debtor; (f) continue providing health insurance and other benefits, and (g) pay the hourly wages and/or fees earned and accrued pre-petition by certain non-employee contract labor force in the aggregate amount of approximately $80,000.

47.     The continued loyalty of a debtor's workforce is a necessary component of any successful reorganization.  The stress and uncertainty caused by the bankruptcy filing of the employer often lead to poor workforce morale at a time when a debtor needs its workforce the

most.  Moreover, many in the Debtor's workforce live paycheck to paycheck and will suffer immediate adverse consequences if they do not receive their full compensation.

48.      The Debtor has approximately 600 Employees.  The Employees comprise of the full spectrum of personnel working across every aspect in the operation of the Hospital.

49.      The Debtor's labor force also includes non-employee Contract Labor Force who are paid based upon hourly or monthly rates.  The Debtor does not withhold taxes for the Contract Labor Force and does not offer health or other benefits to the Contract Labor Force.

50.      The relief requested in the Wage Motion is necessary to avoid immediate and irreparable harm to the Debtor.  The Debtor cannot afford to lose its workforce because they are not paid their wages and compensation.

51.      The prepetition wages and salaries owed to most of the Employees do not exceed the $15,150 cap set by section 507(a)(4) of the Bankruptcy Court.  The Debtor will not pay an individual Employee over the capped amount.

52.      The Contract Labor Force work closely with the Debtor on a regular basis.  Some have been with the Debtor for a number of years.  Each group of the Contract Labor Force provides an essential service that the Debtor's operations cannot do without.  Similar to most of the Employees, the Contract Labor Force also depends on the Debtor's paying their wages and fees and will discontinue working with the Debtor if they cannot receive payment for work done. The aggregate prepetition amount owed to the Contract Labor Force, approximately $80,000 is a *de minimis* amount in terms of the Debtor's operational costs and expenses.  Paying the amount, however, will ensure services that provide enormous benefit for the continued smooth operation of the Hospital.

53.      The Debtor offers a health plan to its Employees which is a Debtor's self-funded plan.  364 employees of the Debtor participate in the Debtor sponsored health plan.  In the ordinary course of business, the Debtor deducts premium from the participating employee's gross pay and the Debtor covers the Healthcare Claims of the participating employees.  As of

the Petition Date, the outstanding Healthcare Claims is approximately $287,500.  The Debtor

seeks the authority, but not the requirement, to pay the prepetition Healthcare Claims.  It is my

understanding that this amount does not exceed the cap under section 507(a)(5) of the

Bankruptcy Code.

54.     The Debtor offers group life insurance for eligible Employees.  As of the Petition

Date, the Debtors seeks the authority to pay the outstanding prepetition portion of employer

paid group life insurance coverage, which the Debtor estimates is $39,395.

55.     The Debtor also deduct from payroll employee contributions to the 401(k) plan

(for which the Debtor does not offer matching contributions), or for premiums to other types of

third-party insurance the employee chooses to participate in (like vision, dental, disability

insurance), among other things.  The Employee Deductions comprise of property of the

employees are not property of the Debtor.  The Debtor thus requests the authority to pay over to

the appropriate parties the Employee Deductions as designated by each of the employees.

56.     The Employees and the Contract Labor Force are a major life source for the

viability of the Debtor.  Some of the Employees and Contract Labor live paycheck to paycheck.

As a result, the Employees and Contract Labor Force can face significant financial hardship if

they do not receive their paycheck and other benefits.  The Debtor submits that the total amount

of prepetition wages/salaries/fees to be paid to the Employees and Contract Labor Force if the

requested relief is granted is *de minimis* compared to the importance and necessity of the need

of the labor force to keep the Hospital operating.  The Bankruptcy Code allows for the payment

of the prepetition labor force compensation and benefits.  Accordingly, the relief sought in the

Wage Motion is in the best interest of the Debtor and its creditors and the Debtor request that

the Court grant the Wage Motion.

