



**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

**THE DATE OF ENTRY IS ON**
**THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed March 7, 2024**

*Mark X. Mullin*

**United States Bankruptcy Judge**

---

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| Lion Star Nacogdoches Hospital, LLC, | Case No. 23-43535 (mxm) |
| d/b/a Nacogdoches Memorial Hospital Debtor. | |

### ORDER GRANTING EXPEDITED MOTION FOR
### ENTRY OF A CONSENSUAL ORDER (A) APPROVING THE SALE OF THE
### DEBTOR'S ASSETS PURSUANT TO 11 U.S.C. § 363; (B) APPROVING
### THE TERM SHEET; AND (C) GRANTING RELATED RELIEF
*[Relates to Dkt. No. (210)]*

Upon consideration of Lion Star Nacogdoches Hospital, LLC's (the "<u>Debtor</u>") *Expedited Motion for Entry of a Consensual Order (A) Approving the Sale of the Debtor's Assets Pursuant to 11 U.S.C. § 363; (B) Approving the Term Sheet; and (C) Granting Related Relief* ("<u>Motion</u>")[1] and the Court having found that it has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and the Court having found that this is a core proceeding pursuant to 28 U.S.C. §

---

[1] Capitalized terms not defined herein shall have the meaning ascribed in the Motion.

157(b)(2); and the Court having found that venue of this proceeding and the Motion in this district

is proper pursuant to 28 U.S.C. §§ 1408 and 1409; the Court having considered the Motion, the

arguments of counsel and the evidence presented at the hearing on the Motion conducted on March

4, 2024 (the "Sale Hearing") and the entire record; and the Court having found that the Debtor

provided due and sufficient notice of the Motion and the Sale Hearing, and it appearing no other

or further notice need be provided; and the Court having reviewed the Motion, the filings in support

of the Motion, and all objections to the relief sought in the Motion, if any; and the Court having

found that the relief requested in the Motion is in the best interests of the Debtor, their estates, their

creditors, and other parties in interest; and after due deliberation and good and sufficient cause

appearing therefor, it is hereby, **FOUND AND DETERMINED THAT**:

1.      The findings of fact and conclusions of law set forth in this Order constitute the

Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable

pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute

conclusions of law, they are hereby adopted as such. To the extent any of the following conclusions

of law constitute findings of fact, they are hereby adopted as such. Any findings of fact or

conclusions of law stated by the Court on the record at the Sale Hearing are incorporated herein

by reference, to the extent they are not inconsistent with this Order.

2.      The statutory and legal bases for the relief requested in the Motion are sections

105(a), 363(b), 363(f), 363(m), 365, 503, and 507 of title 11 of the United States Code (the

"Bankruptcy Code"), Rules 2002, 6004, 6006, 9007, and 9014 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules").

3.      This Order constitutes a final and appealable order within the meaning of 28 U.S.C.

§ 158(a). Notwithstanding Rules 6004(h) and 6006(d) of the Bankruptcy Rules, and to any extent

necessary under Rule 9014 of the Bankruptcy Rules and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Order, and expressly directs entry of judgment as set forth in this Order.

4.      The Purchased Assets (as defined in the Term Sheet) constitute property of the Debtor's estate and title to the Purchased Assets is vested in the Debtor's estate, within the meaning of section 541(a) of the Bankruptcy Code. The Purchased Assets include Debtor's bank accounts at Prosperity Bank ending in Account Nos. 8338 – Commercial, 8346 - Government, and 8583 – NMPG (collectively, the "Prosperity Account"), but do not include (i) Debtor's bank accounts at Prosperity Bank ending in Account Nos. 8281 – Operating/Debtor-in-Possession, 8303 - Payroll, 8311 – Accounts Payable, 8699 – MERPs, and 8818 – LPPF (collectively, the "Excluded Bank Accounts"), or (ii) a 2020 Lincoln Nautilus which is subject to a lien in favor of Prosperity Bank (the "Lincoln"). The Debtor is the sole and rightful owner of the Purchased Assets with all rights, title, and interest to transfer and convey the Purchased Assets to the Nacogdoches County Hospital District (the "District") and no other person other than the Debtor has any ownership right, title, or interest therein other than those persons or entities who have validly perfected liens and security interests in the Purchased Assets. The Debtor has articulated good and sufficient reasons for this Court to grant the relief requested in the Motion.

5.      Sufficient notice of the Motion and Sale Hearing has been provided in accordance with sections 102(1), 363, 364, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, 6004, 6006, and 9014.

6.      Actual written notice of the Motion and a reasonable opportunity under the exigent circumstances to object or be heard with respect to the Motion and the relief requested in the

Motion have been afforded to the following parties: (a) all entities that have, to the best knowledge

of the Debtor's management and advisors, executed a written non-disclosure agreement ("NDA")

related to a potential sale of the Purchased Assets from the Debtor as described in the Term Sheet

(the "Sale Transaction") within the past six (6) months; (b) all entities known to have asserted any

lien, claim, interest, or encumbrance in or upon any of the Purchased Assets, including eCapital

Healthcare Corp. f/k/a CNH Finance Fund I, L.P. ("DIP Lender"); (c) the Official Committee of

Unsecured Creditors (the "Committee"); (d) the U.S. Trustee; (e) any party that has requested

notice pursuant to Bankruptcy Rule 2002; (f) to the extent not already included above, all parties

in interest listed on the Debtor's creditor matrix, and (g) counsel to the District, the DIP Lender,

and the Committee (collectively, the "Notice Parties") and no further notice of the Motion or the

Sale Hearing is required.

7.      The District will serve on or before sixty (60) days after entry of this Order a *Notice
of Desired 365 Contracts That May Be Assumed and Assigned in Connection with the Sale
Transaction* (the "Notice of Desired 365 Contracts"), on all known counterparties to executory

contracts and unexpired leases that may be assumed and assigned in connection with a sale of the

Purchased Assets (the "Desired 365 Contracts").  The District shall also file an omnibus Notice of

Desired 365 contracts with the Court on or before sixty (60) days after entry of this Order.

Performance under Bankruptcy Code §365 for contract and lease counterparties is suspended

unless the District agrees to pay for the services during the period while the District decides

whether to assume the contracts and leases.

8.      The Term Sheet attached to this Order as **Exhibit A** was negotiated and entered

into after arms' length, good faith negotiations between Debtor, the District, the Committee and

the DIP Lender and their respective counsel and advisors, and without collusion. The District is

not an insider of the Debtor. The District did not engage in any improper conduct. Prior to the

Closing Date, the Debtor shall file an Asset Purchase Agreement (the "APA") reflecting the terms

and conditions of the Term Sheet with the Court. The DIP Lender, the Debtor, the District, and the

Committee shall work in good faith to reach agreement on the APA.  Following the filing of the

APA with the Bankruptcy Court, the terms and conditions of the APA shall govern the Sale

Transaction and to the extent there is any conflict between the Term Sheet and the APA, the APA

shall control. If the parties cannot reach an agreement on the APA, each party reserves the right to

file a request for an emergency hearing with the Court.

9.      The consideration provided by the District pursuant to the Term Sheet is fair and

reasonable and constitutes (i) reasonably equivalent value under the Bankruptcy Code and the

Texas Uniform Fraudulent Transfer Act, (ii) fair consideration under the Texas Uniform

Fraudulent Transfer Act and (iii) reasonably equivalent value, fair consideration, and fair value

under any other applicable laws of the United States, any state, territory or possession, or the

District of Columbia.

10.      The District is a "good faith purchaser" as that term is used in section 363(m) of

the Bankruptcy Code.  The District is hereby granted all protections and benefits provided to a

good faith purchaser under such section. Neither the reversal nor modification on appeal of this

Order or the authorization contained herein shall affect the validity of the Sale Transaction and the

consummation of the transactions contemplated herein.

11.      The Term Sheet represents a fair and reasonable offer to purchase the Purchased

Assets under the circumstances of this Chapter 11 Case. No other person or entity or group of

entities has offered to purchase the Purchased Assets for greater economic value to the Debtor's

estate than the District.

12.     Approval of the Motion and the consummation of the transactions contemplated thereby are in the best interests of the Debtor, its estate, and other parties in interest.

13.     The Debtor has demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the Sale Transaction outside of a plan of reorganization. The Debtor's entry into and performance under the APA, which consummates transactions reflected in the Term Sheet (i) are a result of due deliberation by the Debtor and constitute a sound and reasonable exercise of the Debtor's business judgment consistent with its fiduciary duties, (ii) provide value to and are beneficial to the Debtor's estate and are in the best interest of the Debtor and its stakeholders, and (iii) are reasonable and appropriate under the circumstances.

14.     The Sale Transaction was not entered into and will not be consummated for the purpose of hindering, delaying or defrauding creditors of the Debtor, and neither the Debtor nor the District have or has entered into the Sale Transaction or is or are consummating the transactions contemplated thereby with any fraudulent or otherwise improper purpose.

15.     The Debtor has full corporate power and authority to close the Sale Transaction, including an APA, and all other documents contemplated thereby, and no further consents or approvals are required for the Debtor to consummate the transactions contemplated by the Term Sheet.