## THE DIP MOTION

### a) Overview of the DIP Facility

57.     Pursuant to the DIP Motion, the Debtor seeks postpetition financing with its prepetition lender on substantially the same terms as existed prior to the Petition Date.  The DIP Motion requests authority for the Debtor to execute and perform the DIP Credit Agreement attached to the Motion as Exhibit B, providing for a revolving credit facility in the principal amount of $10,000,000.  Additionally, the Motion requests approval of the roll-up of the Pre-Petition Obligations into to the DIP Credit Facility such that the Pre-Petition Obligations will be deemed to constitute loans under the DIP Credit Agreement.  As of the Petition Date, the outstanding principal amount of the Pre-Petition Obligations was approximately $4,664,662.

### b) The Pre-Petition Obligations

58.     The Debtor, as borrower, and eCapital Healthcare Corp. (f/k/a CNH Finance Fund I, L.P., "eCapital"), as lender (in such capacity, the "Pre-Petition Lender"), are parties to that certain Credit and Security Agreement, dated as of July 16, 2021 (as amended, restated, supplemented, or otherwise modified, the "Pre-Petition Credit Agreement," and collectively with the Loan Documents (as defined in the Pre-Petition Credit Agreement) and other related agreements and documents, the "Pre-Petition Credit Documents").

59.     Pursuant to the Pre-Petition Credit Agreement, the Pre-Petition Lender provided revolving credit and other financial accommodations to the Debtor pursuant to the Pre-Petition Loan Documents (the "Pre-Petition Credit Facility").

60.     The Pre-Petition Credit Facility provided the Debtor with Revolving Loan Commitments (as defined in the Pre-Petition Credit Agreement) subject to, among other things, a Facility Cap of $10,000,000.  As of the Petition Date, the aggregate principal amount outstanding under the Pre-Petition Credit Facility was approximately $4,664,661.94 (collectively, with all other outstanding obligations allowable under the Pre-Petition Credit Facility, the "Pre-Petition Credit Obligations").

61.     As more fully set forth in the Pre-Petition Credit Documents, prior to the Petition

Date, the Debtor granted to the Pre-Petition Lender a first priority security interest in and

continuing lien on (the "Pre-Petition Liens") the Pre-Petition Collateral, which includes the

Debtor's interest in all accounts and other personal property, subject only to the Permitted Liens

(as such terms are defined in the Pre-Petition Credit Agreement).   All of the Debtor's cash,

including any cash in deposit accounts of the Debtor, wherever located, constitutes Cash

Collateral of the Pre-Petition Lender.

### c)  Other Secured Creditors

62.     Several regional taxing authorities under the umbrella of the Nacogdoches

Appraisal District hold *ad valorem* tax liens on the Debtor's personal property.  In addition, the

Debtor is party to various security agreements and capital leases secured by specific

equipment, including the following:

| Secured Creditor | Collateral |
|---|---|
| GE Government Finance, Inc | Optima CT 660, Optima MR450, and Mobile Optima 220 X-Ray |
| Intuitive Surgical, Inc.; | da Vinci Xi Surgical System Robot |
| Med One Capital Funding, LLC; | TabloXT, Alpinion X-Cube 90, Alaris System Model 8015 Point of Care Units, 8100 LVP Alaris System Model 8100 LVP Pumping Modules, Alaris System Model 8110 Syringe Modules and 914-0170 IV Strands |
| Ortho-Clinical Diagnostics, Inc | 2 Vitros 5600 Integrated Systems |

### d)  Entering into the DIP Facility is in the Best Interest of the Hospital

63.     Prior to becoming Chief Administrative Officer with the Debtor, I spent seven (7)

years as a restructuring/bankruptcy advisor.  In such capacity, I have been involved in several

chapter 11 and out-of-bankruptcy turnarounds for struggling hospitals and other businesses.  I am

familiar with debtor-in-possession financing and the process for obtaining such financing.  Prior to

determining to enter into the DIP Credit Facility, I and other principals of the Debtor searched for alternative financing.  Based on this market check, the Debtor determined that, in the current credit market, there are no feasible options for DIP financing on terms more favorable than the DIP Credit Facility.  The DIP Credit Facility offered by the DIP Lender had the best terms we have been able to find.  Moreover, the Debtor already has a working relationship with the DIP Lender and the DIP Facility is substantially similar to the prepetition credit facility.  I also believe it is advantageous to have a lender who we trust and knows and trusts us.