16.     The transfer of the Purchased Assets to the District, as of the Closing Date, will be a legal, valid, and effective transfer of such Purchased Assets and will vest the District with all right, title, and interest of the Debtor to the Purchased Assets free and clear of all Liens (as described in the Term Sheet) and, to the extent permitted under applicable law, other interests accruing, arising, or relating to any time prior to the applicable closing date, SAVE AND EXCEPT

any valid liens held by or in favor of any taxing authority relating solely to the Purchased Assets

(the "Ad Valorem Personal Property Tax Liens").  For avoidance of doubt, the Purchased Assets

are not subject to any liens assessed on any real property.

17.     Holders of Liens are deemed to have consented to the Sale Transaction, pursuant

to section 363(f)(2) of the Bankruptcy Code. All persons having claims of any kind or nature

whatsoever against the Debtor or the Purchased Assets shall be forever barred, estopped, and

permanently enjoined from pursuing or asserting such claims against the District or any of its

assets, property, affiliates, successors, assigns, or the Purchased Assets. The Debtor, the

Committee, the DIP Lender, and the District reserve the right to seek a further order of this Court

to address actions by Holders of Liens in violation or contravention of this Order.

18.     The sale and transfer of the Purchased Assets to the District, and transfer of title to

Purchased Assets subject to any lien will not make the District a successor of the Debtor nor subject

the District to any liability (including successor liability) with respect to the operation of the

Debtor's business prior to the Closing Date or by reason of such transfer. The District (i) is not,

and shall not be considered, a successor to the Debtor or any officer, director, agent, employee, or

anyone under the direction of any of the foregoing, (ii) has not, *de facto* or otherwise, merged with

or into the Debtor, (iii) is not a continuation or substantial continuation, and is not holding itself

out as a mere continuation, of the Debtor, the Debtor's estate, its respective businesses or

operations, or any enterprise of the Debtor, and (iv) does not have a common identity of

incorporators, directors, or equity holders with the Debtor.

19.     The District would not have entered into the Sale Transaction and would not

consummate the transactions contemplated thereby if the sale of the Purchased Assets to the

District were not, except as otherwise provided in the Term Sheet, free and clear of all Liens of

any kind or nature whatsoever, or if the District were not free of all successor liability with respect to Debtor's liabilities, except as expressly assumed in the Term Sheet.

20.     Pursuant to the terms of the Term Sheet and once filed, the APA, if requested by the District, the Debtor shall assume and assign to the District each Desired 365 Contract identified by the District to the Debtor in writing that is capable of being assumed and assigned. The District shall pay all cure amounts for the Desired 365 Contracts. To the extent sought by the District and approved by the Court in a subsequent order, the District shall assume and perform and discharge the liabilities to be assumed by the District (the "Assumed Liabilities"), if any, under the Desired 365 Contracts, including pursuant to any contract or lease assignment agreements, as applicable.

21.     To enhance the Debtor's level of liquidity, to preserve the value of the Debtor's estate and reduce the amount of post-petition expense borne by the Debtor, it is essential that the sale of the Purchased Assets occur within the time constraints set forth in the Term Sheet. Time is of the essence in consummating the Sale Transaction.

22.     Given the facts and circumstances of this Chapter 11 Case and the adequacy and fair value of the consideration, the sale of the Purchased Assets to the District constitutes a reasonable and sound exercise of the Debtor's business judgment and should be approved.

23.     The Sale Transaction does not constitute a *de facto or sub rosa* plan of reorganization or liquidation because the Debtor does not propose to (i) impair or restructure existing debt of, or equity interests in, the Debtor, (ii) impair or circumvent voting rights with respect to any plan proposed by the Debtor, (iii) circumvent chapter 11 safeguards, including those set forth in sections 1125 and 1129 of the Bankruptcy Code, or (iv) classify claims or equity interests.

24.     As of the Closing Date, the transfer of the Purchased Assets to the District will be a legal, valid, and effective transfer of the Purchased Assets and will vest the District with all right, title, and interest of the Debtor in and to the Purchased Assets free and clear of all Liens. The consummation of the Sale Transaction is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a), 363(b), 363(f), 363(m), 364, 365(b) and 365(f), and all applicable requirements of such sections have been complied with in respect of the Sale Transaction.

25.     The Sale Transaction, and the consummation thereof shall be specifically enforceable against and binding upon the Debtor and any chapter 7 or chapter 11 trustee appointed in this Chapter 11 Case and shall not be subject to any rejection or avoidance by the foregoing parties or any other person.

26.     The legal and factual bases set forth in the Motion and at the Sale Hearing establish just cause for the relief granted herein.

IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED THAT:

27.     The relief requested in the Motion is GRANTED AND APPROVED as set forth in this Order, the Term Sheet and the Sale Transaction contemplated thereby is APPROVED.

28.     Notwithstanding anything to the contrary herein, the Purchased Assets do not include the Accounts, the Supplemental Payments (each as defined in the Term Sheet), the Excluded Bank Accounts, or the Lincoln, nor do they include estate causes of action with the exception of claims against the District.

29.     The Term Sheet constitutes the highest and/or best offer for the Purchased Assets and will provide a greater recovery for the Debtor's estate than would be provided by any other available alternative. The Debtor's determination, in consultation with the Committee, that the

Term Sheet constitutes the highest and/or best offer for the Purchased Assets and constitutes a valid and sound exercise of the Debtor's business judgment.

30.      The Term Sheet represents a fair and reasonable offer to purchase the Purchased Assets under the circumstances of this Chapter 11 Case.

31.      Pursuant to sections 105(a), 363(b), 363(f), 365(b), and 365(f) of the Bankruptcy Code, the Debtor is authorized and directed to transfer the Purchased Assets on the Closing Date (as defined in the Term Sheet). Upon the Closing Date, the District shall take title to and possession of the Purchased Assets.  All Liens against Purchased Assets shall attach to the proceeds of the Sale Transaction with the same validity, priority, force, and effect that they now have as against the Purchased Assets, subject to any claims and defenses the Debtor and its estate may possess with respect thereto, SAVE AND EXCEPT ONLY the Ad Valorem Personal Property Tax Liens.

32.      The Debtor and its respective officers, employees, and agents are authorized and directed to execute and deliver, and authorized to perform under, consummate, and implement, all additional instruments and documents that may be reasonably necessary or desirable to implement the Sale Transaction and to take all further actions as may be (a) reasonably requested by the District for the purpose of assigning, transferring, granting, conveying, and conferring to the District, or reducing to the District's possession, the Purchased Assets or (b) necessary or appropriate to the performance of the obligations contemplated by the Term Sheet or to implement the Sale Transaction, all without further order of the Court.

33.      The sale of the Purchased Assets to the District shall be, except as otherwise provided in this Order, free and clear of all Liens. The Purchased Assets shall not be subject to any claims or interests allowed in this Chapter 11 Case, including, without limitation, any claims allowed under sections 361, 362, 363, 364, 365, 502, 503, 506, or 507 of the Bankruptcy Code,

nor shall the Purchased Assets be subject to a surcharge or "carve out" that is otherwise agreed to or approved in this Chapter 11 Case. For the avoidance of doubt and without limiting anything in this Order, the Sale Transaction shall be free and clear of any successor liability to the District for any of the Debtor's liabilities, except for the Assumed Liabilities.

34.     Subject to the Closing Date, each of (i) the Debtor on behalf of itself and the Estate, (ii) the District, and (iii) the Committee, hereby waive and release the DIP Lender from any and all claims and causes of action to the extent permitted by applicable law, whether known or unknown, now existing or hereafter arising, asserted or unasserted, mature or inchoate, contingent or non contingent, liquidated or unliquidated, material or non-material, disputed or undisputed, and whether imposed by agreement, understanding, law, equity, or otherwise.

35.     Except as expressly provided by this Order, all persons and entities holding any Lien on all or any portion of the Purchased Assets are forever barred, estopped, and permanently enjoined from asserting against the District or its successors or assigns, their property, or the Purchased Assets, such Liens and all claims and rights relating thereto. On the Closing Date, each holder of a Lien is authorized and directed to execute such documents and take all other actions as may be deemed by the District to be necessary or desirable to release its Lien on the Purchased Assets, as provided for in this Order, as such Liens may have been recorded or may otherwise exist.

36.     All persons and entities are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of the Debtor to sell and transfer the Purchased Assets to the District in accordance with the terms of this Order. The Debtor or the District may seek relief from this Court to enforce this or any other provision of this Order.

37.    All persons and entities that are in possession of some or all of the Purchased Assets on the Closing Date are directed to surrender possession of such Purchased Assets to the District or on the Closing Date. The Debtor shall exercise commercially reasonable efforts to assist the District in assuring that all persons that are presently, or on the applicable Closing Date may be, in possession of some or all of the Purchased Assets will surrender possession of the Purchased Assets to either (i) the Debtor before the Closing Date or (ii) the District on or after the Closing Date.