64.      Moreover, it is unlikely another lender would be in a position to provide as favorable a financing arrangement as currently available under the DIP Facility because (a) the DIP Lender (as the Pre-Petition Lender) currently holds a first priority perfected lien on substantially all of Debtor's assets and (b) the DIP Facility provides favorable terms to the Debtor which no other lender would be able to match under the circumstances. The Debtor submits that these factors provide additional and ample reason to approve the DIP Facility.

65.      The Debtor has determined in its business judgment that entering into the DIP Facility is in the best interest of the Hospital and its creditors and will ensure continued patient care and safety.  The Debtor will very likely return a higher value to stakeholders by continuing its business operations. However, to maintain adequate working capital for operations and for general corporate purposes, the Debtor requires immediate access to reasonably priced financing. The DIP Lender is willing to provide such financing.

66.      The Debtor is a community hospital and has continuing care obligations to current and future patients. If the Debtor's access to DIP funding is denied, the Debtor will be forced to cease operations essentially immediately and with little warning. Such an event would lead to the layoff of hundreds of employees and place any overnight patients (the Debtor has 231 patient rooms) at unnecessary risk until their care can be transferred, which is not assured. Moreover, patients with already-scheduled procedures will be unduly harmed by needing to reschedule their care with other providers. Such a cessation of operations and care will almost

certainly eliminate any possibility of reorganizing and of providing any distribution to creditors above the value of its assets that secured creditors might receive through a liquidation.

67. For these reasons, the Debtor determined in its sound business judgment that the DIP Facility provides a greater amount of financing on more favorable terms than any other reasonably available alternative. The Debtor negotiated the DIP Facility with the DIP Lender in good faith, at arm's length, and with the assistance of outside counsel to obtain the required postpetition financing on terms favorable to the Debtor. I therefore believe that entering into the DIP Facility constitutes an exercise of the Debtor's sound business judgment that should be approved by the Court.

68. I likewise believe that the Roll-Up provision in the DIP Facility Agreement is a sound exercise of the Debtor's business judgment for the following reasons:

(a) The negotiation and subsequent granting of the Roll-Up is required as a condition for the DIP Lender to provide the liquidity necessary to continue the Debtor's operations;

(b) The prepetition debt facility is a revolving line of credit that relies on generated accounts receivables as the basis for providing continued funding. If the Roll-Up is denied but the post-petition financing is otherwise approved, on a post-petition basis, the Debtor will be required to rely solely on post-petition generated accounts receivables to access funding. Even a brief reduction of accounts receivables generation would jeopardize the Debtor's ability to pay post-petition obligations as it would restrict the Debtor's ability to draw on the line of credit. On the other hand, if the DIP Lender is entitled to roll-up its prepetition obligations, the DIP Lender can look to all Eligible Receivables (as defined in the DIP Credit Agreement) from which to make its lending decision, whether those receivables were generated pre- or postpetition;

(c) The DIP Lender already holds the senior lien on the DIP Collateral and, therefore, the positions of other creditors, both secured and unsecured will be unharmed;

(d) The DIP Lender's prepetition liens appear to be properly secured and perfected. The DIP Lender does not appear to be using a Roll-Up for the purpose of correcting any prepetition perfection concerns;

(e)     The DIP Lender has required a Roll-Up as a condition to extending postpetition financing. If the Court were to deny the Roll-Up and the DIP Lender subsequently terminated the DIP Agreement, the Debtor would not have access to needed working capital funds, which possibly could cause the immediate cessation of the Debtor's operations and jeopardize patient care;

(f)     The Roll-Up is intended to continue postpetition the relationship the DIP Lender and Debtor have had prepetition. The Roll-Up thus offers advantages for the Debtor in accounting and practical efficiencies; and

(g)     Other creditors will be adequately protected because they will be entitled postpetition to the same priority vis-à-vis the DIP Collateral as they were prepetition.

69.     The terms of the Roll-Up in the DIP Facility are reasonable and necessary components of the DIP Facility. The DIP Facility—including the Roll-Up—represents the best financing option available to address the Debtor's liquidity needs under these circumstances. The terms and conditions of the DIP Facility are reasonable, appropriate, and reflective of the current market for debtor-in-possession financing under these circumstances.