38.    This Order (a) shall be effective as a determination that, as of the Closing Date, all Liens will have been unconditionally released, discharged, and terminated as to the District and the Purchased Assets and that the conveyances and transfers described herein will have been effected and (b) is and shall be binding upon and govern the acts of all persons, including all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, county, and local officials, and all other persons who may be required by operation of law, the duties of their office, or contract to accept, file, register, or otherwise record or release any documents or instruments that reflect that the District is the assignee and owner of the Purchased Assets free and clear of all Liens, or who may be required to report or insure any title or state of title in or to any lease (all such entities being referred to as "Recording Officers"). All Recording Officers are authorized and specifically directed to strike recorded Liens, claims, liens, and other interests against the Purchased Assets recorded prior to the date of this Order. A certified copy of this Order may be filed with the appropriate clerk and/or recorded with the appropriate recorder to cancel any Liens of record.

39.     If, following a request duly made, any person or entity that has filed statements or other documents or agreements evidencing Liens on all or any portion of the Purchased Assets shall not have delivered to the District on or prior to the Closing Date, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of Liens and any other documents necessary or desirable to the District for the purpose of documenting the release of all Liens, which the person or entity has or may assert with respect to all or any portion of the Purchased Assets, the Debtor is hereby authorized and directed, and the District is hereby authorized, to execute and file such statements, instruments, releases and other documents on behalf of such person or entity with respect to the Purchased Assets. This Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, county, or local government agency, department, or office.

40.     This Order shall govern the acts of all persons and entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal and local officials and all other persons and entities who may be required by operation of law, the duties of their office or contract to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing persons and entities is hereby authorized and directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by this Order.

41.     Following the Closing Date, no holder of any claim shall interfere with the District's title to or use and enjoyment of the Purchased Assets based on or related to any such claim or based on any actions the Debtor may take in this Chapter 11 Case.

42.    Except as otherwise provided in this Order and to the maximum extent available under applicable law, the District shall be authorized, as of the Closing Date, to operate under any license, permit, registration and governmental authorization or approval of the Debtor with respect to the Purchased Assets, and to the maximum extent available under applicable law, all such licenses, permits, registrations and governmental authorizations and approvals are deemed to have been transferred to the District as of the Closing Date. All existing licenses or permits applicable to the Purchased Assets shall remain in place for the District's benefit until either new licenses and permits are obtained or existing licenses and permits are transferred in accordance with applicable administrative procedures. To the extent provided by section 525 of the Bankruptcy Code, no governmental unit may revoke or suspend any grant, permit, or license relating to the operation of the Purchased Assets sold, transferred or conveyed to the District on account of the filing or pendency of this Chapter 11 Case or the consummation of the Sale Transaction.

43.    On the Closing Date, this Order shall be considered and constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of the Purchased Assets or a bill of sale or assignment transferring good and marketable, indefeasible title and interest in all of the Purchased Assets to the District as of the Closing Date.

44.    Except as expressly set forth in the Term Sheet, the District and its successors and assigns shall have no liability for any claim, whether known or unknown as of the Closing Date, now existing or hereafter arising, whether fixed or contingent, whether derivatively, vicariously, as a transferee or successor or otherwise, of any kind, nature, or character whatsoever, by reason of any theory of law or equity, including claims arising under, without limitation: (a) the Debtor's business operations or the cessation thereof; (b) any litigation involving the Debtor; (c) any employee, workers' compensation, occupational disease, or unemployment or temporary disability

related law, including, without limitation, claims that might otherwise arise under or pursuant to (i) the Employee Retirement Income Security Act of 1974, as amended, (ii) the Fair Labor Standards Act, (iii) Title VII of the Civil Rights Act of 1964, (iv) the Federal Rehabilitation Act of 1973, (v) the National Labor Relations Act, (vi) the Worker Adjustment and Retraining Notification Act of 1988, (vii) the Age Discrimination and Employee Act of 1967 and Age Discrimination in Employment Act, as amended, (viii) the Americans with Disabilities Act of 1990, (ix) the Consolidated Omnibus Budget Reconciliation Act of 1985, (x) state and local discrimination laws, (xi) state and local unemployment compensation laws or any other similar state and local laws, (xii) state workers' compensation laws, or (xiii) any other state, local, or federal employee benefit laws, regulations, or rules or other state, local, or federal laws, regulations, or rules relating to wages, benefits, employment, or termination of employment with the Debtor or any predecessors; (d) any antitrust laws; (e) any environmental laws, rules, or regulations, including, without limitation, under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601, *et seq.*, or similar statutes; (f) any bulk sales or similar laws; (g) any federal, state, or local tax statutes, regulations, or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended, or the Texas Tax Code; and (h) any common law doctrine of *de facto* merger or successor or transferee liability, successor-in-interest liability theory, or any other theory of or related to successor liability.

45.     The District shall not have any liability for any obligation of the Debtor arising under or related to any of the Purchased Assets prior to the Closing Date. Without limiting the generality of the foregoing, the District shall not be liable for any claims against the Debtor or any of their predecessors or affiliates. By virtue of the Sale Transaction, the District and its respective affiliates, successors and assigns shall not be deemed or considered to (a) be a legal successor or

otherwise be deemed a successor to any of the Debtor, (b) have, *de facto* or otherwise, merged with or into the Debtor, or (c) be a continuation or substantial continuation, or be holding itself out as a mere continuation, of the Debtor or its estate, businesses or operations, or any enterprise of the Debtor, in each case by any law or equity, and the District has not assumed nor is it in any way responsible for any liability or obligation of the Debtor or the Debtor's estate. The District shall have no successor or vicarious liabilities of any kind or character, including, but not limited to, any theory of antitrust, environmental, successor or transferee liability, labor law, *de facto* merger or substantial continuity, whether known or unknown as of the Closing Date, now existing or hereafter arising, whether fixed or contingent, with respect to the Debtor or any obligations of the Debtor arising prior to the Closing Date, including, but not limited to, liabilities on account of any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of any of the Purchased Assets prior to the Closing Date.

46.      Pursuant to Bankruptcy Rules 4001, 6004(h), 6006(d), 7062, and 9014, this Order shall be effective immediately upon its entry, and the Debtor and the District are authorized to close the Sale immediately. Notwithstanding the provisions of Bankruptcy Rule 6004 and 6006 or any applicable provisions of the Local Rules, this Order shall not be stayed for fourteen (14) days after the entry hereof, but shall be effective and enforceable immediately upon entry, and the fourteen (14) day stay provided in such rules is hereby expressly waived and shall not apply.

47.      All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

48.      To the extent that this Order is inconsistent with any prior order or pleading with respect to the Motion filed in this Chapter 11 Case, the terms of this Order shall govern.

49.     The District shall permit, for a period of not less than two (2) years, the Debtor and its professionals and any direct or indirect successors to any of the foregoing, the Committee and its professionals, and the DIP Lender and its professionals (collectively, the "Permitted Parties"), reasonable access to all books and records of the Debtor, that are Purchased Assets relating to the Debtor's operations prior to the applicable Closing Date and are in the District's (or any affiliate's, agent's or affiliate's agent's) possession or control for the purposes of (a) pursuing, assessing, settling, or otherwise dealing with any assets or liabilities that are excluded from the applicable Sale Transaction; (b) pursuing, assessing, defending, settling, or otherwise dealing with (including, without limitation, exercising rights and remedies with respect to) any claim, action, or cause of action (including, without limitation, any objection or motion) that any Permitted Party has a right to pursue, including collections of accounts receivable; (c) assisting any one or more of the Permitted Parties in connection with or otherwise relating to the claims reconciliation process relating to the Debtor (including, without limitation, with respect to claims against any person), including, without limitation, assessing, resolving, settling, and/or otherwise dealing with priority and administrative claims and any general unsecured claims that accrue prior to the closing of the applicable Sale Transaction; and (d) without limiting the generality of the preceding clauses (a) through (c), otherwise administering the Debtor's estate (including, without limitation, the preparation and confirmation of a bankruptcy plan relating to the Debtor and the preparation of any accompanying disclosure statement, and compliance with any subpoena, document request, or order of any court compelling any Permitted Party to produce documents to third parties, winding down the Debtor's estate, preparing or filing tax returns, and causing audits to be performed) and/or for any other reasonable purpose.

50.     The provisions of this Order and any actions taken pursuant hereto or thereto shall survive entry of any order which may be entered (a) confirming or consummating any plan of reorganization of the Debtor, (b) converting this Chapter 11 Case from chapter 11 to chapter 7 of the Bankruptcy Code, (c) dismissing the case, or (d) pursuant to which this Court abstains from hearing this case.

51.     The Court shall retain jurisdiction to, among other things, interpret, implement and enforce the terms and provisions of this Order, the Sale Transaction, and all amendments thereto and any releases, waivers, and consents hereunder and thereunder, and each of the agreements executed in connection therewith to which the Debtor is a party or which has been assigned by the Debtor to the District, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to any of the foregoing, including any disputes that may arise among the Debtor and the District. So long as this Chapter 11 Case is not closed (or, if closed but then reopened), the Court shall retain jurisdiction to enforce the injunctions and other rights of the District described in this Order, in the event that after the Closing Date any third parties attempt to or actually interfere with such rights of the District, even if the Debtor is not directly involved or named in any such actions or disputes between the District and such third parties.