70.     The Debtor has determined that the terms of the DIP Credit Facility are reasonable, appropriate and in the best interest of the Debtor and other stakeholders, including the granting of superpriority and secured status to the DIP Lender as provided in the DIP Credit Agreement.  First, as explained above, the Debtor has been unable to obtain sufficient postpetition financing in the form of unsecured credit, solely as an administrative expense, or secured by a lien junior or equal to those held by existing secured creditors.  In light of rising interest rates, which has reduced financing availability generally, the Debtor has been precluded from obtaining postpetition financing in the amount required on terms other than on a first priority, secured, and superpriority basis as described in the DIP Agreement.

71.     Second, the Debtor needs the funds to be provided under the DIP Facility to preserve the value of its estate for the benefit of all creditors and other parties in interest. Absent the DIP Facility, the Debtor will be unable to operate its business or prosecute the Chapter 11 Case, which will threaten the Debtor's going concern value. Providing the Debtor with

the liquidity necessary to preserve its going concern value through the pendency of the Chapter 11 Case is in the best interest of all stakeholders.

72.    Third, the terms of the DIP Facility Documents are reasonable and adequate to ensure the Debtor's ongoing ability to operate in Chapter 11. Indeed, the DIP Facility will provide the Debtor with sufficient and necessary liquidity to allow the Debtor to maintain its operations and relationships with key constituents during the Chapter 11 Case. Accordingly, the terms of the DIP Facility are reasonable and the DIP Facility is sufficient to support the Debtor's operations and restructuring activities through the pendency of the Chapter 11 Case.

73.    Fourth, the Debtor and the DIP Lender negotiated the DIP Facility in good faith and at arm's-length, and the Debtor's entry into the DIP Facility Documents is an exercise of its sound business judgment and is in the best interests of its estate, creditors, and other parties in interest.  Accordingly, the Court should authorize the Debtor to provide the DIP Lender liens on the DIP Collateral and grant the DIP Obligations superpriority administrative expense status as provided in the DIP Motion.

74.    The DIP Lender should be deemed a good faith lender under the Bankruptcy Code.  As explained herein, the DIP Facility is the result of the Debtor's reasonable and informed determination that the DIP Lender offered the most favorable terms on which to obtain needed postpetition financing, and of extended arm's-length, good faith negotiations between the Debtor and the DIP Lender. The terms and conditions of the DIP Facility are fair and reasonable, and the proceeds under the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code.  Further, no consideration is being provided to any party to the DIP Facility other than as described herein. Accordingly, I believe the DIP Lender is a "good faith" lender within the meaning of the Bankruptcy Code.

75.    The Debtor requires immediate access to the DIP Facility.  The Debtor and its estate will suffer immediate and irreparable harm if the interim relief requested herein is not granted promptly. An extended delay in obtaining the DIP Facility would jeopardize the Debtor's

ability to satisfy its postpetition obligations and provide safe patient care and would threaten the

Debtor's viability; thus, causing significant harm to the Debtor's estates and creditors.

Accordingly, the Debtor has an immediate need for access to the DIP Facility to, among other

things, permit the orderly continuation of the operation of its business, to make payroll, and to

satisfy other working capital and operational needs, all of which are required to preserve and

maintain the Debtor's going concern value for the benefit of all parties in interest.

76.     For similar reasons, the Debtor should be authorized to use Cash Collateral.  In

addition, the DIP Lender consents to the use of Cash Collateral, both in its capacity as the DIP

Lender and as the Pre-Petition Lender, subject to the terms and limitations set forth in the

Interim Order.  As described above, access to Cash Collateral on an interim basis is essential to

the continued operation of the Debtor's business.  Thus, the use of Cash Collateral is in the best

interests of the Debtor's estate and its stakeholders, including the Prepetition Lender and the

DIP Lender and should be approved.

77.     For all of the reasons set forth above, the Debtor believes the relief requested in

the DIP Motion is essential to the Debtor's operations and that entry of the Interim Order is

necessary to avoid immediate and irreparable harm to the Debtor's estate.

(Remainder of page left intentionally blank)

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is

true and correct.

Executed on:  November 20, 2023

/s/ *Edmund C. King*
Edmund C. King

L:\JPROSTOK\Lion Star Nacogdoches Hospital, LLC #6429\Pleadings\Declaration in Support of First Days 11.19.23.docx