52.     It is further **ORDERED** that

a.     The Term Sheet, the APA, the Sale Transaction and the terms and conditions thereof are hereby APPROVED, and the Debtor is authorized and directed to enter into all documents related thereto. The failure to include specifically any particular provision of the Term Sheet in this Order shall not diminish or impair the effectiveness of such provision, it being the

intent of the Court that the Term Sheet and the APA be authorized and approved in their entirety.

b.      Pursuant to sections 105, 363, and 365 of the Bankruptcy Code, the Debtor is authorized and directed to take any and all actions necessary appropriate to (a) consummate the sale of the Purchased Assets to the District pursuant to and in accordance with the terms and conditions of this Order; (b) close the Sale Transaction, and (c) execute and deliver, close, perform under, consummate, and implement the documents required to effectuate the Sale Transaction and other ancillary documents that may be reasonably necessary or desirable to implement the Sale Transaction.

c.      Nothing in this Order, the Term Sheet, or otherwise, shall prohibit the Debtor, the Committee, or the DIP Lender from engaging with or employing any employees of the Hospital that the District has determined not to employ.

d.      Following the Closing Date, and until such time as the DIP Obligations are paid in full in cash, the District shall continue to provide reporting to the DIP Lender related to the Accounts (with copies to the Committee or chapter 7 trustee, if applicable) and the collections thereof in the same or similar form and substance as provided immediately prior to the Closing Date.

e.      Nothing in this Order, the Term Sheet, the APA or otherwise shall obligate the DIP Lender to provide any cash advances in excess of those amounts

expressly set forth on <u>Schedule A</u> to the Term Sheet for the purpose of funding payroll and to fund the Carve Out (as described in the Term Sheet).

53.     The Lincoln shall be deemed abandoned by the Debtor and Prosperity Bank may exercise any and all rights including, without limitation, foreclosure and/or sale of the Lincoln without further order of the Court and the automatic stay under 11 U.S.C. 362(a) is hereby terminated as to Debtor and the Lincoln for such purposes.

54.     As of the Closing Date, the *Final Order Granting Debtor's Emergency Motion for Interim and Final Orders Authorizing the Debtor to Maintain Existing Cash Management System, Bank Accounts, Checks and Business Forms* [ECF No. 201] (the "<u>Cash Management Order</u>") and all Blocked DACAs, Springing DACAs, and Control Agreements shall be terminated with respect to the Prosperity Account.  The Cash Management Order shall continue in full force and effect with respect to the Excluded Bank Accounts.  Notwithstanding such termination, the DIP Lender shall retain its secured interest in the Accounts and the Supplemental Payments.  Notwithstanding such termination, Prosperity Bank shall have the right to seek attorney's fees from the Debtor to the extent allowable under the terms of the DACAs or any other agreements or applicable law subject to further court Order upon proper application, and all parties reserve their rights with respect thereto.  To effectuate the terms of this Order (i) the Debtor's rights in the Prosperity Account shall be transferred to the District and the District shall execute any and all documents required by Prosperity Bank to sweep all funds in the Prosperity Account into an account controlled by the District at Prosperity Bank as described in the APA, and (ii) the Debtor and the District shall execute all other usual and customary documents required by Prosperity Bank to evidence the transfer of the Prosperity Account to the District and/or the sweep agreement described above, including, without limitation, deposit account agreements, signature cards,

certification of beneficial owners, and account authorizations.  Notwithstanding the transfer, the account numbers of the Prosperity Account shall remain unchanged and the name of the Prosperity Account shall remain unchanged unless (1) Prosperity Bank and the District agree to change the name or (2) Prosperity Bank is required by applicable law or regulation to change the name; provided that, prior to changing any name on the account, Prosperity Bank shall give ten (10) business day's written notice to counsel for the Debtor (or Trustee, if applicable), the Committee, the District and eCapital (the "Notice Parties") of such intent to change the name on the Prosperity Account and each of the Notice Parties shall have the right to seek a determination from this Court that no applicable law or regulation mandates such a change and an order prohibiting such a change or granting such other relief as the Court may order.  Prosperity Bank shall have the right to debit the Excluded Accounts, the Prosperity Account, and the account created by the District for all periodic service charges and other customary fees incurred in the ordinary course of business in connection with maintaining the Excluded Accounts, the Prosperity Account, and/or the account created by the District, *i.e.* such accounts may be debited for such charges and fees incurred in connection with that specific account.  Nothing contained in this Order shall be construed as (i) altering or modifying Prosperity Bank's rights and remedies under any existing agreement with the Debtor at law or in equity, or (ii) altering, impairing or modifying Prosperity Bank's right to seek relief from the Court to terminate or modify the Prosperity Account, the Excluded Bank Accounts, or any other account agreements pursuant to the terms set forth therein and/or applicable law and/or for cause, or (iii) altering, impairing or modifying the right of the parties to terminate or modify the Prosperity Account, the Excluded Bank Accounts, or any other account agreements by the written consent of the Debtor (or Trustee, if applicable), the District, the DIP Lender, and Prosperity Bank (provided District consent shall not be required with respect to the Excluded Bank

Accounts). Prosperity Bank will have no liability to any party for relying on the contents of this Order concerning ownership of the Prosperity Account. The District agrees to indemnify and hold Prosperity harmless against any and all third party claims arising out of Prosperity Bank's compliance with this Order from the Prosperity Account but not as to the Excluded Accounts.

55.      Nothing in this Order or related documents, including the APA, discharges, releases, precludes, or enjoins: (i) any liability to any governmental unit as defined in 11 U.S.C. § 101(27) ("Governmental Unit") that is not a "claim" as defined in 11 U.S.C. § 101(5) ("Claim"); (ii) any Claim of a Governmental Unit arising on or after the Closing Date; (iii) any liability to a Governmental Unit under police and regulatory statutes or regulations that any entity would be subject to as the owner or operator of property after the closing date of the Sale; or (iv) any liability to a Governmental Unit on the part of any Person other than the Debtor. Nor shall anything in this Order enjoin or otherwise bar a Governmental Unit from asserting or enforcing, outside this Court, any liability described in the preceding sentence.

56.      Additionally, the State of Texas does not waive any claims, liabilities, rights, defenses or causes of action it may have under applicable non-bankruptcy law with respect to the applicable Medicare provider agreements ("Medicare Agreements") or the applicable Medicaid contracts ("Medicaid Contracts"), including, without limitation, all rights, claims, and defenses of and to setoff and recoupment under non-bankruptcy law with respect to the applicable Medicare Agreements or the applicable Medicaid Contracts and under section 553 of the Bankruptcy Code, and all such claims, liabilities, rights, defenses, and causes of action are preserved, and the State of Texas's police and regulatory power against the Debtor, the District, and any non-Debtor party are reserved, as are all rights and defenses the Debtor, the District, and any non-Debtor party may have with regard to such police and regulatory power.

57.     Further, nothing in this Order or related documents, including the APA, authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under police or regulatory law.  Nothing in this Order shall relieve any entity from any obligation to address or comply with information requests or inquiries from any Governmental Unit.  Nothing in this Order shall affect any setoff or recoupment rights of any Governmental Unit.  Nothing in this Order divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret this Order or to adjudicate any defense asserted under this Order.

58.     This Order shall be binding in all respects upon the Debtor, its estate, all holders of equity interests in the Debtor, all holders of any Claim(s) (as defined in the Bankruptcy Code) against the Debtor, whether known or unknown, any holders of Liens on all or any portion of the Purchased Assets, all counterparties, the Notice Parties, the District, all successors and assigns of the District, any other bidders for the Purchased Assets, and any trustees, if any, subsequently appointed in this Chapter 11 Case or upon a conversion to chapter 7 under the Bankruptcy Code of the Debtor's case. This Order shall inure to the benefit of the Debtor, its estate, its creditors, the District, and each of its successors and assigns. Nothing contained in any plan of reorganization or liquidation or order of any type or kind entered in this Chapter 11 Case or any subsequent chapter 7 or chapter 11 case for the Debtor or any related proceedings after the entry of this Order shall directly conflict with or derogate from the terms of this Order. The Sale Transaction, and this Order shall not be subject to rejection or avoidance by the Debtor, its estate, its creditors, or any trustee, examiner, or receiver.

59.     The transactions contemplated by and consummated under this Order were undertaken by the District without collusion and in good faith and at arms-length, as that term is defined in sections 363(m) and 364(e) of the Bankruptcy Code, as applicable. The Sale Transaction will not be consummated for the purpose of hindering, delaying or defrauding creditors of the Debtor, and neither the Debtor nor the District have or has entered into the Term Sheet or is or are consummating the Sale Transaction contemplated thereby with any fraudulent or otherwise improper purpose.

60.     Sean Fowler, Edmund C. King, Harte Hintze, Amelia Commander and Melynda Winslow are each individually authorized to execute any and all documents related to the Sale Transaction; provided, however, that only a single signature is required.

61.     It is necessary and appropriate, in order to ensure the validity of the sale of the Assets and to ensure compliance with this Order, for this Court to retain jurisdiction to: (a) interpret and enforce the provisions of the APA and this Order; (b) protect the District and any of the Purchased Assets against any Lien or Claim; (c) resolve any disputes arising under or relating to the APA and/or this Order; and (d) and the disposition of the proceeds of sale of the Purchased Assets and Excluded Assets including Accounts and Supplemental Payments.

62.     The District will be liable for utility services provided by CenterPoint Energy Resources Corp. ("CERC") and Symmetry Energy Solutions, LLC ("Symmetry" and with CERC, the "Utility Companies") on utility accounts currently in the Debtor's name from and after the Effective Time until such time that the District cancels the services.  Following the Effective Time, the Debtor and Utility Companies will endeavor in good faith to agree on the amount of the Utility Companies' remaining administrative claims, after application of the adequate assurance deposits held by the Utility Companies ($36,665 as to CERC and $10,715 as to Symmetry) for post-petition

services.  If an agreement is reached as to the unpaid administrative claims, the Debtor and Utility

Companies will cooperate to prepare a Stipulation and Agreed Order for the allowance of such

administrative claims.

### End of Order ###

J. Robert Forshey
Texas State Bar No. 07264200
Jeff P. Prostok
Texas State Bar No. 16352500
**Forshey & Prostok, LLP**
777 Main Street, Suite 1550
Fort Worth, Texas 76102
Phone: 817-877-8855
Email: bforshey@forsheyprostok.com
      jprostok@forsheyprostok.com

**ATTORNEYS FOR
LION STAR NACOGDOCHES HOSPITAL, LLC**

Deborah D. Williamson
Texas State Bar No. 21617500
**Dykema Gossett PLLC**
112 E. Pecan St., Suite 1800
San Antonio, Texas 78205
Phone: 210-554-5500
Email: dwilliamson@dykema.com

and

Scott C. Skelton
Texas State Bar No. 00784979
Holli Baze
Texas State Bar No. 24013357
**Skelton Slusher Barnhill Watkins Wells PLLC**
1616 S. Chestnut
Lufkin, Texas 75901
Phone: (936) 632-2300
Email: sskelton@ssbww.law
Email: hbaze@ssbww.law

**ATTORNEYS FOR NACOGDOCHES COUNTY HOSPITAL DISTRICT**

Ryan E. Manns
Texas State Bar No. 24041391
Kristian W. Gluck
Texas State Bar No. 24038921
**Norton Rose Fulbright US LLP**
2200 Ross Avenue, Suite 3600
Dallas, TX 75201
Phone: 214-855-8000
Email: ryan.manns@nortonrosefulbright.com
        kristian.gluck@nortonrosefulbright.com

**ATTORNEYS FOR OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

Edward J. Green
Illinois State Bar No. 6225069
**Foley & Lardner LLP**
321 N. Cark Street, Suite 3000
Chicago, IL 60654
Phone:  312-832-4500
Email: egreen@foley.com

and

Jake William Gordon
Illinois State Bar No. 6325636
**Foley & Lardner LLP**
500 Woodward Avenue, Suite 2700
Detroit, MI 48226-3489
Phone:  248-943-6484
Email: jake.gordon@foley.com

**ATTORNEYS FOR ECAPITAL HEALTHCARE CORP.**

**<u>Exhibit A</u>**
**(Term Sheet)**

**FINAL VERSION**

## LION STAR NACOGDOCHES[1]
## TRANSACTION SUPPORT AGREEMENT TERM SHEET

This term sheet (the "Term Sheet") summarizes certain material terms of the proposed Asset Purchase Agreement (the "Agreement") to be entered into between (i) Lion Star Nacogdoches Hospital, LLC d/b/a Nacogdoches Memorial Hospital (the "Debtor"), pending in case number 23-43535-MXM in the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court") (ii) the Nacogdoches County Hospital District ("District"), (iii) the Official Committee of Unsecured Creditors for the Debtor's bankruptcy case (the "UCC" or "Committee"), and (iv) eCapital Healthcare, Corp. ("DIP Lender" and together with the Debtor, the District, and the UCC, the "Parties").

This Summary of Principal Terms does not constitute a binding commitment by any Party with respect to any transaction. The Summary of Principal Terms reflects only the Parties' current understanding of a proposed transaction, and a binding contract will not exist between the Parties unless and until the later of (a) entry of a Final Order or (b) the satisfaction or waiver of all conditions and occurrence of the Closing Date (as defined below).

The completion of the transactions contemplated by this Term Sheet will be subject to, among other things, execution and delivery of legally binding definitive agreements between the parties consistent herewith and otherwise on terms mutually acceptable to the parties and approval by the Bankruptcy Court.

### Definitions:

"Accounts" means all of Debtor's (i) accounts (as that term is defined in the Uniform Commercial Code), (ii) Payment Intangibles, and (iii) all other rights of payment, collection or reimbursement (whether owed directly to Debtor or assigned to Debtor by a patient or other third party), whenever due, that arose out of, or will arise out of, the rendering of services, the provision of room, board or other daily living assistance, or the sale, assignment, lease or license of Equipment, prosthetics, pharmaceutical or other Goods, whether before or after the date of this Term Sheet and including, all of Debtor's rights of payment, collection or reimbursement with respect to such services from any insurer, federal or state government agency or other third party; whether billed on a fee for service, monthly per patient capitation charge or any other basis, whether or not the accounts, payment intangibles, or rights of payment, collection or reimbursement have been invoiced or billed, written off, partially paid, currently assigned to collection agencies or other third party service vendors. Without limiting the foregoing, Accounts shall also any payments attributable to any Litigation Settlements to the extent and solely to the extent, that such payments are related to treatment or medical services provided by the Debtor between July 14, 2021 and the Closing Date and all monies due or to become due to Debtor and obligations to Debtor in any form (whether arising in connection with contracts, contract rights, Instruments, or Chattel Paper), in each case whether or not earned by performance, now or

---

[1] This draft is for discussion purposes. This draft does not constitute an offer to purchase and shall not create any binding obligations which shall be evidenced, if at all, by definitive documentation.

hereafter in existence, and all documents of title or other documents representing any of the foregoing, and all collateral security and guarantees of any kind, now or hereafter in existence, given by any Person with respect to any of the foregoing. For purposes of this definitions, capitalized terms not otherwise defined herein shall have the meaning assigned such terms in the Uniform Commercial Code.

"Administrative Expense Claim" means any right to payment from the Debtor that constitutes a cost or expense of administration incurred during the Chapter 11 Case of the kind specified under 503(b) of the Bankruptcy Code and entitled to priority under sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code.

"Ancillary Facilities" means the various affiliated ancillary healthcare clinics or facilities operated by the Debtor, all located in Nacogdoches County, Texas.  Locations include those commonly known as the Nacogdoches Diagnostic Center (1023 N. Mound St., Suites A, B and H), the Cecil Bomar Rehabilitation Center (707 Woods St.), the Care First Clinic - Garrison (149 South Hwy. 59), and the Accounting/IS Building (914 Raguet St.).

"APA" means the Asset Purchase Agreement between Lion Star and the District effective July 14, 2021.

"Approval Order" means the Order of the Bankruptcy Court approving the Sale pursuant to the terms of the Agreement or such other terms reasonably acceptable to the Parties.

"Avoidance Actions" means any and all causes of action to avoid a transfer of property or an obligation incurred by Seller arising under sections 542, 544, 545, and 547 through and including 553 of the Bankruptcy Code.

"Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as in effect on the Petition Date..

"Carve-Out" has the meaning ascribed to such term in paragraph 16 of the DIP Order.

"Chapter 11 Case" means the case filed by the Debtor under chapter 11 of the Bankruptcy Code, which is administered under Case No. 23-43535-mxm-11.

"Claim" has the meaning ascribed to such term under section 105 of the Bankruptcy Code.

"Closing Date" means the first business day occurring after fifteen (15) calendar days following entry of the Final Order as such date may be extended in writing with the consent of the Debtor, the DIP Lender, and the District (for which email shall suffice).

"DIP Credit Agreement" means the *Superpriority Debtor-In-Possession Credit and Security Agreement* approved by the DIP Order.

"DIP Obligations" shall have the meaning ascribed to such term under the DIP Order.

"DIP Order" means the *Final Order (I) Authorizing The Debtor To Obtain Postpetition*

*Financing On A Secured, Superpriority Basis; (II) Authorizing The Debtor To Use Cash Collateral; (III) Modifying The Automatic Stay, And (IV) Granting Related Relief* [Docket No. 127].

"District Acquired Assets" means the Prosperity Account, property of the kind and character sold or otherwise transferred pursuant to Section 1.01 of the APA regardless of whether acquired from the District or acquired by Lion Star after July 14, 2021, including without limitation, Transferred Records, equipment, computers, servers, Intellectual Property, copyrights, trademarks, patents, and tradestyles, Purchased Inventory, Licenses, general intangibles including, but not limited to, software and Insurance Proceeds, all property of the kind and character sold or otherwise transferred under the Lease and/or the APA and any and all Claims against the District, if any, owned in whole or in part by the Debtor. Assets shall also include any Litigation Settlements related to services provided prior to July 14, 2021[2] and after Closing Date. District Acquired Assets shall not include the Excluded Assets. District Acquired Assets is not limited to assets or property owned by the District prior to the APA. Except where specifically exempted, District Acquired Assets include property owned and controlled by the Debtor since July 14, 2021.

"District Collection Period" shall have the meaning ascribed to such term in section 3 below.

"Estate" means the estate created for the Debtor in its Chapter 11 Case under sections 301 and 541 of the Bankruptcy Code upon the commencement of the Debtor's Chapter 11 Case.

"Excluded Assets" means all Accounts the Debtor accrued on or before the Closing Date and such assets, rights, business, claims, or properties of the Debtor: (i) Accounts for items and services provided or rendered prior to the Closing Date; (ii) all current and non-current cash and cash equivalents, securities, investments, endorsements, bond funds and other funds created by bond indentures, financial assurances, and certificates of deposits; (iii) all claims or receivables on account of employee advances; (iv) all right to operate or otherwise conduct business[3] issued by a Governmental Authority or applicable accreditation organization that are not assignable to the District pursuant to applicable Law or the requirements of applicable accreditation organizations; (v) all insurance policies and rights thereunder (including any prepaid expenses with respect to insurance policies) subject to the rights of the District under such policies, the Lease and the APA as a beneficiary under such policies; (vii) those Pharmaceuticals and Medications that cannot, by law, be transferred by the Debtor to the District; (viii) all claims, rights, interests, and proceeds with respect to state or local tax payments, refunds, and credits (including property tax refunds and charity tax credits) related to the operations of the Hospital or the Assets with respect to periods ending prior to the Closing Date; (ix) all claims, causes of action, choses in action, rights of recovery, rights of set off, and rights of recoupment of the Debtor with respect to periods prior to the Closing Date, and any payments, awards or other proceeds resulting therefrom SAVE and EXCEPT claims, if any, against the District; (x) all Avoidance Actions, avoidance, recovery,

---

[2] Under the APA, the District retained all such settlements for services prior to July 14, 2021.

[3] License is defined to be those that can be transferred to the District.

subordination, or other claims, actions or remedies that may be brought by or on behalf of Seller, their bankruptcy estates, or other authorized parties-in-interest under the Bankruptcy Code or applicable non-bankruptcy law, including claims, actions, or remedies under §§ 502, 510, 542, 544, 545, and 547 through and including 553 and 724(a) of the Bankruptcy Code or under similar local, state, federal or foreign statutes and common law, including fraudulent-transfer laws; (xi) the rights of the Debtor under the Agreement; (xii) all claims or causes of action relating to or arising from any of the Assets, including any Avoidance Actions relating to or arising from any of the Assets; and (xiii) any payments attributable to settlements related to tobacco, opioids, or other products where the Claim relates to services performed after July 14, 2021 and prior to the Closing Date.

"Final Order" means an order of the Bankruptcy Court approving this Term Sheet on terms and conditions reasonably acceptable to each of the Parties.

"Governmental Authority" means any federal, state, local, foreign, or municipal government; any governmental or quasi-governmental authority; and any body or agency exercising or entitled to exercise any administrative, executive, judicial, regulatory, legislative, or taxing authority, whether by delegation, contract or otherwise, including any arbitrator (public or private), the Federal Trade Commission, the Antitrust Division of the Department of Justice and any applicable state antitrust enforcement authorities, including the Texas Attorney General.

"Hospital" means Nacogdoches Memorial Hospital located at 1204 Mound Street, Nacogdoches, Texas.

"Hospital Operations" means the Hospital and Ancillary Facilities

"IGT" means intergovernmental transfers or payments made in connection with one or more of the Supplemental Payments.

"Insurance Proceeds" means any casualty insurance proceeds and casualty insurance proceeds receivable (subject to applicable deductibles, co-payments or self-insured requirements) arising from the District Acquired Assets prior to the Closing Date.

"Lease" or "Leases" means the real property leases between the District and the Debtor effective July 14, 2021.

"License" and "Licenses" mean to the extent transferable or assignable and subject to any applicable consent requirements, rights to all state, federal, special, or local licenses or permits (including, but not limited to, air, water or other environmental licenses and permits), rights, franchises, accreditations, registrations, permits, approvals and consents, and all applications therefor and waivers of any requirements pertaining thereto issued to Debtor for the Hospital Operations.

"Litigation Settlements" payments attributable settlements (i) for services that arose or (ii) related to tobacco, opioids, or other products.

4

"Net Supplemental Payment" shall mean any Supplemental Payment net of any IGT(s) paid by the District on account of the Hospital after the Closing Date.

"Petition Date" means November 17, 2023.

"Pharmaceuticals and Medications"  means any drug owned by the Debtor used for medicinal purposes.  Pharmaceuticals and Medications will not include any pharmaceuticals or medications which (i) are expired, (ii) will expire within sixty (60) days of the Closing Date or (iii) the District elects not to acquire.

"Prosperity Account" means the account(s) at Prosperity Bank into which payments from Accounts and/or Supplemental Payments are deposited.

"Provider Agreements" means applicable payor agreements, managed care agreements, and Medicaid and Medicare provider agreements presently held by the Debtor for the Hospital Operations.

"Provider Numbers" means any billing code numbers associated with Provider Agreements.

"Purchased Assets" means the Purchased Inventory and the District Acquired Assets. For the avoidance of doubt, Purchased Assets shall not include the Accounts or the Supplemental Payments.

"Purchased Inventory" means all goods and supplies of the Hospital owned by Debtor, including Pharmaceuticals and Medications, food, janitorial supplies, office supplies, forms, consumables, disposables, linens, and medical supplies which the District elects to purchase in its sole discretion. Purchased Inventory shall not include any good or supplies which the District elects to purchase during the Transition Period for use in Hospital Operations.

"Supplemental Payments" means all payments attributable to any programs funded or administered by a Governmental Authority, or contractor(s) thereof, for the purpose of paying for healthcare items and services. Such programs include Medicare, Medicaid, TRICARE, and similar or successor programs with or for the benefit of designated federal, state or local residents, including Disproportionate Share Hospital ("DSH") payments, Delivery System Reform Inventive Payments, Comprehensive Hospital Increase Reimbursement Program ("CHIRP") or Uncompensated Care ("UC") payments.

"Transferred Records" means, to the extent transferable or assignable and subject to any applicable consent requirements, all documents, books, records, operating and policy manuals, compliance policies, and files owned by the Debtor, pertaining to or used primarily in connection with Hospital Operations, whether in hard copy or other forms, patient records, medical records, medical staff records, clinical records, financial records, equipment records and medical and administrative libraries, personnel records and purchase and vendor records, existing and wherever located.

"<u>Transition Period</u>" means the period between the entry of the Final Order and the earlier of (i) Closing Date or (ii) such date agreed upon in writing by the Parties (for which email shall suffice).

**Terms:**

For purposes of this Summary of Principal Terms, unless otherwise provided herein, whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender.

1.     On the Closing Date, the Purchased Assets will be deemed transferred to the District free and clear of all liens, claims, interests and encumbrances to the fullest extent permitted by the Bankruptcy Code.  Notwithstanding anything to the contrary herein, the DIP Lender shall retain its security interests in the Accounts and the Supplemental Payments.

2.     All Leases with the District shall be deemed rejected and, at the election of the District, terminated as of the Closing Date pursuant to section 365 of the Bankruptcy Code.  The APA shall be deemed rejected as of the Closing Date pursuant to section 365 of the Bankruptcy Code. As of the Closing Date, the District will have the authority to immediately exercise all rights and remedies which were granted to the District under the Leases and the APA upon termination of the Leases including deemed reversion of any asset or rights transferred under the Leases and/or APA.

3.     Notwithstanding anything to the contrary herein, Accounts (including healthcare accounts receivable) for services provided by the Debtor prior to the Closing Date will remain assets of the Estate (and subject to the liens of the DIP Lender) and shall not be considered a "Purchased Asset".  The District will use commercially reasonable efforts for a period of 180 days to collect the Accounts in accordance with the practices and procedures used by the District prior to the execution of the APA and using contractual adjustments and write-offs consistent with such practices, provided that such time may be shortened pursuant to a written agreement between the District and the DIP Lender (the "<u>District Collection Period</u>").  All amounts attributable to Accounts including, without limitation, funds deposited into the Prosperity Account, collected during the District Collection Period shall be paid to the DIP Lender until such time as the DIP Lender has been paid in full in cash, at which point such funds shall be distributed to the Estate. During the District Collection Period, the District agrees to use its employees to administer and collect the Accounts and will follow such processes as the District uses for collection of amounts due for services provided by the District after the Closing Date.  For avoidance of doubt, the District will not engage or otherwise employ a third party company to administer the Accounts. Following the District Collection Period, all Accounts shall be turned over to the DIP Lender until such time as the DIP Lender has been paid in full in cash and then subsequently to the Estate; if the DIP Lender has been paid in full in cash, such Accounts shall be turned over to the Estate.  The District shall provide a list of proposed employees to administer the Accounts to the DIP Lender no later than 48 hours prior to the Closing Date.  The District will have no obligation to initiate any litigation or third-party collection process on account of the Accounts provided that the DIP Lender may fund and implement such processes at its discretion. Notwithstanding anything to the

contrary herein, at any time prior to the payment in full in cash of the DIP Obligations, at the DIP Lender's sole and absolute discretion, the DIP Lender may demand, and the District shall promptly provide all information, access, and resources requested by the DIP Lender which are reasonably necessary or helpful for the DIP Lender to assume responsibility for the collection of the Accounts and the District shall permit the DIP Lender to assume such responsibility.

4.     The District shall acquire the existing Purchased Inventory for the greater of (i) Six Hundred Thousand ($600,000) Dollars or (ii) 90% of the purchase price of up to Six Hundred Sixty-Six Thousand Six Hundred Sixty-Six and 66/100 ($666,666.66) dollars plus, at the District's option, inventory with a purchase price in excess of $666,666.66 for 30% of the incremental purchase price.  For the avoidance of doubt, the District shall have no obligation to pay more than $666,666.66 regardless of the purchase price of the Purchased Inventory.  Such amounts shall be payable on the Closing Date in immediately available funds to the DIP Lender. During the Transition Period, Sylvia Thompson will prepare a schedule reflecting the purchase price of all supplies, pharmacy products, and other inventory on the Debtor's property.  The District shall have the right, but not the obligation, to acquire or purchase supplies and/or inventory during the Transition Period which supplies and/or inventory will not be included in any calculation of Purchased Inventory price or included in any inventory.

5.     The Debtor will cooperate with the District to file any necessary Change of Ownership applications (including CMS Forms 855a / 855b) to reflect the transfer of ownership and responsibility for the Hospital transferred to the District; provided that the District shall pay for any necessary, reasonable and documented legal fees accrued by the Debtor on account of such cooperation to the extent that such services are requested by the District and provided by a firm agreed upon by the District.  Notwithstanding the foregoing, to facilitate the District's operation of the Hospital Operations as of the Closing Date, the District shall have the right to bill for services rendered from and after the Closing Date utilizing the Provider Agreements and Provider Numbers until either new provider numbers are issued to District or the Provider Numbers are transferred to the District. So long as the District remains in compliance with its regulatory obligations in all material respects, no party shall take any action to terminate the Provider Agreements or take any other action that negatively impacts the ability of the District to use the Provider Numbers.

6.     The District will use commercially reasonable efforts to the extent permitted by law to obtain Supplemental Payments.  An amount equal to One Hundred (100%) percent of the Net Supplemental Payments shall be paid to the DIP Lender until such time as all DIP Obligations have been paid in full in cash.  Following payment in full in cash of the DIP Obligations, Net Supplemental Payments received prior to December 31, 2024 but following payment in full in cash of the DIP Obligations, shall be allocated as follows: (a) an amount equal to one hundred percent (100%) of any Net Supplemental Payments earned on or before July 15, 2024 shall be paid to or for the benefit of the Estate; and (b) Supplemental Payments earned from July 16, 2024 –December 31, 2024 shall be retained by the District subject to an obligation to pay an amount equal to thirty (30%) percent of the amount of each Supplemental Payment less any amounts paid to the DIP Lender from Supplemental Payments earned on or after July 15, 2024 but prior to December 31, 2024.   Supplemental Payments received after December 31, 2024, shall solely belong to the District.

7.      The District shall pay $1,200,000.  Such sum shall be payable in twelve equal installments of $100,000 with the first payment to be made on the Closing Date and subsequent payments on the first business day of the immediately following eleven (11) months to the DIP Lender until such time as the DIP Lender has been paid in full in cash and subsequently to the Estate.

8.      The DIP Lender will fund payroll under the terms and conditions of the DIP Credit Agreement up to the amounts and on the dates reflected on **Schedule 1** attached hereto (the "Payroll Schedule").  To avoid doubt, the DIP Lender will have no obligation to fund any amounts in excess of those included on the Payroll Schedule and those required to fund the Carve Out.  Any amounts provided to fund payroll and the Carve Out shall be added to the DIP Obligations and entitled to superpriority status as described in the DIP Order.  In the event the amounts reflected in the Payroll Schedule do not accurately reflect the payroll amounts which shall be confirmed by the Debtor upon the execution of this Agreement, and such amounts are insufficient to fund payroll during the Transition Period, the DIP Lender may terminate this Term Sheet effective immediately in its sole and absolute discretion.

9.      All payments by the District under this Term Sheet shall be paid to an account designated by the DIP Lender for the benefit of the DIP Lender until the DIP Lender is paid in full in cash on account of all DIP Obligations.  Thereafter, payments shall be made to or for the benefit of the Estate.

10.     The District will subordinate any and all claims against the Debtor to claims of third parties.  For the avoidance of doubt, the District's claims will not be subordinated to claims, if any, of Sean Fowler, Edmund King, Howard Brand, their affiliates, relatives, or partners.

11.     The definitive agreement will include a full release of the DIP Lender by all Parties, which shall be fully and finally released from any and all Claims and all pending litigation, which shall be dismissed with prejudice. Prior to the Closing Date: (a) the Committee will review the potential causes of action by the Debtor against Sean Fowler, Edmund King, and Howard Brand (collectively, the "Owners") based on the $750,000 distribution made by the Debtor to the Owners during November 2022, and (b) to the extent that the Committee determines that there is no merit to a potential claim related to the  $750,000 distribution referenced in (a), the Parties will negotiate in good faith a release of such claims by the Debtor against the Owners.

12.     On the Closing Date, the DIP Lender will promptly release any lien on the Purchased Assets. For the avoidance of doubt, the DIP Lender will not release its security interests on the Accounts and the Supplemental Payments.

13.     The District will waive any right to receive payment on an Administrative Expense Claim.

14.     As soon as reasonably practicable upon the Parties agreeing to this Term Sheet, the Debtor will file a motion for an order approving the private purchase and sale of assets and assumption and assignment of contracts to the District (the "District Sale Motion"), all in a form reasonably acceptable to the Parties. Among other things, the District Sale Motion will seek entry

8

of a private sale order not more than 14 days after the District Sale Motion is filed, which procedures will contain reasonable and customary provisions related to (i) approval of the asset purchase agreement, (ii) designation of executory contracts and leases to be assumed and assigned by the District, (iii) procedures governing the assumption and assignment of executory contracts and leases, and the cure costs associated therewith, and (iv) that the Final Order will be binding on any chapter 11 trustee, chapter 7 trustee, chief restructuring officer (a "<u>CRO</u>"), and the Estate. The District shall be responsible for any cure costs.

15.     The District shall indemnify and reimburse the Estate for any amounts recouped or otherwise which reduce an Account (including, without limitation, any Supplemental Payment) based solely on alleged "Obligations or liabilities to Government Reimbursement Programs, Private Programs, and/or Governmental Authority arising from disposition, settlement, or resolution of the Children's Hospital Association of Texas (CHAT) v. Azar litigation and related litigation regarding Disproportionate Share Hospitals (DSH) costs and entitlements" as set forth in section 1.04(k) of the APA. At the direction of Lion Star, on February 28, 2024, the District has delivered $2,149,632 to the Debtor's account at Prosperity Bank.

16.     If on or before December 31, 2024 the District transfers the Hospital to a party not owned or controlled by the District or not an affiliate of the District (a "<u>Subsequent Third Party Transaction</u>"), the District shall pay an amount equal to ten (10%) of the net proceeds received by or for the benefit of the District from such Subsequent Third Party Transaction ("<u>Subsequent Third Party Transaction Net Proceeds Payment</u>") to the DIP Lender until such time as the DIP Lender has been paid in full in cash and subsequently to the Estate. The District may not effectuate a Subsequent Third Party Transaction prior to payment in full in cash of the DIP Obligations without the written consent of the DIP Lender. Absent written consent of the DIP Lender, all obligations under this Term Sheet shall remain in full force and effect following any Subsequent Third Party Transaction.

17.     On (or as soon as practicable following) the Closing Date:

    a.     For the Debtor's account, DIP Lender will remit to counsel to the Debtor, Forshey & Prostok, LLP ("<u>Forshey</u>") $800,000 on account of Carve Out amounts incurred and to be incurred by Forshey (such amount, the "<u>Forshey Payment</u>"). Upon such remittance, the DIP Lender will have no further liability or obligations to the Debtor or Forshey related to the Carve Out for Forshey. If and to the extent that the professional fees and expenses that the Court allows on a final basis to Forshey for the period through the date of entry of a final decree in the Chapter 11 Case is less than the payment allowed to Forshey by the Bankruptcy Court then within five (5) business days after such final allowance, Forshey will remit the unused amount of the Forshey Payment to the DIP Lender for application to the DIP Obligations (but, if the DIP Obligations have been paid in full at such time, such excess will be remitted to the Debtor pending further order of Court). Nothing herein constitutes consent by any party to the allowance of any fees or expenses of Forshey.

b.  For the Committee's Professionals' account, DIP Lender will remit to counsel to the Committee, Norton Rose Fulbright US LLP ("Norton Rose") $500,000 on account of Carve Out amounts incurred and to be incurred by the Committee Professionals (such amount, the "Committee Payment"). Upon such remittance, the DIP Lender will have no further liability or obligations to the Committee or the Committee Professionals related to the Carve Out for the Committee or the Committee Professionals. If and to the extent that the professional fees and expenses that the Court allows on a final basis to Committee Professionals for the period through the date of entry of a final decree in the Chapter 11 Case is less than the payment allowed to Committee Professionals by the Bankruptcy Court then within five (5) business days after such final allowance, Norton Rose will remit the unused amount of the Committee Payment to the DIP Lender for application to the DIP Obligations (but, if the DIP Obligations have been paid in full at such time, such excess will be remitted to the Debtor pending further order of Court). Nothing herein constitutes consent by any party to the allowance of any fees or expenses of the Committee Professionals.

c.  For the account of the patient care ombudsman, DIP Lender will remit to counsel to the PCO, Susan Goodman (the "PCO") $50,000 on account of Carve Out amounts incurred and to be incurred by the PCO (such amount, the "PCO Payment"). Upon such remittance, DIP Lender will have no further liability or obligations to the PCO related to the Carveout. If and to the extent that the fees and expenses that the Court allows on a final basis to the PCO for the period through the date of entry of a final decree in the Chapter 11 Case is less than the payment allowed to the PCO by the Bankruptcy Court, then within five (5) business days after such final allowance, the PCO will remit the unused amount of the PCO Payment to the DIP Lender for application to the DIP Obligations (but, if the DIP Obligations have been paid in full at such time, such excess will be remitted to the Debtor pending further order of Court). Nothing herein constitutes consent by any party to the allowance of any fees or expenses of the PCO.

d.  For the benefit of the Debtors, the DIP Lender will continue to hold $122,104.42 in reserve for the Carve Out for the fees of the Office of the United States Trustee through the entry of a final decree in the chapter 11 case. DIP Lender will remit an amount equal to the actual Carve Out for such fees to the Office of the United States Trustee when due and payable.

**Implementation:**

**A.    Documentation.**

The Parties contemplate negotiating and executing, no later than March [__], 2024, an asset purchase agreement effectuating the settlement terms and conditions set forth in this Summary of Principal Terms (the "Sale Agreement"). The Sale Agreement shall be in all respects materially

consistent with this Summary of Principal Terms and in form and substance acceptable to the Parties.  Upon execution, the Sale Agreement shall supersede and replace this Summary of Principal Terms.

**B.**     **Debtor**.

1.     **Conduct of the Debtor**. During the period from the date of entry of the Final Order through the Closing Date:

(a) the Debtor shall: (i) use commercially reasonable efforts to carry on the Hospital Operations in the usual, regular, and ordinary course in all material respects, in substantially the same manner as heretofore conducted;  and (ii) use commercially reasonable efforts to maintain and preserve intact its current Hospital Operations organization, operations and to preserve the rights, goodwill and relationships of its Employees, customers, patients, suppliers, regulators and others having relationships with the Hospital Operations;

(b) other than as may be required by or in conformance with legal requirements in order to permit or facilitate the consummation of the transactions contemplated hereby, the Debtor shall not sell, encumber or otherwise dispose of, or agree to sell, encumber or otherwise dispose of, any of its material assets other than in the ordinary course of business consistent with past practice; and

(c)     Nothing herein shall create any obligation by any party to extend credit or provide services or goods to the Debtor.

**C.**     **District Rights During Transition Period**

1.     As soon as reasonably practicable, the Debtor, the District, the DIP Lender, and the Committee shall work in good faith to reach definitive agreements reflecting the terms in this Term Sheet.

2.     Except as otherwise required under this Term Sheet, during the Transition Period, the District may (but is not required to) extend offers of employment during the Transition Period to the Debtor's current employees on such terms and conditions as the District deems appropriate. The District will attempt to make such offers prior to termination of any employment by the Debtor.

3.     During the Transition Period, the District may conduct reasonable and customary due diligence, including, without limitation, access to employee records, vendor records, contracts, Leases, and similar information.

4.     During the Transition Period, the District (including any former employees of the Debtor) will have full, complete, and unrestricted access to the Hospital, any clinics, and such books and records as it deems necessary in its sole and absolute discretion to assume operations of the Hospital after the Transition Period.

11

5.      For a period of sixty days after entry of the Approval Order, the District may (but is not required) seek Bankruptcy Court approval to assume such unexpired leases and executory contracts that it deems beneficial to operations of the Hospital pursuant to section 365 of the Bankruptcy Code. The District shall be obligated to pay any cure amounts under any assumed contracts.  Following the sixty-day period after the entry of the Final Order, all unexpired leases and executory contracts shall be deemed rejected. The order approving the sale will provide that performance under 365 for contract and lease counterparties is suspended unless the District agrees to pay for the services during the period while they decide whether to assume the contracts.

### D.      Post-Transition

1.      Effective the day after the Closing Date, the Debtor shall have no employees or officers and a chapter 11 trustee shall be appointed by the United States Trustee or a CRO shall be engaged to manage the Estate provided the estate has funds to appoint a chapter 11 trustee or engage a CRO.  Upon the Closing Date, a CRO (who shall be approved by the Debtor, the DIP Lender, and the Committee) shall be engaged. If the parties cannot agree on a CRO or if the parties agree to the appointment of a chapter 11 trustee, then the Court will enter an order directing the United States Trustee to appoint a chapter 11 trustee.  If the United States Trustee appoints a chapter 11 trustee, he shall appoint the chapter 11 trustee "after consultation with the parties" in accordance with section 1104(d). If engaged, the CRO or if appointed, the chapter 11 trustee, shall be authorized, pursuant to Bankruptcy Code §§ 105 and 363, to commence, perform, execute, undertake, administer, and otherwise carry out the liquidation of the Estate and such other matters related or necessary to liquidate and protect property of the Debtor in accordance with the terms and conditions of this agreement. If engaged, the CRO or if appointed, the chapter 11 trustee shall be responsible for ensuring that any applicable tax returns of the Debtor are timely and properly filed.  The District shall provide reasonable assistance, as necessary, to complete such filings.

2.      If appointed, the chapter 11 trustee or if engaged, the CRO and the Committee shall work in good faith to determine whether a plan of liquidation shall be filed or whether the Chapter 11 Case shall be converted to a case under Chapter 7 of the Bankruptcy Code.

3.      The District acknowledges that, subsequent to the Closing Date, the Debtor will need access to information or documents in the control or possession of the District, including the Transferred Records, for the purposes of concluding the transactions herein contemplated, audits, compliance with laws, the prosecution or defense of third-party claims, and for the purpose of (i) pursuing, assessing, settling, or otherwise dealing with any Excluded Assets (including causes of action), (ii) pursuing, assessing, defending, settling, or otherwise dealing with causes of action, including any objection or motion that the Debtor has a right to pursue, (iii) performing and/or otherwise dealing with any obligations of the Debtor pursuant to the Settlement Agreement, including the Excluded Assets, (iv) assisting the Debtor or its representatives in connection with or otherwise relating to the claims reconciliation process relating to the Debtor, including, with respect to causes of action against any person, including assessing, resolving, settling, and/or otherwise dealing with priority and Administrative Expense Claims and any general unsecured claims that accrue prior to the Closing Date, and (v) without limiting the generality of the immediately preceding clauses (i) through (iv), otherwise administering the Debtor's Estate

12

including the preparation and confirmation of a plan relating to the Debtor and the preparation of an accompanying disclosure statement, and compliance with any subpoena, document request, or order of any court compelling the production of documents to third parties, winding down the Debtor's Estate, collecting Accounts Receivable, preparing or filing tax returns and causing audits to be performed and/or for any other reasonable purpose. Accordingly, the District shall, for a period of seven (7) years after the Closing Date, maintain in accordance with retention requirements under applicable law and make reasonably available to the Debtor and their respective representatives and/or Governmental Authorities, upon written request and reasonable advance notice and at the expense of the Debtor, such documents and information as may be available relating to the Hospital for periods prior to the Closing Date to the extent necessary to facilitate concluding the transactions herein contemplated, audits, compliance with laws, and the prosecution or defense of claims. Each Party shall cooperate with the other in connection with the handling of any such post-closing matters as may reasonably be requested.

## Schedule 1
Payroll Schedule

| Date | Maximum Funding Amount |
|---|---|
| February 23, 2024 | $373,500 |
| March 1, 2024 | $1,205,000 |
| March 8, 2024 | $270,390 |
| March 15, 2024 | $1,077,000 |